**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN PABLO DI BENEDETTO, GALESSI HOLDING CORP, AND PABLO GRECO, Individually and On Behalf of All Others Similarly Situated, <br><br>                  Plaintiff, <br><br>       v. <br><br> QUDIAN INC., MIN LUO, and CARL YEUNG, <br><br>                  Defendants. | Case No.: 1:20-cv-00577-GHW <br><br> **<u>AMENDED CLASS ACTION COMPLAINT</u>** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 7

III.    PARTIES ............................................................................................................ 8

IV.     SUBSTANTIVE ALLEGATIONS .................................................................... 9

    A.   Qudian's History of Failed Businesses ..................................................... 9

        1.   Qudian's Failed Relationship With Ant Financial .................... 10

        2.   Qudian's Failed Attempts to Grow Outside of Its Loan Business ........... 13

    B.   Defendants' Plan to Misrepresent Qudian's Lending Business During the Class Period ........ 16

    C.   Qudian's Regulatory Violations in Its Core Loan Book ........................ 18

        1.   Qudian Violated Circular 141's Prohibition on Outsourcing Credit Assessments ............ 20

        2.   Qudian Was Subject to Strict Licensing Regulations .............. 22

        3.   Regulatory Issues With Qudian's Core Loan Book Decreased The Amount of Funding Available to the Company ............ 24

        4.   Defendants Falsely Described Qudian's Core Loan Book as Compliant With Regulations ............ 25

    D.   Qudian's Open Platform Business ....................................................... 27

    E.   Open Platform Was in Direct Competition With the Core Loan Book for Qudian's Best Borrowers ............ 34

        1.   Qudian Shifted Its Best Borrowers From the Core Loan Book to Open Platform ............ 34

        2.   Qudian Lowered Credit Standards in Its Core Loan Book to Cover for Diverting its Best Borrowers to Open Platform ............ 36

    F.   Defendants Made Several Types of False and Misleading Statements Concerning the Relationship Between Open Platform and Qudian's Core Loan Book ............ 40

        1.   Defendants Misrepresented The Reason Why Qudian Developed Open Platform ............ 40

        2.   Defendants Misrepresented the Fact That Open Platform Took the Best Borrowers from Qudian's Core Loan Book ............ 42

        3.   Defendants Misrepresented that the Revenue From the Core Loan Book Came From Qudian's "Conservative" Approach Rather than From the Company Lowering its Lending Standards ............ 42

    G.   Defendants Unrealistically Raised Guidance in June 2019 .................. 44

    H.   Qudian's Flawed Business Model Led to Its Poor Performance in the Second Half of 2019 ............ 46

I.       Defendants Finally Admitted the True Nature of Open Platform ...................... 54

    1.    Qudian's Shift to Open Platform Was Motivated by Regulatory Concerns With Qudian's Core Loan Book ...................................................... 54

    2.    Open Platform Took the Best Borrowers from Qudian's Core Loan Book .................................................................................................... 57

    3.    Open Platform Was Very Similar to Qudian's Prior Loan Facilitation Business and Was in Competition With the Core Loan Book ................. 59

    4.    Qudian Planned to Shift Entirely to Open Platform and Exit the Loan Book ......................................................................................... 61

V.       DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ............................................................ 62

    A.    Defendants' False and Misleading Statements From the Fourth Quarter of 2018 63

    B.    Defendants' False and Misleading Statements in the 2018 Annual Report.......... 70

    C.    Defendants' Materially False and Misleading Statements From the First Quarter of 2019 ................................................................................ 72

    D.    Defendants' Materially False and Misleading Guidance Raise on June 21, 2019 77

    E.    Defendants' Materially False and Misleading Statements From the Second Quarter of 2019 .................................................................................... 78

    F.    Defendants' Materially False and Misleading Statements From the Third Quarter of 2019 ................................................................................ 86

VI.      THE TRUTH BEGINS TO EMERGE ................................................ 90

VII.     ADDITIONAL SCIENTER ALLEGATIONS .................................................. 96

VIII.    ITEM 303 ..................................................................................... 101

IX.      NO SAFE HARBOR .................................................................... 102

X.       CLASS ACTION ALLEGATIONS ................................................. 103

XI.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS ........................................... 104

XII.     COUNT I ................................................................................... 105

XIII.    COUNT II .................................................................................. 109

XIV.     PRAYER FOR RELIEF ............................................................... 110

XV.      DEMAND FOR TRIAL BY JURY .................................................. 111

Lead Plaintiffs Juan Pablo di Benedetto, Galessi Holding Corp, and Pablo Greco (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Qudian Inc. ("Qudian" or the "Company"), analysts' reports and advisories about the Company, interviews of confidential witnesses, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.  <u>INTRODUCTION</u>

1.      This federal securities class action arises out of Defendants' false and misleading statements concerning the nature of Qudian's consumer lending business from the end of 2018 through the beginning of 2020. Plaintiffs bring this action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Qudian securities between December 13, 2018 and January 15, 2020, both dates inclusive (the "Class Period").

2.      Qudian describes itself as "a leading provider of online small consumer credit products in China."  The Company has undergone many shifts in its business model over the course of its brief history, but has never been able to find its footing. During the Class Period, Qudian's business was focused on its legacy core loan book and its new Open Platform loan-referral business.  While Qudian would take on the credit risk of the loans that it made in its

---

[1] Emphases in this Amended Complaint are added unless otherwise noted.

core loan book, in its Open Platform, Qudian would refer borrowers to other financial institutions that would make loans directly to the borrowers. Defendants blatantly misrepresented the regulatory compliance of Qudian's core loan book and its true relationship to Open Platform.

3. By the end of 2018, China's strict regulation of the online consumer lending industry—including Circular 141, which Chinese regulators issued in December 2017—posed an existential threat to Qudian's core loan book. In response, Qudian secretly violated these regulations while telling investors that the Company had a "regulatory compliant and stable operating structure." The Company also did not tell investors that Open Platform was intended to address the regulatory problems with Qudian's core loan book and that Qudian was shifting its best borrowers to the more regulatory-compliant Open Platform business.

4. Furthermore, Defendants falsely told investors that Qudian's positive performance during the Class Period was a result of its "conservative" core loan business growing alongside Open Platform. These statements covered-up the fact that the only reason that Qudian was able to achieve positive results in both its core loan book and Open Platform was that the Company had furtively lowered the credit standards in its core loan book to compensate for diverting its highest-quality borrowers to Open Platform. Qudian's seemingly positive financial results therefore masked the problems in Qudian's core loan book. The vastly increased amount of risk and the lower credit quality of the core loan book—which Defendants misrepresented to investors—also set the Company up for large credit losses when the bad loans that Qudian accepted began to mature as the Class Period progressed.

5. China's online lending regulations affected Qudian's business in three main ways that Defendants misrepresented to investors. First, these regulations prohibited financial institutions from outsourcing core parts of the loan process to online lending companies such as

Qudian. The Company egregiously violated this rule by continuing to conduct credit assessments for financial institutions when local regulators were willing to look the other way.   A Qudian employee who assisted Defendant Luo during the Class Period has explained that certain financial institutions that "had a good relationship with the local regulator" would improperly rely on Qudian's risk assessment.

6.     Second, China imposed strict licensing requirements on online lending businesses.   Defendants represented that Qudian had the licenses that were necessary for it to make loans in the core loan book. But Defendants did not tell investors that in May 2019, the government severely restricted Qudian's lending license by changing it to a narrow local license. This limited Qudian to making loans within the limits of Ganzhou district and its surrounding counties.

7.     Third, China's online lending regulations made many of the financial institutions that provided Qudian with its funding reluctant to do business with the Company. This decreased the amount of funding that Qudian had for its core loan book and posed a further threat to the viability of Qudian's business. The same Qudian employee noted above explained that these regulations made it difficult for Qudian to get funds from financial institutions, but Qudian "did not disclose [these] operational difficulties."

8.     In addition, Defendants falsely described the relationship of Qudian's core loan book to Open Platform. Qudian developed Open Platform to address the regulatory problems that it had with its core loan book. Because the financial institutions that Qudian referred loans to, rather than Qudian, were the parties taking on the credit risk in Open Platform, they demanded that Qudian send only its best borrowers to Open Platform. Defendants misrepresented Open Platform as a promising new venture that was adding to Qudian's business alongside the

continued growth of its core loan book. This was false because by taking the best borrowers away from the core loan book, Open Platform was *in competition with* that legacy business.

9.    In order to maintain the façade of growth in its core loan book that Qudian promised the market even though the Company secretly shifted its best borrowers to Open Platform, Qudian lowered the lending standards in the core loan book when it started Open Platform in the second half of 2018. This caused the quality of borrowers in Qudian's core loan book to decline substantially. Instead of telling investors about the degradation of the asset quality in Qudian's core loan book, Defendants mispresented the core loan book as taking a "conservative" approach to risk.

10.    At the beginning of the Class Period, before the impact of the weak borrowers that populated Qudian's core loan book materialized, the core loan book and Open Platform grew in tandem. But this growth was a mirage The only reason that Qudian was able to grow its core loan business alongside Open Platform was that it lowered its credit standards in the core loan book so much that at least 20% of the core loan book was comprised of borrowers that did not meet Qudian's credit standards. Naturally, once the bad loans in the core loan book matured, Qudian's core loan book suffered enormous losses from borrower delinquencies and never grew at the level that Qudian promised.

11.    Defendants also misled investors by promoting the results that Qudian achieved through the first two quarters of 2019 as showing that the core loan book and Open Platform were both contributing to the Company's revenue growth and profits. On June 21, 2019, Qudian raised its net income guidance for 2019 from RMB3.5 billion, as announced on December 13, 2018, to RMB4.5 billion. Defendants falsely described this lofty new guidance as supported by "encouraging trends in our business," including "effective efforts to address evolving regulation

and partnership landscapes"; "strong momentum in our open platform initiative"; and the fact that "given our sufficient funding and strong user demand, growth of our loan book is well ahead of our previously set targets, giving us strong confidence that we will meet our revised guidance." This guidance, and its accompanying explanation, were false in light of the regulatory problems and lower credit standards in Qudian's core loan book that Defendants misrepresented.

12.     Then, in the third quarter of 2019, as a natural consequence of Qudian's lowering the credit standards in its core loan book, the Company suffered substantial losses from borrower delinquencies and did not grow at nearly the level that Defendants promised (or that it had grown earlier in 2019). Revenue from the core loan book fell from 1.6 billion yuan in the second quarter to 1.4 billion yuan in the third quarter, delinquencies rose dramatically from under 8% in the second quarter to 12% by the time Qudian announced its third quarter results on November 18, 2019, and the Company's credit losses skyrocketed from 500 million yuan the prior quarter to over 1 billion yuan in the third quarter. At this point, Defendants finally began to admit the extent to which Qudian degraded the credit quality of its core loan book in an effort to artificially boost its growth. At least 20% of Qudian's loans in that business fell below the Company's lending standards. Investors had no indication until this point of the extent to which Qudian populated its core loan book with bad loans.

13.     Defendants also finally admitted at this time—contrary to their prior description of Open Platform as *adding* to Qudian's core loan book—that the core loan book would continue to decline because Open Platform took the *best* borrowers from Qudian's user base away from the core loan book. As Defendant Yeung admitted on Qudian's November 18, 2019 earnings call, "[w]e expect [the drop in loan book business] to continue to drop in the Q4 and next year as

we found a much better growth engine, the open platform. **We can do the same business, focus on the high quality borrowers**, earn an interesting fee and carry on growth."

14.     Moreover, Defendants admitted after Qudian's disastrous third quarter results that Open Platform was actually motivated by a concern to have a financial technology business that was fully compliant with Chinese regulations. For example, Defendant Luo explained in the Company's November 18, 2019 earnings release that Qudian's many efforts to comply fully with the "complex and evolving regulatory framework over the past several years . . . [,] have all cumulated to our open platform solution." He described Open Platform as "likely to be the ultimate form of regulatory compliant fintech in China." That is a very different motivation than Defendants' prior description of Open Platform as a promising new business line that was *adding* revenue to Qudian's legacy loan book.

15.     Qudian then held an emergency conference call on November 25, 2019, to discuss the market's negative reaction to its poor third quarter results that the Company had released the prior week. Yeung responded to a question on this call concerning how the pool of approved borrowers in Open Platform compares with the Company's traditional loan book by admitting that Qudian had not previously explained Open Platform's borrower composition to the market. Yeung expressly apologized to investors, stating, "*I'm sorry that this may not have been apparent to the market yet*, but it will be over time." He finally explained that "we've only allowed 5.5 million out of the 21 million [approved borrowers] access to open-platform."

16.     Because of Qudian's surprisingly bad results for the third quarter of 2019, the Company lowered its earnings guidance for 2019 from the 4.5 billion RMB in net income that it announced on June 21, 2019, to 4 billion RMB. Qudian's ADS price then plummeted

approximately 45% over the course of several days following the Company's announcement of this terrible news.

17.     Defendants, however, continued to give investors hope in the Company's prospects. For example, on the Company's November 25, 2019 "Business Update Call" that it held to try to assuage investor concerns, Yeung explained that "[w]e are perplexed, first of all, on how the market reacted. We think it's unreasonable." He assured investors that Qudian's steeply rising loan delinquencies would stabilize by the beginning of 2020. When even that hope was dashed on January 16, 2020, because Qudian fully abandoned its financial guidance for 2019 and stopped providing future guidance, the Company's ADS price sank another 25% in the following days.  Investors lost at least hundreds of millions of dollars in value as a result of Defendants' fraud.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

20.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Qudian securities trade on the New York Stock Exchange ("NYSE"), located within this Judicial District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

22.     Plaintiffs Juan Pablo di Benedetto, Galessi Holding Corp, and Pablo Greco, as set forth in their Certifications previously filed with the Court, acquired Qudian American Depositary Shares ("ADS") at artificially inflated prices during the Class Period and were damaged upon the revelation of Defendants' fraud.  (See Plaintiffs' Certifications at Dkt. Nos. 18-2 and 27-3).

23.     Defendant Qudian is a Cayman Islands corporation with principal executive offices located at Tower A, AVIC Zijin Plaza, Siming District, Xiamen, Fujian Province 361000, China. Qudian registered ADS that are listed and traded on the NYSE under the ticker symbol "QD." The only public market for Qudian securities is for the Company's NYSE-listed ADS. Each ADS represents one of Qudian's Class A ordinary shares.

24.     Defendant Min Luo ("Luo") founded Qudian in 2014 and has served as its Chief Executive Officer since that time. He has also served as the Chairman of its Board of Directors its entire time as a public company. Luo also owned 21.4% of Qudian's total ordinary shares and 73.1% of the Company's aggregate voting power, as reported in Qudian's 2018 Annual Report

25.     Defendant Carl Yeung ("Yeung") served as Qudian's Chief Financial Officer from October 2016 until he abruptly resigned from the Company on March 18, 2020.

26.     Defendants Luo and Yeung are sometimes referred to herein as the "Individual Defendants."

27.     Qudian and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Qudian's History of Failed Businesses

28.     Qudian describes itself as "a leading provider of online small consumer credit products in China." "Small credit products" are loans that "serve consumers' immediate needs for discretionary consumption" and that "typically have short durations." Qudian operates an online platform, with nearly all of its transactions facilitated through mobile devices. Prospective borrowers can apply for small amounts of credit on their mobile phones and receive approval within a few seconds. Qudian's average loan size during the Class Period was less than $300, with an average duration of under one year.

29.     Defendant Luo founded Qudian in 2014 and initially operated the Company through an entity called Beijing Happy Time. He took Qudian public through an initial public offering on October 18, 2017 that listed Qudian's ADS on the New York Stock Exchange.

30.     Since the time of its founding, Qudian has sought to ride the boom of the online consumer lending industry in China. But Qudian has been forced to fundamentally change its business model several times as a result of increased government regulation of the industry and failed business projects.

31.     When Luo founded Qudian in 2014, it was focused on facilitating high-interest loans to college students across China. This business came under pressure after several students were reported to have committed suicide when various loan companies were accused of using improperly threatening collection tactics. Qudian was forced to shift its focus after Chinese regulations banned on-campus student lending.[2]

---

[2] *See* Jason Booth, "Qudian CEO Gives Up Pay Check After Stock Price Collapse," *China Money Network* (Mar. 11, 2018) (https://www.chinamoneynetwork.com/2018/03/13/ceo-online-lender-qudian-gives-pay-check-stock-price-tanks); https://medium.com/@actallchinatech/can-chinas-leading-fintech-firm-qudian-survive-its-pr-crisis-9208bc8ed0ea.

32.     In November 2015, Qudian shifted to providing and facilitating small high-interest loans to younger consumers.  It also shifted from offline to online operations.  Since July 2016, Qudian has engaged all of its borrowers through online channels and nearly all of its transactions have been facilitated through mobile devices.

33.     Qudian targets younger consumers who seek short-term small loans for discretionary purposes, but do not have the adequate credit history to access credit cards or other types of credit from large financial institutions.  The Company explains that "[w]e target the large and growing number of creditworthy borrowers in China who we believe are of emerging prime credit quality but have limited credit history and access to traditional consumer credit from banks or other lenders."  Since the time of its IPO in October 2017, at least 84% of Qudian's active borrowers were between 18 and 35 years old.

34.     In April 2017, in response to Chinese regulations capping the amount of interest and fees that online lenders can charge, Qudian adjusted the pricing of its credit products so that the annualized fee rates charged on all credit drawdowns would not exceed 36%.  Historically, Qudian had often charged annualized rates over 36% (including for 59.5% of transactions that Qudian facilitated in 2016).

35.     The Class Period starts on December 13, 2018, when Qudian announced an upbeat financial forecast for 2019 while misrepresenting the regulatory problems with its core loan book and the Company's efforts to address them through Open Platform.  The following background leading up to that time explains why Defendants needed to misrepresent the true nature of Qudian's core loan book and Open Platform during the Class Period.

### 1.     Qudian's Failed Relationship With Ant Financial

36.     In 2015, after Qudian was forced to abandon the college lending market, the Company established a business partnership with Ant Financial, a finance company associated

with the Chinese e-commerce company Alibaba.  This relationship allowed Qudian to source borrowers through Alipay, which is Ant Financial's popular mobile third-party payment service provider.  Alipay offered several channels for borrowers to apply for loans from Qudian through the Alipay app.  At the time of Qudian's IPO in October 2017, it obtained the majority of its active borrowers through Alipay.

