UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN PABLO DI BENEDETTO, GALESSI HOLDING CORP., AND PABLO GRECO, Individually and On Behalf of All Others Similarly Situated,<br><br>                                 Plaintiff,<br><br>                        v.<br><br>QUDIAN INC., MIN LUO, and CARL YEUNG,<br><br>                                 Defendants. | Case No.: 1:20-cv-00577-GHW<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
QUDIAN INC., MIN LUO, AND CARL YEUNG'S MOTION TO DISMISS
PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

James G. Kreissman
jkreissman@stblaw.com
Stephen P. Blake
sblake@stblaw.com
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Counsel for Defendants Qudian Inc., Min
Luo, and Carl Yeung*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 4

QUDIAN'S RELEVANT DISCLOSURES ................................................................... 8

ARGUMENT ...................................................................................................................... 12

    I.     PLAINTIFFS FAIL TO ADEQUATELY ALLEGE ANY MATERIALLY
         FALSE OR MISLEADING STATEMENT OR OMISSION ....................................13

         A.     Qudian's Forward-Looking Statements Are Not Actionable Because They
               Are Protected By The PSLRA Safe Harbor.....................................................13

         B.     Plaintiffs Fail To Plead Any Actionable Non-Forward Looking
               Misrepresentations Or Omissions ...................................................................16

    II.    PLAINTIFFS FAIL TO PLEAD FACTS GIVING RISE TO A STRONG
         INFERENCE OF SCIENTER .........................................................................................28

         A.     Plaintiffs Fail To Adequately Allege Motive And Opportunity .....................29

         B.     Plaintiffs Fail To Allege Facts That Constitute Strong Circumstantial
               Evidence Of Conscious Misbehavior Or Recklessness ...................................30

          C.     The Totality Of Plaintiffs' Allegations Do Not Support A Finding Of
               Scienter .............................................................................................................34

    III.   PLAINTIFFS' SECTION 20(A) CLAIM MUST ALSO BE DISMISSED ...............35

CONCLUSION..................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................................... 12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................. 12, 13, 26

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019) ............................................................................ 18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................................... 12

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ....................................................................................... 16

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007) ............................................................................ 33

*Campo v. Sears Holdings Corp.*,
   371 F. App'x 212 (2d Cir. 2010) ................................................................................ 31, 32

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ............................................................................................ 35

*Chiarella v. U.S.*,
   445 U.S. 222 (1980) ......................................................................................................... 13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ....................................................................................... 20, 21

*City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*,
   No. 10 CV 00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ............................... 15

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) ................................................................................................ 4

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ................................................................................................ 13

*DeMaria v. Andersen*,
   153 F. Supp. 2d 300 (S.D.N.Y. 2001) ............................................................................ 27

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018) ................................................................. 13, 20, 35

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ........................................................................... 16, 29, 30

*Fogel v. Vega*,
    759 Fed. Appx. 18 (2d Cir. 2018) ................................................................................. 21

*Friedman v. Endo Int'l PLC*,
    No. 16-CV-3912 (JMF), 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) .................................... 16

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ..................................................................................... 5

*In re Adient plc Sec. Litig.*,
    No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) .................................... 16

*In re AT&T/DirecTV Now Secs. Litig.*,
    --- F. Supp. 3d ----, 2020 WL 4909718 (S.D.N.Y. Aug, 17, 2020) ................................. 32, 33

*In re Bank of Am. Corp. Secs., Deriv., and Employee Ret. Income Sec. Act (ERISA) Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010) ............................................................................. 26

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ............................................................................. 31

*In re Braskem S.A. Secs. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017) ............................................................................. 22

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996) ............................................................................... 27

*In re Citigroup, Inc. Secs. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) ......................................................................... 20, 30

*In re Facebook, Inc. Secs. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) ............................................................................ 21

*In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................................. 35

*In re MSC Indus. Direct Co., Inc.*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ............................................................................. 24

*In re Nokia Oyj (Nokia Corp.) Secs. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................................. 16

*In re Pfizer Inc. Shareholder Deriv. Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010) ............................................................................. 19

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
  729 F. Supp. 3d 569 (S.D.N.Y. 2010) ................................................................................................................ 28

*In re Sotheby's Holdings, Inc.*,
  No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ............................... 30

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................................................... 31

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ...................................................................................................................... 13

*In re Top Tankers, Inc. Sec. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007) ............................................................................................... 28

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) .................................................................................................................. 29

*Kas v. First Union Corp.*,
  857 F. Supp. 481 (E.D. Va. 1994) ...................................................................................................... 21

*Kinsey v. Cendant Corp.*,
  No. 04 Civ.0582, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004) ............................................ 35

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) ............................................................................................................ 4, 19

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  No. 07 Civ. 0976 (LAP), 2008 WL 4449280, (S.D.N.Y. Sept. 30, 2008) ....................... 13, 27

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................................................................. 12

*Lickteig v. Cerberus Capital Mgmt.*,
  No. 19-cv-5263-GHW, 2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) ............... 14, 25, 29, 30

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. Mar. 2, 2020) ......................................................................... 19, 32

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006) .................................................................................................................... 4

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................................................. 13

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................................................. 31

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) .................................................................................... 35

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ................................................................................................. 26

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996) ................................................................................................... 14

*SEC v. DiMaria*,
  207 F. Supp. 3d 343 (S.D.N.Y. 2016) .................................................................................. 12

*SEC v. Mudd*,
  885 F. Supp. 2d 654 (S.D.N.Y. 2012) .................................................................................. 30

*SEC v. Takeyasu*,
  Case No. 1:17-cv-4866-GHW, 2018 WL 2849777 (S.D.N.Y. June 11, 2018) ...................... 29

*Secs. Investor Protection Corp. v. Bernard L. Madoff Inv. Securities LLC*,
  505 B.R. 135 (S.D.N.Y. 2013) ................................................................................................. 4

*Shemian v. Research In Motion Ltd.*,
  No. 11 CIV. 4068 RJS, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ................................... 27

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................................................. 14

*Smallen v. W. Union Co.*,
  No. 17-CV-00474, 2019 WL 1382823 (D. Colo. Mar. 27, 2019) ........................................... 21

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................................................... 4

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ................................................................................................... 30

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) .................................................................................. 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................. 13, 29, 34

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................................................. 22

*Woodward v. Raymond James Fin., Inc.*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010) .................................................................................. 28

*Woolgar v. Kingstone Cos., Inc.*,
   No. 19-CV-5500 (RA), 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020) ................................... 32

**Federal Statutes**

15 U.S.C. § 78u-4 ......................................................................................................... 13, 29

15 U.S.C. § 78u–5 ......................................................................................................... 14, 15

Fed. R. Civ. P. 12 ............................................................................................................... 12

Fed. R. Civ. P. 9 ................................................................................................................. 12

Qudian Inc. ("Qudian"), its CEO Min Luo ("Luo"), and its former CFO Carl Yeung ("Yeung") (collectively, "Defendants") submit this Memorandum of Law in support of their motion to dismiss the Amended Class Action Complaint (Dkt. No. 44) filed by Lead Plaintiffs Juan Pablo Di Benedetto, Galessi Holding Corp., and Pablo Greco ("Plaintiffs").

## INTRODUCTION

Qudian is one of China's leading providers of consumer "micro-loans."  Individuals—often with limited or weak credit histories—borrow from Qudian to purchase items such as cell phones or computers, similar to how consumers in the United States might use credit cards. Qudian thus provides an important and underserved community in China with access to capital.

This case centers around Qudian's fiscal 2019 earnings guidance.  In December 2018, Qudian projected RMB 3.5 billion in 2019 non-GAAP net income.  It outperformed its own expectations for the first half of 2019, earning over RMB 2 billion in that period.  Qudian then increased its full year forecast to RMB 4.5 billion.  Soon thereafter, a downturn in China's credit markets and major regulatory changes significantly harmed Qudian's business.  As a result, Qudian earned RMB 3.4 billion in fiscal 2019, 31.5% higher than the prior year and just short of its initial RMB 3.5 billion target, but well short of its mid-year guidance.

Plaintiffs' initial complaint alleged securities fraud based on Qudian's failure to meet its 2019 earnings guidance.  But missed guidance is a far cry from securities fraud.  Such misses are quite common, given the difficulty of forecasting, particularly for businesses in volatile industries.  Therefore, earnings guidance and other forward-looking statements are protected from litigation by the safe harbor of the Private Securities Litigation Reform Act ("PSLRA").

Undoubtedly cognizant of this obstacle, Plaintiffs then filed a byzantine, 111-page amended complaint ("AC") that seeks to recast their missed guidance claim as a claim of financial fraud, alleging that Defendants misrepresented the nature of Qudian's regulatory risks,

business model, and credit standards.  However, the AC similarly fails to pass muster because it does not come close to pleading *specific facts* that either show an actionable false statement or omission or give rise to a strong inference of scienter.  Moreover, Defendants' public statements, relied on by the AC, instead show that the allegedly omitted risks were clearly disclosed, both prior to and during the class period.  Plaintiffs' claims therefore fail for numerous reasons.

**Qudian's Forward-Looking Statements Are Protected by the PSLRA Safe Harbor**: The AC alleges fraud in connection with classic forward-looking statements, such as future earnings guidance.  These statements are not actionable under the PSLRA safe harbor because (i) the AC fails to plead that these statements were made with *actual knowledge* of their falsity, and (ii) all of the projections were accompanied by meaningful cautionary language.