37.     Qudian's relationship with Alipay ran into trouble right after the Company's IPO. On November 24, 2017, Qudian announced that Ant Financial was limiting the effective annualized rate (covering all interest, fees and charges) that Qudian could charge consumers for all transactions on Alipay to only 24%.  This significantly hurt Qudian's profitability, and the Company was forced to adjust its business strategy.  Qudian shifted "to implement measures to promote the use of its [own] mobile applications"—as opposed to Alipay—where Qudian would continue to charge customers an annualized rate of 36%. Qudian stated that it was "committed to continuing to implement new strategies to grow its business, evolve to meet market demand and respond to industry developments."

38.     The market immediately recognized the significance of this change to Qudian's business model.  For example, in a November 24, 2017 report entitled "Rising uncertainties on earnings outlook from Ant rate cap," Morgan Stanley cautioned that "the change in Ant's approach towards the cash loan business will likely lead to a notable change in [Qudian's] business model," causing the analysts to substantially "reduce [their] earnings forecasts and price target" for Qudian "[i]n light of the associated earnings uncertainty." Qudian's stock price dropped by 24% immediately following this development.

39.     Qudian's discord with Ant Financial continued.  When Qudian announced its second quarter results for 2018 on August 24, 2018, it told investors that "[t]he Company's

agreement with Ant Financial relating to user engagement through Alipay's dedicated channel for online third-party service providers expires in August 2018, and the parties have decided not to renew the agreement."   Qudian reassured investors, however, that "[t]he Company has primarily engaged users through its own mobile apps since the first quarter of 2018, and it does not expect the non-renewal to have a material impact on the Company's current business."

40.     Qudian employees, however, observed that the loss of business from Ant Financial had a significant impact on the Company. For example, a former regional manager, project manager, and business cooperation manager, who worked at Qudian from November 2017 through May 2019 and, most recently, reported to the director of the financial markets department, who, in turn, reported to Defendant Luo (Confidential Witness, or "CW," 1), explained that with "Ant Financial cut[ting] off its user traffic" and Qudian "not attracting customers through new products," the Company "was purely living off its past gains." And "[a]lthough [Qudian] claimed to have 70 million users in reserve, these users were not just with this one company. They would go with whichever gave them the best deal."[3]

41.     A former employee who worked as a regional manager at Qudian from October 2017 to December 2018 ("CW 2") in Dabai Auto and Qudian's online education business, explained that "the end of its partnership with Alipay was an important turning point. Even though the number of users still grew afterwards, it was very different from the kind of exponential growth it had when still working with Alipay."

42.     Indeed, Qudian's core loan business suffered following the loss of Ant Financial, particularly when compared to Qudian's performance the prior year, before Ant Financial capped the amount of fees that Qudian could charge. Qudian's 2018 Annual Report shows that its total

---

[3] Quotations from the confidential witnesses described in this Amended Complaint are based on translations of statements that the witnesses made in their native Mandarin.

loan balance (including both on- and off-balance sheet transactions) dropped from approximately $89 billion in 2017 to $59 billion in 2018.

### 2.     Qudian's Failed Attempts to Grow Outside of Its Loan Business

43.     Qudian has also repeatedly tried to grow through new projects outside of its core loan business that ultimately failed.

44.     A former employee who worked in operations at Qudian from November 2017 to December 2018 ("CW 3") explained that Qudian's "crisis at the end of 2018 was its greatest. It was the end of the partnership with Ant Financial, there was the pressure from laying off employees, the pressure from Dabai Auto, and the pressure from being unable to find new breakthroughs. All kinds [of pressure]. They would give us regular classes during that time, in which Luo Min or the CFO [Defendant Yeung] talked to us [to boost employee morale]." This witness also described a lot of conflict between employees and upper management at this time. There were a lot of layoffs after October 2018 and this witness stated that all of the Company's capable employees left the company at this time.

45.     Qudian's most prominent failed project is its Dabai Auto business. Shortly after Qudian's IPO, as Ant Financial was capping the amount of fees that Qudian could charge, the Company launched its Dabai Auto business. This was a budget auto financing business where Qudian would purchase cars that it would lease to borrowers or sell to buyers through loans that Qudian would facilitate. On August 24, 2018, Defendant Luo explained that "Dabai represents our efforts to activate and monetize our massive existing user base by offering a diversified service scope."

46.     Qudian had high hopes for its Dabai Auto business. As of December 31, 2017, over 45% (737 out of 1614) of Qudian's employees worked for Dabai Auto, which opened "a nationwide network of showrooms to engage prospective car buyers." On March 12, 2018, when

announcing Qudian's results for 2017, Defendant Luo described this "budget auto financing [business as] a unique opportunity to serve [the] credit needs" of the large number of Qudian's 62.4 million registered users who "sought a larger credit size than what our cash credit and merchandise credit products were offering."  Qudian gave guidance at that time that Dabai Auto would lease out over 100,000 vehicles in 2018.

47.    Qudian received approximately RMB 2.2 billion in sales income from Dabai Auto in 2018, which was 28.3% of Qudian's total revenue, but the business lost a lot of money. On August 24, 2018, Qudian suddenly explained that it "expect[ed] the number of vehicles sold during the full year 2018 to be between 25,000-30,000, down from the previous guidance of 100,000, as the Company focuses on profitability."  By that time, the Company had used $300 million of its $800 million IPO proceeds to fund Dabai Auto. On this news, Qudian's share price dropped from a closing price of $6.86 per ADS on August 23 to a closing price pf $6.02 on August 24, 2018, a drop of over 12%.4 Dabai Auto ultimately failed and Qudian shut down the project in the second quarter of 2019.

48.    Qudian also tried to expand its business through other projects, but they all failed. For example, Qudian has tried entering the e-commerce market several times. But Defendant Yeung stated on Qudian's November 21, 2018 earnings call for the third quarter of 2018 that while "we have always had an ambition to do e-commerce . . . [,] It's not something that we want to focus on in the near term."

---

4 Qudian is currently subject to a separate securities litigation where the court held that the complaint adequately alleged that, at the time of its IPO, "Qudian misleadingly failed to disclose that it was 'in the process of launching a new . . . business called Dabai Auto.'" *In re Qudian Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 U.S. Dist. LEXIS 167072, at *26-27 (S.D.N.Y. Sep. 27, 2019).

49.     These are just some examples of the projects that Qudian has unsuccessfully tried in order to grow its business beyond its core loan book. Among other businesses, Qudian has tried businesses related to online education and housekeeping, among many others.

50.     CW 2, who worked as a regional manager in Dabai Auto and Qudian's online education business from October 2017 to December 2018, described Qudian's repeated attempts to start new businesses as "blind innovations." This witness explained that Qudian tried so many "blind innovations" that employees "thought they were just a joke." The details of these projects were often not publicly reported. For example, Qudian shifted employees away from Dabai Auto "to develop a high-end housekeeping product" and Defendant Luo told employees that it would earn approximately 10 billion yuan in one year. CW 2 described this business as a "mess" and it was cancelled. Qudian's employees became "very used to this type of decisions" and CW 2 "joked [with colleagues] that the company made its decisions with just a slap on the thigh."

51.     These internal workings are consistent with Defendant Luo's erratic reputation. A March 11, 2018, article in China Money Network noted that Luo "has a history of making bold, and sometimes damaging statements," including his having "rattled investors by publicly joking about violence being used in the loan collection process."5

---

5Jason Booth, "Qudian CEO Gives Up Pay Check After Stock Price Collapse," China Money Network (Mar. 11, 2018) (available at https://www.chinamoneynetwork.com/2018/03/13/ceo-online-lender-qudian-gives-pay-check-stock-price-tanks). This article also noted that Luo "says he will not receive a salary or bonus until his company reached a market capitalization of US$100 billion. The NYSE-traded company currently has a market capitalization of US$5.54 billion, after falling nearly 50% from it initial public offering in October." As Luo announced on March 12, 2018, in connection with Qudian's results for the fourth quarter of 2017, "I have signed an agreement with the Company to relinquish my salary and bonus until our market capitalization reaches US$100 billion, as measured by the daily closing quotation of the New York Stock Exchange. This affirms my deep conviction in Qudian's tremendous growth potential and my focus on driving shareholder value."

52.     As a result of Qudian's loss of business from Ant Financial and the failure of its other projects such as Dabai Auto, Qudian's share price fell over 82% from its IPO price of $24 per ADS to just $4.2 per ADS on November 5, 2018, just before the start of the Class Period.

**B.    Defendants' Plan to Misrepresent Qudian's Lending Business During the Class Period**

53.     After seeing its projects outside of its consumer lending business consistently fail, Qudian decided to change course and focus just on its consumer lending business during the Class Period. Investors reacted very favorably to Defendants' positive descriptions of the performance of Qudian's lending business during this time. But these statements were false because Qudian's core lending business violated China's regulations over the online lending industry and, as a result, Qudian was forced by lenders to shift its best borrowers to Open Platform. Instead of acknowledging these problems in Qudian's core loan book, Defendants substantially lowered its credit standards to falsely portray a veneer of growth in the core loan book even though its significantly degraded credit quality set the business up for failure.

54.     On December 13, 2018, the first day of the Class Period, Qudian announced that it expected its net income in 2019 to be over RMB 3.5 billion based on "strong user demand and risk-adjusted returns on track with our target," as well as its "large and growing user base and fully institutionalized funding base." The Company's share price rose 20% on over 24 million shares traded, from $5.26 per ADS the prior day to $6.32 per ADS at the close of trading on December 13. Furthermore, the Company's ADS price increased by a remarkable 43% from $5.26 on December 12, 2018 to $7.5 per ADS at the close of trading on November 15, 2019, just before Defendants began to reveal the true nature of its lending business.

55.     When Qudian reported its financial results for the first few quarters during the Class Period, they appeared to show both the core loan book and Open Platform growing

healthily. For example, when Qudian announced its results for the first quarter of 2019, on May 20, 2019, it told investors that it would be "winding down" the Dabai Auto business and stated that "[g]iven the exciting and visible growth throughout these core business lines, we will stay focused on our technology-based consumption credit services and have discontinued efforts outside of consumption credit opportunities." Qudian reported approximately 1.65 billion yuan in revenue from its core lending business and approximately 160 million yuan in revenue from Open Platform (which Qudian characterized as a "referral service fee"). This was the first time that Qudian separately broke-out its revenue for Open Platform.  Qudian's 1.81 billion yuan in revenue from its core loan book and Open Platform combined was an extraordinary 65% year-over-year increase over the 1.1 billion yuan in revenue from its core loan book during the first quarter of 2018. As the following results show, even the Company's revenue from just the core loan book increased by an astounding 50% from the prior year, even as the Company added entirely new revenue from Open Platform in the first quarter of 2019:[6]

### QUDIAN INC.
#### Unaudited Condensed Consolidated Statements of Operations

| | Three months ended March 31, | | |
| | 2018 | 2019 | |
| (In thousands except for number of shares and per share data) | (Unaudited) RMB | (Unaudited) RMB | (Unaudited) US$ |
|---|---|---|---|
| **Revenues:** | | | |
|     Financing income | 776,747 | 1,010,758 | 150,608 |
|     Sales commission fee | 111,379 | 135,854 | 20,243 |
|     Sales income | 546,034 | 136,971 | 20,409 |
|     Penalty fee | 4,886 | 10,140 | 1,511 |
|     Loan facilitation income and others | 277,577 | 644,412 | 96,020 |
|     Referral service fee | — | 158,724 | 23,651 |
| **Total revenues** | **1,716,622** | **2,096,859** | **312,442** |

56.     Defendant Luo touted Qudian's "record [first] quarter." In addition, Defendant Yeung explained that this seemingly great performance was "a result of successfully growing our

---

[6] Qudian's revenue from its core loan book and Open Platform for the first quarter of 2019 also showed a seemingly impressive 22% increase over the 1.48 billion yuan in revenue that Qudian reported for the fourth quarter of 2018 for its lending business.  In addition, even the Company's revenue from just the core loan book increased by over 11% from the prior quarter.

loan balance while managing risk appropriately," with the loan book growing 91.2% year-on-year, and Open Platform "already showing strong profit potential, generating RMB158.7 million in revenue for the first quarter with little marginal operational cost and zero credit cost."

57.     This growth, however, was fueled by the lower-quality borrowers that Qudian was secretly accepting in its core loan book. If Qudian had not surreptitiously lowered its credit standards, the Company would not have been able to achieve these results. Moreover, as the following sections will explain, Qudian's core lending business violated China's strict regulation of the online lending industry. Qudian started Open Platform not because it was a promising new business line, but rather, in order to address the regulatory problems in Qudian's core lending business. The financial institutions that participated in Open Platform took on the risk of default, rather than having Qudian do so (as it did in its core loan book), because that was more compliant with China's online lending regulations. But because these lenders were now taking on the risk of default, they demanded that Qudian send its best borrowers to Open Platform. Rather than explain the predicament that Qudian's core loan book was in as a result of its regulatory problems, Defendants accepted at least 20% of borrowers in the core loan book that did not meet the Company's credit standards. Defendants, however, falsely conveyed the core loan book's performance as consistent with the Company's "conservative" approach to risk.

**C.     Qudian's Regulatory Violations in Its Core Loan Book**

58.     Qudian's core loan book funded approximately RMB 57.9 billion (or $8.4 billion) worth of loans in 2018.  The Company categorized approximately 64% of those transactions as "on-balance sheet" and approximately 36% as "off-balance sheet."  Qudian's "on-balance sheet" transactions consist of loans that Qudian funds with its own capital and loans that are funded by its institutional funding partners.

59.     Qudian's "off-balance sheet" transactions consist of loans that Qudian facilitates directly between borrowers and third parties.  The Company explains that this service allows banks to utilize Qudian's "data-driven credit assessment model to screen potential borrowers who are traditionally underserved by banks due to the lack of credit data. Under such agreements, we refer to such banks qualified credit applications from borrowers, including our assessment of their credit profiles and our suggested credit limits. They will then review the credit applications independently in accordance with their credit assessment standards and approve credit for drawdown. Once a credit limit is approved and funding is requested, the banks will fund the credit to the borrower directly." Qudian receives a "loan facilitation fee" for this service and guarantees the full loan amount to the funding partner if the borrower defaults.

60.     The following chart from Qudian's 2018 Annual Report shows the breakdown of the different types of loans that Qudian made in its core loan book:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2016 | 2017 | 2018 | |
| | RMB | RMB | RMB | US$ |
| | (In thousands) | | | |
| **On-balance sheet transactions:** | | | | |
| Credit drawdowns that were funded by institutional funding partners | 10,698,269 | 47,247,820 | 17,786,502 | 2,586,939 |
| Credit drawdowns transferred to institutional funding partners | 8,987,195 | 22,430,309 | 1,664,062 | 242,020 |
| Credit drawdowns funded through trusts(1) | 1,711,074 | 24,817,711 | 16,122,440 | 2,344,211 |
| Credit drawdowns that were funded by our own capital | 19,523,408 | 31,225,916 | 19,249,864 | 2,799,777 |
| **Total on-balance sheet transactions** | 30,221,677 | 78,473,736 | 37,036,366 | 5,386,716 |
| **Off-balance sheet transactions** | 2,008,961 | 10,469,933 | 20,904,603 | 3,040,448 |
| **Total** | 32,230,638 | 88,943,669 | 57,940,969 | 8,427,164 |

(1)     Excludes credit drawdowns funded by our own capital through trusts.

The table below sets forth a breakdown by funding sources, as a percentage of the amount of transactions, in the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | % | | |
| **On-balance sheet transactions** | | | |
| Credit drawdowns that were funded by institutional funding partners | 33.2 | 53.1 | 30.7 |
| Credit drawdowns transferred to institutional funding partners | 27.9 | 25.2 | 2.9 |
| Credit drawdowns funded through trusts(1) | 5.3 | 27.9 | 27.8 |
| Credit drawdowns that were funded by our own capital | 60.6 | 35.1 | 33.2 |
| **Total on-balance sheet transactions** | 93.8 | 88.2 | 63.9 |
| **Off-balance sheet transactions** | 6.2 | 11.8 | 36.1 |
| **Total** | 100.0 | 100.0 | 100.0 |

(1)     Excludes credit drawdowns funded by our own capital through trusts.

61.     In recent years, China has imposed strict regulations on the nascent online consumer lending industry.  One of China's most prominent regulations is the Circular on Regulating and Rectifying Cash Loan Business—also known as Circular 141—that China's

Office of the Leading Group for Specific Rectification against Online Finance Risks and the Office of the Leading Group for Specific Rectification against P2P Online Lending Risks jointly issued on December 1, 2017.

62.     Qudian explained in its 2018 Annual Report that Circular 141 "provides restrictions on banks' collaboration with third parties in cash loan business," including that "[a] bank may not outsource its core business functions, such as credit assessment and risk management, to third parties" and 2 – "[a] bank participating in loan facilitation transactions may not accept credit enhancement services from a third party which has not obtained any license or approval to provide guarantees, including credit enhancement service in the form of a commitment to assume default risks."

63.     Qudian misrepresented three main regulatory problems with its core loan book. First, Qudian improperly provided credit assessments (i.e., assessing the creditworthiness of borrowers) for loans that were made or funded by other financial institutions.

64.     Second, Qudian did not tell investors that in May 2019, the government severely narrowed the geographic scope of the Company's lending license. This substantially limited the amount of loans that Qudian could make in its core loan book.

65.     Third, Qudian misrepresented Open Platform as a promising new business that would add to the Company's core loan book. This was false because Open Platform was started to address the regulatory problems with Qudian's core loan book and was actually taking the best borrowers away from the core loan book.

### 1.     Qudian Violated Circular 141's Prohibition on Outsourcing Credit Assessments

66.     The loans that Qudian made through other financial institutions—including its off-balance sheet loan facilitation business and on-balance sheet loans that were funded by other

financial institutions—violated existing regulations. Qudian acknowledged in its 2018 Annual Report that under Circular 141, "[a] bank may not outsource its core business functions, such as credit assessment and risk management, to third parties."

67.     Qudian claimed that it complied with this regulation in its loan facilitation business because even though it would refer to "banks qualified credit applications from borrowers, including our assessment of their credit profiles and our suggested credit limits," the banks would "then review the credit applications independently in accordance with their credit assessment standards and approve credit for drawdown."

68.     Qudian also touted its "rigorous credit assessment model and robust risk management system" that it used in all parts of its core loan book. This system used artificial intelligence and machine learning on Qudian's voluminous set of borrower data, and included 177 employees on Qudian's risk management team in 2018, "[t]o maintain healthy credit performance."