**No Materially False or Misleading Statement or Omission**:  The AC's reliance on non-forward-looking statements fares no better.  It alleges three types of such misrepresentations or omissions, each of which fails.  ***First***, Plaintiffs claim Qudian failed to disclose two regulatory problems: (i) that one of the licenses it used in its primary micro-lending business, known as its core loan book ("CLB"), was restricted in May 2019 and (ii) that Qudian was violating Circular 141, a Chinese regulation restricting the ability of banks to rely on credit assessments from third-parties.  Both of these allegations fail.  Qudian informed investors that it had *stopped using* the license in question in December 2017, a year *before* the class period began.  Similarly, the Company disclosed for years that it was providing credit assessments to banks and that this practice could be found to violate Circular 141—a new regulation whose interpretation was uncertain.  Moreover, Plaintiffs fail to allege that, even to this day, the Chinese government has either accused Qudian of violating Circular 141 or found it liable for having done so.

***Second***, the AC claims that Qudian inaccurately described its "Open Platform" ("OP")

business, launched in late 2018, which connects consumers on Qudian's platform with third-party lenders.  The AC claims that Qudian described its OP business as a new source of revenue when it was merely a rebranding of part of its existing CLB business.  However, the AC itself contradicts this claim, explaining that the CLB business (a lending business) exposed Qudian to credit risk in the event of borrower default, while the OP business (a commission-based loan placement business) did not.  Thus, Plaintiffs' rebranding assertion fails.

Plaintiffs further argue that Qudian failed to disclose that the OP business would divert Qudian's best borrowers from its CLB business.  In fact, Qudian disclosed that certain CLB borrowers would migrate to the OP program, explaining that banks lending through the OP could choose either existing CLB borrowers or consumers who had not met Qudian's prior lending criteria.  Moreover, the complaint contains no well-pleaded facts suggesting that the OP business took the highest-quality borrowers from the CLB.  Instead, the statements relied on by the AC for this proposition demonstrate only that one purpose of the OP business was to allow certain of Qudian's higher quality borrowers access to *larger loans than those Qudian was willing to offer as part of the CLB*.  Thus, by definition, such loans could not have been part of the CLB.

***Finally***, Plaintiffs allege that Qudian failed to disclose the launch of a CLB "credit trial program" in late 2018 that "furtively lowered [its] credit standards" and fueled unsustainable growth.  This allegation fails because Qudian *did* inform investors prior to the class period that it would relax its credit standards in the fourth quarter of 2018 and also disclosed the program in detail during the class period.  Moreover, because Qudian had never disclosed its precise credit standards, it had no obligation to disclose the specifics of any modifications to those standards.

<u>**No Scienter**</u>: The AC should also be dismissed for the separate and independent reason that Plaintiffs fail to allege particularized facts giving rise to a strong inference of scienter, as

required under the PSLRA.  Plaintiffs plead no stock sales or other facts supporting motive and

opportunity to commit fraud.  They likewise fail to plead any facts giving rise to a strong

inference that Defendants consciously or recklessly made any alleged misstatement.  Rather,

Plaintiffs rely entirely on allegations that are insufficient to show scienter as a matter of law,

such as Luo's and Yeung's corporate positions, their signing of SEC filings, supposed

"admissions" that admitted no wrongdoing, and a confidential witness who did not even work at

Qudian during the class period.  Rather than raise a "strong inference" of scienter, the AC

compellingly shows that Qudian prospered in 2019, while performing slightly worse than

initially expected in the face of a credit slowdown and negative regulatory developments.

## FACTUAL AND PROCEDURAL BACKGROUND

The Company:  Qudian is a leading provider of small consumer loans in China.  AC ¶¶ 2,

28.[1]  Founded in 2014, it originally focused on college campus lending, before switching to

---

[1]  All facts set forth herein are drawn from the AC, materials incorporated by reference therein, or publicly available documents properly subject to judicial notice.  As the Second Circuit has explained, matters properly considered at the pleading stage include the facts alleged in the complaint, "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  "[A]llegations contradicted by documents incorporated into the pleadings by reference need not be accepted as true."  *Secs. Investor Protection Corp. v. Bernard L. Madoff Inv. Securities LLC*, 505 B.R. 135, 141 (S.D.N.Y. 2013).  Courts have noted that "it is highly impractical and inconsistent with Fed. R. Evid. 201 to preclude a district court from considering such documents when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions," because, "[w]ere courts to refrain from considering such documents, ***complaints that quoted only selected and misleading portions of such documents*** could not be dismissed."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (emphasis added).  "Similarly, when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  Finally, Defendants request that the Court take judicial notice of certain media reports of regulatory developments for the fact of their publication.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously held that it is proper to take judicial notice of the fact that press coverage,

online lending in 2015.  *Id.* ¶¶ 31-32.  Qudian completed its initial public offering in October

2017, with its ADRs trading on the New York Stock Exchange.  *Id.* ¶¶ 23, 29.

Qudian's FY 2019 Guidance.  Qudian provided 2019 guidance on December 13, 2018,

AC ¶ 198, stating, based on "preliminary expectations of its regulatory environment, customer

demand, market conditions and operations in the near future, the Company expects that its total

non-GAAP net income for the full year of 2019 will be greater than RMB3.5 billion."  *Id.* ¶ 199.

Its PSLRA "Safe Harbor Statement" set forth extensive cautionary language, explaining that:

> This announcement contains forward-looking statements.  These statements are
> made under the "safe harbor" provisions of the United States Private Securities
> Litigation Reform Act of 1995 . . . .  Forward-looking statements involve inherent
> risks and uncertainties.  ***A number of factors could cause actual results to differ
> materially from those contained in any forward-looking statement***, including but
> not limited to . . . Qudian's future business development, financial condition and
> results of operations . . . [and] Qudian's expectations regarding keeping and
> strengthening its relationships with borrowers, institutional funding partners . . .
> and other parties . . . .  ***Further information regarding these and other risks is
> included in Qudian's filings with the SEC***.

Declaration of James G. Kreissman ("Kreissman Decl.") ¶ 2, Ex. A at 1 (emphasis added).

Qudian's later press releases and analyst calls discussing guidance contained almost identical

language.  *See, e.g.*, Kreissman Decl. ¶¶ 3-7, Exs. B-F (2019 earnings releases and Nov. 18, 2019

analyst call at 1).

Qudian's performance in the first half of 2019 was quite robust, with over RMB 2 billion

in non-GAAP net income—over half the December 2018 full year guidance of RMB 3.5 billion.

AC ¶¶ 128, 297.  As a result, on June 21, 2019, Qudian increased its full-year guidance to RMB

4.5 billion.  *Id.* ¶¶ 260-61.  However, soon thereafter, the Company's growth slowed, following a

downturn in Chinese credit markets and a series of industry-wide regulatory developments,

---

prior lawsuits, or regulatory filings contained certain information."); *Garber v. Legg Mason, Inc.*,
347 F. App'x 665, 669 (2d Cir. 2009) (considering media articles).

including significant restrictions on debt collection practices and "P2P" (peer-to-peer) lending and new data privacy regulations. *See* Kreissman Decl. ¶ 7, Ex. F at 1 (discussing "overall industry credit weakening driven by macroeconomic environment" and "reduced liquidity, as non-compliant players exit" after regulatory actions concerning "the nationwide P2P wind-down, collection practices and user data privacy"). [2]

As a result, in Q3 2019, Qudian merely kept pace with its first half of 2019 results, earning approximately RMB 1 billion in non-GAAP net income, and bringing its total net income for Q1-Q3 2019 to approximately RMB 3 billion. Kreissman Decl. ¶ 6, Ex. E (Nov. 18, 2019 Press Release) at 2. In light of industry headwinds, Qudian reduced its full-year 2019 net income guidance from RMB 4.5 billion to RMB 4 billion on November 18, 2019. AC ¶ 144.

Qudian's business continued to slow in the fourth quarter of 2019 as the credit and regulatory environments deteriorated further. Echoing the same three factors noted above, Qudian stated in a January 16, 2020 press release withdrawing its guidance that:

> "China's online consumer finance industry was affected by several regulatory developments in the fourth quarter of 2019, including further restrictions on loan collection practices, more stringent user data privacy rules and the requirements for P2P lending platforms to orderly exit," which "reduced the availability of funding for consumer credit and driven up delinquency rates across the industry."

AC ¶ 343 and n.13 (quoting January 16, 2020 press release).[3]

---

[2] While Qudian is not a P2P lender, the restrictions on P2P lending adversely affected Qudian's business because they limited consumers' access to capital through P2P lending that could be used to repay non-P2P loans, thus driving up delinquency rates across the online consumer finance industry. *See* AC ¶ 343 and n.13 (quoting January 16, 2020 press release).

[3] These regulatory developments were reported in numerous public articles. For example, in late 2019, Chinese police raided dozens of P2P lenders, debt collection companies, and third-party data providers in connection with the regulatory developments discussed above. *See, e.g.*, Kreissman Decl. ¶ 8, Ex. G.10 (describing highly publicized raid of Chinese Fintech company 51 Credit Card); *id.*, Ex. G.13 (describing crackdown on consumer data providers); *id.* ¶ Ex. G.6 (describing dramatic impact of government crackdown on P2P lenders). Several regulatory pronouncements also formally imposed restrictions at this time. *See, e.g.*, *id.*, Exs. G.2, G.8, G.9

On March 18, 2020, Qudian announced its full-year results.  AC ¶ 160.  Its net income of RMB 3.4 billion was just shy of its original RMB 3.5 billion projection and represented a healthy 31.5% increase from the prior year.  *Id.* ¶¶ 128, 169.  Revenues also grew to RMB 8.8 billion, a 14.9% annual increase.  *See, e.g.*, Kreissman Decl. ¶ 9, Ex. H (March 18, 2020 Press Release) at 2.  Moreover, as shown below, 2019 represented the fourth consecutive year of revenue and net income growth at Qudian.  *See, e.g.*, Kreissman Decl. ¶ 10, Ex. I (2019 20-F) at 1-2.