69.     CW 4—a former employee who directly assisted Defendant Luo, communicated with him on a daily basis, and worked with Qudian's funding partners from early 2018 until the summer of 2018—explained that many of the banks that Qudian did business with were actually outsourcing the credit assessment function to Qudian. This witness explained that already in 2018, Qudian and the financial institutions that provided it with funding were aware of the prohibition on Qudian conducting credit assessments for these funding partners. The witness also described how certain financial institutions that "had a good relationship with the local regulator" would rely on Qudian's risk assessment rather than conducting their own independent risk assessment after receiving Qudian's initial review. In other words, CW 4 confirmed that it

was common for Qudian to violate Circular 141's prohibition on having financial institutions outsource their credit assessments to Qudian.

70.     In addition, CW 4 explained that the prohibition on outsourcing credit assessments made it difficult for Qudian to get funds from financial institutions. But Qudian "did not disclose [these] operational difficulties, so you couldn't see them from the outside. It doesn't mean they did not have them."

### 2.     Qudian Was Subject to Strict Licensing Regulations

71.     Qudian assured investors that it had the proper licenses to be making loans itself, particularly with its own capital. For example, it referred in its 2018 Annual Report to certain of its subsidiaries having a "microloan license" and referred to the trusts that the Company used to make certain of its loan as having "been licensed by financial regulatory authorities to lend."

72.     Unbeknownst to investors, the risk that Qudian's microlending  licenses would be restricted came to pass during the Class Period. At the start of the Class Period, Qudian had two online microlending licenses, which were associated with Fuzhou Gaoxin District Qufenqi Microlending Co. Ltd. (抚州高新区趣分期小额贷款有限公司, founded on May 19, 2016) and Ganzhou Happy Life Online Microlending Co. Ltd. (赣州快乐生活网络小额贷款有限公司, founded on December 14, 2016).   In May 2019, the government downgraded the scope of business that Qufenqi Microlending could engage in so that its lending license was narrowed from not having any geographic restriction to being just a regional microlending license. This severely restricted Qudian to making microloans within the limits of Ganzhou district and surrounding counties.

73.     Defendants did not disclose this development at the time, which substantially narrowed the amount of loans that Qudian was able to make itself. This information was not

publicly reported until May 11, 2020, when it was revealed by Beijing News because the publication was reporting on a meeting that the Ganzhou Finance Office had that month (in May 2020) with companies that had microlending licenses.7  Caijing Online reported the next day that "in May 2019, Qufenqi Microlending changed its business scope from 'offering online microlending services and debt assignment services through internet platforms" to "offering microloan services in Gaoxin District, Fuzhou and its surrounding counties.' That is to say, the two online microlending licenses held by Qudian have been reduced to one. [Qudian's] loan leverage ratio will be restricted. The value of the loans on its balance sheet will [also] be adjusted."8

74.    These articles also reported that as a result of these new restrictions, because Qudian would no longer be able to make the same amount of loans that it was making before, on July 29, 2019, Qufenqi Microlending reduced its registered capital by 90%, from 1 billion yuan to 100 million yuan. Defendants also did not disclose these developments at the time. But they had a significant impact on Qudian's core loan book.  Qudian's "financing income" from its on-balance sheet transactions—which includes the type of transactions that were affected by this change—steadily decreased over the course of 2019 from approximately RMB 1 billion in the second quarter (when these restrictions were first imposed), to RMB 800 million in the third quarter, to RMB 700 million in the fourth quarter.  Furthermore, while Qudian did not disclose the amount of transactions by quarter, for 2019 as a whole, its total on-balance sheet transactions declined significantly from approximately RMB 37 billion in 2018 to just RMB 22.8 billion in 2019.

---

7  The Beijing News, "Ganzhou Microlending Supervision Has a New Trend; Qufenqi Microlending is No Longer an Online Microlender," 11 May 2019.
8  Caijing Online, "Qudian's Two Online Microlending Licenses Are Reduced to One; Loans On Balance Sheet Will be Restricted," 12 May 2020.

### 3. Regulatory Issues With Qudian's Core Loan Book Decreased The Amount of Funding Available to the Company

75.     All of these regulatory problems made Qudian deeply worried about the viability of its core loan book. Former employees confirm this concern. For example, a former management trainee at Qudian from January 2018 to June 2019 who worked on multiple projects outside of Qudian's core loan book (including Dabai Auto) and was involved in hiring in the human resources department for several months ("CW 5"), explained that Qudian developed many new businesses because the "cash loan business was affected by government regulations. They were afraid that regulatory changes would destroy the whole business, so they needed to have some backup plans."

76.     In addition, CW 4, who communicated with Defendant Luo on a daily basis and worked with Qudian's funding partners, similarly explained that these regulatory concerns were one of the reasons that Qudian was constantly trying to start new businesses outside of its core loan book. CW 4 stated that Qudian was "looking for new ways to generate income. The business has declined to the lowest possible [level] by just relying on cash loans. The regulations of cash loan and P2P businesses are becoming increasingly strict." Moreover, former colleagues that worked on Open Platform told CW 4 that the financial institutions that provided Qudian's funding were reluctant to work with Qudian because of regulatory concerns with an intermediary such as Qudian guaranteeing loans (as Qudian did in its core loan book but not in Open Platform).

77.     CW 4 explained that all of these regulatory issues resulted in "[m]any funding partners [that] did not want to conduct personal cash loan business, so it was hard to get their funds. Some of them stopped the partnership because they did not want to report their personal cash loan projects to the banking regulatory commission. This put a lot of pressure on Qudian in

terms of securing funding." In particular, "[m]any trusts and some small banks had stopped cooperating with Qudian" during this witness's time at the Company in 2018. "There was a lot of pressure in funding."

### 4. Defendants Falsely Described Qudian's Core Loan Book as Compliant With Regulations

78. Defendants repeatedly assured investors during the Class Period that Qudian was compliant with online lending regulations. For example, when discussing Qudian's results for the fourth quarter and full year of 2018, Defendant Yeung emphasized "our current regulatory compliant and stable operating structure."

79. Qudian also included slides in its Management Presentations throughout the Class Period that described the Company as compliant with applicable regulations. For example, its presentation for the second quarter of 2019 contained the following slide declaring that "Regulatory Compliant is Embedded in Our DNA," which described "key regulatory developments" such as Circular 141 and Qudian's key "compliance undertakings":



80.     Defendants falsely portrayed Qudian as being in compliance with all applicable regulations, even though the Company was violating Circular 141 by improperly conducting credit assessments for other financial institutions and it had its lending license severely restricted in May 2019.

81.     In sum, Defendants misrepresented Qudian's core loan book as compliant with regulations and central to Qudian's performance, while failing to disclose that Qudian 1 – improperly conducted credit assessments on behalf of other financial institutions, in violation of Circular 141; 2 – was stripped of its key lending license in May 2019; and 3 – started Open Platform not because it would add to Qudian's core loan book, but rather, in order to address the

regulatory problems with the Company's core loan book.  The following sections describe how Defendants misrepresented the connection between Qudian's core loan book and Open Platform.

D.     **Qudian's Open Platform Business**

82.     When Qudian announced its results for the first quarter of 2019, it stated it was "investing in our open-platform initiative launched in the third quarter of 2018 to drive additional profit growth." Qudian explained in its 2018 Annual Report that Open Platform:

> [O]ffers our large user base with more choices to satisfy their financial needs, while incurring no material cost of operations and no credit risk for us. For users that do not meet our credit requirements, we provide recommendations of financial products that are offered by financial service providers that participate on our platform. The relevant financial service providers perform independent credit assessment of users and make the ultimate credit decisions. We typically charge such financial service providers for lead generation on a cost-per-click basis. On the other hand, for users with better credit profiles that are applying for large loan amounts that exceed the limit permitted under our policy, we refer their applications to our institutional funding partners. We do not bear credit risk and receive commissions from our institutional funding partners for such referrals.

83.     A financial analyst at Qudian from October 2016 to September 2018 ("CW 6") described Open Platform as being Defendant Yeung's idea.

84.     Qudian portrayed Open Platform's results at the beginning of the Class Period as providing the next source of growth that the Company needed after the loss of business from Ant Financial and the failure of its other projects (such as the Dabai Auto business).  At the end of 2018, Qudian had 71.8 million registered users but only 5.3 million outstanding borrowers. Defendants told investors that Open Platform would enable Qudian to achieve its stated goal of profiting from its tens of millions of registered users that were not taking out loans.

85.     In reality, however, Qudian developed Open Platform to address its serious regulatory concerns with its core loan business.  Qudian also did not accurately describe how Open Platform and the core loan book were in competition with each other because Open

Platform was taking the highest-quality borrowers from the core loan book.  Rather than accessing Qudian's tens of millions of inactive users, Open Platform was actually limited to the much smaller set of the highest-quality borrowers from Qudian's core loan book. This made the financial results that Qudian reported for the core loan book and Open Platform highly misleading. These results did not truly reflect the simultaneous growth of both the core loan book and Open Platform. Really, this performance was a direct result of Qudian lowering the lending standards in its core loan book to compensate for its loss of the best borrowers to Open Platform.

86.     When Defendant Luo discussed Qudian's results from the fourth quarter and full year 2018, on March 19, 2019, he described Open Platform as supporting the Company's "earnings outlook through activations in our existing user base" and as a business that would "deliver[] long-term growth for our shareholders."

87.     Analysts took note of Qudian's new Open Platform business.  For example, on March 19, 2019, Deutsche Bank raised its target price for the Company's shares by 13% to $6 per ADS. Deutsche Bank noted that one of Qudian's fourth quarter highlights was that "it started traffic referral to other online lenders as well as traditional FIs with Rmb30mn revenue recorded in 4Q18. Management said referral fee could be 10%-12% of loan balance without taking any risks."

88.     Similarly, when Qudian reported its results for the first quarter of 2019, on May 20, 2019, Defendant Luo stated, "We're pleased to report another record quarter." He described the Company's strategy as pursuing the dual goals of being "focused on growing our loan book steadily looking for exceptional risk-adjusted profits, while investing in our open-platform initiative launched in the third quarter of 2018 to drive additional profit growth."  He specifically touted the potential of Open Platform by describing it as "already showing strong profit

28

potential, generating RMB158.7 million in revenue for the first quarter with little marginal operational cost and zero credit cost."

89.     Defendant Yeung stated on this call that "Open platform marks the most exciting part of our Company's future and have proved early success with two strong quarters of results on a fantastic growth trend."   He also touted the Company's loan book business as showing "continue[d] robust growth." Defendant Luo stated that "regarding growth for the rest of the year a lot of it will come from the loan balance growth in the coming quarters, some new user growth, but I think the most exciting part is the open platform initiative."

90.     At this point, analysts were further assured that Open Platform was providing Qudian with its next leg of growth from a different set of borrowers that were not already using the Company's  core loan book.  They relied on Defendants' assurances that the Company was growing Open Platform alongside continued growth in the Company's core loan book. On May 21, 2019, in a note titled "Robust 1Q19 reinforces FY guidance; open-platforms gaining momentum," Credit Suisse maintained its Outperform rating based on its assessment that "asset-light transaction referral business model has low marginal operational cost and zero credit risk, and is one of the growth priorities for QD going forward. It should become an important revenue growth driver, *if QD successfully monetizes the potential user base*."

91.     Defendants touted Open Platform as a supposedly great new line of business alongside Qudian's legacy loan book business for as long as they could get away with doing so. This was consistent with how they described past longshot projects—such as Dabai Auto—that inevitably failed. It also bought Defendants more time to continue trying to find a new avenue of growth.

92.     Defendants did not merely describe Open Platform in overly optimistic terms; rather, they grossly misrepresented the role that Open Platform played in the Company's business.  Open Platform was very similar to Qudian's pre-existing off-balance sheet loan facilitation business, which also facilitated loans directly between Qudian's users and third-party financial institutions.  Qudian's reason for shifting to Open Platform was actually that it was more compliant with China's strict online lending regulations, not that it presented a promising new avenue of growth separate from the core loan book. But rather than explaining the Company's true reason for its shift to Open Platform, Defendants described Open Platform as a great new business opportunity that would provide Qudian with its long-sought-after next leg of rapid growth alongside continued growth in its core loan book.

93.     As the following image from Qudian's March 18, 2019 Management Presentation shows, Qudian represented Open Platform as providing the Company with the ability to attain *additional* "growth beyond [the core] loan book" from Qudian's "massive dormant user base" of approximately 65 million registered users who were not currently borrowing from the core loan book:



94.     Qudian continued perpetuating this narrative in its subsequent Management Presentations during the Class Period. For example, its presentation for the first quarter of 2019 continued to present Open Platform as providing growth beyond the core loan book and added a slide presenting the core loan book as expanding "at Stable and Healthy Leverage":





95.     Former employees of Qudian consistently explain that Open Platform was substantially the same as Qudian's legacy loan facilitation business, and the Company hyped Open Platform as a new business initiative for public relations purposes. Open Platform might have alleviated Defendants' regulatory concerns, but it could not ever (and did not) provide a novel avenue for growth *in addition to* the core loan book.

96.     For example, CW 4 explained that Open Platform is "just a PR story[, but i]t did not change Qudian's practice," because "Qudian also facilitated loans before it had Open Platform. By shifting to Open Platform it probably wanted to create a story. In the past, people didn't know it was doing loan facilitation and might worry that its cash loan business would be

banned in the future. With Open Platform it created a more positive image. It also made itself sound more like a technology-driven platform. So I think it was more like a PR story."  CW 4 also explained that many of Qudian's funding partners stopped doing business with the Company because of regulatory concerns with the Company's core loan business, as described above.  (See supra ¶¶ 76-77).

97.     This testimony highlights how regulatory pressure posed the dual threat of 1 – forcing the core loan book to close because of its violations of existing regulations and 2 – making less funding available to Qudian because the financial institutions that Qudian relied on stopped doing  business with Qudian because of these regulatory concerns.

98.     Similarly, CW 1 worked for Qudian's loan business until CW 1 left the Company in May 2019. CW 1 described Open Platform as substantially the same as Qudian's prior loan business and stated that Qudian described Open Platform as a new line of business "[f]or compliance reasons." CW 1 explained that part of Qudian's prior loan business was "renamed as Open Platform" around the time that CW 1 left the Company in May 2019. (Consistent with this observation, the first time that Qudian used the term Open Platform was when it announced its 2018 results on March 18, 2019.) In addition, CW 1 explained that because of Circular 141, which came out in 2017, Qudian could no longer give loans itself the way that it had previously and the old loan business therefore "could no longer be continued."

99.     Furthermore, CW 7, a business manager at Qudian from July 2017 to June 2019, explained that Qudian tried so many new business lines outside of its core loan book because of the Company's understanding that the core loan book ran afoul of government regulations and need to be shut down entirely.

100.     CW 7 also explained how Open Platform took business away from Qudian's core loan book. This witness stated that while Open Platform "made much profit in the short term, in the long term, it was just using up its own customers." CW 7 elaborated that Open Platform relied on old customers from Qudian's core loan book and "[i]t basically reduced the lifecycle of its customers" by offering them higher loan balances.

101.     In addition, a former employee who worked as a public relations specialist at Qudian from November 2017 to March 2020 ("CW 8"), explained that Open Platform was not a "new product," but rather, "only became more important" in late 2018. CW 8 described the difference between Open Platform and Qudian's prior loan facilitation business as being focused on regulatory concerns because "[b]efore the government regulation," loan facilitation companies such as Qudian "normally provided guarantee, but the later Open Platform did not. That's the difference."

E.     **Open Platform Was in Direct Competition With the Core Loan Book for Qudian's Best Borrowers**

102.     Defendants misrepresented how Open Platform compared to Qudian's core loan book business.  Even before Open Platform, Qudian was already facilitating loans directly between borrowers and financial institutions with the Company's off-balance sheet portfolio. In 2018, 36.1% of the loans that Qudian funded (totaling approximately RMB 20.9 billion) were from these off-balance sheet transactions.

1.     **Qudian Shifted Its Best Borrowers From the Core Loan Book to Open Platform**

103.     Both Open Platform and Qudian's prior off-balance sheet loan facilitation business would refer borrowers to financial institutions that would lend directly to the borrowers. The main difference between Open Platform and Qudian's  loan facilitation business was that Qudian would guarantee the direct off-balance sheet loans that it facilitated, but would not

34

guarantee its Open Platform loans.  This made Open Platform more compliant with China's strict rules prohibiting loan facilitators such as Qudian from guaranteeing loans that it arranges for other financial institutions.

104.    Because the financial institutions that Qudian did business with were now guaranteeing the risk of default in Open Platform, they demanded that only Qudian's highest-quality borrowers could participate. Defendants did not disclose until later that the borrowers that Qudian shifted to Open Platform were the highest quality, most credit-worthy borrowers that it had in its pool of registered users. (See infra Section IV.I.2). This meant that not only was Open Platform taking business volume away from Qudian's core loan book, it was taking away the highest quality borrowers.  The borrowers that were left for Qudian's core loan book were therefore of lower quality and more likely to default on their loans.

105.    Instead of telling investors that Open Platform took Qudian's best borrowers away from the core loan book, the Company chose to relax its lending standards in the core loan book. This gave the core loan book the façade of growth, but hid the fact that these results were supported by borrowers that did not meet Qudian's lending standards and therefore set the core loan book up for failure.

106.    Qudian finally admitted that Open Platform took its best borrowers after its core loan book started to collapse in the third quarter of 2019. For example, Yeung admitted on Qudian's November 25, 2019 call that it held to address its poor results, that Open Platform is "a better business model" that focuses on the "highest-quality borrowers" and the "best-quality users."

### 2. Qudian Lowered Credit Standards in Its Core Loan Book to Cover for Diverting its Best Borrowers to Open Platform

107.     Qudian also lowered its lending standards in the core loan book to try to boost its growth following the loss of business from Ant Financial in August 2018. A former Qudian employee, a public relations manager at Qudian from December 2017 to October 2019 ("CW 9"), confirmed that when Ant Financial ended its partnership with Qudian, and the Company therefore no longer had the benefit of Alipay's user traffic, this loss "definitely affected [Qudian's] business." CW 9 also explained that Qudian's lowering its lending standards to address this problem would worsen "the delinquency situation."

108.     Qudian tried to pass its lowering of credit standards off as what it called its "Credit Trial Program."  This program entailed Qudian making loans in its core business to riskier borrowers that were not approved under Qudian's traditional risk assessment.  In other words, Qudian simply lowered its credit standards to allow for riskier borrowers. This enabled Qudian to portray its core loan book as continuing to grow alongside Open Platform.  In reality, however, Qudian was populating its legacy business with much riskier loans that would have a much higher rate of default.

109.     For example, for the first quarter of 2019, Defendant Yeung touted the Company's loan book as growing "by 91.8% year-on-year, demonstrating overwhelming user demand and ample institutional funding."  But that growth was achieved only by relaxing Qudian's credit standards and making loans to much-riskier borrowers.