Plaintiffs' Claims In This Lawsuit.  On January 22, 2020, Plaintiffs filed their original complaint in this action, asserting plain vanilla missed guidance claims.  In that complaint, Plaintiffs alleged that "Qudian's business was unprepared to mitigate the risks associated with [] regulatory changes," which "made Qudian's repeated assertions concerning its FY19 financial guidance unrealistic."  Dkt. 1 ¶ 4.  On June 17, 2020, Plaintiffs filed the AC, which brings claims under Section 10(b) of the Exchange Act and Rule 10b-5 and control person claims under Section 20(a), AC ¶¶ 383, 498, on behalf of a putative class who acquired the ADRs between December 13, 2018 and January 15, 2020.  *Id.* ¶ 1.  The AC reasserts the missed guidance claims and attempts to add claims that are not subject to the PSLRA safe harbor.  Dkt. 44.  In its rather opaque 111 pages, the AC adds alleged misrepresentations and omissions in three areas:

(describing new P2P lending and personal data regulations).  An index of news articles reporting these events is attached as Exhibit G.1 to the Kreissman Declaration.

- Regulatory developments, including Qudian's alleged failure to disclose (a) restriction of one of its micro-lending licenses, AC ¶¶ 71-74, and (b) that it violated Circular 141 by providing credit assessments to potential lenders, *id.* ¶¶ 66-70;

- Misstatements concerning the nature and purpose of the OP, including an alleged failure to disclose that the OP was merely a rebranding of a portion of the CLB business and that it was taking the best borrowers from the CLB, *id.* ¶¶ 82-106; and

- Failure to disclose Qudian's 2019 credit trial program and its implications. *Id.* ¶¶ 107-18.

As set forth below, Qudian disclosed all of the allegedly concealed information.

## QUDIAN'S RELEVANT DISCLOSURES

<u>Impact of Regulations, Including Circular 141, on Qudian's CLB and Licensing</u>

<u>Structure</u>.  Qudian's annual disclosures on Form 20-F and other SEC filings clearly disclosed that Qudian was a new company operating in an uncertain, volatile regulatory and financial environment.  For example, in Qudian's April 9, 2018 Form 20-F for 2017, the Company stated that "*[w]e have a limited operating history in a new and evolving market, which makes it difficult to evaluate our future prospects,*" explaining that:

> The regulatory framework for this market is also evolving and may remain uncertain for the foreseeable future . . . . If our business practices or the business practices of our institutional funding partners are deemed to violate any PRC laws or regulations, our business, financial condition, results of operations and prospects would be materially and adversely affected.

Kreissman Decl. ¶ 11, Ex. J (2017 20-F) at 4.  Qudian repeated these warnings throughout its disclosures.  *See, e.g.*, Kreissman Decl. ¶ 12, Ex. K (2018 20-F) at 4, 10 (same).

Qudian's principal area subject to regulatory uncertainty was the CLB, under which Qudian partially or fully guaranteed small loans to consumers, with an average loan size of roughly US $150-$250.  2017 20-F at 62.  Qudian historically funded these loans through (i) two Qudian online "small credit" entities licensed to make loans, AC ¶¶ 71-72; (ii) trust arrangements; or (iii) funding obtained from institutional partners (*i.e.,* banks).  2018 20-F at 5,

9.  Qudian bore credit risk for these loans, absorbing all or part of the loss in the event of default, and agreeing to indemnify its partners.  *Id.* at 8, 63-64.

    <u>Reliance of Lending Licenses</u>.  Beginning in late 2017, Qudian significantly changed its lending structure.  Qudian disclosed that by "December 2017, [Qudian's] two online small credit companies ha[d] been subject to inspections by the local regulatory authorities." 2017 20-F at 12.  As a result, Qudian "ceased funding credit drawdowns through [its] online small credit companies since December 2017, and . . . facilitated credit drawdowns through other funding arrangements."  *Id.*  Thus, after December 2017, Qudian *only* funded loans through trusts and institutional funding partners.  *See id.* at 5 ("we currently rely on institutional funding partners and trusts established in collaboration with trust companies to fund . . . credit drawdowns"); 2018 20-F at 9 ("We historically funded credit drawdowns through online small credit companies . . . ."); Kreissman Decl. ¶ 7, Ex. F at 10 ("We started our business with 2 proper micro Internet lending licenses . . . we've had a pretty restrained use ***and froze them*** . . . .") (emphasis added).

    <u>Circular 141</u>.  On December 1, 2017, Chinese regulators promulgated the Circular on Regulating and Rectifying Cash Loan Business, known as "Circular 141."  2017 20-F at 16, 87; *see* AC ¶¶ 3, 61-62.  As the AC explains, and as Qudian disclosed in each of its annual reports on Form 20-F, Circular 141 "'provides restrictions on banks' collaboration with third parties in cash loan business,'" including that "'[a] bank may not outsource its core business functions, such as credit assessment and risk management, to third parties'" and "'[a] bank participating in loan facilitation transactions may not accept credit enhancement services from a third party which has not obtained any license or approval to provide guarantees, including credit enhancement service in the form of a commitment to assume default risks.'"  AC ¶ 62 (quoting 2018 20-F).

    Qudian disclosed that it continued to provide credit assessment services to banks

following the issuance of Circular 141.  AC ¶ 67; *see, e.g.*, 2018 20-F at 13 ("We have entered

into arrangements with several banks which directly fund credit drawdowns to borrowers.  We

refer to such banks qualified credit applications from borrowers, including our assessment of

their credit profiles and our suggested credit limits.").  Qudian further disclosed that Circular 141

created significant uncertainty.  AC ¶ 67; *see, e.g.*, 2018 20-F at 12-13 ("Pursuant to Circular

141, a bank may not outsource its core business functions, such as credit assessment and risk

management . . . . ***As Circular 141 is relatively new, it remains uncertain how the regulatory***

***authorities will interpret and enforce the requirements***.") (emphasis added).  Qudian also

repeatedly stated that its business could be subject to severe sanctions if it was found to violate

Circular 141.  *See, e.g.*, *id.* at 13 ("If our arrangement to provide guarantees . . . [is] deemed to be

in violation of Circular 141, ***we could be subject to penalties and/or be required to change our***

***business model*** . . . our business, financial condition, results of operations and prospects ***could***

***be materially and adversely affected***.") (emphasis added).

> Importantly, however, the Company also noted that Circular 141 on its face regulated

*banks*, not third-party service providers like Qudian.  *See, e.g.*, *id.* at 12 ("Circular 141 provides

restrictions ***on banks' collaboration*** with third parties in cash loan business.") (emphasis added).

Moreover, despite years of disclosures that it was providing credit assessments to banks, the AC

does not allege that Qudian has ever been accused of violating Circular 141 by Chinese

regulators or found to have violated that regulation.  *See, e.g.*, AC ¶¶ 66-68.

> Qudian's OP Business.  As set forth in the AC, Qudian has made a number of changes to

its business model in recent years.  *See, e.g.*, AC ¶¶ 31-34, 45-48.  One such change occurred in

the third quarter of 2018, when Qudian launched its OP business.  AC ¶ 82; *see, e.g.*, 2018 20-F

at 62.  Unlike the CLB, the OP business is not a lending business.  Instead, through the OP

business, Qudian connects potential borrowers with banks and earns a commission if those

lenders extend credit.  *See, e.g.*, AC ¶¶ 2, 8.  Unlike its lending business, Qudian does not incur

credit risk or guarantee any portion of loans made pursuant to its OP business.  *See id.*

Qudian disclosed that the OP was open to both existing CLB borrowers and other types

of borrowers.  For example, Qudian explained that:

> **For users that do not meet our credit requirements**, we provide
> recommendations of financial products that are offered by financial service
> providers that participate on our platform," while, "for users with better credit
> profiles **that are applying for large loan amounts that exceed the limit permitted
> under our policy**, we refer their applications to our institutional funding partners.

AC ¶ 82 (emphasis added) (quoting 2018 20-F at 16).  Qudian also explained that banks were

free to choose borrowers from either the CLB (in which case Qudian would bear all or part of the

credit risk) or the OP (in which case the lenders, not Qudian, would bear the entire credit risk).