110.     Even though Qudian started its Credit Trial Program in the third quarter of 2018, it did not disclose its existence until a year later, when the Company disclosed its results for the second quarter of 2019 on August 16, 2019. Defendant Yeung explained that "we started to conduct credit trials in the third quarter of 2018 by extending credit to cohorts of non-core

borrowers identified by our AI base algorithms, which may not have met our strictest credit standards." This is how Qudian was able to fulfill its earlier promise of "continuing the activation of our dormant user base." At this point, however, Defendants were highly circumspect about the extent to which the Company chose to degrade the credit quality of its core loan book in order to obscure the other problems with that business. Yeung said, "I cannot give you the specifics of the so-called user profile [in the Credit Trial Program] because that is a highly trade secret, what we're doing."

111.    While Yeung noted that "we've essentially added 700,000 outstanding borrowers in one single quarter from Q1 to now Q2," he did not disclose what portion of those new borrowers came from the Credit Trial Program.  Indeed, on the conference call for the second quarter of 2019, Yeung stated that "the outstanding borrower base from [the Credit Trial Program] on the loan book side increased by 12% to reach 6 million in one single quarter." But, as Qudian disclosed in its press release for that quarter, that 12% increase (from 5.4 million outstanding borrowers in the first quarter of 2019 to 6.1 million in the second quarter) was for both Qudian's core loan book (only an unknown portion of which was for the Credit Trial Program) and for the "transaction referral business" (i.e., Open Platform). Defendants thus led investors to believe that loans from the Credit Trial Program comprised a significantly lower portion than the 20% that Defendants finally disclosed after the disastrous third quarter of 2019.

112.    Moreover, when Defendants finally disclosed the existence of the Credit Trial Program in August 2019, a year after it began, they falsely minimized it as a small program that was equivalent to a marketing expense used to acquire new borrowers. Yeung explained on the earnings call discussed in the prior paragraph that the Company had been "conservative" with its credit standards and the Credit Trial Program made sense because "[l]ogically speaking the

default rate cannot be 50%." He described the program as limited to loans that were even smaller than the Company's usual size, restricted to "RMB500 or RMB1,000 ticket sizes, and these would be much more blind-sided testing. And we're able to absorb these provision costs because we have such large net income that can support us to do so."

113.    Yeung also explained on the second quarter 2019 earnings call that "we are proactively doing this so called [profit and loss] marketing method. And if we were to take out the [profit and loss] for marketing purpose. I think the delinquency rate on some of the back calculations we've done would have [decreased substantially to have] been just around 3.7% on M1+. And then just around 2.1% on the M6 charge-off. So pretty much stable like before. That's kind of how we think about it." He characterized loans in the Credit Trial Program as "really for sales and marketing purpose."

114.    Defendant Yeung also referenced on this call Defendant Luo's description of the Credit Trial Program and explained that "approximately RMB500 million was provisioned in the quarter to bring on more outstanding borrowers" through the program. This 500 million yuan is what Qudian accounted for in the second quarter of 2019 as a "provision for receivables" for its entire core loan book, not just the Credit Trial Program.

115.    This grossly understated the portion of Qudian's borrower base that the Company accepted under lower credit standards since late 2018 and the extent of the credit losses that these relaxed credit standards risked. Companies can control "sales and marketing" expenses by deciding exactly how much to spend on them. In contrast, and unbeknownst to investors, Qudian's relaxing of its credit standards during the Class Period would cause the Company to lose billions of yuan from the third quarter of 2019 through the beginning of 2020—far more than Defendants told investors that the Company had allocated to the Credit Trial Program.

Qudian allocated approximately 2.4 billion yuan to credit losses in the third and fourth quarters of 2019.9 This was almost five time more than the 500 million yuan that Defendants had told investors that they were allocating to credit losses.

116.    Qudian finally admitted after these problems began to materialize in the third quarter of 2019 that 20% of the loans in the Company's core loan book were part of the Credit Trial Program. Moreover, even this figure understated the extent to which Qudian had lowered its lending standards earlier in the Class Period because when Defendants gave this information on November 18, 2019, they stated that Qudian had stopped issuing new loans under the Credit Trial Program.

117.    Moreover, Defendants continued to misrepresent the true nature of Open Platform and the Company's inability to continue to grow its core loan book alongside Open Platform. For example, the quality of Qudian's core loan book was impacted not just by the Company's lowering its credit standards, but by the best borrowers being diverted to Open Platform. Even if Qudian had not relaxed its lending standards, the borrowers that the core loan book received from Qudian's set of approved borrowers came from the lower end of that pool because Open Platform was taking away the top tier of approved borrowers.

118.    CW 1, who was a manager in Qudian's loan business until May 2019, had not heard of the Credit Trial Program, but explained that it was common practice for Qudian to lower "credit standards right before filing their financial reports so that they can raise the total loan amount and consequently reduce the delinquency rates."

---

[9] This 2.4 billion yuan includes the Qudian's "changes in guarantee liabilities and risk assurance liabilities" and its "Provision for receivables and other assets" in the third and fourth quarters of 2019. These figures totaled approximately 1 billion yuan in the third quarter of 2019 and approximately 1.4 billion yuan in the fourth quarter.

F. **Defendants Made Several Types of False and Misleading Statements Concerning the Relationship Between Open Platform and the Core Loan Book**

119. Defendants made several categories of false and misleading statements as part of their effort to portray Open Platform as Qudian's long-sought engine of growth alongside the Company's core loan book. They misrepresented (1) Qudian's true reason for implementing Open Platform, which was to alleviate regulatory violations associated with Qudian's core loan book, rather than to create a substantially new line of business; (2) the fact that Open Platform took the best borrowers from Qudian's core loan book; and (3) that the revenue from Qudian's core loan book was the result of the Company lowering its credit standards so much that at least 20% of the core loan book was comprised of borrowers that did not meet Qudian's credit standards. Defendants' specific false and misleading statements will be described in further detail in Section V below.

1. **Defendants Misrepresented The Reason Why Qudian Developed Open Platform**

120. Defendants falsely portrayed Open Platform as a great new business initiative that was providing Qudian with substantial growth while the Company continued to grow its core loan book alongside Open Platform.

121. For example, when discussing Qudian's results from the first quarter of 2019, Defendant Yeung stated on this call that "Open platform marks the most exciting part of our Company's future and have proved early success with two strong quarters of results on a fantastic growth trend."   He also touted the Company's loan book business as showing "continue[d] robust growth." Similarly, Defendant Luo stated that "regarding growth for the rest of the year a lot of it will come from the loan balance growth in the coming quarters, some new user growth, but I think the most exciting part is the open platform initiative."

122.    Defendants also falsely described Qudian's core loan book as compliant with regulations. For example, when discussing Qudian's results for the fourth quarter and full year of 2018, Defendant Yeung assured investors of "***our current regulatory compliant and stable operating structure.***"

123.    Similarly, Defendant Yeung explained the Company's raising of its financial guidance on its call for the second quarter of 2019 by stating that "***[s]ince 2019, we have made effective efforts to address evolving regulation and partnership landscapes***, and our share price performance has performed well to reflect the more positive sentiment. With ***solid second quarter results driven by strong momentum in our open platform initiative and better-than-expected loan book growth***, we have raised our original guidance of RMB3.5 billion by 28.6% to RMB4.5 billion on a non-GAAP net income basis. And our second quarter earnings have again exceeded the Street consensus by 32.7%."

124.    These statements were false and misleading because Qudian's true reason for developing Open Platform was that its core lending business ran afoul of China's strict online lending regulations and risked being shut-down because 1 – Qudian improperly conducted credit assessments for other financial institutions; 2 – the government severely restricted the amount of loans that Qudian could make when it substantially narrowed the geographic scope of Qudian's lending license in May 2019; 3 – Qudian was losing its funding sources for its core loan book because other financial institutions were concerned about the regulatory problems with the core loan book. Defendants did not view Open Platform as an additional product that generated revenue on top of Qudian's core loan book, but rather, as a revised business model that would allow Qudian to conduct its loan business in a regulatory compliant manner. In fact, Defendants actually planned to shift Qudian's entire loan business to Open Platform.

**2.      Defendants Misrepresented the Fact That Open Platform Took the Best Borrowers from Qudian's Core Loan Book**

125.     Qudian portrayed Open Platform as serving a different set of borrowers "beyond" the borrowers that were already approved to access the core loan book. For example, Qudian's March 18, 2019 Management Presentation discussed above (*see supra* ¶ 93), represented Open Platform as providing the Company with the ability to attain *additional* "growth beyond [the core] loan book" from Qudian's "massive dormant user base" of approximately 65 million registered users who were not currently borrowing from the core loan book. In reality, however, Open Platform was drawing on the much-smaller-subset of the best borrowers from Qudian's smaller pool of approved borrowers.

126.     Defendants did not disclose until later that the borrowers that Qudian shifted to Open Platform were the highest quality, most credit-worthy borrowers that it had in its pool of approved borrowers .  This meant that not only was Open Platform taking business volume away from Qudian's core loan book, it was taking away the highest quality borrowers.  The borrowers that were left for Qudian's core  loan book were therefore of lower quality and more likely to default on their loans.  (See infra Section IV.I.2). .

127.     Unbeknownst to investors and contrary to Defendants' representations, rather than being a promising new business line, Open Platform merely shifted Qudian's best borrowers to a more regulatory compliant business model.

**3.      Defendants Misrepresented that Qudian Lowered its Lending Standards in the Core Loan Book**

128.     Qudian attained approximately RMB 2.5 billion in non-GAAP net income in 2018.  The Company announced on December 13, 2018 that it expected its total non-GAAP net income for the full year of 2019 to be greater than RMB3.5 billion.   As the Class Period proceeded, Defendants falsely assured investors that Qudian was on pace to achieve (and

surpass) these results based on the results that it had already achieved in 2019 in both the core loan book and Open Platform.

129.    For example, for the first quarter of 2019, Qudian reported on May 20, 2019, approximately 1.65 billion yuan in revenue from its core lending business and approximately 160 million in revenue from Open Platform. This reflected a seemingly exceptional increase in revenue from the core loan book as compared to the prior year and quarter. (See supra ¶¶ 55-57). It appeared to show that Qudian was increasing its core loan book revenue while simultaneously adding an entirely new source of revenue in Open Platform.

130.    In the press release for these first quarter 2019 results, Defendant Luo touted Qudian's "record [first] quarter." In addition, Defendant Yeung explained that this ostensibly great performance was "a result of successfully growing our loan balance while managing risk appropriately," with the loan book growing 91.2% year-on-year, and Open Platform "already showing strong profit potential, generating RMB158.7 million in revenue for the first quarter with little marginal operational cost and zero credit cost."

131.    On the earnings call for the First Quarter of 2019, Defendant Luo stated that "a lot" of the Company's "growth for the rest of the year" would "come from the loan balance growth in the coming quarters [and] some new user growth" in the Company's core loan book, in addition to Open Platform.

132.    Defendants consistently described its approach to risk in its core loan book as "conservative." For example, Defendant Luo stated on the March 18, 2019 earnings call for the fourth quarter of 2018 that "[f]or the year, as a result of our commitment in delivering risk adjusted return and conservative risk management approach, our asset quality was kept within our target levels. During 2018, we made several calculated management decisions to make sure

asset quality was sustainable. First, we remained selective in serving new users in light of increased delinquency and elevated credit risk in the industry during early 2018."

133.     Similarly, on the May 20, 2019 earnings call for the first quarter of 2019, Defendant Yeung represented on this call that the purpose of Open Platform was to "grow beyond our loan book, right? because there's only so much risk appetite that this company is willing to take. And we had been overall quite conservative" in the core loan book.

134.     Furthermore, Yeung even went so far as to say on this call that "[s]ince, we don't underwrite the risk, we don't really care whether the -- where the losses are" in Open Platform—as opposed to the Company's more conservative approach to risk in its core loan book.

135.     Yeung also stated on this call that "the funding for sort of the core consumption credit part is there. The users are there. So there should be no problem growing." He also described the loan book business as "continu[ing] robust growth."

136.     These statement were false. In order to cover for the loss of Qudian's best borrowers from its core loan book to Open Platform, as well as the problems that its core loan business was already suffering, Qudian lowered its lending standards in its core loan book in late 2018 to the point at which at least 20% of the borrowers in the core loan book did not meet the Company's credit standards.

### G.     Defendants Unrealistically Raised Guidance in June 2019

137.     As Defendants saw Open Platform grow in the first half of 2019 and they continued to generate substantial revenue from the core loan book by lowering credit standards, they raised guidance in order to convey to the market that the Company had finally found its long-sought-after growth engine. On June 21, 2019, Defendant Luo stated:

> We are pleased to announce upwardly adjusted non-GAAP net income guidance for the full year based on encouraging trends in our business. Thanks to strong momentum in our open platform initiative, Qudian is generating a higher level of

no-risk, high margin incremental profits than we had anticipated. Additionally, given our sufficient funding and strong user demand, growth of our loan book is well ahead of our previously set targets, giving us strong confidence that we will meet our revised guidance. With the right growth strategy in place we are excited about Qudian's ability to deliver value for our shareholders.

138. Luo therefore raised the Company's total 2019 non-GAAP net income guidance for 2019 from greater than RMB3.5 billion, as announced on December 13, 2018, to over RMB4.5 billion.

139. CW 4 described Luo's raising guidance despite the problems with Qudian's business as consistent with this witness's impression of Luo based on CW 4's daily interactions with him. CW 4 observed that Luo "says random things" and that "[h]e just talks like that." This witness also relayed that former colleagues told CW 4 that they viewed the Company's raised guidance as "a very high forecast." CW 2 similarly described this guidance raise as consistent with the Company's approach to "blind innovations" that were viewed internally as a joke.

140. Defendants repeated this story when they announced the results for the second quarter on August 16, 2019. Qudian attributed its "solid second quarter results" to "strong momentum in our open-platform initiative and better-than-expected loan book growth, we are reaffirming our previously announced Non-GAAP net income guidance of RMB4.5 billion."

141. On the Q2 2019 earnings call, Luo stated that "[l]ike we said in the past quarter, we are committed and the focused on this consumer credit opportunity and ***both the loan book and open platform approaches*** are making strong inroads with our massive proprietary app-based user base."

142. Defendant Yeung also based the Company's performance on Open Platform working in tandem with the Company's core loan book. He assured that the Company was "carefully managing" the core loan book's "so-called trajectory so that we meet our guidance

numbers carefully."   He also explained that for the "really micro lending stuff," Qudian's funding partners "still want to stick with a loan book business, that we provide a underwriting service for" (i.e., by guaranteeing the risk of default).

143.    Analysts took Defendants at their word that Qudian would be able to achieve its guidance by continuing to focus on both its core loan book and Open Platform. For example, after Qudian raised its 2019 guidance, Morgan Stanley wrote on June 24, 2019, in a report titled "What to expect after upward revision to FY19 earnings guidance," that the "company plans to remain focused on the cash lending business with credit risks in 2019."

**H.**      **Qudian's Flawed Business Model Led to Its Poor Performance in the Second Half of 2019**

144.    When Qudian announced its results for the third quarter of 2019, on November 18, 2019, it reduced its full-year 2019 guidance—which it had just raised a few months earlier—from RMB 4.5 to RMB4.0 billion.

145.    Qudian's financial results from the third quarter of 2019 show how starkly its performance suffered.  Qudian was foreseeably unable to grow its core loan book in the way that it had earlier in 2019. The Company had only RMB 1.4 billion in revenue from its core loan book (including approximately RMB 800 million in "financing income" from its on-balance sheet loans and RMB 600 million in "loan facilitation income" from its off-balance loans).  This was a substantial decrease in revenue as compared to the prior quarter, when the Company had approximately RMB 1.6 billion in revenue from its core loan book:

| (In thousands except for number of shares and per-share data) | Three months ended September 30, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | |
| | (Unaudited) | (Unaudited) | (Unaudited) |
| | RMB | RMB | US$ |
| Revenues: | | | |
| Financing income | 960,207 | 797,879 | 111,627 |
| Sales commission fee | 35,650 | 69,873 | 9,776 |
| Sales income | 586,057 | 135,533 | 18,962 |
| Penalty fee | 9,047 | 10,993 | 1,538 |
| Loan facilitation income and other related income | 337,950 | 583,340 | 81,612 |
| Transaction services fee and other related income | - | 993,299 | 138,968 |
| Total revenues | 1,928,911 | 2,590,917 | 362,483 |

146.    Qudian attributed its significant (approximately 17%) decline in its "financing income," as compared to the third quarter of 2018, to "a decrease in average on-balance sheet loan balance." This was a direct result of Qudian's sending its highest-quality borrowers who sought larger loan balances to Open Platform.

147.    In addition, the Company's "new active borrowers" decreased substantially, from approximately 1.1 million people in the second quarter to under 700,000 in the third quarter. This was a result of the Company abruptly halting the Credit Trial Program after suffering devastating delinquencies because it had lowered credit standards. Qudian was therefore unable to continue replacing the borrowers that it was shifting over to Open Platform with poorer-quality borrowers in its core loan business.

148.    In total, Qudian recorded approximately RMB 1 billion in expenses related to its credit costs for poor-performing loans in just the third quarter, including operating costs and expenses, guarantee liabilities, and risk assurance liabilities:[10]

---

[10] In particular, Qudian's "Provision for Receivables"—which is the amount of losses that the Company was allocating or overdue loans—increased "by 136.4% to RMB691.1 million (US$96.7 million) from RMB292.4 million for the third quarter of 2018." The Company explained that "[t]he increase was primarily due to an increase in past-due on-balance sheet outstanding principal receivables compared to the third quarter of 2018." Qudian also booked approximately RMB 330 million in new guarantee and risk assurance liabilities for the third quarter of 2019. All of these amounts are attributable to Qudian's core loan book rather than Open Platform because Qudian did not guarantee the credit risk of loans in Open Platform.

| Operating cost and expenses: | | | |
|---|---|---|---|
| Cost of revenues | (698,519) | (206,336) | (28,867) |
| Sales and marketing | (120,071) | (65,538) | (9,169) |
| General and administrative | (48,233) | (65,069) | (9,104) |
| Research and development | (41,237) | (44,103) | (6,170) |
| Changes in guarantee liabilities and risk assurance liabilities[1] | (28,578) | (328,631) | (45,977) |
| Provision for receivables and other assets | (292,350) | (691,080) | (96,686) |
| Total operating cost and expenses | (1,228,988) | (1,400,757) | (195,973) |
| Other operating income | 2,886 | 29,425 | 4,116 |

----------

| LIABILITIES AND SHAREHOLDERS' EQUITY | | | |
|---|---|---|---|
| Current liabilities: | | | |
| Short-term borrowings and interest payables | 3,241,491 | 777,726 | 108,808 |
| Short-term lease liabilities | 11,957 | 18,373 | 2,570 |
| Accrued expenses and other current liabilities | 657,416 | 828,466 | 115,907 |
| Guarantee liabilities | 409,160 | 422,022 | 59,043 |
| Risk assurance liabilities | 760,313 | 1,083,721 | 151,618 |
| Income tax payable | 339,715 | 626,189 | 87,607 |
| Total current liabilities | 5,420,052 | 3,756,497 | 525,553 |

149. These skyrocketing credit costs were a natural consequence of 1 - the lower quality of borrowers in the core loan book because of the Credit Trial Program and 2 - Open Platform taking the top tier of approved borrowers. These losses were much worse than what Qudian had disclosed when it described the Credit Trial Program the prior quarter. Defendants stated in August 2019 that they were allocating RMB 500 million for losses for the entire core loan book (not just the Credit Trial Program). Qudian was now allocating twice that amount to overdue loans for just the third quarter of 2019. This RMB 1 billion in credit losses was even more startling because Qudian's revenue and total number of outstanding borrowers from the core loan book fell as compared to the prior quarter. This means that Qudian suffered *twice the amount of losses on a smaller pool of loans*.