*See, e.g.*, Kreissman Decl. ¶ 13, Ex. L (August 16, 2019 Call) at 12 ("I think the funding partners

enjoy both types of business because it's really about the user cohorts. **For the really micro**

**lending stuff** that they don't have the capability on, I think they still want to stick with the loan

book business . . . . But for risk that they begin to understand, **especially for larger ticket size, I**

**think that they are happy to go with the open-platform model**.") (emphasis added).

Qudian's Credit Trial Program.  Qudian has never disclosed its precise lending standards,

instead noting that its standards change over time.  For example, in its Form 20-F for 2017,

Qudian noted that "we broaden our prospective borrower base from time to time as we enhance

our credit assessment model to include those with different credit profiles than borrowers that we

currently provide credit to."  2017 20-F at 9.  Qudian also disclosed that it loosened credit

standards in July 2017 for "applicants who seek to draw down small amounts for one-week

durations."  *Id.*  Qudian emphasized that "[w]e expect to experience higher delinquency rates for

new borrower groups as we test and refine our credit assessment model" and that "we may be unable to maintain low delinquency rates for transactions facilitated by us in the future."  *Id.*

In the third quarter of 2018, Qudian instituted one of its periodic attempts to "broaden" its borrower base, by launching a "credit trial program."  AC ¶¶ 108-11.  On its November 21, 2018 earnings call, Qudian stated that its credit standards "will actually relax a lot more into [the] fourth quarter," leading to "a higher number of outstanding borrowers."  Kreissman Decl. ¶ 16, Ex. O at 12.  In August 2019, Qudian discussed the program extensively, explaining that, for loans of "RMB500 or RMB1,000," it relaxed lending criteria to draw in additional borrowers, leading to higher delinquency rates, which Defendant Yeung set forth in detail.  AC ¶¶ 112-13.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "plaintiffs must allege in their complaint facts that, if accepted as true, 'state a claim to relief that is plausible on its face.'" *SEC v. DiMaria*, 207 F. Supp. 3d 343, 351 (S.D.N.Y. 2016) (Woods, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To meet the plausibility standard, "plaintiffs must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged.'"  *Id.* at 352.  "Legal conclusions need not be accepted as true," and, where allegations "are 'merely consistent with' a defendant's liability, [they] 'stop[] short of the line between possibility and plausibility.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

To state a Section 10(b) claim, Plaintiffs must allege, *inter alia*, (1) misstatements or omissions of material fact and (2) scienter.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Allegations must meet the pleading requirements of Rule 9(b),

under which Plaintiffs must (1) "adequately specify the statements [they] claim[] were false or misleading"; (2) "give particulars as to the respect in which plaintiff[s] contend[] the statements were fraudulent"; (3) "state when and where the statements were made"; and (4) "identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).

Moreover, under Rule 10b-5, "'[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.'" *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 434 (S.D.N.Y. 2018) (Woods, J.) (quoting *Chiarella v. U.S.*, 445 U.S. 222, 235 (1980)). Thus, a defendant has no "duty to disclose information simply because it is material." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *accord, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Rather, the allegedly omitted material must be "necessarily inconsistent" with the company's disclosures. *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *16 n.16 (S.D.N.Y. Sept. 30, 2008).

Finally, a complaint alleging securities fraud must also meet the heightened pleading requirements of the PSLRA, 15 U.S.C. § 78u-4(b), under which a plaintiff must (i) "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each act or omission. 15 U.S.C. § 78u-4. "For an inference of scienter to be strong," it must be "cogent and *at least as compelling* as any opposing inference.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

## I. PLAINTIFFS FAIL TO ADEQUATELY ALLEGE ANY MATERIALLY FALSE OR MISLEADING STATEMENT OR OMISSION

### A. Qudian's Forward-Looking Statements Are Not Actionable Because They Are Protected By The PSLRA Safe Harbor

The central theme of the AC remains that Qudian's FY2019 earnings guidance was, in hindsight, overly optimistic.  Plaintiffs allege that Qudian issued false or misleading guidance, both when it announced that, based on its "preliminary expectations" as to its "regulatory and operating environment, the Company expects that its total non-GAAP net income for the full year of 2019 will be greater than RMB3.5 billion" in December 2018, AC ¶ 199, and each time Qudian discussed guidance thereafter.  *See* AC ¶¶ 226 (reaffirming guidance of RMB 3.5 billion); *id.* ¶ 261 (raising guidance to RMB 4.5 billion)); *id.* ¶¶ 262, 265, 282, 284, 297, 301, 303, 306, 309-311, 319, 324, 337 (subsequent guidance adjustments).[4]

These guidance statements are not actionable under the PSLRA safe harbor, which protects forward-looking statements like earnings guidance that either (i) were not made "with actual knowledge" of falsity or (ii) were accompanied by "meaningful cautionary language." 15 U.S.C. § 78u–5(c)(1); *see Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive.")  All statements at issue here satisfy both of these prongs.

*First,* the AC fails to allege facts suggesting Defendants *knew* the guidance would not be achieved.  *See infra* at 28-34.  Absent well-pleaded allegations of "actual knowledge" of falsity, "[s]tatements of 'hope, opinion, or belief about the company's future performance' are not actionable."  *Lickteig v. Cerberus Capital Mgmt.*, No. 19-cv-5263-GHW, 2020 WL 1989424, at *9 (S.D.N.Y. Apr. 26, 2020) (Woods, J.) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).

*Second*, even if Plaintiffs could show actual knowledge of falsity, these claims still fail

---

[4]  Plaintiffs also allege that other forward-looking statements made by Qudian about both its future performance and potential changes to its regulatory environment were misleading. Kreissman Decl. ¶ 14, Ex. M (compilation of allegations).  These allegations fail for the same reasons as Plaintiffs' guidance claims.

because the PSLRA protects *all* forward-looking statements accompanied by meaningful cautionary language—even those purportedly made with actual knowledge of falsity.  15 U.S.C. § 78u–5(c)(1) (setting forth meaningful cautionary language as an independent basis to apply safe harbor); *see, e.g.*, *City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10 CV 00967, 2011 WL 7158548, at *4-5 (S.D.N.Y. Sept. 6, 2011) (holding that statements regarding "projected outlook—including expected financial results . . . are not actionable pursuant to the forward-looking statement safe harbor" when accompanied by adequate cautionary language).

Here, Qudian's guidance was accompanied by detailed warnings that its performance might fall short of its projections.  For example, the December 2018 press release announcing its 2019 guidance warned investors that forward-looking statements involve "inherent risks and uncertainties."  Kreissman Decl. ¶ 2, Ex. A at 2.  Defendants also based their guidance on "macroeconomic performance indicators" and "preliminary expectations of its regulatory environment," AC ¶¶ 199, and made a clear PSLRA safe harbor statement explaining that "a number of factors could cause actual results to differ materially from those contained in any forward-looking statement, including but not limited to . . . future business development," "expectations regarding keeping and strengthening its relationships with borrowers, institutional funding partners . . . and other parties," and many others.  *See* Kreissman Decl. ¶ 2, Ex. A at 2. Qudian then directed investors to the more detailed risk factor discussion in its SEC filings, *id.*, including Qudian's annual reports on 20-F, which provide specific warnings about the uncertain operating and regulatory environment for micro-lenders in China.[5]

---

[5]  *See*, *e.g.*, 2017 20-F at 4-60.  For example, Qudian warned investors in bold and italics in its 20-Fs that the Company had "*a limited operating history in a new and evolving market, which makes it difficult to evaluate our future prospects*"; that "*the regulatory regime and practice*" were "*evolving and subject to uncertainty*"; and that regulations were in a "*nascent stage and*

This meaningful cautionary language is more than sufficient to insulate Qudian from any liability based on its guidance. Indeed, courts routinely find far less extensive cautionary language sufficient to invoke the safe harbor. *See, e.g.*, *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *20 (S.D.N.Y. Apr. 2, 2020) (statements protected by safe harbor where defendant noted forward-looking statements were "'subject to numerous important risks, uncertainties, assumptions and other factors, some of which are beyond Adient's control, that could cause Adient's actual results to differ materially from those expressed or implied by such forward-looking statements," and that annual reports contained other "cautionary language"); *In re Nokia Oyj (Nokia Corp.) Secs. Litig.*, 423 F. Supp. 2d 364, 401 (S.D.N.Y. 2006) (warnings sufficient where they "clearly and unequivocally cautioned investors that statements preceded by words such as 'expect' are forward looking that involve risks and uncertainties" and "explicitly warned that results may differ from the projections").[6]

**B.    Plaintiffs Fail To Plead Any Actionable Non-Forward Looking Misrepresentations Or Omissions**

In an attempt to circumvent the PSLRA safe harbor, the AC seeks to recast certain missed guidance allegations into alleged misstatements or omissions of historical fact, concerning:

---

*subject to further change and interpretation*," which could "*materially and adversely affect[]*" the business. *Id.* at 4, 12, 14 (emphasis in original).

[6] Many of Plaintiffs' allegations based on forward-looking statements also fail because the challenged statements are non-actionable statements of corporate optimism or puffery. *See* AC ¶ 200 ("Our large and growing user base and fully institutionalized funding base provide strong visibility as to what we can achieve into next year"); *id.* ¶¶ 201, 226 ("[w]e have a pretty good confidence in delivering 3.5 billion"); *id.* ¶¶ 262, 284 ("confidence" in meeting other guidance figures). These statements are immaterial because they are "too general to cause a reasonable investor to rely upon them." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (statement that "*we are confident*" in competitive strength immaterial puffery) (emphasis added); *Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (statement of "*confidence in achieving our full-year guidance*" was classic puffery) (emphasis added).

(i) regulatory issues, (ii) the OP, and (iii) the credit trial program.  These allegations fail because the disclosures relied on by the AC demonstrate that the alleged misstatements were not legally actionable or were never made and that the information allegedly omitted was, in fact, disclosed.

> **1.      Plaintiffs fail to plead a valid misrepresentation or omissions claim based on Qudian's disclosures of regulatory matters**

Plaintiffs allege two categories of regulatory misstatements and omissions, arguing Qudian failed to disclose that: (1) in May 2019, the government "severely restricted Qudian's lending license," AC ¶¶ 6, 64, 72-73, and that (2) Qudian was violating Circular 141 by providing credit assessments to banks.  *Id.* ¶¶ 67–69, 80.  These claims fail both because no material facts were concealed and for the separate and independent reason that Plaintiffs fail to plead the existence of a duty to disclose any omitted fact.