48

150.    Delinquencies in the core loan book also rose substantially. Qudian disclosed after the third quarter of 2019 that its D1 delinquency rate (which is the delinquency rate for all overdue loans) in its core loan book rose from between 6% to 8% in the second quarter of 2019 to 12% by the time Qudian disclosed its third quarter results on November 18, 2019. In addition, as Defendant Yeung explained on the earnings call for the third quarter, the D1 delinquency rate for Open Platform in November 2019 was "significantly lower" than 10%. The following chart from Qudian's Management Presentation for the third quarter of 2019 shows its D1 delinquency rates:[11]



_____

[11] Yeung pointed out to an analyst that was confused by this chart that the lower line on the chart showing a 10% delinquency rate in November 2019 shows the *combined* delinquency rate for the core loan book and Open Platform together. He explained that the "Open [P]latform delinquency rate is significantly lower."

151.    On the earnings call for the third quarter of 2019, Defendant Yeung said that he was "not at liberty to disclose th[e] specific amount" of losses attributable to the Credit Trial Program, but revealed that the Company had stopped the program.  He stated that the Company's delinquency rate was "about 20% less" excluding the Credit Trial Program, "but we wouldn't disclose that number because I don't think it's meaningful."

152.    Analysts were stunned by Qudian's poor performance and attributed it to the previously unknown problems in the Company's core loan book. Macquarie Research observed in a November 20, 2019 note titled "Time to Pay the Bills" that "**Pinching the penny doesn't work.** We believe [Qudian's] strategy to fully exploit its existing user base has helped Qudian double its loan book with 21% lower SG&A costs over the past year. . . . The rising D-1 delinquency trend suggests that what has been saved in SG&A [*i.e.*, selling, general, and administrative expense] could now be translated into credit costs."

153.    Other analysts were also disheartened by the poor performance of Qudian's loan book. For example, Nomura explained in a November 20, 2019 note that Qudian's delinquency rates were increasing, "reflecting the ongoing deterioration in asset quality." Nomura also noted the zero-sum nature of Qudian's loan book being in tension with Open Platform, explaining that "[w]e think the size of its loan book business will gradually decrease as the company is shifting its focus towards the open-platform business. In fact, loan origination for its loan book business was down by 25% q-q and the total outstanding loan balance for its loan book business was down by 9% q-q for 3Q19." Nomura drastically cut its target price for Qudian's ADS by approximately 35%, from $10 per ADS to only $6.51,

154.    Similarly, in a November 18, 2019 note, Macquarie Research described Wall Street's surprise at Qudian's downward guidance and noted that the Company's "D-1

delinquency rate, the early indicator of asset quality, rose to 10-11% in September from 8-9% in June and broke the level of 12% in November." Macquarie also viewed Open Platform's success as "unlikely sustainable."

155.    Then, in its November 20, 2019 note titled "Time to Pay the Bills," described above, Macquarie noted the unusually high delinquency rates in Qudian's loan book, with a rate of 12% in the third quarter for on-balance sheet loans ("with new delinquency formation rising to 33% in 3Q19") and the problem "spill[ing] over to off-balance-sheet book, which is reflected in falling take-rate and rising losses on guarantee liabilities."  Macquarie took the view that Qudian would *completely exit this failing business*.

156.    At this point, Qudian attempted to assuage the market about its future prospects. When Qudian announced its results for the third quarter of 2019, Defendant Luo reassured investors that "I very much look forward to continue to share with you the remarkable and sustainable financial results and returns from our open platform initiative." Yeung also assured investors on this call that Qudian had the "strong conviction" that its rising delinquency rates would stop in the first quarter of 2020 because the Company had halted the Credit Trial Program, "and that quality will improve significantly into next year." (*See also infra* ¶¶ 336-41).

157.    Then, on November 25, 2019, after the market was extremely disappointed with Qudian's third quarter results, the Company held an emergency "Business Update Call" to try to calm investor concerns.  Yeung explained that "[w]e are perplexed, first of all, on how the market reacted. We think it's unreasonable . . . . [W]e are confident exceptional returns will be delivered in our platform."

158.    However, Qudian's business faced continued risks that resulted from the problems with its core loan book and Open Platform that Defendants had misrepresented throughout the Class Period.

159.    On January 16, 2020, Qudian announced that these risks materialized. That day, Qudian issued a press release stating "that the Company withdraws its fiscal 2019 guidance and will not issue guidance in the near term due to uncertainty related to the recent regulatory and operating environment." Qudian's worsening performance in the fourth quarter of 2019—on top of the surprisingly poor results that the Company had already announced for the prior quarter—was a result of its misrepresenting to investors that the core loan book had continued to grow alongside Open Platform while misrepresenting that Open Platform took the best borrowers from the core loan book and the extent to which the Company lowered its credit standards in the core loan book.

160.    Qudian announced its full-year 2019 results on March 18, 2020. By all measures, the Company's results were awful.  Its total revenue decreased by 25% from the third quarter of 2019. Each of the Company's three sources of loan revenue—including from on-balance sheet, off-balance sheet, and Open Platform—decreased substantially from the prior quarter (by approximately 21%, 10% and 35%, respectively) and the delinquency rate of the Company's loans again rose significantly. Qudian earned only approximately RMB 157 million in non-GAAP net income for the quarter, as compared to RMB 1.1 billion for the prior quarter.

161.    The Company's non-GAAP net income for 2019 was only RMB 3.4 billion for 2019 even though the Company had estimated as recently as November 2019 that it would earn RMB 4 billion (even after the Company lowered its earlier guidance of RMB 4.5 billion).

Qudian would have had to have earned approximately *five times* the net income that it did during the fourth quarter to meet even that recently lowered guidance.

162.   Qudian acknowledged on its earnings call for the fourth quarter of 2019, held on March 18, 2020, that "[i]f you look at our fourth quarter number, if we single out the open platform business, *we are actually experiencing a loss for our loan book business*."

163.   Moreover, the Company disclosed in its 2019 Annual Report (issued on April 27, 2020) how dramatically the delinquency rates of the Company's loans had risen. The Company's press release for its fourth quarter and full year 2019 results stated that its D1 delinquency rate had "risen to around 13% as of the end of the fourth quarter of 2019, from around 10% as of the end of the previous quarter." In addition, the "D1 delinquency rate doubled to 20% in February 2020 from approximately 10% for the third quarter of 2019." Qudian stated in its 2019 Annual Report that "[o]ur D1 delinquency rate was approximately 21% as of the end of the first quarter of 2020, and we expect to record higher provision for receivables and other assets and changes in guarantee liabilities and risk assurance liabilities for such quarter." The Company expected "a material loss in the first quarter of 2020." Qudian ended up allocating an additional 1.8 billion yuan to credit losses in the first quarter of 2020—on top of the 2.4 billion yuan that it had already allocated in the third and fourth quarters of 2019. This stands in stark contrast to the Company's prior assurances that its delinquency rates would improve in the first quarter of 2020. (*See supra* ¶ 156).

164.   In addition, when Qudian released its full-year 2019 results on March 18, 2020, it announced that Defendant Yeung was resigning from his position as CFO "due to personal reasons," effective that day.

## I.     Defendants Finally Admitted the True Nature of Open Platform

165.    When Qudian's fraudulent scheme began to collapse in the third quarter of 2019, Defendants finally acknowledged the true nature of Open Platform and how it was in competition with Qudian's core loan book.

166.    The core loan book's decline in revenue and sharp rise in delinquency rates during this quarter were a materialization of the risk that Defendants set in place by secretly lowering the Company's credit standards to such a degree that at least 20% of its loan balance was for borrowers that did not meet the Qudian's credit standards. Defendants also admitted for the first time the following additional aspects of its lending business that explained the Company's dramatic decline in performance in the third and fourth quarters of 2019.

### 1.     Qudian's Shift to Open Platform Was Motivated by Regulatory Concerns With Qudian's Core Loan Book

167.    Defendants finally admitted when discussing Qudian's third quarter of 2019 that the true purpose of Open Platform was to have a more regulatory compliant business model. Qudian needed to make this change to its business because its core loan book violated government regulations against conducting credit assessments for other financial institutions, the government severely restricted the scope of the Company's lending license, and other regulatory concerns posed a substantial threat to the viability of the core loan business.

168.    Defendant Luo explained in the November 18, 2019 earnings release that "[i]n the face of a complex and evolving regulatory framework over the past several years we have proven our ability to lead and innovate, creating China's leading regulatory compliant fintech company. Our past efforts in full compliance with Circular 141, restrained use of micro lending license, complete avoidance of P2P business model, 100% institutional funding base, disciplined approach to collection and respect of our customers' data privacy have all cumulated to our open

platform solution." He described Open Platform as "likely to be the ultimate form of regulatory compliant fintech in China."

169.     Defendant Luo made a substantially similar statement on the November 18, 2019, conference call for the third quarter of 2019, adding that "[w]e take regulatory compliance the number one priority" and that Open Platform is "very likely to be the ultimate form of regulatory compliant fintech in China."

170.     In addition, on the conference call for the third quarter of 2019, Defendant Yeung finally revealed that there were regulatory concerns motivating the shift to Open Platform.  He explained that Qudian was not "too interested in new forms of [lending] licenses" because "[w]e found a better way, the way where we do open platform, where we allow licensed lenders, 100% licensed lenders, to lend, we don't touch the loan from a lending perspective, but we just service the loan. It's probably the better way to conduct FinTech. And it just makes us sleep better at night. It should make all of our shareholders sleep better at night over time. So that's our direction to be a tech company."

171.     He also emphasized that "most importantly, most, most importantly, for us and all my funding partners, [Open Platform] is the most regulatory compliant structure because there is no third party involved in guaranteeing risk. Banks are doing exactly what they're supposed to do, lend and put stuff on balance sheet." This statement highlights Defendants' dual concern that regulatory pressure threatened the existence of Qudian's core loan book because of compliance concerns with its business model, and also because it prevented Qudian from obtaining the funding that the Company needed from its funding partners in light of their concerns with Qudian's regulatory compliance.

172. These regulatory concerns diverged drastically from Defendants' prior description of Open Platform as providing the next leg of growth that the Company had long sought to add to its core loan book.

173. After the market reacted very negatively to Qudian's revelations in the Third quarter of 2019 of the true nature of Open Platform, the Company held an emergency conference call on November 25, 2019 to address what Defendant Yeung described as "unreasonable volatility in our ADR trading prices." He said that the call was part of Qudian's continuous effort to be transparent" with investors.

174. Yeung explained on this call that the Company's focus on Open Platform was based on its "diligently interpreting regulatory directions," which led the Company to conclude that "the future of fintech in China is not about risk-taking. The existence of fintech is about putting together technology to help license regulated [financial institutions] do what they are supposed to do in the first place, namely, lending month and taking risk on it. We want to be clear we do not take risk or provide any implicit guarantees on open platforms."

175. He also explained that "[s]ince our inception in 2016, we have gone through stages of business and regulatory compliance upgrades from license-based lending to loan facilitation for financial institutions to now becoming a technology-based free driven platform. We take regulatory compliance as the number one priority and [are] highly conservative on risk-taking." Yeung thus finally admitted that Qudian had "found a better way through open platform to address the massive market opportunity from the emerging Chinese consumption credit." This statement acknowledged that rather than being a new line of business that would complement the Company's core loan book, Open Platform was a "regulatory compliance upgrade."

176.    Yeung similarly explained on this November 25, 2019 call that "[w]e are investing in the better business model and the technologies in a regulatory-compliant way to do things for the long term."

## 2.    Open Platform Took the Best Borrowers from Qudian's Core Loan Book

177.    Defendants also revealed after Qudian's poor results for the third quarter of 2019 that Open Platform was in tension with its loan book business because it took the best, highest-quality borrowers away from the core loan book.

178.    On Qudian's November 18, 2019 earnings call for the third quarter of 2019, Defendant Yeung revealed that Open Platform was reserved for Qudian's "higher quality borrowers." This was because now that the financial institutions that Qudian worked with would be taking on the risk of default in Open Platform, "the economics only makes sense to my funding partner if the loss rate is lower," which required sending them Qudian's highest-quality borrowers.  He acknowledged that the "open platform borrower numbers, as you can see, is about 1 million. It is a subset of our total outstanding borrower base of 6.3 million. . . .  [T]he high quality customers were there" already, prior to Open Platform. He said Open Platform "opened up a gold mine that was already in our ecosystem."

179.    Similarly, Yeung explained that Open Platform is "focused on the high-quality borrowers. . . .  [W]ith open platform, all of my good borrowers can now get access to the credit enhancement, get to a more appropriate credit size than before. So that's all it is, that's all it is, and these are the best quality borrowers."

180.    Open Platform's focus on the highest-quality borrowers from the Qudian's user base directly contradicted Defendants' prior descriptions of Open Platform drawing from the larger pool of Qudian's tens of millions of registered users. It also went against Defendants' prior

descriptions of the core loan book's conservative approach to growth alongside Open Platform. Because the best borrowers from Qudian's user base were being funneled to Open Platform, that left a lower quality of borrowers for the Company's core loan book. The only way that the core loan book could continue to contribute to the Company's revenue at the same levels as before was for it to lower its credit standards, leading to substantially higher delinquencies.

181.    Indeed, Qudian's 6.3 million total outstanding borrowers in the third quarter of 2019—after Qudian halted its Credit Trial Program—reflected a meager 3.4% increase from the prior quarter. Qudian told investors on its third quarter earnings call that 1 million of those borrowers were from Open Platform.  This means that 5.3 million were from the core loan book. In the second quarter of 2019, Qudian disclosed that it had 6.1 million total outstanding borrowers and (as it disclosed on its earnings call for the second quarter) 440,000 of those borrowers were from Open Platform.  This shows that while Open Platform's borrowers increased in third quarter, the *core loan book's borrowers decreased substantially* from approximately 5.7 million in the second quarter to 5.3 million in the third quarter. Even if the number of Open Platform borrowers was growing, that came at the expense of growth in Qudian's core loan book.

182.    In addition, Yeung acknowledged on the Company's emergency November 25, 2019 call to address investors' concerns following the Company's disastrous third quarter results, that Qudian suffered from higher delinquency rates in the third quarter of 2019 due to the Company's prior "proactive customer activation efforts"—in other words, its having lowered its credit standards in order to compensate for the problems in Qudian's core loan book. Now—after the third quarter of 2019—Qudian started to reveal the extent to which the Company relaxed its credit standards. Yeung stated that the Credit Trial Program accounted for "about probably 20%

from each angle [of Qudian's total loan balance] that are outstanding right now. So we did enjoy a very large uptake in [borrowers from the Credit Trial Program]." This 20% rate was a much higher proportion of Qudian's loan balance than Defendants had previously tied to the Credit Trial Program. (*See supra* ¶¶ 111-15).

183.    Yeung also admitted on Qudian's November 25, 2019 call that Open Platform is "a better business model" that focuses on the "highest-quality borrowers" and the "best-quality users."

184.    Moreover, Yeung responded to a question on this call concerning how the pool of approved borrowers in Open Platform compares with the Company's traditional loan book, by admitting that Qudian had not explained this to the market previously.  Yeung apologized to investors, stating, "***I'm sorry that this may not have been apparent to the market yet***, but it will be over time." He finally explained that "we've only allowed 5.5 million out of the 21 million [approved borrowers] access to open-platform."

185.    Yeung also admitted on this call that Qudian did not fully disclose delinquency information, which would have better alerted investors to how the Company had lowered its credit standards in the core loan book as a result of Open Platform.  He said, "I don't want to have the community track us on a day-to-day basis. Give us some room. We want to be transparent. We are already leading the industry in transparency, I think. So, whether we can do more? Let us -- give us some time to think about how we can be better at this. ***There's obviously still much work to do***" in being more transparent with investors.

### 3.    Open Platform Was Very Similar to Qudian's Prior Loan Facilitation Business and Was in Competition With the Core Loan Book

186.    Open Platform was very similar to the loan facilitation component of Qudian's core loan book.  The main difference was that Qudian did not guarantee Open Platform loans for

regulatory reasons. Open Platform's other differences from the core loan book stemmed from Qudian's decision to stop guaranteeing loans for regulatory purposes. Because the more-established financial institutions that Qudian worked with would now be taking on the credit risk in Open Platform, they demanded that Qudian send them its best borrowers. And while Open Platform offered higher credit limits than the core loan book, these higher loan amounts were offset by the fact that Qudian received a lower percentage fee on each loan in Open Platform because the Company was no longer taking on any credit risk.

187.    Moreover, contrary to Qudian's claim that it did not want to provide higher credit limits in its core loan book because it took a more conservative approach to that business, CW 4 explained that Qudian wanted to increase the loan size in its core loan book, but was unable to do so because of the "funding pressure" described above from Qudian's funding partners. This "put restrictions on what the company could do with its clients. For example, it couldn't raise its loan limit, because in case all clients requested larger loans, it would have a problem with its funds."

188.    At bottom, both Open Platform and Qudian's loan facilitation business involved Qudian receiving a fee for referring customers from its pool of approved borrowers to other financial institutions. Defendants finally disclosed the extent of this substantial overlap when discussing the Company's disappointing results for the third quarter of 2019.

189.    On Qudian's November 18, 2019 earnings call, Defendant Yeung revealed that the Company's core loan book would decline as a direct result of its overlap with Open Platform. He said that "[w]e expect [the drop in loan book business] to continue to drop in the Q4 and next year as we found a much better growth engine, the open platform. *We can do the same business*, focus on the high quality borrowers, earn an interesting fee and carry on growth."