> **(a)      Any allegedly concealed material facts were disclosed**

<u>License Suspension</u>.  Plaintiffs allege that "Defendants represented that Qudian had the licenses that were necessary for it to make loans in the core loan book," without disclosing that, "in May 2019, the government severely restricted Qudian's lending license by changing it to a narrow local license."  AC ¶ 6.  Plaintiffs further allege that, as a result of this restriction, one of Qudian's two original "online small credit" entities[7] was limited to "offering microloan services in Gaoxin District, Fuzhou and its surrounding counties."  *Id.* ¶¶ 72-73.  This claim fails because Qudian publicly disclosed that it had abandoned the use of its micro-lending licenses long before May 2019.  Qudian's SEC filings explain that, beginning in December 2017, it "***ceased funding credit drawdowns*** through [its] online small credit companies," including the Fuzhou entity.

---

[7] The entity at issue is 抚州高新区趣分期小额贷款有限公司.  AC ¶ 72.  Plaintiffs' translation of the name is "Fuzhou Gaoxin District Qufenqi Microlending Co. Ltd.," while Qudian's is "Fuzhou High-tech Zone Microcredit Co., Ltd."  *Compare id. with* 2017 20-F, Ex. 8.1.

2017 20-F at 12 (emphasis added); *see supra* at 9.  Having disclosed that it no longer used this

entity to make loans, any later restriction of the entity's lending license was clearly immaterial.

*See, e.g.*, *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 262 (S.D.N.Y. 2019)

(dismissing allegation that defendant had failed to disclose alleged financing problems with prior

business model where company clearly disclosed it had "abandon[ed] its previous model" and

additional details thus would not have "significantly altered the total mix of relevant information

available to an investor"); *see also Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 346 (S.D.N.Y.

2015) (alleged misconduct by subsidiary comprising 0.1% of revenue immaterial).[8]

    Circular 141.  Plaintiffs' claim that the CLB was violating Circular 141 fares no better.

*See, e.g.*, AC ¶¶ 66-80, 234-35.  The AC concedes that Qudian disclosed the credit assessment

services it provides to banks, the uncertainty surrounding Circular 141, and the fact that it could

face regulatory action for violating Circular 141.  *See* AC ¶ 62 ("Qudian explained in its 2018

Annual Report that Circular 141 'provides restrictions on banks' collaboration with third parties

in cash loan business'" and described those restrictions in detail); *id.* ¶ 67 ("Qudian claimed that

it complied with this regulation . . . because even though it would refer to 'banks qualified credit

applications from borrowers, including our assessment of their credit profiles and our suggested

credit limits,' the banks would 'then review the credit applications independently . . . .'"); *see*

---

[8]  Plaintiffs' other micro-lending license allegations are even more misguided.  For example,
Plaintiffs claim that the statement in Qudian's August 2019 Management Presentation that it had
"obtain[ed] a license to provide financing guarantee services" was misleading because "Qudian
had its lending license severely restricted in May 2019."  AC ¶¶ 273-74.  The presentation
clearly refers to a "financing guarantee service" license (not a lending license) obtained in March
2019 (more than a year after Qudian suspended use of the Fuzhou license) by a different entity,
for a different purpose.  *Id.* ¶ 79; *see* 2018 20-F at 13 ("One of our wholly-owned subsidiaries,
Xiamen Xincheng Youda Financing Guarantee Ltd. . . . has obtained a license to provide
financing guarantee service."); *id.* at 15.  Any restriction on the long-abandoned micro-lending
license would be irrelevant in the context of discussing this new and different license.

*also supra* at 9-11 (describing discussion of Circular 141 risks in Qudian's SEC filings).

Plaintiffs appear to argue that Qudian had to go beyond disclosing its actions and the risks it faced, and affirmatively disclose that it was violating Circular 141. Any such suggestion strains credulity for two reasons. First, Plaintiffs have not alleged that Qudian has ever been accused, investigated, or found liable for violating Circular 141. Second, Circular 141, on its face, governs the actions of *banks* who rely on others for credit assessments, not those who provide credit assessments to the banks. *See, e.g.*, AC ¶¶ 66-67, 2018 20-F at 12-13.[9]

Moreover, Qudian, having disclosed the applicable law and facts, had no legal obligation to draw negative conclusions or predict future legal consequences. Courts in this Circuit routinely hold that a company is not required to engage in "self-flagellation" by characterizing its publicly disclosed activities as unlawful or improper. *In re Pfizer Inc. Shareholder Deriv. Litig.*, 722 F. Supp. 2d 453, 465 (S.D.N.Y. 2010) (no obligation to disclose Code of Conduct violation); *accord, e.g.*, *Kramer*, 937 F.2d at 776 (rejecting Section 10(b) claim that defendant had "fraudulently failed to characterize the adjustment to [its] Equity Plan as illegal" and explaining

---

[9] Plaintiffs also claim that, while Qudian asserted that banks would independently verify its credit assessments, a single confidential witness—CW4—alleges that "certain financial institutions that 'had a good relationship with the local regulator' would rely on Qudian's risk assessment rather than conducting their own independent risk assessment." AC ¶ 69. CW4 offers no basis for opining as to what actions these banks (where CW4 does not claim to have worked) took and provides no corroborative details, such as the names of the banks. Moreover, the AC alleges that CW4 left Qudian in "the summer of 2018," *id.*, months before the putative class period began. Because the AC provides no basis to conclude that this individual had any knowledge of Qudian's operations or that statements about past practices apply to the present"); *see also* *Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 569 Fed. Appx. 43, 45 (2d Cir. 2014) (affirming dismissal where "allegations by the confidential witnesses were not sufficiently close in time" because witnesses left prior to "the class action period").

that "[t]he disclosure required . . . is not a rite of confession . . . . What is required is the disclosure of material **objective factual matters**.") (emphasis added) (citations omitted); *In re Citigroup, Inc. Secs. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("the federal securities laws do not require a company to accuse itself of wrongdoing").[10]

**(b)    Defendants had no duty to disclose any omitted information**

A separate and independent reason to dismiss Plaintiffs' regulatory claims is that a defendant only has a duty to disclose an allegedly omitted fact if that fact would be necessary to prevent another of defendant's statements from being materially false or misleading or if the defendant has an independent duty to disclose that allegedly omitted information. *See DoubleLine*, 323 F. Supp. 3d at 434. Here, even if Plaintiffs' allegations were correct—and they are not—Defendants had no duty to disclose the allegedly omitted regulatory information.

A statement can only be rendered false or misleading by an omission if it is sufficiently factual in nature to be potentially actionable. Here, the statements Plaintiffs claim were rendered false or misleading by the alleged regulatory omissions, set forth below, were not actionable:

- "Regulatory Compliance Is Embedded In Our DNA," AC  ¶¶ 79, 273.

- "We will continue to make efforts to ensure that we are compliant with the existing laws, regulations and governmental policies relating to our industry and to comply with new laws and regulations or changes under existing laws and regulations that may arise in the future." AC ¶ 230.

- Qudian's statement that it employed a "regulatory compliant operating structure." *Id.*

---

[10]  Furthermore, even if the AC contained any well-pleaded facts suggesting that Qudian *had* violated Circular 141, this Court has repeatedly explained that "a corporation does not have a duty to disclose information simply because it suggests the corporation or its employees engaged in uncharged illegal conduct," *DoubleLine*, 323 F. Supp. 3d at 434, because, "in the absence of an express prior disclosure, a corporation has no affirmative duty to disclose '**uncharged, unadjudicated** wrongdoing.'" *Id.* at 441 (emphasis added) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)). Here, far from assuring investors that it was in compliance with Circular 141, Qudian expressly warned investors that regulators might deem these activities unlawful. *See supra* at 9-11.

¶¶ 3, 78, 122, 222, 224. 271.

These statements are so general in nature, aspirational, and/or reflective of "corporate optimism" that they are non-actionable.[11]

Plaintiffs' reliance on Defendant Luo's statement in March 2019 that "there are no material regulatory uncertainties for us," AC ¶¶ 206, 218, is also misplaced.  First, as with the statements set forth above, it is a non-actionable general statement about compliance with the law.  *Fogel*, 759 Fed. Appx. at 21-22.  Moreover, in his statement, Luo specifically refers to the business changes Qudian had made in response to "new regulations and guidelines *issued in 2018*," and his belief that Qudian had adapted to a "regulatory compliant" structure in response to those changes.  Kreissman Decl. ¶ 3, Ex. B (March 18, 2019 Press Release) at 2 (emphasis added).  By definition, this statement does not relate to the subsequent restriction of Qudian's micro-lending license in 2019 or the earlier promulgation of Circular 141 in 2017.  Further, the press release refers investors to the detailed disclosures about regulatory uncertainty, including those related to Circular 141, that Qudian made in its SEC filings.  *Id.* at 8; *see* 2018 20-F at 10.