190.   Yeung also admitted that 90% of the financial institutions using Open Platform had previously used Qudian's loan facilitation business and they switched to Open Platform because "it's the final form, it's a final shape and form of how fintech companies can work with banks. Regulatory compliance is a priority."

191.   Because Open Platform and Qudian's loan facilitation business in the core loan book were the "same business," with Qudian shifting its best borrowers to Open Platform, Qudian lowered its credit standards in the core loan book to compensate for the loss of business to Open Platform.

### 4.   Qudian Planned to Shift Entirely to Open Platform and Exit the Loan Book

192.   Because Defendants viewed Open Platform as the only viable path forward in the face of government regulations, they planned to shift their entire business to Open Platform. This was a very different strategy than Defendants' explanations earlier in the Class Period that they planned to continue the Company's core loan book in tandem with Open Platform.

193.   On the November 18, 2019 earnings call for the third quarter of 2019, Defendant Yeung revealed that Qudian "strives to be a technology company rather to be a lender. . . . all our focus now is to become a tech company. And I think that's a better way to go from the overall regulatory shifts and changes, our shareholders will be much more protected from any regulatory noise. . . . If the opportunity allows, if the opportunity really allows, we wouldn't have a loan book at all."

194.   Then, on the November 25, 2019 call where Defendants tried to soothe the market, Defendant Yeung admitted that Open Platform was "the final and long-term viable form of fintech in China. We have demonstrated well in our history we lead in regulatory compliance.

Focusing on this is *the only path to deliver sustainable results* and therefore long-term leadership."

195.    He also explained that by focusing on Open Platform, the Company was "investing in the better business model and the technologies in a regulatory-compliant way to do things for the long term."

196.    In sum, at the start of the Class Period, Qudian decided to focus on its consumer lending business and to stop its consistently unsuccessful projects outside of that core area. But Qudian's core loan book violated China's strict online lending regulations. This regulatory pressure threated Qudian's ability to continue its core loan book. Qudian therefore started Open Platform to address these regulatory concerns. During the Class Period, Defendants falsely portrayed its loan business as performing well based on the favorable results in both the core loan book and Open Platform. But Defendants misrepresented the regulatory problems with the core loan book that led the Company to start Open Platform, the fact that it diverted its best borrowers to Open Platform, and that its financial performance was actually the result of the Company lowering credit standards in its core loan book so much that at least 20% of its borrowers did not meet Qudian's credit standards. These misrepresentations started to come to light in the third quarter of 2019 when Defendants' untenable actions caused delinquency rates in the core loan book to spike and revenue to decline substantially.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

197.    During the Class Period, Defendants made statements that were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to Qudian's business and operations, which were known to Defendants or recklessly disregarded by them: (i) the core loan book violated Circular 141's prohibition on

Qudian conducting credit assessments on behalf of other financial institutions; (ii) the amount of loans that Qudian was permitted to make in the core loan book was severely limited when the government narrowed the geographic scope of the Company's lending license in May 2019; (iii) Qudian lowered its lending standards in the core loan book under the Credit Trial Program to such a degree that at least 20% of the loans in its core loan book were made to borrowers that did not meet Qudian's lending standards; (iv) Open Platform took the best, highest-quality borrowers from Qudian's user base, which hurt the core loan book's credit quality and its ability to perform alongside Open Platform; and (v) Open Platform was not a promising new line of business that Qudian added to its core loan book, but rather, was intended to address regulatory problems in the core loan book.

### A.     Defendants' False and Misleading Statements From the Fourth Quarter of 2018

198.     The Class Period begins on December 13, 2018 when Qudian issued a press release, during pre-market hours, announcing its financial guidance for 2019. This press release was filed with the SEC as an exhibit to a Form 6-K that was signed by Defendant Yeung.

199.     This press release assured investors that the Company's 2019 financial forecast accounted for a variety of factors and risks that could impact the Company's financial results, and was therefore a reliable estimate of the Company's 2019 financial results, stating, in relevant part:

> [B]ased on the Company's current operational outlook while acknowledging recent market conditions and macroeconomic performance indicators, as well as its preliminary expectations of its regulatory environment, customer demand, market conditions and operations in the near future, the Company expects that its total non-GAAP net income for the full year of 2019 will be greater than RMB3.5 billion, after excluding non-recurring costs and charges.

200.     This press release also quoted Defendant Luo as justifying the Company's earnings guidance as based on the Company's "continu[ing] to be well positioned in the

developing online small consumption credit space. Recent operating data continues to show strong user demand and risk-adjusted returns on track with our target. Our large and growing user base and fully institutionalized funding base provide strong visibility as to what we can achieve into next year."

201.   Luo also explained in this press release, the Company's increase in its share repurchase plan as "reflect[ing] *our confidence in our growth prospect* and our continuous commitment to enhancing shareholder value."

202.   The statements referenced in ¶¶ 199-201 above were materially false and/or misleading for the reasons set forth in ¶ 197 (i) and (iii), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions and Qudian lowered the credit standards in its core loan book to such a degree that at least 20% of its loans were made to borrowers that did not meet Qudian's lending standards.

203.   On March 18, 2019, Qudian issued a press release announcing its fourth quarter and full year financial results for fiscal year 2018. This press release was filed with the SEC on March 19, 2019, as an exhibit to a Form 6-K that was signed by Defendant Yeung.

204.   This press release reiterated the Company's confidence in its 2019 financial guidance that it gave on December 13, 2018, which it stated was "based on current market conditions and reflects the Company's preliminary expectations as to market conditions, its regulatory and operating environment, as well as customer demand."

205.   The statements referenced in ¶ 204 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (iii), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial

64

institutions and Qudian lowered the credit standards in its core loan book to such a degree that at least 20% of its loans were made to borrowers that did not meet Qudian's lending standards.

206.    This press release also quoted Defendant Luo assuring that "Qudian is a leader and pioneer to operate a purely institutional funding base of licensed lenders strictly under regulatory compliant annual interest rate and regulated lending activities happen between borrowers and institutions, ***meaning there are no material regulatory uncertainties for us***."

207.    The statements referenced in ¶ 206 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (v), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions and Open Platform was not a promising new line of business that Qudian added to its core loan book, but rather, was intended to address regulatory problems in the core loan book. Luo's statement that "there are no material regulatory uncertainties for us" was particularly false because Qudian was at the time violating Circular 141 and started Open Platform to address the regulatory problems in the Company's core loan book.

208.    Defendant Luo also described Open Platform as a successful example of how Qudian "will continue to undertake new challenges and investments where we believe further new growth areas may emerge" while "do[ing] so responsibly with the priority that our core consumption finance operations will not be interrupted and targets will be delivered."

209.    The statements referenced in ¶ 208 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Open Platform was not a "new growth area" that would allow Qudian's "core consumption finance operations [to] not be interrupted and targets will be delivered," but rather, was started to address regulatory problems

with the core loan book and detracted from the credit quality and performance of that core business.

210.    In addition, Defendant Luo touted that "[t]he fourth quarter of 2018 was the first full quarter following the termination of user engagement through Alipay's dedicated channel for online third-party service providers. Despite the termination, our registered users continued to grow to 71.8 million and outstanding borrowers grew to 5.3 million in this quarter, demonstrating that an innately affordable and attractive service does not require costly marketing or special channels to successfully grow."

211.    The statements referenced in ¶ 210 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii), including because Qudian grew its outstanding borrowers not through its "innately affordable and attractive service," but rather, by lowering the credit standards in its core loan book to such a degree that at least 20% of its loans were made to borrowers that did not meet Qudian's lending standards

212.    Qudian's March 18, 2019 Management Presentation described above (*see supra* ¶ 93), which Qudian posted on the Investor Relations section of its website, represented Open Platform as providing the Company with the ability to attain additional "growth beyond [the core] loan book" from Qudian's "massive dormant user base" of approximately 65 million registered users who were not currently borrowing from the core loan.

213.    The statements referenced in ¶ 212 above were materially false and/or misleading for the reasons set forth in ¶ 197(iv)-(v), including because Open Platform would not allow for "growth beyond [the core] loan book" from new, inactive registered users, but rather, was started to address regulatory problems with the core loan book and took the best borrowers from the core loan book.

214.    On March 18, 2019, Qudian held its conference call for the fourth quarter of 2018. Defendants Luo and Yeung continued to falsely describe the Company's business on this call.

215.    When discussing Open Platform, Luo stated that "[l]ooking into 2019, we are confident about our earnings outlook through activations in our existing user base and available funding."

216.    Luo also described "our open-platform initiative, [where] we recently started to refer transaction that we cannot fund to our licensed institutional lender partners, where we do not -- ...  undertake risk but earn a greater margin matching compared to traffic referral."

217.    The statements referenced in ¶¶ 215-16 above were materially false and/or misleading for the reasons set forth in ¶ 197(iv)-(v), including because Open Platform was started to address regulatory problems with the core loan book and took the best borrowers from the core loan book.

218.    Defendant Luo also stated, referring to Qudian's loan facilitation business in its core loan book, that "[o]n regulatory risks, there were various new regulations and guidance issued in 2018 for Internet finance. Yet, we are the first in the industry to shift from being a direct lender to being a pure platform assisting loans between borrowers and licensed institutional funding partners with annual interest rate kept under legal cap. Therefore, *there are no material regulatory uncertainties for us*. We successfully deepened our cooperation with existing funding partners in funding size and scope and secured 19 new funding sources compared with a year ago."

219.    The statements referenced in ¶ 218 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (v), including because Defendants were not satisfied that

there were "no material regulatory uncertainties for us." Indeed, Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions and Open Platform was started to address regulatory problems in the core loan book.

220.   Luo also stated on this call that "[f]or the year, as a result of our commitment in delivering risk adjusted return and conservative risk management approach, our asset quality was kept within our target levels. During 2018, we made several calculated management decisions to make sure asset quality was sustainable. First, we remained selective in serving new users in light of increased delinquency and elevated credit risk in the industry during early 2018."

221.   The statements referenced in ¶ 220 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(iv), including because Qudian did not have a "conservative risk management approach" and was not "selective in serving new users in light of increased delinquency and elevated credit risk." Rather, Qudian lowered its lending standards in the core loan book to such a degree that at least 20% of the loans in its core loan book were made to borrowers that did not meet Qudian's lending standards and Open Platform took the best, highest-quality borrowers from Qudian's user base.

222.   In addition, on this call, Defendant Yeung stated that "[o]ur *solid results were attributable to our growing user base, low operating costs, regulatory compliant operating structure and solid asset quality*. In 2018, our loan book saw growth of 69.9% year-on-year and this further demonstrated the strong demand from our users with reliable funding to serve. . . . We would [sic] delighted to see our outstanding borrower base reached 5.3 million following the termination of paid marketing on Alipay, while our sales and marketing expenses decreased 49.4% year-on-year for our core consumption finance business. This again proved our capability in sustaining user growth without reliance on expensive marketing."

223.     The statements referenced in ¶ 222 above were materially false and/or misleading for the reasons set forth in ¶ 197(i), (iii), and (v), including because Qudian violated Circular 141, it lowered its lending standards in the core loan book to such a degree that at least 20% of the loans in its core loan book were made to borrowers that did not meet Qudian's lending standards, and Qudian started Open Platform to address the regulatory problems in its core loan book.

224.     When discussing how Qudian would allocate its net income, Defendant Yeung stated that "*[g]iven our current regulatory compliant and stable operating structure*, we look to put more that cash into our product that design that we work with our funding partners."

225.     The statements referenced in ¶ 224 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (v), including because Qudian did not have a "regulatory compliant and stable operating structure." Indeed, Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions and Open Platform was started to address regulatory problems in the core loan book.

226.     In addition, Defendant Yeung strongly affirmed the Company's 2019 earnings guidance by explaining:

> We have a pretty good confidence in delivering 3.5 billion [in 2019]. ***The math to us was pretty simple. On an average loan balance, we're taking conservatively net take of roughly 13% to 15% using a mix of capital of our own money and external funding.*** If we're just to use our own money to lend from a bank to these borrowers, it would be excess of 20% returns. . . . ***So to achieve a RMB 3.5 billion, if you work through the back of the envelope, all we need to do is carry average loan balance of RMB 25 billion throughout the whole year. So we're pretty confident in delivering that number.*** But right now, our priority is to make sure as much as our profit is secured. So we're putting that cash to use right now [for share buybacks].

227.     The statements referenced in ¶ 226 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(iv) above, including because the "simple" math that Yeung

described did not account for the fact that Qudian diverted its best borrowers to Open Platform and lowered the credit standards in its core lending business.

### B.     Defendants' False and Misleading Statements in the 2018 Annual Report

228.     On April 15, 2019, Qudian filed its 2018 Annual Report on Form 20-F with the SEC. Defendant Luo signed the 2018 Annual Report.

229.     The 2018 Annual Report contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Luo and Yeung, certifying that the Report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," the financial information contained in the 2018 Annual Report was accurate, the Company's internal controls over financial reporting were designed effectively, and any material changes to the Company's internal controls over financial reporting were disclosed in the Report.

230.     The 2018 Annual Report misrepresented Qudian's regulatory compliance by stating, in a section titled "Economic Conditions and Regulatory Environment in China," that "[w]e will continue to make efforts to ensure that we are compliant with the existing laws, regulations and governmental policies relating to our industry and to comply with new laws and regulations or changes under existing laws and regulations that may arise in the future."

231.     The statements referenced in ¶ 230 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (v), including because Qudian was not "compliant with the existing laws, regulations and governmental policies relating to our industry." Indeed, Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions and Open Platform was started to address regulatory problems in the core loan book.

232.     The 2018 Annual Report described Open Platform as follows:

> In the fourth quarter of 2018, we launched an open platform for loan recommendations and referrals. The platform offers our large user base with more choices to satisfy their financial needs, while incurring no material cost of operations and no credit risk for us. For users that do not meet our credit requirements, we provide recommendations of financial products that are offered by financial service providers that participate on our platform. . . .  On the other hand, for users with better credit profiles that are applying for large loan amounts that exceed the limit permitted under our policy, we refer their applications to our institutional funding partners. We do not bear credit risk and receive commissions from our institutional funding partners for such referrals.

233.     The statements referenced in ¶ 232 above were materially false and/or misleading for the reasons set forth in ¶ 197(iv)-(v), including because Qudian started Open Platform to address regulatory problems in the core loan book and it was reserved for Qudian's best borrowers.

234.     The 2018 Annual Report also falsely described Qudian as complying with Circular 141's "restrictions on banks' collaboration with third parties in cash loan business." The Report described how, "[p]ursuant to Circular 141, a bank may not outsource its core business functions, such as credit assessment and risk management, to third parties" and then explained how "[w]e have entered into arrangements with several banks which directly fund credit drawdowns to borrowers. We refer to such banks qualified credit applications from borrowers, including our assessment of their credit profiles and our suggested credit limits. *They will then review the credit applications and approve credit for drawdown*."

235.     The statements referenced in ¶ 234 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (v), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions and Open Platform was started to address regulatory problems in the core loan book.

C.      **Defendants' Materially False and Misleading Statements From the First Quarter of 2019**

236.    On May 20, 2019, Qudian issued a press release announcing its financial results for the first quarter of 2019. This press release was filed with the SEC that day as an exhibit to a Form 6-K that was signed by Defendant Yeung.

237.    This press release affirmed the Company's confidence in its 2019 financial guidance that it gave on December 13, 2018 and March 19, 2019, which it stated was "based on current market conditions and reflects the Company's preliminary expectations as to market conditions, its regulatory and operating environment, as well as customer demand."

238.    The statements referenced in ¶ 237 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(iii), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions, the amount of loans that Qudian was permitted to make in the core loan book was severely limited when the government narrowed the geographic scope of the Company's lending license in May 2019, and Qudian lowered the credit standards in its core loan book to such a degree that at least 20% of its loans were made to borrowers that did not meet Qudian's lending standards.

239.    This press release quoted Defendant Luo as stating:

> ***We remained focused on growing our loan book steadily looking for exceptional risk-adjusted profits, while investing in our open-platform initiative launched in the third quarter of 2018 to drive additional profit growth***. Leveraging our affordable and streamlined product and service offerings as well as strong brand recognition, our registered users grew to 73.3 million during the quarter with minimal incremental marketing costs. Notably, new active borrowers grew to 523,979 from the fourth quarter of 2018

240.    The statements referenced in ¶ 239 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact

that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

241.    This press release also quoted Defendant Luo as stating that "[l]ooking ahead, we will continue to invest in our open platform and expand partnerships in funding and user engagement, fueling growth above and beyond the capacity of our balance sheet. Given the exciting and visible growth throughout these core business lines, we will stay focused on our technology-based consumption credit services."

242.    The statements referenced in ¶ 241 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

243.    Qudian's May 20, 2019 Management Presentation described above (*see supra* ¶ 94), which Qudian posted on the Investor Relations section of its website, continued the prior quarter's represented of  Open Platform as providing growth beyond the core loan book, and added a slide describing the core loan book as expanding "at Stable and Healthy Leverage."

244.    The statements referenced in ¶ 243 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

245.    Qudian held its earnings call for the first quarter of 2019 on May 20, 2019.

246.     On this call, Defendant Luo stated that "we did a good job last quarter in growing that new user by about 0.5 million and that's really again driven by -- its *always been too much demand*. And we always try to fight not letting too many people through the door because we do operate at the core business, a risk based thing. . . . So that is always been a way that we can drive new users and we never really spent money on sales and marketing and believe a better product should sell itself. . . . *[R]egarding growth for the rest of the year a lot of it will come from the loan balance growth in the coming quarters, some new user growth*, but I think the most exciting part is the open platform initiative."

247.     The statements referenced in ¶ 246 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Qudian did not have "too much demand" for its core loan book. Rather, the reasons set forth in ¶ 197(iii)-(v) above prevented Qudian from being able to profit from both the core loan book and Open Platform in the way that Defendants represented.

248.     Defendant Luo also stated that "*[o]ur core small more consumption finance business continues to deliver exceptional risk-adjustment profit driven by strong user demand and risk management capability*. First, on the user side. Since our thoughtful and streamlined product and service offering, as well as strong brand recognition, our registered users continued to grow to 73.3 million with a little additional marketing costs. In particular, our efforts to activate our dormant user base have paid off, evidenced by a sequential growth of 16.6% in new active borrowers."

249.     He also stated that the Company was stopping its Dabai Auto business because of "the exciting and reasonable growth outlook throughout our core business line."