In addition, several of the statements set forth an opinion (*e.g.*, that the Company's structure would pass regulatory muster) and therefore could only be actionable if Plaintiffs had

---

[11]  *See, e.g., Fogel v. Vega*, 759 Fed. Appx. 18, 21 (2d Cir. 2018) (statement that "strict compliance" with regulations is one of defendant's "non-negotiable core values" was non-actionable puffery; explaining that "statements about . . . general compliance with the law[] are not sufficient to state a claim under Section 10(b) and Rule 10b-5"); *Smallen v. W. Union Co.*, No. 17-CV-00474, 2019 WL 1382823, at *15 (D. Colo. Mar. 27, 2019) ("[T]he . . . statement by Defendant . . . that 'compliance culture is in our DNA' . . . is nothing more than unverifiable puffery."); *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (dismissing allegations based on statements about "compliance" efforts that were "explicitly aspirational" based on phrases such as "'aims to'"); *In re Facebook, Inc. Secs. Litig.*, 405 F. Supp. 3d 809, 835-36 (N.D. Cal. 2019) (statement that "[w]e've worked hard to make sure that we comply with" regulatory requirements "too vague to be actionable"); *Kas v. First Union Corp.*, 857 F. Supp. 481, 490 (E.D. Va. 1994) (statement that defendants would "use best efforts" to comply with requirements "no more than 'expressions of optimism'").

pleaded specific facts showing that Defendants did not genuinely believe these statements when they were made. *See, e.g.*, *In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731, 745, 753 (S.D.N.Y. 2017) (statements that "broadly emphasized [defendant's] general compliance" or "broadly touted [defendant's] . . . 'compliance with the laws'" were non-actionable absent well-pleaded facts showing that "'the speaker did not hold the belief she professed'") (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)). The fact that the AC contains no such allegations, *see infra* at 28-34, provides another basis to dismiss these statements as non-actionable.[12]

## 2.   Qudian Accurately Disclosed Its Open Platform Initiative

Plaintiffs next assert that Defendants made misstatements concerning Qudian's OP business. *See, e.g.*, AC ¶¶ 215-16, 232, 253-54, 258, 278-79. To be clear, Plaintiffs do not challenge OP's financial performance, including the fact that the business experienced explosive revenue growth and strong profitability throughout the class period. *See* AC ¶¶ 55, 160-161, 164; Kreissman Decl. ¶¶ 4, 9, Ex. C (May 20, 2019 Press Release) at 2, Ex. H (March 18, 2020 Press Release) at 2 (increase in OP revenue from RMB 158.7 million in Q1 2019 to RMB 649.4 million in Q4 2019 and RMB 2.2 billion for full-year 2019).

Instead, Plaintiffs allege Qudian's disclosures about the OP business were misleading for three reasons: (i) OP was a rebranded version of a portion of the CLB business, not a new business, AC ¶¶ 84-85, 93-94, 125, 133, 191, 208, 212, 241, 243, 253; (ii) Qudian did not tell investors that OP was created to avoid Circular 141 risk arising from the CLB business, *id.* ¶¶ 3, 197, 207, 274, 279, 288; and (iii) Qudian did not inform investors that it was shifting its best borrowers from CLB to OP. *Id.* ¶¶ 3, 8-9, 13, 53, 57, 65, 85, 105-06, 117, 119, 125, 127, 136, 159, 180, 186, 191, 196, 213, 217, 227, 233, 255, 259, 279, 283, 296, 298, 328, 355.

---

[12]  Plaintiffs also fail to plead a valid, independent disclosure duty. *See infra* at 28.

Plaintiffs' claim that "Open Platform and Qudian's loan facilitation business in the core loan book were the 'same business,' *id.* ¶ 191, is inconsistent both with the language of the AC and the documents relied on in the AC.  The AC acknowledges that Qudian bore credit risk as part of CLB, while it did not do so in OP, where it instead earned commissions when third-party borrowers loaned money to consumers using the OP platform.  *See, e.g.*, *id.* ¶¶ 2, 82 (excerpting detailed summary from 2018 20-F).  Guaranteeing loans and bearing losses in the case of a default is hardly the same business as a risk-free commission-based referral platform.[13]

Second, Plaintiffs' assertion that the OP business was "intended to address the regulatory problems with Qudian's core loan book" likewise fails to state an actionable claim.  *See* AC ¶ 3.  As discussed above, Plaintiffs fail to plead facts showing that Qudian ever faced regulatory inquiries or penalties with respect to Circular 141.  *See supra* at 18-20.  Moreover, while Plaintiffs claim that, in November 2019, Defendants "finally revealed" that an advantage of the OP business was that it lowered Qudian's regulatory exposure, AC ¶¶ 167-171, in fact, Qudian expressed that view since the start of the OP business.  *See, e.g.*, Kreissman Decl. ¶ 13, Ex. L (Q2 2019 Earnings Call Transcript) at 13 (contrasting Qudian's need for a "proper finance guarantee license" to be "regulatory compliant" in its CLB with the OP business where "we have taken this to an even further step by not touching the loan in itself.  So if you look at the regulation that applies in this transaction structure, we are an Internet technology company . . . .

---

[13]  To support their assertion that OP is a rebranding of part of CLB, Plaintiffs point to a statement by Defendant Yeung from Qudian's November 18, 2019 earnings call.  AC ¶ 13.  When asked about Qudian's reduction of its credit exposure, Yeung stated that, through OP, Qudian could reduce its risk and credit exposure while still doing "the same business."  Kreissman Decl. ¶ 7, Ex. F at 11.  This statement by Yeung serves to *further illustrate* the difference between CLB and OP.  Yeung's reference to the "same business" clearly refers to the general business of connecting lenders and borrowers.  When read in context, it *distinguishes between the credit risk of CLB and OP*; it does not mean that OP was a rebranding of CLB.

The banks have a proper lending license."); *id.* ¶ 15, Ex. N (Q1 2019 Management Presentation) at 17 (highlighting OP's "regulatory complian[ce]"); *id.* ¶ 7, Ex. F (Q3 2019 Earnings Call Transcript) at 9 (explaining that OP would provide "protect[ion] from any regulatory noise").[14]

      Plaintiffs' argument also fails because its central premise—that OP was designed to avoid Circular 141 exposure from providing credit assessments—is demonstrably incorrect.  Plaintiffs ignore the fact that ***Qudian continues to provide credit assessments as part of its OP business:***

> In the second half of 2018, we launched an open platform for transaction services business. The open platform helps financial service providers grow, while simultaneously bringing value to consumers. The transaction services business also allows us to further monetize our user base and mitigate our credit risk exposure. ***We perform credit assessment on users applying for credit on our platform, following which we primarily refer users that meet our credit requirements to licensed institutional funding partners that participate on the platform.*** We receive commissions from the institutional funding partners for such referrals.

Kreissman Decl. ¶ 10, Ex. I (2019 20-F) at 22 (emphasis added); *see also id.* ¶ 6, Ex. E (Nov. 18, 2019 Press Release) at 2 (defining "transaction services business" as relating "to various services, including credit assessment, referral and post-origination services, ***provided through our open-platform***, which was launched in the second half of 2018.") (emphasis added).  By definition, Qudian could not have created OP to avoid Circular 141 risk based on credit assessments if it continued performing those assessments as part of the OP business.

---

[14]  Similarly, Plaintiffs' argument is not supported by conclusory CW statements that Qudian created OP to avoid regulatory violations.  Those statements, if credited, would not trigger a disclosure duty given the disclosures Qudian already made.  Moreover, the statements fall far short of meeting the high bar to allege fraud with particularity under Rule 9(b) and the PSLRA. *See id.* ¶ 96 (conclusory statement by CW4 that, "[i]n the past, people didn't know [Qudian] was doing loan facilitation and might worry that its cash loan business would be banned," when Qudian disclosed it was providing credit assessments to banks for years); *id.* ¶ 98 (bald assertion that "Qudian's prior loan business was 'renamed as Open Platform' around the time that CW 1 left the Company in May 2019," when OP has fundamentally different business model than CLB); *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) (rejecting "allegations . . . based on vague quotes and conclusory" CW statements); *infra* at 31-32.

Third and finally, Plaintiffs' assertion that Qudian failed to disclose that OP took the "best borrowers" from CLB fails to state a claim. *Id.* ¶ 3. Once again, this allegation ignores the Qudian disclosures on which it seeks to rely. Qudian made clear from the outset that its funding partners could lend under either the CLB or the OP. *See, e.g.*, 2018 20-F at 62-63 (describing both options); *see also* AC ¶ 142 ("Defendant Yeung . . . explained that for the 'really micro lending stuff,' Qudian's funding partners 'still want to stick with a loan book business, that we provide a underwriting service for' (*i.e.*, by guaranteeing the risk of default)").

Qudian also told investors that, "[f]or users ***that do not meet our credit requirements***, we provide recommendations of financial products that are offered by financial service providers," while, "for users with better credit profiles ***that are applying for large loan amounts that exceed the limit*** permitted under our policy, we refer their applications to our institutional funding partners." AC ¶ 232 (emphasis added). In other words, the "better" borrowers Plaintiffs claim the CLB supposedly lost to OP sought loans larger than the CLB was authorized to make. *Id.*

Thus, the AC contains no well-pleaded facts suggesting that the OP business cannibalized the best borrowers that otherwise would have borrowed from the CLB.[15] Simply put, despite asserting nearly three dozen times that Qudian sent the "best borrowers" from the CLB to OP,[16] the AC fails to offer a single factual allegation to support this conclusion, dooming this claim. *See, e.g.*, *Lickteig*, 2020 WL 1989424, at *5, 9 (rejecting allegation that lacked "particularized facts" under PSLRA and explaining that "[a] plaintiff must . . . 'do more than say that the

---

[15] For example, Plaintiffs' assertion that Qudian "admitted" this fact rests on nothing more than Yeung's statement that "Open Platform . . . focuses on the 'highest-quality borrowers,'" *id.* ¶ 106—a statement entirely consistent with Qudian's disclosures that it referred through OP "better" borrowers who sought larger loans than Qudian could provide under CLB. Indeed, Yeung clarified later in the call that he was referring to "the open-platform larger credit size." Kreissman Decl. ¶ 17, Ex. P (November 25, 2019 Call) at 9.