250.    The statements referenced in ¶¶ 248-49 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Qudian's core loan book did not provide "***exceptional risk-adjustment profit driven by strong user demand and risk management capability***" or "exciting and reasonable growth." Rather, Defendants' misrepresented the fact that Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented

251.    In addition, Defendant Yeung stated on this call that "our open platform initiative has done a great job in Q1, we have a lot of hope that it would grow even faster in the upcoming quarters," while also saying that for the core loan book, "Yes, the funding for sort of the core consumption credit part is there. The users are there. So there should be no problem growing."

252.    The statements referenced in ¶ 251 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

253.    Yeung also represented on this call that the purpose of Open Platform was to "grow beyond our loan book, right? because there's only so much risk appetite that this company is willing to take. And we had been overall quite conservative" in the core loan book.

254.    Yeung even went so far as to say on this call that "[s]ince, we don't underwrite the risk, we don't really care whether the -- where the losses are" in Open Platform—as opposed to the Company's more conservative approach to risk in its core loan book.

255.    The statements referenced in ¶¶ 253-54 above were materially false and/or misleading for the reasons forth in ¶ 197(iii)-(iv), including because Qudian was not more conservative in its core loan book than in Open Platform. Just the opposite was true, because Qudian sent its best borrowers to Open Platform and lowered its credit standards in Open Platform.

256.    Yeung also stated that "our loan book grew by 91.2% year-on-year this demonstrated robust user demand and ample institutional funding. During this quarter, through successful efforts in testing and activating our dormant user base, new active borrowers increased by 16.6% from last quarter and contributed 18% of total active borrower. . . . While our loan book business continue[s] robust growth, our open platform initiative contributed meaningful revenue with little marginal operating costs and zero credit costs."

257.    The statements referenced in ¶ 256 above were materially false and/or misleading for the reasons set forth in ¶ 197(i) and (iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

258.    In addition, Yeung described Open Platform on this call as focusing on *lower quality* borrowers. He explained:

> So, we started traffic referrals so for **transactions that we may not have sufficient funding to do or we don't think the risk appetite is exactly right for us, but it might be right for some other players**. We do see CPC [cost-per-click]-based business where we send this user across to the other app. Okay, so that's kind of how we generate the CPC sort of advertising business. But then, our funding partners which are mostly banks came back and say "Well look. If you guys are so open minded about sharing your 70 million user base can we go beyond CPC, can we say you do some more work and you send the transaction over. And I'll happily to do a CPS [cost-per-sale] with you". So they're doing a revenue share with us. So that just took off, so we referred like 160,000 people to bank partners

in Q1, and totally we earned RMB159 million in revenues versus RMB30 million in Q4.

259.    The statements referenced in ¶ 258 above were materially false and/or misleading for the reasons set forth in ¶ 197(iv)-(v), including because Qudian started Open Platform to address regulatory problems in the core loan book and it was reserved for Qudian's best borrowers.

D.    **Defendants' Materially False and Misleading Guidance Raise on June 21, 2019**

260.    On June 21, 2019, Qudian issued a press release raising its financial guidance for 2019. This press release was filed with the SEC that day as an exhibit to a Form 6-K that was signed by Defendant Yeung.

261.    This press release stated that "based on its latest operational outlook and market conditions, *as well as preliminary expectations of the relevant regulatory environment in the near future*, the Company raised its total non-GAAP net income guidance for the full year of 2019 from greater than RMB3.5 billion, as announced on December 13, 2018, to greater than RMB4.5 billion."

262.    This press release also quoted Defendant Luo, who attributed the increased FY19 financial guidance to "encouraging trends in our business"; "strong momentum in our open platform initiative"; "a higher level of no-risk, high margin incremental profits than we had anticipated"; and that, "given our sufficient funding and strong user demand, growth of our loan book is well ahead of our previously set targets, giving us strong confidence that we will meet our revised guidance." Defendant Luo concluded by affirming that "[w]ith the right growth strategy in place we are excited about Qudian's ability to deliver value for our shareholders."

263.    The statements referenced in ¶¶ 261-62 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(v). All of these reasons related to regulatory

problems in Qudian's core loan book and its relationship to Open Platform made the Company's raising of guidance, and the reasons it gave to support that guidance, false and misleading.

      **E.**     **Defendants' Materially False and Misleading Statements From the Second Quarter of 2019**

264.    On August 16, 2019, Qudian issued a press release announcing its financial results for the second quarter of 2019. This press release was filed with the SEC on August 19, 2019, as an exhibit to a Form 6-K that was signed by Defendant Yeung.

265.    This press release affirmed the Company's 2019 financial guidance that it raised on June 21, 2019, which it stated was "based on current market conditions and reflects the Company's preliminary expectations as to market conditions, its regulatory and operating environment, as well as customer demand."[12]

266.    The statements referenced in ¶ 265 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(v), for the same reason that Qudian's prior raising of guidance on June 21, 2019 was false and misleading..

267.    This press release quoted Defendant Luo as stating that "[s]trategically, via our open-platform initiative we are further opening up our dormant registered user base beyond our loan book to financial institution partners who wish to grow their own loan book."

268.    The statements referenced in ¶ 267 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

---

[12]Defendant Yeung made substantially the same statement on the Company's earnings call for the second quarter of 2019 on August 16, 2019.

269.   This press release also quoted Luo as stating that "[i]n the second quarter we achieved new records in net income and borrower numbers and made great progress on our open-platform initiative . . . . [U]nderserved mass-market Chinese consumers are attracted to the affordable and seamless loans offered through our platform, creating overwhelming demand that drives natural traffic with minimal acquisition costs for us. As the end of the second quarter 2019, our registered user base grew to 76.0 million and total outstanding borrowers reached 6.1 million, both the highest in our Company's history."

270.   The statements referenced in ¶ 269 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

271.   In addition, this press release quoted Yeung as stating that "[w]e delivered another record Non-GAAP net income of RMB1,158.6 million, a 57.1% year-over-year increase as a result of our fast-growing user base, risk-free incremental profits from our open-platform initiative, low operating costs, regulatory compliant operating structure and solid asset quality . . . . Ow[e]ing to our massive under-tapped user base our open-platform initiative continued to prove its strong potential to become a major growth driver, generating RMB398.1 million in revenue for the second quarter with little marginal operational cost and zero credit risk."

272.   The statements referenced in ¶ 271 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and

therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

273.    Qudian's August 16, 2019 Management Presentation described above (*see supra* ¶ 79), which Qudian posted on the Investor Relations section of its website, falsely described the Company as compliant with applicable regulations. This presentation included a slide declaring that "Regulatory Compliant is Embedded in Our DNA," which described "key regulatory developments" such as Circular 141 and Qudian's key "compliance undertakings," including its obtaining a license to provide financing guarantee services.

274.    The statements referenced in ¶ 273 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(ii) and (v), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions, Qudian had its lending license severely restricted in May 2019, and Open Platform was intended to address regulatory problems in the core loan book.

275.    Qudian held its earnings call for the second quarter of 2019 on August 16, 2019.

276.    On this call, Defendant Luo stated that  "[w]ith the consumer lending industry in China sized at over RMB8 trillion, I continue to be excited by our prospects. ***Like we said in the past quarter, we are committed and the focused on this consumer credit opportunity and both the loan book and open platform approaches are making strong inroads with our massive proprietary app-based user base***."

277.    The statements referenced in ¶ 276 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and

therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

278.    Defendant Luo also stated on this call that "[i]n previous quarter, we have experienced that we do not need costly marketing to drive user growth. *We pride ourselves in having a competitive regulatory compliance fee* [sic] and a one-stop seamless user experience welcomed by young mobile centric and under-banked population. Our scalable and profitable platform *allows us to consistently catch the new and dormant users* using NPL [sic], allowing us to have an organic based user growth."

279.    The statements referenced in ¶ 278 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(ii) and (v), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions, Qudian had its lending license severely restricted in May 2019, and Open Platform was intended to address regulatory problems in the core loan book. The statements referenced in ¶ 278 were also materially false and/or misleading for the reasons stated in ¶ 197(iii)-(iv), including because Qudian lowered its lending standards in the core loan book and Open Platform was reserved for Qudian's best borrowers.

280.    Defendant Yeung stated on this call that Qudian reached "another milestone, achieving another record non-GAAP net income of RMB1.16 billion, up 57.1% year-to-year. *This came as a result of continuing to ramp up our risk-free open platform initiative and successfully growing our loan balance, while managing risk appropriately*. Particularly, our loan book grew by 91.8% year-on-year, demonstrating overwhelming user demand and ample institutional funding."

281.    The statements referenced in ¶ 280 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

282.    Defendant Yeung also stated that "*[s]ince 2019, we have made effective efforts to address evolving regulation and partnership landscapes*, and our share price performance has performed well to reflect the more positive sentiment. *With solid second quarter results driven by strong momentum in our open platform initiative and better-than-expected loan book growth, we have raised our original guidance* of RMB3.5 billion by 28.6% to RMB4.5 billion on a non-GAAP net income basis. And our second quarter earnings have again exceeded the Street consensus by 32.7%."

283.    The statements referenced in ¶ 282 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(v), including because these statements misrepresented the regulatory problems with Qudian's core loan book and the fact that it lowered its credit standards in the core loan book to cover-up for sending the best borrowers to Open Platform. Moreover, Qudian had no basis for providing this guidance in light of these underlying problems.

284.    Defendant Yeung also affirmed the Company's raised guidance , saying "again on guidance, we remain fully confident in our growth prospects given sufficient funding, strong user demand and ramp up of our open platform."  He thus tied the Company's growth to "sufficient funding" and "strong user demand" in the Company's core loan book in addition to the growth of Open Platform.

285.     The statements referenced in ¶ 284 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

286.     On this call, Defendant Yeung also affirmed that both Qudian's core loan book and Open Platform were regulatory compliant. He explained that "in our case, we've taken [regulatory compliance] to an even further step by not touching the loan in itself. . . . We don't touch that money. Just don't. . . . Now, that can be recorded as a financing income if it's our capital that is being invested through a bank, or a loan facilitation income if that capital happens to be bank's own capital."

287.     Yeung also told investors on this call that "[w]e stay away from anything that are susceptible to regulatory change."

288.     The statements referenced in ¶¶ 286-87 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(ii) and (v), including because Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions, Qudian had its lending license severely restricted in May 2019, and Open Platform was intended to address regulatory problems in the core loan book. .

289.     In addition, Defendant Yeung assured investors on this call that the Company was "carefully managing" its mix between its core loan book business and Open Platform "so that we meet our guidance numbers carefully."

290.     Yeung also explained that Qudian would continue to focus on both its loan book and Open Platform because "funding partners enjoy both types of business because it's really

about the user cohorts for the really micro lending stuff that they don't have the capability on, I think they still want to stick with a loan book business, that we provide a underwriting service for. But for risk that they begin to understand, especially for larger ticket size, I think that they are happy to go with the open-platform model. . . . So I think most of my partners like to do both, depending on the right user cohort."

291.    The statements referenced in ¶¶ 189-90 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(v), including because Defendants' misrepresented the fact that as a result of these reasons, Qudian lowered the credit standards in its core loan book and therefore could not profit from both the core loan book and Open Platform in the way that Defendants represented.

292.    Defendants also grossly misrepresented how Qudian had relaxed its credit standards and the true nature of the Credit Trial Program. On this call for the second quarter of 2019, Defendant Yeung falsely minimized the Credit Trial Program as a small program that was the equivalent of a marketing expense to acquire new borrowers. He explained that the Company had been "conservative" with its credit standards because "we have actually have a fairly large gap [of] about 40 million potential customers" out of Qudian's 76 million registered users "that did not meet the Company's credit standards and "that we've just been conservative on."

293.    Yeung also tried to pass the Credit Trial Program off as tantamount to a marketing expense. He explained on the second quarter 2019 earnings call that "we are proactively doing this so called [profit and loss] marketing method. And if we were to take out the [profit and loss] for marketing purpose. I think the delinquency rate on some of the back calculations we've done would have [decreased substantially to have] been just around 3.7% on M1+. And then just around 2.1% on the M6 charge-off. So pretty much stable like before. That's kind of how we

think about it." He characterized loans in the Credit Trial Program as "*really for sales and marketing purpose*."

294.    Defendant Yeung also described on this call Defendant Luo's discussion of the Credit Trial Program and explained that the program uses "our credit assessment model [and] identifies specific user cohorts to which we *extend very small [credit size] for a short duration to quickly gauge their credit behavior data and thereby can extrapolate risk profiles for multiple clusters of the test user group, gradually adding qualified users to our core user group.*."

295.    Yeung also explained when discussing the Credit Trial Program that an "[a]pproximately additional RMB500 million was provisioned in the quarter [for credit losses] and the outstanding borrower base from that effort on the loan book side increased by 12% to reach 6 million in one single quarter. *We continue to be conservative on our provisioning and operations*."

296.    The statements referenced in ¶¶ 292-95 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii)-(iv), including because Qudian lowered its lending standards in the core loan book under the Credit Trial Program to such a degree that at least 20% of the loans in its core loan book were made to borrowers that did not meet Qudian's lending standards, and because Qudian did this to hide the fact that it sent its best borrowers to Open Platform.

297.    In addition, Defendant Yeung affirmed the Company's raised guidance on this call by saying, "the second half momentum, I think will continue to be strong. *I don't see any sort of data or trends pointing otherwise*. So if you add up the first two quarters that we just completed, the first quarter's our non-GAAP net income was RMB970 million. We just did

RMB1.16 billion. So we were north of RMB2 billion already. So I think that's -- reaffirming my guidance. ***So I expect in the second half total combined Q3 and Q4, we should be able to deliver, around the numbers that can get us across the guidance line with good confidence. So I don't think there are any factors that point towards a specific slowdown yet. And I think that demand continues to be strong.***"

298.    The statements referenced in ¶ 297 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(v), including because these statements misrepresented the regulatory problems with Qudian's core loan book and the fact that it lowered its credit standards in the core loan book to cover-up for sending the best borrowers to Open Platform. Moreover, Qudian had no basis for reaffirming its guidance in light of these underlying problems.

**F.    Defendants' Materially False and Misleading Statements From the Third Quarter of 2019**

299.    On November 18, 2019, Qudian issued a press release announcing its financial results for the third quarter of 2019. This press release was filed with the SEC that day as an exhibit to a Form 6-K that was signed by Defendant Yeung.

300.    While Defendants began at this point to reveal the true nature of Open Platform and the problems with Qudian's business model, they continued to misrepresent to investors the extent of the problems.

301.    This press release based the Company's new 2019 guidance of  RMB 4.0 billion "on current market conditions and reflects the Company's preliminary expectations as to market conditions, its regulatory and operating environment, as well as customer demand."

302.    The statements referenced in ¶ 301 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(iii). Even though these statements represented a disappointing downgrade of Qudian's financial outlook, they still grossly overstated the

Company's true situation based on the full extent to which Qudian had lowered credit standards in, and  the regulatory problems with, Qudian's core loan book.

303.    This press release also stated that "[i]n our risk undertaking business, **we implemented a conservative strategy** of reducing credit volumes and paused our credit trial program. **Our proactive and prompt management of macro driven risk was effective in stabilizing the delinquency rates**. . . . [W]e **expect to continue a conservative approach on our risk-taking book into the final quarter of 2019 and thus revise our full year guidance accordingly**."

304.    The statements referenced in ¶ 303 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(iii), including because Qudian was not taking a "conservative" approach to risk in its core loan book. Defendants still misrepresented the full extent to which Qudian had lowered credit standards in, and  the regulatory problems with, Qudian's core loan book..

305.    On November 18, 2019, Qudian also held its conference call to discuss the results for the third quarter of 2019.  While Defendants also began to reveal on this call the true nature of Open Platform, Defendants falsely reassured investors concerning the extent of Qudian's problems.

306.    Defendant Yeung stated on this call regarding delinquencies in Open Platform, "I think we are going to start to see some pretty interesting good trends into Q1. Q4 will still be like a tail end of what's happening in 2019, but Q1, we should expect to see some fantastic results from doing all of this."

307.    The statements referenced in ¶  306 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(iii), including because Defendants still misrepresented the

full extent to which Qudian had lowered credit standards in, and  the regulatory problems with, Qudian's core loan book.

308.    Defendants also continued these misrepresentations when Qudian held its emergency "Business Update Call" on November 25, 2019, to address the market's concern with the Company's third quarter results.

309.    Defendant Yeung specifically justified Qudian's new guidance that it would earn RMB 4 billion for 2019 because Defendants were "quite comfortable that the risk curve will stabilize in Q4 and then it will roll back off in Q1 and Q2."

310.    Yeung described this new guidance as "conservative" based on "the control user activations drove delinquency up and more importantly, the tightened regulatory scrutiny we have observed against other players in the recent past few months, we wish to move in to be more conservative and be just in case, if other aggressive players have issues down the road."

311.    Similarly, Yeung stated, "Now you alluded to sort of where Q4 is pointed. As you can see from the guidance that if you take out the absolute dollars or net income we've made in the first three quarters, it's a conservative number. . . . So, I think Q4 is -- we'll probably look at a good loan balance growth, but on loan origination, it could be around flat from Q3 because Q3 was a big step up. Since it's early stage for open-platform, it's more of a step function of growth rather than a linear function for growth."

312.    The statements referenced in ¶¶ 309-11 above were materially false and/or misleading for the reasons set forth in ¶ 197(i)-(iii), including because Defendants still misrepresented the full extent to which Qudian had lowered credit standards in, and  the regulatory problems with, Qudian's core loan book.

313.     Yeung also justified Qudian's failed Credit Trial Program by explaining that it cost less than spending money on sales and marketing, and that "we are a dynamic company that knows how to navigate the changing landscape."

314.     The statements referenced in ¶ 313 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii), including because Defendants still misrepresented the full extent to which Qudian had lowered credit standards in Qudian's core loan book

315.     Defendant Yeung also assured investors that "as we paused [the] credit program," the rise in the Company's delinquency rate "just paused. And *we see that actually to improve over the next year. We have strong conviction the credit delinquency D1 will improve over the next years. . . quality will improve significantly into next year.*"

316.     He similarly told investors that because of the ending of the Credit Trial Program, the Company's rising delinquency rates and credit losses "will finish perhaps by the end of this year into the first quarter. *So that's why we are quite convinced that the D1 delinquency rate is now stable and now in fact dropped into potentially Q1 and Q2 next year.*"

317.     Yeung also assured that "as a result of our commitment to delivering risk-adjusted returns and *our overall conservative risk appetite*, we swiftly reduced credit volumes and paused credit trial programs. *The proactive management of market-driven risk was proven effective in stabilizing delinquency rates.*"

318.     The statements referenced in ¶¶ 315-17 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii), including because Defendants still misrepresented the full extent to which Qudian had lowered credit standards in Qudian's core loan book

319.     Defendant Yeung also tried to calm investor concerns on this call by stating that
"*risk remains well managed*" and "we expect to continue a *conservative approach on our risk-taking book into the final quarter of 2019*. Thus, revise our full year guidance accordingly to RMB4 billion."