[16] *See* AC ¶¶ 3, 8-9, 13, 53, 57, 65, 85, 105-06, 117, 119, 125, 127, 136, 159, 180, 186, 191.

statements . . . were false and misleading; [they] must demonstrate with specificity why and how

that is so'") (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)); *In re Bank of Am.*

*Corp. Secs., Deriv., and Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 317

(S.D.N.Y. 2010) (rejecting allegations "premised upon speculation" that "fail to satisfy the

PSLRA's bar against 'conclusory' fraud claims 'unsupported by factual assertions'") (quoting

*ATSI*, 493 F.3d at 99).

### 3.      Qudian Accurately Disclosed Its Credit Trial Program

Plaintiffs also claim that Qudian misled investors by failing to disclose a "credit trial

program" launched in 2018.  AC ¶¶ 107-16, 136, 210, 220, 222, 239, 241, 243, 246, 248-49, 251,

256, 269, 271, 276, 278, 280, 290, 292-95, 313, 315-17, 319.  Plaintiffs contend that "the only

reason that Qudian was able to achieve positive results in both its core loan book and Open

Platform was that the Company had furtively lowered the credit standards in its core loan book,"

with the program eventually comprising as much as "20% of the core loan book."  *Id.* ¶¶ 4, 10.

This claim fails because Qudian disclosed both the fact that it regularly adjusts its credit

standards and *the specific credit standard adjustment at issue in this litigation.*  Qudian disclosed

that it regularly changes its credit standards, as well as the risk that any loosening of those

standards could affect delinquency rates.  *See*, *e.g.*, 2017 20-F at 9 ("*we broaden our prospective*

*borrower base from time to time* as we enhance our credit assessment model to include those

with different credit profiles . . . *we expect to experience higher delinquency rates* for new

borrower groups . . . . As a result of such changes, we may be unable to maintain low

delinquency rates.") (emphasis added); 2018 20-F at 5 ("As our business develops or in response

to competition . . . [w]e will also seek to expand the base of prospective borrowers that we serve,

*which may result in higher delinquency rates* . . . .") (emphasis added).

As to the specific credit standard adjustment at issue in this litigation, just before the start

of the putative class period, Qudian explicitly told investors during an analyst call that its credit standards "will actually relax a lot more into fourth quarter," leading to a "higher number of outstanding borrowers."  Kreissman Decl. ¶ 16, Ex. O (Q3 2018 Earnings Call Transcript) at 12. As Plaintiffs concede, Qudian then disclosed the program in detail in an August 2019 earnings call, including highlighting the fact that broadening its borrower base had a significant negative effect on delinquency rates.  Kreissman Decl. ¶ 13, Ex. L (Aug. 16, 2019 Earnings Call) at 4 (cited in AC ¶¶ 112-14) (Yeung describing program and explaining that "[o]ur M1+ vintage delinquency rates would have decreased by 0.5% excluding users in these trial programs.").

Under these circumstances, where both the general practice of credit adjustments and the specific adjustments in question were disclosed, Plaintiffs' credit standards claim must fail.  *See supra* at 11-12; *Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *19 (S.D.N.Y. Mar. 29, 2013) ("Each of the alleged omissions fails because the information at issue was, in fact, disclosed . . . ."); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) (dismissing claim where defendant "made substantial disclosure with respect to the precise omissions that undergird plaintiffs' claim").

Plaintiffs' credit standards claim also fails because Qudian had no duty to disclose the specific credit standards it was employing during the purported class period.  *See In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996) ("Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information.  There is no such obligation . . . .").  Such a duty arises only where disclosure is necessary to avoid rendering another statement misleading, *Ladmen*, 2008 WL 4449280, at *16 n.16, or where an independent basis for disclosure exists.  *See supra* at 20-22.  Here, prior to the start of the class period, Qudian had never disclosed the credit

standards it was employing.  Thus, it had no obligation to disclose any modification to those

standards, particularly given that it disclosed that its credit standards vary from time to time.[17]

### 4. Plaintiffs' Claims Based on a Purported Affirmative Duty to Disclose Under Item 303 of Regulation S-K Fail

Plaintiffs' only attempt to allege that Defendants had an affirmative duty to disclose any

allegedly omitted facts is their claim that, under Item 303 of Regulation S-K, "Defendants . . .

had an independent duty to disclose the risk and uncertainty that its fundamental business model

in its core loan book violated Chinese regulations" and "to disclose the true nature of Open

Platform and the trends of which borrowers were populating Open Platform and the core loan

book."  AC ¶¶ 366, 370-71; *see also id.* ¶ 369 (separately alleging that Qudian failed to disclose

"known trends" under Item 5 of Form 20-F).  These claims fail for the same reasons set forth

above.  *See supra* at 17-28.  Moreover, to state a disclosure claim under Item 303 of Regulation

S-K or its correlate for foreign private issuers,[18] Plaintiffs must plead that Defendants possessed

actual knowledge of any materially omitted trend as of the time of the alleged omission.  As set

forth *infra* in Section II, Plaintiffs fail to plead any such actual knowledge.

## II.    PLAINTIFFS FAIL TO PLEAD FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

---

[17]  Any argument that Qudian had a duty to disclose specific credit standards in light of certain statements that Qudian's credit standard practices were "conservative," AC ¶¶ 253, 292-295, 315-17, fails.  Courts consistently find such statements to be "classic examples of puffery." *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010).  Indeed, addressing statements regarding "conservative lending practices," a court in this district held that "[t]his sort of statement is nothing more than a general platitude that accompanies nearly every press release or public statement . . . it defines the term 'puffery.'"  *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010).  Because general statements of conservatism are not actionable, they could not trigger a duty to disclose the specific details of the credit trial program.

[18]  Qudian, as a foreign private issuer, is not subject to Reg. S-K.  *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007).  Instead, Qudian's disclosures of known trends are governed by Form 20-F Item 5(d).

Plaintiffs' claims should be dismissed for the separate and independent reason that they fail to adequately plead scienter.  The PSLRA assigns to Plaintiffs the burden to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "In the Second Circuit, a plaintiff may plead scienter either '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Lickteig*, 2020 WL 1989424, at *12 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001)).  However, "[a]n 'inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent,'" *id.* at *13 (quoting *Tellabs*, 551 U.S at 314), and, if "a fraudulent inference is not at least as compelling as a nonfraudulent one, it must be rejected, even in a close case."  *Id.* (citation omitted).  Moreover, where, as here, a plaintiff's case revolves around omissions (rather than affirmative misrepresentations), courts are less likely to infer scienter from circumstantial evidence.  *See generally Tellabs*, 551 U.S. at 326.

### A.     Plaintiffs Fail To Adequately Allege Motive And Opportunity

Plaintiffs have not alleged facts sufficient to show that any Defendant had both motive and opportunity to commit fraud.  "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while "[o]pportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  *SEC v. Takeyasu*, Case No. 1:17-cv-4866-GHW, 2018 WL 2849777, at *15 (S.D.N.Y. June 11, 2018) (Woods, J.) (citation omitted).  Thus, in order to adequately plead "motive and opportunity," Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *See ECA*, 553 F.3d at 198 (citation omitted).

Here, the AC does not allege that Defendants sold stock during the putative class period.

Indeed, it alleges no "concrete and personal benefit" at all, *id.*, relying solely on Luo's stated decision to forgo a salary and bonus until Qudian's "market capitalization reaches US$100 billion." AC ¶ 362. Such a general desire "to keep stock prices high to increase officer compensation . . . do[es] not constitute 'motive'" as a matter of law. *See ECA*, 553 F.3d at 198.

### B.   Plaintiffs Fail To Allege Facts That Constitute Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

Plaintiffs also fail to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. "Conscious misbehavior" is conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care," *SEC v. Mudd*, 885 F. Supp. 2d 654, 661 (S.D.N.Y. 2012) (citation omitted), while recklessness requires a showing of "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Lickteig*, 2020 WL 1989424, at *12 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)). The AC falls far short of this standard.

### 1.   Role-Based Allegations Are Insufficient

In attempting to show conscious misbehavior or recklessness, Plaintiffs rely on Defendants Luo and Yeung's status as "Qudian's two most senior executives," AC ¶ 363, as well as their signing of Sarbanes-Oxley Act certifications. *Id.* ¶ 354. Courts routinely reject substantively identical allegations as insufficient to plead scienter. "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *accord, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) (holding that scienter allegations based on seniority alone failed because "Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false

at the time they were made"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008) ("[A] Sarbanes–Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as 'glaring accounting irregularities or other "red flags,"' of which the certifying defendant had 'reason to know.'") (citation omitted). These allegations therefore fail to raise a strong inference of scienter as a matter of law.[19]

### 2. Plaintiffs' Conclusory Confidential Witness Allegations Fall Far Short of Raising a Strong Inference of Scienter

The AC also cannot rely on its conclusory confidential witness statements to create a strong inference of scienter. For the Court to give weight to confidential witness allegations, the witnesses must be described in the complaint with "sufficient particularity" to support the probability that a person in that position would possess the information alleged. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Moreover, CWs who lacked direct contact with senior management—and who do not claim personal knowledge that management was aware of the conduct at issue—cannot establish scienter. *See, e.g.*, *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (rejecting CWs who "had no personal knowledge" of Defendants' alleged awareness of fraud).

Here, the only confidential witness that Plaintiffs even attempt to tie directly to senior management is CW4, who allegedly "directly assisted Defendant Luo" and "communicated with him on a daily basis." AC ¶ 69. However, CW4 left the company ***months before*** the putative class period began, does not allege any misconduct during the purported class period, and never claims that any of the issues raised in the AC were directly communicated to Luo or Yeung.