320.     The statements referenced in ¶ 319 above were materially false and/or misleading for the reasons set forth in ¶ 197(iii), including because Defendants still misrepresented the full extent to which Qudian had lowered credit standards in Qudian's core loan book .

## VI.     THE TRUTH BEGINS TO EMERGE

321.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

322.     Throughout the Class Period, the price of Qudian securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

323.     The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

324.     On November 18, 2019, before the market opened, Qudian issued a press release announcing its financial results for the third quarter of fiscal 2019. This press release disappointingly reduced the Company's previously reported 2019 guidance by approximately RMB 0.5 billion. The press release advised that "[d]ue to recent strategy for the company to reduce risk-taking loan balance and focus on higher quality borrowers via open platform, the

Company has adjusted its expected total Non-GAAP net income for [FY19] to RMB4.0 billion, which will represent an approximately 57% increase from RMB2.55 billion for 2018."

325.    Qudian's results for the third quarter of 2019 were also disappointing because of the high delinquency rates of its loans and the particularly poor performance of its core loan book.  (*See supra* Section IV.H).

326.    In addition, Defendants began to reveal during Qudian's November 18, 2019 conference call discussing its third quarter 2019 results, the true nature of Open Platform as devised to address regulatory concerns rather being a promising new business line, and the extent to which the Company lowered its credit standards in the core loan book to hide the fact that it was diverting its best borrowers to Open Platform.  (*See supra* Section IV.I).

327.    Market analysts took note of Qudian's surprisingly poor results, the problems in Qudian's core loan, and the tension between the core loan and Open Platform that Qudian described at this time.   (*See supra* ¶¶ 152-55).

328.    For example, on November 18, 2019, Macquarie Research described Qudian's cutting of its 2019 guidance as "a surprise to the street."

329.    On the news of Qudian's third quarter 2019 results, Qudian's ADS price fell $1.58 per share, or 21.07%, on unusually high trading volume of approximately 28 million shares—which was over 6 times to the trailing 20-day average volume—to close at $5.92 per share on November 18, 2019.

330.    Qudian's share-price decline continued over the next three days as the market continued to absorb the impact of Qudian's lowering of guidance and the information that the Company disclosed with its poor third quarter results.

331.    On November 20, 2019, in a note titled "Time to Pay the Bills," Macquarie downgraded Qudian to "underperform" and cut its price target from $7 to $4 per ADS, an extraordinary reduction of 43%.

332.    Macquarie explained in its November 20 note that Qudian's "strategy to save costs by fully exploiting existing user base has now translated into higher credit costs for both on/off balance-sheet books."  Macquarie determined that Qudian's core "loan book, on or off balance-sheet, has exposed its weakness in risk management."  According to Macquarie, Qudian would be forced to "exit [its loan  book] business due to falling profitability and pressure from funding banks." Macquarie concluded that "the performance of its existing loan book has proven that the [Company's] business model is unsustainable."

333.    Similarly, on November 20, 2019, Nomura cut its target price for Qudian's ADS from $10 per share to $6.51, an astonishing 35% reduction. Nomura based  its assessment on Qudian's rising delinquency rates, which "reflect[ed] the ongoing deterioration in asset quality," and  Nomura's view that "the size of its loan book business will gradually decrease as the company is shifting its focus towards the open-platform business. In fact, loan origination for its loan book business was down by 25% q-q and the total outstanding loan balance for its loan book business was down by 9% q-q for 3Q19."

334.    Qudian's ADS price dropped 5.07% on November 19, 18.33% on November 20, and 10.68% on November 21, 2019, on unusually high trading volumes of approximately 10 million (approximately twice the 20-day average volume), 25 million (approximately 4 times the 20-day average volume), and 28 million shares (also approximately four times the 20-day average volume), respectively.

335.   Qudian's ADS price closed at $4.10 per share on November 21, 2019.   This reflected a total drop of $3.40 per ADS, or over 45% below the Company's ADS price of $7.50 per share at the close of trading on November 15, 2019 (the trading day before Qudian disclosed its third quarter results on November 18, 2019).

336.   Despite this large share price decline, Qudian's securities continued to trade at artificially inflated prices as a result of Defendants' misrepresentations and unduly optimistic statements when describing the Company's third quarter 2019 results.

337.   For example, Qudian lowered its 2019 non-GAAP net income guidance by only RMB 0.5 billion (from RMB 4.5 billion to RMB 4 billion) and assured investors that the Company was still on strong footing.

338.   Defendants further reassured investors by stating in Qudian's November 18, 2019, press release announcing the results for the third quarter of 2019 that "[g]iven a large disconnect between the strong momentum in our open-platform and  risk-free fee based business model and the market value of our company which is near net assets, we have announced another US$195 million of shares under our forward stock repurchase program, bringing our total buyback amount to US$572 million since we became a public company. This reflects our confidence in Qudian's growth prospects and upholds our commitment to creating shareholder value."

339.   Yeung also affirmed on this call Qudian's "strong conviction" that its rising delinquency rates would stop in the first quarter of 2020 because the Company had halted the Credit Trial Program, and "and that quality will improve significantly into next year."

340.   Defendant Yeung also reassured investors on the Company's November 25, 2019 "Business Update Call" that was held specifically to alleviate investor concerns, by stating that Qudian was undervalued and that "[w]e are perplexed, first of all, on how the market reacted.

We think it's unreasonable . . . . [T]here is a pretty large disconnect between the fundamentals and the value of the company. So, we've been consistently buying back."

341.    Similarly, Yeung assured investors on this November 25, 2019 call that "[w]e will continue to maintain the most transparent communication and disclosure standards in the industry. And we are confident exceptional returns will be delivered in our platform."

342.    Defendants also still did not disclose at this point the regulatory problems in Qudian's core loan book, including that 1 – it violated Circular 141 by improperly conducting credit assessments for other financial institutions, 2 – its microlending license was severely restricted in May 2019, and 3 – financial institutions stopped providing  it with funding because of substantial regulatory concerns.

343.    Then, on January 16, 2020, Qudian shocked the market by announcing "that the Company withdraws its fiscal 2019 guidance and will not issue guidance in the near term due to uncertainty related to the recent regulatory and operating environment." This press release blamed Qudian's withdrawal of its guidance on the claim that "China's online consumer finance industry was affected by several regulatory developments in the fourth quarter of 2019, including further restrictions on loan collection practices, more stringent user data privacy rules and the requirements for P2P lending platforms to orderly exit their P2P businesses," which had "reduced the availability of funding for consumer credit and driven up delinquency rates across the industry, including the Company's loan portfolio." Really, however, Qudian knew about these issues—including regulatory concerns and the exiting of P2P (*i.e.*, peer-to-peer) lenders— long before the beginning of 2020 and it did not explain what new developments came about in

the fourth quarter of 2019.[13] Qudian's worsening performance in the fourth quarter of 2019—even after its surprisingly poor results in the prior quarter—was a further result of the misrepresentations that Defendants made during the Class Period concerning the nature of Qudian's core loan book and Open Platform.

344.     Market analysts were shocked by this turn of events, particularly because Qudian had so adamantly affirmed its newly revised guidance less than two months before, on November 18, 2019.

345.     Nomura commented on January 22, 2020, that Qudian's "operating outcome is worse than expected," downgraded the Company to Reduce from Neutral, and cut its target price in half, from $6.51 per ADS to $3.08. Nomura observed that Qudian's announcement meant that "**any boost from its open-platform initiative from 1Q19 onwards will fade out faster than our expectation.**" (Emphasis in original.)

346.     Similarly, on January 17, 2020, Macquarie Research concluded based on Qudian's withdrawal of its guidance that "[t]hough we downgraded Qudian to UP and cut our earnings estimates on 22 November last year (Qudian (QD US) - Downgrade to UP: Time to pay the bills), we believe there could be more downside to our numbers, let alone the consensus."

---

[13] For example, Qudian had known for several years that Chinese regulators were eliminating P2P lenders from the market. Qudian had even billed this as a strength to its business because it did not consider itself a P2P lender.  On the Company's November 20, 2019 conference call for the third quarter of 2019, Defendant Yeung noted Qudian's "past efforts in the early adoption of Circular 141, complete avoidance of P2P business model, a 100% institutional funding base." He also acknowledged that the government's crackdown on P2P lenders started in 2017 and there was "another uptick with the P2P crack-down through the summer of 2018." Indeed, Qudian disclosed in its 2018 Annual Report, which it released on April 15, 2018, that the Chinese government had started regulating the P2P lending industry in 2015.  By the time of this report in April 2018, Qudian was already aware of a new government directive ordering that lenders "exit the peer-to-peer lending industry or cease operation." Qudian did not consider itself a peer-to-peer lender and in April 2017, it "ceased transferring credit drawdowns to P2P platforms."

347.    On this news, Qudian's ADS price fell $0.84 per share, or 19.13%, on unusually high trading volume of approximately 31 million shares—which was nearly five times the 20-day trailing average volume—to close at $3.55 per share on January 16, 2020.

348.    Qudian's stock price continued to fall over the next two days as the market fully absorbed the import of the Company's withdrawal of its financial guidance.

349.    On January 17, 2020, Qudian's ADS price fell by 0.85%, or $0.03 per ADS, on trading volume of approximately 16 million ADS (over twice the 20-day average volume).

350.    Then, on January 21, 2020, the next trading day, Qudian's ADS price fell by another 6.25%, or $0.22 per ADS, on trading volume of approximately 12 million ADS (over 1.5 times the 20-day average volume).

351.    In total, Qudian's ADS price fell 24.8%, or $1.09 per ADS, from $4.39 at the close of trading on January 15, 2020, to $3.30 per ADS at the close of trading on January 21, 2020.

352.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

353.    Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in ¶ 197 above for the reasons described in the Substantive Allegations section of this amended complaint.

354.    The Individual Defendants' actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which certified that the SEC filings, among

other things, "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Before vouching for the accuracy of the statements made in Qudian's SEC filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations of Qudian described therein.

355.    Luo's and Yeung's scienter are also established by their *admissions* after Qudian performed poorly in the third quarter of 2019 1 – that Open Platform was established to address regulatory concerns with the core loan book; 2 – that Open Platform took the best borrowers from Qudian's user base; 3 – of  the extent to which Qudian had relaxed its lending standards in the core loan book as part of its Credit Trial Program;  4 – that Open Platform and the core loan book target the same business; 5 – Qudian planned to shift its entire business to Open Platform; and 6 – that Qudian was not as transparent as it should have been about the composition of borrowers in Open Platform.

356.    In addition, Luo's and Yeung's scienter is further established by their decision to not even mention the fact that Qudian had relaxed its lending standards as part of the Credit Trial Program until a year after the program started in the third quarter of 2018. They chose instead to falsely describe Qudian's core loan book as taking a "conservative" approach to risk.

357.    Defendant Yeung's scienter is further established by CW 6, who described Open Platform as being Yeung's idea.

358.    Defendants' scienter is also established by the fact that Qudian had its microlending licenses severely restricted in May 2019, which was precisely the type of regulatory problem that posed an existential threat to the Company's core loan book.

359.    Defendants' scienter is also established by the stream of former employees who consistently described Qudian's core loan book as in crisis during the Class Period because of substantial regulatory concerns and concerns about its viability after the  loss of business from Ant Financial. These witnesses repeatedly described, among other information described above, that:

- Qudian's violation of Circular 141's prohibition on financial institutions outsourcing credit assessments to Qudian

- Regulatory pressure on Qudian's core loan book made financial institutions stop providing Qudian with funding and challenged the viability of the business;

- Qudian was in a crisis at the end of 2018, including because of the loss of business from Ant Financial, the failure of its projects outside of its consumer lending business, and the departure of its best employees; and

- Qudian described Open Platform as a promising new business for public relations purposes, but it was actually very similar to Qudian's loan facilitation business.

360.    Defendant Luo's scienter is further established by the statements of multiple former employees that he often spoke and acted recklessly, making proclamations and taking actions without any basis for doing so.  His scienter is also supported by press reports of his "history of making bold, and sometimes damaging statements."

361.    Defendants' scienter is also supported by Yeung's leaving the Company on March 18, 2020, immediately after Qudian suffered its disastrous performance from the third quarter of 2019 through the first quarter of 2020.

362.    Luo's scienter is further established by his financial motive based on his decision in March 2018 to "relinquish [his] salary and bonus until [Qudian's] market capitalization reaches US$100 billion." This highly unusual arrangement incentivized Luo to falsely portray

Qudian's business as having much more room for growth than it actually did during the Class Period, in order to buy more time for the Company to find a way to achieve those goals.

363.   In addition, Defendants Luo and Yeung were Qudian's two most senior executives.   Luo founded Qudian in 2014, has been its CEO since that time, and has been the Chairman of its Board of Directors its entire time as a public company.  He also owned 21.4% of Qudian's total ordinary shares and 73.1% of Qudian's aggregate voting power, as reported in Qudian's 2018 Annual Report. Yeung was Qudian's chief financial officer from October 2016 until his abrupt departure from the Company in March 2020. Luo and Yeung were also the two main executives who represented Qudian to investors for each quarterly report and conference call during the Class Period. They were, literally, the face of the Company, as shown in the following slide that Qudian included in its Management Presentations for the second and third quarters of 2019:



Defendants Luo and Yeung would therefore have had unique knowledge of Qudian's basic business strategies and concerns, including its concerns with the viability of its core loan book from a business and regulatory perspective, and the true nature of Open Platform.

364.   Luo's and Yeung's scienter is also established because the alleged misstatements and omissions at issue here concerned Qudian's core operations, including its *core* loan book and its Open Platform business that were the focus on the Company's  operations during the Class Period.  Indeed, Qudian announced on May 20, 2019, that it was focusing its attention on its "core business lines" of its loan book and Open Platform, and that "we will stay focused on our technology-based consumption credit services and have discontinued efforts outside of consumption credit opportunities." Defendants, by virtue of their roles in senior management and

involvement in Company's core operations, would have had knowledge of the true nature of the Company's core businesses during the Class Period.   In addition, Defendants had access to reports and communications describing these operations.

365.    Qudian itself had scienter as to the false and misleading nature of the statements described above based on the knowledge of the Individual Defendants, who were the Company's two most senior executives and part of the Company's management team. In addition, because the false and misleading statements at issue here relate to the Company's basic business model, the Company's scienter can be inferred because these statements would have been approved by corporate officials that knew they were false or misleading.

## VIII.   ITEM 303

366.    SEC regulations require that a company's quarterly and annual financial statements comply with item 303 of Regulation S-K (17 C.F.R. § 229.303, "Item 303"). Item 303 requires the disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

367.    To determine if a known trend or uncertainty must be included in a company's filings, the SEC has stated that companies should determine 1 – whether a trend, demand, commitment, event, or uncertainty is presently known to management and 2 – whether it is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

368.    The SEC has stated that the disclosure requirements of Item 303 apply to foreign issuers such as Qudian.

369.    For example, Item 5 of Form 20-F requires foreign issuers such as Qudian to disclose "any known trends, uncertainties, demands, commitments or events that are reasonably

likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."

370.    Defendants therefore had an independent duty to disclose the risk and uncertainty that its fundamental business model in its core loan book violated Chinese regulations and might have to be shut-down because of regulatory issues.

371.    Defendants also had an independent duty to disclose the true nature of Open Platform and the trends of which borrowers were populating Open Platform and the core loan book.

## IX.    NO SAFE HARBOR

372.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## X. CLASS ACTION ALLEGATIONS

373.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Qudian securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

374.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Qudian securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Qudian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

375.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

376.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

377.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Qudian;

- whether the Individual Defendants caused Qudian to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Qudian securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

378.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

379.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Qudian securities are traded in an efficient market;

- the Company's ADSs were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Qudian securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts

380.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

381.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United State*s, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.   COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

382.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

383.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

384.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Qudian securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Qudian securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

385.   Defendants also had a duty to disclose the material facts discussed above because they were known trends or uncertainties that were reasonably likely to have a material effect on the company's finances.

386.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Qudian securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Qudian's finances and business prospects.

387.   By virtue of their positions at Qudian, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.   Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.   In addition, each Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

388.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.   As the senior managers and/or directors of Qudian, the Individual Defendants had knowledge of the details of Qudian's internal affairs.

389.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Qudian.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Qudian's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Qudian securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning  Qudian's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Qudian securities at artificially inflated prices and relied upon the price of the

securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

390. During the Class Period, Qudian securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Qudian securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Qudian securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Qudian securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

391. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

392. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XIII.   COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

393.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

394.    During the Class Period, the Individual Defendants participated in the operation and management of Qudian, and conducted and participated, directly and indirectly, in the conduct of Qudian's business affairs.  Because of their senior positions, they knew the adverse non-public information about Qudian's  misstatement of income and expenses and false financial statements.

395.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Qudian's financial condition and results of operations, and to correct promptly any public statements issued by Qudian which had become materially false or misleading.

396.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Qudian disseminated in the marketplace during the Class Period concerning  Qudian's results of operations.

397.    In addition, the Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.

398.     Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Qudian to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Qudian within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Qudian's securities.

399.     Each of the Individual Defendants, therefore, acted as a controlling person of Qudian.  By reason of their senior management positions and/or being directors of Qudian, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Qudian to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Qudian and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

400.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Qudian.

## XIV.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XV.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.


Dated:  June 16, 2020                              Respectfully submitted,

                                                   **POMERANTZ LLP**

                                                   */s/ Michael Grunfeld*
                                                   Jeremy A. Lieberman
                                                   Michael Grunfeld
                                                   600 Third Avenue, 20th Floor
                                                   New York, New York 10016
                                                   Telephone: (212) 661-1100
                                                   Facsimile: (212) 661-8665
                                                   Email: jalieberman@pomlaw.com
                                                   Email: mgrunfeld@pomlaw.com

                                                   *Co-Lead Counsel for Co-Lead Plaintiff Juan Pablo di Benedetto and Galessi Holding Corp*


                                                   **KAHN SWICK & FOTI, LLC**

                                                   */s Kim E. Miller*
                                                   Kim E. Miller
                                                   J. Ryan Lopatka
                                                   250 Park Avenue, Suite 2040
                                                   New York, NY 10177
                                                   Telephone: (212) 696-3730
                                                   Facsimile: (504) 455-1498
                                                   Email: kim.miller@ksfcounsel.com
                                                   Email: j.lopatka@ksfcounsel.com

                                                   *Co-Lead Counsel for Co-Lead Plaintiff Pablo Greco*