---

[19] Similarly, because Plaintiffs plead no facts linking Yeung's resignation to any purported misconduct, AC ¶ 361, it cannot give rise to any inference of scienter. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005) (no scienter where Plaintiffs fail to link resignation to alleged improprieties, given that there are many innocent reasons an executive may resign).

Under these circumstances, the CW4 allegations cannot raise a strong inference of scienter. *See, e.g.*, *Long Miao*, 442 F. Supp. 3d at 805 (no scienter where CW left before class period began and alleged no misconduct or management knowledge of same during class period).

Finally, as summarized in the table below, the remaining CWs on which Plaintiffs rely were low-level employees who do not allege any direct communication with Luo or Yeung:

| CW | Position(s) |
|---|---|
| 1 | "regional manager, project manager, and business cooperation manager" (AC ¶ 40) |
| 2 | "regional manager" in unrelated business line (Dabai Auto) (*id.* ¶ 41) |
| 3 | "employee who worked in operations" (*id.* ¶ 44) |
| 5 | "management trainee"  (*id.* ¶ 75) |
| 6 | "financial analyst" who left Qudian before start of putative class period (*id.* ¶ 83) |
| 7 | "business manager" (*id.* ¶ 99) |
| 8 | "public relations specialist" (*id.* ¶ 101) |
| 9 | "public relations manager" (*id.* ¶ 107) |

Because Plaintiffs do nothing to tie these CWs to any alleged awareness by Luo or Yeung of the conduct at issue, their allegations cannot establish scienter. *See Campo*, 371 F. App'x at 217.[20]

---

[20]  Plaintiffs claim that "Luo's and Yeung's scienter is also established because the alleged misstatements and omissions at issue here concerned Qudian's core operations, including its core loan book and its Open Platform business that were the focus of the Company's operations during the Class Period." AC ¶ 364.  Plaintiffs thus attempt to plead scienter based on the so-called "core operations doctrine."  Numerous recent decisions in this Circuit, however, "have cast doubt on the continued viability of the doctrine, which pre-dates the PSLRA by several years," and have further explained that, to the extent it remains viable at all, courts "invoke[] the doctrine only to **bolster** other evidence of scienter, rather than relying on it as an independently sufficient basis."  *In re AT&T/DirecTV Now Secs. Litig.*, --- F. Supp. 3d ----, 2020 WL 4909718, at *17 (S.D.N.Y. Aug, 17, 2020) (emphasis added) (collecting cases); *accord, e.g., Woolgar v. Kingstone Cos., Inc.*, No. 19-CV-5500 (RA), 2020 WL 4586792, at *26 (S.D.N.Y. Aug. 10, 2020) (reiterating that core operations doctrine cannot "independently establish scienter") (citation omitted).  Thus, even if Plaintiffs had adequately alleged a failure to disclose a significant issue affecting Qudian's CLB or OP businesses (and they have not, *see supra* at 16-28), courts routinely find that Plaintiffs cannot establish scienter merely by relying on a core operations theory or "on the magnitude of the [alleged fraud] as evidence of Defendants' conscious misbehavior or recklessness."  *Id.* (citation omitted); *accord, e.g., Caiafa v. Sea*

### 3.    The Alleged "Admissions" Do Not Establish Scienter

While Plaintiffs incorrectly claim that certain statements by Defendants Luo and Yeung

constitute "admissions" establishing scienter, a cursory review of the statements at issue shows

that they are not admissions at all.  For example, Plaintiffs assert that Luo admitted the true

purpose of OP was to avoid the CLB's violations of Circular 141.  AC ¶¶ 168-70.  Instead, Luo

stated that Qudian's "past efforts" were "***in full compliance with Circular 141***."  *Id.* ¶ 168

(emphasis added).  Moreover, Qudian continues to provide credit assessments as part of OP,

undercutting any suggestion that Luo's statement was an admission.  *See supra* at 24.

Plaintiffs next claim that Yeung admitted that "Qudian planned to shift its entire business

from CLB to OP" and that "Qudian was not as transparent as it should have been about the

composition of borrowers in Open Platform," when he "apologized to investors" in late 2019.

AC ¶¶ 184, 355.  The AC mischaracterizes Yeung's statement, reproduced below, in two aspects.

> So first of all, it's over 21 million people whom our partners deem that are
> capable—suitable for them to underwrite risk. . . . Do you know, in the past 12
> months, actually, we've only allowed 5.5 million out of the 21 million people
> access to open-platform.  We haven't opened the entire open-platform to our
> borrower base yet. . . . . So only 5.5 million people out of 21 million people have
> access on the open-platform larger credit size right now.  We will slowly and surely
> open up to more, eventually to all the 21 million people. . . . So I think we are in a
> fairly good position that there's still a deep pocket for open-platform, and I think
> that's quite obvious to us.  I'm sorry that this may not have been apparent to the
> market yet, but it will be over time.

Kreissman Decl. ¶ 17, Ex. P (November 25, 2019 Call).  Under, Yeung merely stated that Qudian

had not yet opened up OP and the associated "larger credit size" to all eligible consumers and

that it would eventually do so.  AC ¶ 184.  Yeung never stated or implied, as Plaintiffs suggest,

---

*Containers Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y. 2007) ("[T]he size of the fraud alone does
not create an inference of scienter.") (citation omitted).  Thus, because Plaintiffs' other
allegations fail to even approach raising a strong inference of scienter, their "core operations
theory fails as well."  *In re AT&T*, 2020 WL 4909718, at *17.

that the expansion of OP would eliminate the CLB (or that Qudian had misrepresented anything about OP).  Indeed, Plaintiffs do not contest the fact that Qudian continues to operate CLB to this date.  <u>Second,</u> the context makes it clear that Yeung was not apologizing to investors, but was instead voicing his belief that the decline in Qudian's stock price, *see*, *e.g.*, AC ¶ 15, had failed to account for the potential for future growth in the OP business, given its "deep pocket" of untapped users.  Kreissman Decl. ¶ 17, Ex. P (November 25, 2019 Call).  Leung thus expressed disappointment that the market did not yet fully appreciate the OP opportunity, but expressed confidence that OP's potential would become "apparent to the market" "over time."  *Id.*[21]

### C.   The Totality Of Plaintiffs' Allegations Do Not Support A Finding Of Scienter

Finally, Plaintiffs' well-pleaded allegations, viewed in totality, are not "*at least as likely as* any plausible opposing inference.*" *Tellabs*, 551 U.S. at 328.  While courts consider "all the allegations holistically," an inference of scienter based on the totality of circumstances is only "strong" if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  Far from suggesting that Qudian's miss of its original forecast (RMB 3.4 billion v. RMB 3.5 billion, AC ¶ 161) evidences any intent to defraud, the well-pleaded allegations in the AC show that it is far more plausible that Qudian's growth slowed in the second half of 2019 for the reasons Qudian disclosed—a sharp credit market downturn and sweeping regulatory changes.  *See* AC ¶ 343 and n.13.  This conclusion is strongly buttressed by the fact that Qudian's competitors 360 Finance, Inc. and FinVolution Group experienced downturns in their loan book volume that paralleled Qudian's:[22]

---

[21]  The AC's other alleged "admissions" similarly fail to show a material misrepresentation or omission, *see supra* at 17-28, and thus provide no support for an inference of scienter.

[22]  Kreissman Decl. ¶ 18, Ex. Q.1 at 1; *Id.*, Ex. Q.2 at 1; *id.* Ex. Q.3 at 1; *id.,* Ex. Q.4 at 1; *id.*, Ex. Q.5 at 18.  As explained *supra* at n. 1, courts routinely take judicial notice of publicly available



This data militates ***against*** any finding of scienter.  *See, e.g.*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301-02 (S.D.N.Y. 2010) (no scienter where corporate write-downs occurred during an economic downturn).[23]

## III.   PLAINTIFFS' SECTION 20(A) CLAIM MUST ALSO BE DISMISSED

To state a Section 20(a) claim, Plaintiffs "'must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *DoubleLine*, 323 F. Supp. 3d at 460 (quoting *Carpenters Pension Tr. Fun19 d of St. Louis v. Barclays PLC, 750* F.3d 227, 236 (2d Cir. 2014)).  Plaintiffs' Section 20(a) claim fails because the AC does not adequately allege either (i) an actionable primary violation of Section 10(b) or (ii) any culpable participation by Luo or Yeung in any primary violation.  *See supra* at 13-35.

## CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.

---

economic data.  *See In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003) (taking judicial notice of fund net asset value).

[23]  Because Plaintiffs fail to plead scienter with respect to Luo, Yeung, or any other "individual corporate officer making [any] statement" that is alleged to be false or misleading, they also fail to establish that Qudian acted with corporate scienter.  *See, e.g.*, *Kinsey v. Cendant Corp.*, No. 04 Civ.0582, 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) (citation omitted).

Dated: September 4, 2020                     SIMPSON THACHER & BARTLETT LLP


                                          By: */s/ James G. Kreissman*
                                              James G. Kreissman

                                              James G. Kreissman (jkreissman@stblaw.com)
                                              Stephen P. Blake (sblake@stblaw.com)
                                              425 Lexington Avenue
                                              New York, NY 10017
                                              Telephone: (212) 455-2000
                                              Facsimile: (212) 455-2502

                                              *Counsel for Defendants Qudian Inc., Min Luo,
                                              and Carl Yeung*