**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN PABLO DI BENEDETTO, GALESSI HOLDING CORP, AND PABLO GRECO, Individually and On Behalf of All Others Similarly Situated**,**<br><br>                                        Plaintiffs,<br><br>     v.<br><br>QUDIAN INC., MIN LUO, and CARL YEUNG,<br><br>                                        Defendants. | **Case No. 1:20-cv-00577-GHW** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE AMENDED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PAGE

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT .......................................................................................... 3

I.   Legal Standards......................................................................... 3

II.  Improper Extraneous Materials and Requests for Inferences in Defendants'
Favor ...................................................................................... 4

III. Detailed, Corroborative Statements from Nine Well-Positioned Former
Employees Strongly Support Plaintiffs' Falsity and Scienter Allegations .................. 6

IV.  The Complaint Adequately Pleads Materially False and Misleading Statements
and Omissions .......................................................................... 10

    A.  Applicable Pleading Standards ................................................... 10

    B.  Materially False and Misleading Statements and Omissions ........................ 11

        1.  Misrepresentations Regarding Qudian's Compliance with Applicable
            Regulations and Omissions of Regulatory Issues and Violations ........... 11

        2.  Misrepresentations About Why Qudian Developed OP ......................... 14

        3.  Misrepresentations about the Composition of OP ................................ 16

        4.  Misrepresentations and Omissions about the Credit Trial Program and
            Qudian's Lending Standards in CLB...................................... 18

    C.  Defendants Violated Their Duty to Disclose Known Trends and
        Uncertainties ................................................................... 20

    D.  The Safe Harbor Does Not Apply ................................................ 22

V.   The Statements Are Neither Opinion nor Puffery ............................... 25

VI.  The Complaint Adequately Pleads Scienter ...................................... 27

    A.  Applicable Pleading Standards ................................................... 27

    B.  Indicia Supporting a Strong Inference of Scienter............................. 27

    C.  Luo and Yeong Had Motive and Opportunity to Commit Fraud.................. 32

    D.  Corporate Scienter is Adequately Alleged...................................... 33

VII. Plaintiffs Adequately Plead Liability Under Section 20(a) ................................ 34

CONCLUSION....................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Abramson v. NewLink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020) ................................................................ 9, 26

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ...................................................................... 32

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
    2019 U.S. Dist. LEXIS 55977 (S.D.N.Y. Mar. 30, 2019) ............................... 13

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................... 2, 3, 5

*Bison Capital Corp. v. ATP Oil & Gas Corp.*,
    2010 U.S. Dist. LEXIS 62836 (S.D.N.Y. June 24, 2010) ................................. 3

*Campo v. Sears Holdings Corp.*,
    635 F.Supp.2d 323 (S.D.N.Y.  2009), *aff'd*, 371 Fed. Appx. 212 (2d Cir. 2010) .......... 10

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc.*,
    2020 U.S. Dist. LEXIS 140925 (S.D.N.Y. Aug. 6, 2020) ........................................ *passim*

*Dandong v. Pinnacle Performance Ltd.*,
    2011 U.S. Dist. LEXIS 126552 (S.D.N.Y. Oct. 31, 2011) ............................... 19

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ...................................................... 19, 20

*Employees' Ret. Sys. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................... 8, 27, 31

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F.Supp.2d 171 (S.D.N.Y. 2010) ...................................................... 20, 24, 27

*Gentry v. Kaltner*,
    2020 U.S. Dist. LEXIS 54182 (S.D.N.Y. Mar. 25, 2020) ................................. 4

*Glaser v. The9, Ltd.*,
    772 F.Supp.2d 573 (S.D.N.Y. 2011) ........................................................ 10

*Golesorkhi v. Green Mountain Coffee Roasters, Inc.*,
    973 F. Supp. 2d 541 (D.Vt. 2013), *aff'd* 569 Fed. Appx. 43 (2d Cir. 2014) ................... 10

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ............................................................................................... 19

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
    422 F.Supp. 3d 821 (S.D.N.Y. 2019) ........................................................................ *passim*

*In re Bear Stearns Cos. Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 459
    (S.D.N.Y. 2011) ................................................................................................................ 26

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ............................................................................... 30

*In re Facebook, Inc.*,
    986 F.Supp. 2d 487 (S.D.N.Y. 2013) ................................................................................ 20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) .................................................. 3

*In re Inv. Tech. Grp.*, *Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ............................................................................... 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    272 F.Supp. 2d 243 (S.D.N.Y. 2003) ................................................................................. 5

*In re Molycorp Sec. Litig.*,
    2015 U.S. Dist. LEXIS 30892 (S.D.N.Y. Mar. 12, 2015) ................................................ 10

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ......................................................................... 26, 29

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................................... 32

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................................. 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018) .............................................. 31

*In re Vale S.A. Sec. Litig.*,
    2017 U.S. Dist. LEXIS 42513 (S.D.N.Y. Mar. 23, 2017) ................................................ 23

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .............................................................................................. 10

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)............................................................................ 25

*In re Warnaco Grp. Inc. Sec. Litig.*,
    388 F.Supp. 2d 307 (S.D.N.Y. 2005)............................................................................ 10

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018).......................................................................................... 4

*Lewy v. Skypeople Fruit Juice, Inc.*,
    2012 U.S. Dist. LEXIS 128416 (S.D.N.Y. Sept. 7, 2012)............................................. 31

*Lickteig v. Cerberus Capital Mgmt., L.P.*,
    2020 U.S. Dist. LEXIS 74575 (S.D.N.Y. Apr. 26, 2020)......................................... 13, 18

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)......................................................................................... 21

*Martinich v. Ward*,
    2017 U.S. Dist. LEXIS 3713 (E.D.N.Y. Jan. 7, 2017) .................................................... 4

*Miao v. Fanhua*,
    442 F.Supp. 3d 774 (S.D.N.Y. 2020)............................................................................ 10

*Monec Holding AG v. Motorola Mobility, Inc.*,
    2014 U.S. Dist. LEXIS 123898 (D. Del. Sep. 5, 2014) ................................................... 4

*Moshell v. Sasol Ltd.*,
    2020 U.S. Dist. LEXIS 153314 (S.D.N.Y. Aug. 24, 2020)............................................... 8

*New Orleans Emples. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ......................................................................... 9, 22, 31

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................................ 9, 10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................................... 3, 10

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16, 36 (S.D.N.Y. 2019) .................................................................... 33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S.Ct. 1318 (2015) ............................................................................................... 26

*Panther v. Jianpu Technology Inc.*,
    2020 U.S. Dist. LEXIS 177272 (S.D.N.Y. Sept. 27, 2020) .................................. 21, 24, 25

*Patel v. L-3 Communs. Holdings, Inc.*,
    2016 U.S. Dist. LEXIS 42978 (S.D.N.Y. Mar. 30, 2016) ................................. 33

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*,
    741 F. Supp. 2d 474 (S.D.N.Y. 2010) ................................................................ 32

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 U.S. Dist. LEXIS 66016
    (S.D.N.Y. Apr. 14, 2020) .................................................................. 22, 24, 27

*Rombach v. Chang*,
    355 F.3d 164, 173 (2d Cir. 2004) ...................................................................... 24

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F.Supp. 3d 313 (S.D.N.Y. 2018) ................................................................ 32

*Skiadas v. Acer Therapeutics Inc.*,
    2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020), *reconsid. denied*,
    2020 U.S. Dist. LEXIS 129104 (July 21, 2020) ....................................... *passim*

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) .............................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................... 27, 32

## STATUTES

15 U.S.C. 78u-4(b)(2) ........................................................................................ 22

15 U.S.C. §78u-5(c)(1) ...................................................................................... 20

## RULES

Rule 12(b)(6) ....................................................................................................... 3

## REGULATIONS

17 C.F.R. § 229.303(a)(3)(ii) ............................................................................ 20

Form 20-F, Item 503(d) ..................................................................................... 20

Lead Plaintiffs Juan Pablo di Benedetto, Galessi Holding Corp, and Pablo Greco ("Plaintiffs") respectfully submit this memorandum in opposition to the Motion to Dismiss Plaintiffs' Amended Class Action Complaint filed by defendants Qudian Inc. ("Qudian," or the "Company"), Min Luo ("Luo"), and Carl Yeung ("Yeung") (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

Despite Defendants' repeated efforts to argue that Plaintiffs have "recast" their complaint (Def. Br. at 1, 7), the Amended Class Action Complaint ("Complaint") is the first and only complaint filed by Lead Plaintiffs in this case. The Complaint details how, between December 13, 2019 and January 15, 2020 (the "Class Period"), Defendants made materially false and misleading statements and omissions concerning the *current* nature of Qudian's consumer lending business and its regulatory compliance, creating the false impression that the business was experiencing significant growth. Those misstatements of current and historical fact were followed by disastrous results for the third quarter of 2019, and even worse results for the fourth quarter of 2019, just a few months after the Company *raised* – and then *reaffirmed* – its fiscal guidance for 2019, shortly before abandoning its guidance altogether.

In particular, Defendants materially misrepresented the nature of the relationship between Qudian's legacy Core Loan Book ("CLB") and Open Platform ("OP"), a purportedly new initiative launched in the third quarter of 2018. First, Defendants misrepresented that Qudian was in compliance with applicable regulations when its lending partners were improperly outsourcing credit assessments to the Company in violation of Circular 141,[2] Qudian lost key lending licenses

---

[1] Citations to the Complaint are indicated as "¶_."
[2] Circular 141, issued by Chinese regulators on December 1, 2017, bars financial institutions from outsourcing core parts of the loan process, such as credit assessment and risk management, to third parties like Qudian. ¶¶5, 61, 62.

that it needed for CLB,[3] and Qudian's multiple regulatory problems made its partners stop providing funding for CLB. ¶¶5-7, 61-81. ***Second***, Defendants described OP as a promising new business line that allowed the Company to draw new borrowers from its large untapped user base while it continued to grow CLB.  ¶¶8, 65, 92-94. In reality, however, OP was created to address deep-seated regulatory concerns with CLB and, in fact, took the best borrowers away from CLB. ¶¶85, 92, 103-06, 125-27, 167-90. ***Third***, Qudian tried to make up for this shortfall in CLB by drastically lowering its lending standards as part of its "Credit Trial Program" to the point where – as finally disclosed by Defendants after the Company experienced terrible results in the third quarter of 2019, well over a year after beginning the Program – 20% of CLB's borrowers did not meet the Company's traditional lending standards. ¶¶9, 12, 105, 107-16, 128-36, 182, 191. Defendants, however, misrepresented that Qudian employed "conservative" lending standards that maintained its strong asset quality. ¶¶4, 9, 112, 132-33, 253. Ultimately, Qudian's relaxing of credit standards caused massive delinquencies that led to losses of billions of yuan.  ¶115.

Unable to squarely address the Complaint, which alleges "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007), Defendants instead offer myriad documents outside the four corners of the Complaint for their truth and ask the Court to ignore the well-pleaded allegations, choose Defendants' preferred set of facts, and find in Defendants' favor at the pleading stage prior to discovery.  These strained arguments ignore the basic rule that the Court cannot resolve factual disputes at this stage and that well-pleaded allegations must be construed in favor of Plaintiffs. *See Skiadas v. Acer Therapeutics Inc.*, 2020 U.S. Dist. LEXIS 105814, at *26-27 (S.D.N.Y. June 16, 2020), *reconsid. denied*, 2020 U.S. Dist.

---

[3] In May 2019, the Chinese government restricted the scope of business Qudian could conduct with one of its two online lending licenses – Fuzhou Gaoxin District Qufenqi Microlending Co. Ltd. (the "Fuzhou License") – from a broad, geographically-unlimited license to a narrow one limited to Ganzhou district and its surrounding counties. ¶¶6, 72. This significantly impacted CLB, as it substantially limited the amount of loans Qudian could make. ¶¶73-74.

LEXIS 129104 (July 21, 2020) (Woods, J.).

Plaintiffs have also adequately alleged scienter, including through Defendants Yeung and Luo's own admissions regarding the nature of OP, their lack of transparency about OP's borrower composition, and Yeung's abrupt departure from the Company on the very same day that Qudian released its abysmal full-year 2019 results. Plaintiffs' allegations are further supported by statements from *nine* former employees – including management-level employees and an employee who dealt directly with Defendant Luo on a daily basis – whose statements are corroborative and who were well positioned at the Company to "support the probability that [they] [ ] possess the information alleged." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc.*, 2020 U.S. Dist. LEXIS 140925, at *17-18 (S.D.N.Y. Aug. 6, 2020) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

Defendants' motion should be denied in full.

## ARGUMENT

### I.   Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, a complaint must simply allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" corroborating the claims. *Twombly*, 550 U.S. at 556. When deciding a motion to dismiss under the PSLRA, "the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171110, at *14 (S.D.N.Y. Dec. 2, 2013) (citations omitted). "[T]he Court's role . . . 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Bison Capital Corp. v. ATP Oil & Gas Corp.*, 2010 U.S. Dist. LEXIS 62836, at *14 (S.D.N.Y. June 24, 2010) (citations omitted).

## II.        Improper Extraneous Materials and Requests for Inferences in Defendants' Favor

Attempting to avoid the Complaint's well-pleaded allegations, Defendants impermissibly offer documents and facts outside the Complaint. "Although the Court may take judicial notice of the publication of a news article on a motion to dismiss, its consideration must be limited to the 'fact that press coverage . . . contained certain information, without regard to the truth of [its] contents.'" *Gentry v. Kaltner*, 2020 U.S. Dist. LEXIS 54182, at \*19 (S.D.N.Y. Mar. 25, 2020) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99 (9th Cir. 2018) (noting "concerning pattern in securities cases" of "overuse and improper application" of incorporation-by-reference and judicial notice doctrines "to defeat what would otherwise constitute adequately stated claims at the pleading stage").

Defendants attach to their Motion 28 articles from various media sources regarding "regulatory developments" in China, none of which relate to Qudian,[4] as well as SEC filings from two of Qudian's purported "competitors," 360 Finance, Inc. and Finolution Group. Def. Br. at 6-7 & n.3, 34-35 & n.22; Kreissman Decl., Exs. G.1-G.29 & Q.1-Q.5. Many of these purported "news articles" are, in reality, blog posts or stories from websites of unknown reliability.[5]

Despite their averments to the contrary, Defendants offer these articles and SEC filings for

---

[4] Defendants' four-page index contains a "Topic" column which purports to summarize the articles and highlight their legal significance. *See* Kreissman Decl., Ex. G.1 at 1 (*e.g.*, topic of Ex. G.8: "New regulation imposes mandatory data reporting obligations on P2P operators, *leading to tightened regulation and greater oversight over P2P lending industry*") (emphasis added). Defendants should not be permitted to circumvent the Court's briefing limitations through the use of exhibits that make additional arguments; Ex. G.1 should be disregarded. *See Martinich v. Ward*, 2017 U.S. Dist. LEXIS 3713, at \*6 (E.D.N.Y. Jan. 7, 2017) (admonishing counsel for attempting to evade page limitations for motions by attaching multiple exhibits and a lengthy affirmation); *see also Monec Holding AG v. Motorola Mobility, Inc.*, 2014 U.S. Dist. LEXIS 123898, at \*3-4 (D. Del. Sep. 5, 2014) ("This court has recognized the impropriety of including legal analyses in charts attached as exhibits to the briefing, as opposed to including them in the briefing itself, for purposes of circumventing page limitations") (citations omitted).
[5] *See, e.g.*, Exs. G.2, G.6, G.8, G.18, G.22, G.25 ("Technode"); G.3 ("New America"); G.7 ("Mingtiandi"); G.9 ("Crowdfund Insider"); G.10, G.13, G.14, G.21 ("Caixin"); G.17 ("The Epoch Times"); G.19 ("Analytics Insight"); G.24 ("Pymnts.com"); G.26 ("Jqknews.com"). Perhaps this is why Defendants did not include the sources' names in the index. *See* Ex. G.1. Plaintiffs do not challenge Ex. G.12, as this source is cited in the Complaint.

their truth, as they cite to them as evidence that "Qudian's business continued to slow down in the fourth quarter of 2019 as the credit and regulatory environments deteriorated further." Def. Br. at 6-7 & n.3; *see also id.* at 34-35.[6] Thus, Defendants are impermissibly trying to use these extraneous sources to refute Plaintiffs' well-pleaded allegations that it was Qudian's lowering of its credit standards – and not regulatory developments – that caused the Company's substantial losses from borrower delinquencies and falling revenues at the end of 2019. However, under *Twombly*, the question is whether Plaintiffs' claims – *construed in Plaintiffs' favor* – are "plausible."  550 U.S. at 570. Defendants may not rewrite the Complaint with their own purported facts, and they are not entitled to inferences from the facts in their favor. *See Acer*, 2020 U.S. Dist. LEXIS 105814, at *26-27 ("At the motion to dismiss stage of a securities fraud action, 'the court reads ambiguities' in challenged statements 'in [the plaintiff's] favor[.]'") (citation omitted).

Moreover, Defendants' alternative factual narrative is particularly implausible because they *admitted*, and market analysts disappointingly observed, that Qudian's lowering its credit standards led to its increased delinquencies and poor performance at the end of 2019. ¶¶147-55, 189. Similarly, Defendants' interpretation of Qudian's results (*see* Def. Br. at 1, 5-7) is misplaced because the Company's results in the first half of 2019 were a mirage fueled by Defendants' acceptance of lower-quality borrowers in CLB. When the Company's share price then collapsed after the truth was revealed, investors reacted not just to Qudian's failure to meet its inflated expectations, but also to the fact that its performance "prove[d] that the [Company's] business model is unsustainable." ¶332; *see also* ¶¶ 53-57.

Defendants' Exhibits G.1-G.29 and Q.1-Q.5, as well as their various proffered "facts" and

---

[6] If Defendants wanted to simply present "publicly available economic data" to the Court, as they claim (Def. Br. at 34-35 n.22), they could have cited to historical stock prices from a website such as Yahoo Finance, as was done in the case cited by Defendants, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F.Supp. 2d 243, 254 (S.D.N.Y. 2003). Instead, Defendants attached 98 pages of other companies' SEC filings to their brief.

requests for inferences in their favor, should be disregarded.

## III.    Detailed, Corroborative Statements from Nine Well-Positioned Former Employees Strongly Support Plaintiffs' Falsity and Scienter Allegations

Plaintiffs' allegations include detailed, corroborative statements of nine CWs that strongly support falsity and scienter.

The CWs establish that Qudian was in crisis at the end of 2018 because of the loss of business from finance company Ant Financial ("Ant") and the failure of its projects outside of its consumer lending business. ¶¶40, 41, 44, 107.[7] CW 4 explained that China's strict online lending regulations made many of the financial institutions that provided Qudian with funding reluctant to do business with Qudian, because of regulatory concerns with an intermediary guaranteeing loans. ¶¶7, 76, 77. This decreased funding for the CLB,[8] which put pressure on Qudian to secure funding and, combined with regulatory concerns, posed a threat to the viability of Qudian's business. ¶¶7, 70, 75-77, 187.

Indeed, according to a former management trainee who worked on multiple projects at Qudian during the Class Period (CW 5), Qudian developed many new businesses because the "cash loan business was affected by government regulations. They were afraid that regulatory changes

---

[7] When Qudian was founded by Defendant Luo in 2014, it focused on facilitating high-interest loans to Chinese college students. ¶31. As a result of increasing scrutiny of such businesses, which resulted in Chinese regulations banning on-campus student lending due to a rash of student suicides in response to threatening collection tactics (¶31 & n.2), the Company changed its business model several times and suffered a variety of failed projects prior to the beginning of the Class Period. For example, in 2015, Qudian established a business partnership with Ant, which allowed Qudian to source borrowers Ant's mobile third-party payment service provider. ¶36. The agreement was not renewed in August 2018, hurting the Company's performance. ¶¶37-42, 107. Shortly after its October 2017 IPO, Qudian launched a budget auto financing business, Dabai Auto, which Qudian shut down by the second quarter of 2019 after it sustained heavy losses. ¶¶4, 45-47. Qudian then decided to focus on its consumer lending business. ¶¶2, 53, 196.

[8] Qudian's consumer lending business focuses on making online, short-term loans to younger consumers in China with inadequate credit history ¶¶2, 28, 33. Such loans typically charge annualized fee rates of up to 36%. ¶34. There are two components to this business: CLB and OP. CLB consists of "on-balance sheet" transactions, which are loans Qudian funds with its own capital and loans funded by its institutional funding partners,  and "off-balance sheet" transactions, where Qudian refers qualified credit applications to banks, who fund the borrowers directly and pay Qudian a loan facilitation fee. ¶¶2, 59. In OP, similar to Qudian's preexisting off-balance sheet loan facilitation business, Qudian refers borrowers to other financial institutions that make loans directly to the borrowers, for which it receives a commission. ¶¶2, 82, 92, 103.  The main difference between OP and Qudian's loan facilitation business was that Qudian guaranteed the direct off-balance sheet loans that it facilitated, but did not guarantee OP loans. ¶103.

would destroy the whole business, so they needed to have some backup plans." ¶75. A former business manager at Qudian during the Class Period (CW 7) similarly explained that Qudian tried so many new businesses because CLB violated government regulations and needed to be shut down entirely. ¶99. A former regional manager in Qudian's Dubai Auto and online education businesses until the month the Class Period began (CW 2) described Qudian's repeated attempts to start new businesses as "blind innovations," of which the Company tried so many that employees "thought they were just a joke." ¶50. And CW 4 explained that regulatory concerns were one reason why Qudian was constantly trying to start new businesses outside of CLB; Qudian was "looking for new ways to generate income." ¶76.

CW 4, who directly assisted Luo, communicated with Luo on a daily basis and worked with Qudian's funding partners, avers that Qudian was violating Circular 141 because it was conducting credit assessments for banks, particularly where the banks "had a good relationship with the local regulator," and banks were relying upon Qudian's risk assessments rather than conducting their own independent assessments. ¶¶5, 69. This demonstrates the falsity of Defendants' statements throughout the Class Period that Qudian was in compliance with banking regulations by having banks conduct their own independent review of credit applications. ¶67. These CW statements also support the falsity of Defendants' repeated assurances to investors that Qudian had a "current regulatory compliant and stable operating structure." ¶¶78-81, 122.

The CW statements further support the allegations that OP was Yeung's idea, was created to address regulatory concerns with CLB, and was not a new product, but was a slightly modified version of Qudian's preexisting loan facilitation business to address those concerns, despite Defendants' representations to the contrary. ¶¶83, 95, 96, 98, 100, 101, 357, 359. A former manager in Qudian's loan business (CW 1) explained that Qudian described OP as a new line of

business "[f]or compliance reasons," and that the preexisting loan business was simply "renamed as [OP] around the time he left the Company" (May 1, 2019). ¶98. Similarly, according to a former public relations specialist at Qudian (CW 8), OP was not a "new product," but "became more important" in late 2018 due to regulatory concerns. ¶101. Further corroborating this is CW 4, who explained that OP was "just a PR story" and that it "did not change Qudian's practice because "Qudian also facilitated loans before it had [OP]." ¶96. Moreover, CW 7 averred that OP took business away from CLB so that while OP "made much profit in the short term, in the long term, it was just using up its own customers." ¶100. This supports the falsity of Defendants' statements throughout the Class Period that OP was created as a promising new venture that was adding to Qudian's business alongside the continued growth of CLB. ¶¶4, 8, 10, 11, 55, 108, 130-31.

Defendants predictably argue that none of the CW statements should be credited but their reasoning is faulty or factually wrong. First, they attack CW 4 because he or she left the Company three months before the Class Period began. But this does nothing to undermine the veracity of the statements and instead draws attention to the fact that CW 4's allegations establish that Defendants had knowledge of Circular 141 violations shortly *before* the Class Period began and before the first false and misleading statement was issued. *See Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (rejecting argument that CW statements "must be linked to specific quarters to meet the pleading standard," because "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period") (citation omitted); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding that pre-class period information may "establish that at the start of the class period, defendants had a basis for knowing" certain information); *Moshell v. Sasol Ltd.*, 2020 U.S. Dist. LEXIS 153314, at *17 (S.D.N.Y. Aug. 24, 2020) (rejecting challenge to CW based on time period of his knowledge). CW 4 also continued

8

to receive information about OP from former colleagues during the Class Period, in addition to CW 4's firsthand observations about Qudian's funding pressure. ¶¶76-77.

Defendants also complain that CW 4's statements should be rejected because he or she did not provide the names of the specific banks that violated Circular 141 with Qudian, but, again, this does not bear on the reliability of his or her statements and is not required. "At the pleadings stage, 'Plaintiff[s] [are] only required to show that the source of the belief is someone in a position to have had personal knowledge.'" *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484-85 (S.D.N.Y. 2018) (rejecting "demand [for] more details" about CW, noting that his "knowledge and credibility regarding the relevant information can be tested in discovery") (citation omitted); *aff'd on other grounds sub nom. Abramson v. NewLink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020)); *New Orleans Emples. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation.") (citation omitted).

Defendants' only remaining CW attack is directed at the eight additional CWs, seeking to discredit them as merely "low-level employees" who did not directly communicate with Luo or Yeung.  Def. Br. at 32.[9] But these CWs included managers (one of whom reported to a director who reported to Luo), regional managers, a public relations specialist, and a financial analyst, all of whom worked at the Company during the Class Period and have been described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *World Wrestling,* 2020 U.S. Dist. LEXIS 140925, at *17-18

---

[9] This attack was not leveled against CW 4, who spoke on a daily basis to Defendant Luo. ¶69.

(citing *Novak*, 216 F.3d at 314);[10] *see* ¶¶40, 41, 83, 99, 101, 107.[11]  Further, "there is no baseline requirement of [contact with individual defendants] in order to allege sufficient particularity . . . A plaintiff need only plead the 'probability that [the CW] know[s] what [he or she] is talking about.'" *New Link*, 297 F. Supp. 3d at 484 (citation omitted). "This liberal standard make[s] sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources . . . ." *World Wrestling*, 2020 U.S. Dist. LEXIS 140925, at *18.

## IV.   The Complaint Adequately Pleads Materially False and Misleading Statements and Omissions

### A.   Applicable Pleading Standards

"'The test for whether a statement is materially misleading under Section 10(b)' is . . . 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis in original) (citation omitted). Materiality "is generally inappropriate for determination at the pleading stage."  *In re Warnaco Grp. Inc. Sec. Litig.*, 388 F.Supp. 2d 307, 313 (S.D.N.Y. 2005) (citation omitted). "Thus, the matter must go to a jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the

---

[10] *See also In re Molycorp Sec. Litig.*, 2015 U.S. Dist. LEXIS 30892, at *3-4 n.2 (S.D.N.Y. Mar. 12, 2015) (accepting CWs identified by employment dates, positions, and direct supervisors); *Glaser v. The9, Ltd.*, 772 F.Supp. 2d 573, 590 (S.D.N.Y. 2011) (courts will "credit confidential sources . . . whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations") (citations omitted).

[11] The cases relied upon by Defendants are inapposite.  In *Campo v. Sears Holdings Corp.*, 635 F.Supp. 2d 323, 327 (S.D.N.Y. 2009), *aff'd*, 371 Fed. Appx. 212 (2d Cir. 2010), plaintiffs relied upon statements from CWs who recanted the allegations attributed to them. 371 Fed. Appx. at 217. In *Miao v. Fanhua*, unlike here, plaintiff did "nothing whatsoever to confirm the identities or statements of the confidential sources" and simply "learned about [them] secondhand from citations in a short-seller's report" which had "significant factual errors." 442 F.Supp. 3d 774, 804 (S.D.N.Y. 2020). Also, unlike here, the CWs' positions, job responsibilities, and employment periods were not described with sufficient particularity, and the statements at issue were "entirely unmoored in time" *Id.* at 802-03; s*ee also World Wrestling*, 2020 U.S.  Dist. LEXIS 140925, at *18 n.1 (distinguishing *Fanhua* for same reasons and rejecting challenge to CW statements). Finally, the CW statements in *Golesorkhi v. Green Mountain Coffee Roasters, Inc.* related to meetings that occurred at least two years before the alleged false statements. 973 F. Supp. 2d 541, 556 (D.Vt. 2013), *aff'd*, 569 Fed. Appx. 43 (2d Cir. 2014).

question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *In re Inv. Tech. Grp.*, *Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (citation omitted).

**B.    Materially False and Misleading Statements and Omissions**

1.    Misrepresentations Regarding Qudian's Compliance with Applicable Regulations and Omissions of Regulatory Issues and Violations

Throughout the Class Period, Defendants claimed that Qudian complied with Circular 141, which – as they conceded – prohibited the "outsourc[ing] [of] core business functions, such as credit assessment and risk management, to third parties." ¶¶66, 67 (citing 2018 20-F). Yet Defendants did not disclose that that banks were outsourcing credit assessments to it and that these banks were relying upon Qudian's credit assessments rather than conducting their own. ¶¶63, 69, 80, 81. Rather, Defendants falsely represented that although Qudian referred credit applications to banks, including "an assessment of their credit profiles and [Qudian's] suggested credit limits," the banks would "review the credit applications *independently* in accordance with their credit assessment standards and approve credit for drawdown." ¶67. Further, Defendants failed to disclose that the amount of loans that Qudian could make in CLB was severely limited in May 2019 when the government narrowed the geographic scope of the Fuzhou License. ¶¶6, 64, 66, 72, 73, 81. Defendants also failed to disclose that China's online lending regulations made many of the financial institutions that provided Qudian with funding reluctant to do business with Qudian because of regulatory concerns with an intermediary guaranteeing loans. ¶¶7, 75-77. Worse, not only did Defendants not disclose these regulatory issues, but they falsely represented CLB complied with applicable regulations, and that there were "no material regulatory uncertainties" for the Company. ¶¶3, 78-81, 122, 206, 218, 222, 224, 230, 271, 278.

Defendants argue that Qudian did, in fact, adequately disclose these regulatory issues. They

claim that Qudian disclosed it had not used the Fuzhou License since 2017, so the 2019 restriction of it was immaterial. Def. Br. at 17-18 (citing 2017 20-F). However, the filing that Defendants reference merely indicates that as of December 31, 2017, Qudian had "*temporarily* ceased funding credit drawdowns through [its] online small credit companies" earlier that month as a result of ongoing "inspections by the local regulatory authorities as part of a broader regulatory effort to promote compliance." 2017 20-F at 12, 73 (Kreissman Decl., Ex. J). In addition to being "temporary," this disclosure does not actually mention Qudian's lending licenses. Defendants ask the Court to make the unfounded factual leap that the only way that Qudian used its lending licenses was through its "online small credit companies," and not for on-balance sheet loans that it indisputably continued to make with its "own capital." ¶¶58, 71. Moreover, elsewhere in the 2017 20-F that Defendants cite, Qudian states: "We fund credit directly to our borrowers through . . . Fuzhou Microcredit, and . . . Ganzhou Microcredit, both of which have obtained approval of the relevant competent local authorities to provide credit." *Id.* at 62. These disclosures do not indicate that Qudian had "abandoned the use of its micro-lending licenses," as Defendants suggest. Def. Br. at 17. At any rate, "[a]t the motion to dismiss stage of a securities fraud action, 'the court reads ambiguities' in challenged statements 'in [the plaintiff's] favor.'" *Acer*, 2020 U.S. Dist. LEXIS 105814, at *26-27 (citation omitted).

With respect to Circular 141, Defendants argue that they have not "been accused, investigated, or found liable for violating Circular 141." Def. Br. at 19; *see also id.* at 23. But this ignores Plaintiffs' well-pleaded allegations that banks were outsourcing credit assessments to Qudian when regulators were willing to look the other way, and that these banks were therefore not conducting "independent" credit assessments, as Defendants falsely represented. ¶69. Defendants also aver they "disclosed the credit assessment services [Qudian] provided to banks,

the uncertainty surrounding Circular 141, and the fact that [Qudian] could face regulatory action for violating Circular 141." Def. Br. at 18. Similarly, Defendants argue that they "disclosed the applicable law and facts" and "had no legal obligation to draw negative conclusions or predict future legal consequences." *Id.* at 19. These are red herrings. Plaintiffs do not argue that Qudian was obligated to disclose legal conclusions or legal interpretations; what Qudian was obligated to disclose were material facts – *i.e.*, that banks were outsourcing credit assessments to it and not conducting their own, independent evaluations of credit files.

Further, while "[a] corporation does not have a duty to disclose information simply because it is material" or "because a reasonable investor would very much like to know that fact," it does have an obligation to do so when 'secret information renders prior public statements materially misleading.'" *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2019 U.S. Dist. LEXIS 55977, at *20 (S.D.N.Y. Mar. 30, 2019) (Woods, J.) (citation omitted); *see also Lickteig v. Cerberus Capital Mgmt., L.P.*, 2020 U.S. Dist. LEXIS 74575, at *23 (S.D.N.Y. Apr. 26, 2020) (Woods, J.) ("Where a company does not have an obligation to speak but chooses to do so anyway, it assumes 'a duty to be both accurate and complete.'") (citation omitted). Here, Defendants disclosed: (i) the existence of Circular 141, (ii) that under Circular 141, "[a] bank may not outsource its core business functions, such as credit assessment and risk management, to third parties," and (iii) that Qudian referred and transferred qualified credit applications and assessments to banks that supposedly conducted independent assessments of those files. ¶¶66-67. Having disclosed these facts, Defendants had a duty to "tell the whole truth" by informing investors Qudian was engaged in the very activities that it conceded violated Circular 141. Their failure to do so was a material omission (in addition to their affirmatively misstating Qudian's regulatory compliance).

Finally, Defendants argue – with no support– that Qudian was not governed by Circular

141 because it "on its face, governs the actions of *banks* who rely on others for credit assessments, not those who provide credit assessments to the banks." Def. Br. at 19 (emphasis in original). This is beside the point. Defendants did not inform investors that banks were outsourcing credit assessments to it – regardless of their self-serving position that they were not subject to Circular 141. Of course, this assertion is belied by Defendants' own statements that show Defendants believed Qudian *was* subject to Circular 141: "If our arrangement with banks is deemed to be in violation of Circular 141, *we* could be subject to penalties and/or be required to significantly change our business model." 2018 20-F at 13 (Kreissman Decl. Ex. K).  Further, the sections of the Complaint and SEC filings that Defendants cite do not indicate that Circular 141 was limited only to banks. *See* ¶66 & 2018 20-F at 12-13 (simply stating that "a bank may not outsource its core business functions, such as credit assessment and risk management, to third parties.").

2.    Misrepresentations About Why Qudian Developed OP

Plaintiffs allege that Defendants falsely portrayed OP as a promising new business initiative that would "drive additional profit growth" alongside continued growth in CLB. ¶¶8, 65, 82-83, 86, 120-21.  For example, on March 19, 2019, when Luo discussed Qudian's results from the fourth quarter and full year 2018, he described OP as supporting the Company's "earnings outlook through activations in our existing user base" and as a business that would "deliver[] long-term growth for our shareholders." ¶86. As the Class Period progressed, Defendants described this dual-track growth as *already occurring*. *See* ¶¶88-89, 121, 239, 248, 256 (Luo describing OP in the first quarter of 2019 as "already showing strong profit potential" while CLB "continue[d] robust growth," with Yeung adding that OP already "contributed meaningful revenue"); ¶¶276, 280, 282 (similar statements from Q2 2019). These were statements of current and historical fact because they described CLB's and OP's past performance as meeting Qudian's business goals.

These statements were materially false and misleading because Qudian's true reason for

14

developing OP was that CLB violated China's strict online lending regulations and risked being shut down because of the violations of Circular 141 and other regulatory issues with CLB, and because Qudian was losing funding sources due to financial institutions' concerns about regulatory problems. ¶¶85, 92, 98-99, 124, 167-76. Indeed, the Complaint adequately pleads that Defendants did not view OP as an additional product that generated revenue on top of CLB, as described to investors, but rather as a revised business model that would allow Qudian to conduct its business in a regulatory compliant manner. ¶¶57, 65, 98, 124.  It was also misleading to describe OP's and CLB's short-term growth without disclosing that this performance was fueled by Qudian's substantially lowering credit standards in CLB, and not by OP drawing on the Company's large pool of previously untapped borrowers. *See infra* § IV.B.3.

In response, Defendants mischaracterize Plaintiffs' allegations regarding the relationship between OP and CLB.  Def. Br. at 23. Plaintiffs do not allege that "[g]uaranteeing loans and bearing losses in the case of a default is [ ] the same business as a risk-free commission-based referral platform." *Id.*  Rather, Plaintiffs' allegation is that OP served the same purpose in Qudian's business plan as CLB's pre-existing loan-referral business. Both acted as vehicles for referring loans to other financial institutions, and any changes that Qudian made in OP were driven by Qudian's regulatory concerns with CLB rather than Defendants' stated (but false) reason that OP presented a new business that would *add* to CLB. ¶¶104, 117, 125, 186-90.[12]

Defendants also argue that because Qudian continues to provide credit assessments as part of OP, "[b]y definition, Qudian could not have created OP to avoid Circular 141 risk…."  Def. Br. at 24; *see also id.* at 33-34. But this argument mischaracterizes the regulatory risk that OP was

---

[12] Defendants also proffer an alternative, logic-straining interpretation of Yeung's statement in the November 18, 2019 earnings call that CLB and OP were doing the "same business."  Def. Br. at 23 n.13. Defendants are impermissibly asking the Court to draw inferences from the well-pleaded allegations of falsity *in their favor*.

designed to address. Plaintiffs do not argue that OP was created *only* to address Circular 141's ban on outsourcing credit assessments, but rather, that it was intended to resolve the problem that CLB guaranteed loans for other financial institutions. After Qudian's disastrous results for the third quarter of 2019, Yeung admitted that the "most important" feature of OP for both Qudian and its funding partners was that it "is the most regulatory compliant structure because there is no third party involved in guaranteeing risk." ¶171; *see also* ¶¶170-76, 193-96. Defendants' failure to even mention this reason for OP in their Motion is telling. Indeed, these regulatory concerns were so stark that Qudian was losing funding sources for CLB because other financial institutions were concerned about these regulatory problems. ¶¶7, 70, 75-77, 96, 124, 187, 359.

### 3. Misrepresentations About the Composition of OP

Plaintiffs allege that Defendants falsely portrayed OP as serving a different set of borrowers in addition to those that were already approved to access CLB. For example, Qudian's March 18, 2019 Management Presentation represented OP as providing the Company with the ability to attain additional "growth beyond [the core] loan book" from Qudian's "massive dormant user base" of approximately 65 million registered users who were not currently borrowing from CLB. ¶¶93, 125, 212. Qudian perpetuated this false narrative in subsequent Management Presentations during the Class Period. ¶¶94, 243.

These statements were materially false and misleading not only because OP was taking business away from CLB but – as Luo and Yeung admitted – it was taking the "highest-quality," most credit-worthy borrowers, leaving lower quality borrowers who were more likely to default on their loans. ¶¶8, 13, 53, 57, 65, 85, 103-06, 125-27, 177-91.  A business manager who worked at Qudian from July 2017 to June 2019 (CW 7) explained how OP took business away from CLB, so that while OP "made much profit in the short term, in the long term, it was just using up its own customers." ¶100. Plaintiffs' well-pleaded allegations – which include a mathematical analysis

16

based on information Qudian disclosed after its poor performance in the third quarter of 2019 –
are more than sufficient to support the falsity of Defendants' statements, as they establish that even
if the number of OP borrowers was growing, that came at the expense of the quality of borrowers
in CLB. ¶181.  Indeed, Qudian's 6.3 million total outstanding borrowers in the third quarter of
2019 – after Qudian halted the Credit Trial Program – reflected a meager 3.4% increase from the
prior quarter. ¶181. This became clear only after Qudian's disastrous third quarter of 2019. ¶181;[13]
*see also* ¶153 (analyst noting on Nov. 20, 2019 that Company was "shifting its focus towards the
open-platform" rather than growing both segments in tandem as Defendants had represented).

Defendants argue that these allegations "misconstrue" the Company's disclosures and that
"the 'better' borrowers Plaintiffs claim that CLB supposedly lost to OP sought loans larger than
CLB was authorized to make" and, therefore, the Complaint does not adequately allege "that the
OP business took the highest-quality borrowers from the CLB" or that these borrowers "otherwise
would have borrowed from the CLB." Def. Br. at 3, 25.  But Defendants cannot seriously contest
that OP took CLB's "best" or "highest-quality" borrowers, because Defendants admitted exactly
that and even apologized for not disclosing it earlier after Qudian's disastrous results from the third
quarter of 2019. ¶¶178-79, 183-84, 189. Yeung explained that Qudian had "only allowed 5.5
million out of the 21 million [approved borrowers] access to open-platform." ¶184.  In other words,
rather than activating more of Qudian's 65 million registered users that were not already using
CLB, as Defendants had represented earlier (¶¶93, 125, 212), the Company had done just the
opposite, by limiting OP to just a subset of Qudian's highest quality borrowers. Defendants'
argument also ignores entirely that even if OP's borrowers were taking out larger loans (with the

---

[13] In particular, Qudian told investors on its third quarter earnings call that 1 million of those borrowers were from
OP, which means that 5.3 million were from CLB.  ¶181. In the second quarter of 2019, Qudian disclosed that it had
6.1 million total outstanding borrowers and 440,000 of those borrowers were from OP.  ¶181.

Company earning a correspondingly lower percentage fee on each loan (¶186)), they still were no longer taking out loans in CLB because they were now borrowing from OP instead. Indeed, Defendants belatedly admitted – when they had no choice because of the Company's terrible performance – that CLB's decline was a result of OP doing "the same business, focus[ing] on the high quality borrowers." ¶¶178-79, 183-84, 189.

Moreover, Defendants' prior disclosure that OP drew from both borrowers "that do not meet our credit requirements" (*i.e.*, lower-quality customers), as well as users with "better credit profiles" that sought larger loan amounts, in no way disclosed to investors that OP focused on CLB's ***best*** borrowers. Indeed, Defendants concede that they did not disclose this key feature of OP because they instead resort to the premature factual argument that OP did not in fact cannibalize CLB's highest-quality borrowers. Def. Br. at 3, 25. But this is contrary to the well-pleaded allegations, which the Court must construe in Plaintiffs' favor. *See Cerberus Capital Mgmt.*, 2020 U.S. Dist. LEXIS 74575, at *31 (holding that because plaintiff's allegations "are consistent with [plaintiff's] theory of liability . . . the Court cannot dismiss his claim as a matter of law").

4.    Misrepresentations and Omissions about the Credit Trial Program and Qudian's Lending Standards in CLB

Plaintiffs allege that in order to compensate for diverting its highest-quality borrowers to OP, Defendants aggressively lowered Qudian's credit standards and passed this off as its Credit Trial Program, while falsely representing that CLB's credit standards were "conservative." ¶¶4, 9, 57, 107-18, 128-36, 180, 187, 253, 292, 303, 319. Far from applying "conservative" standards, Defendants had *lowered* credit standards in CLB, thus drastically increasing the risk of borrower default. ¶¶4, 9, 107-11, 136. Further, when Defendants finally disclosed the existence of the Credit Trial Program, they falsely represented that it was small when, in reality, it represented at least 20% of Qudian's loan portfolio.  ¶¶10, 110-16, 182, 292-95.

Defendants argue that their disclosures with respect to the Credit Trial Program were adequate because they disclosed that Qudian "regularly adjusts" its credit standards and they disclosed the specific adjustments in question. Def. Br. at 26-27. But "risk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made." *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (citation omitted). Thus, "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks." *Id.* (citation omitted); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (plaintiff can overcome risk disclosure statements and cautionary language if "the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss"). "Put differently, '[g]eneral risk disclosures in the face of specific known risks which border on certainties' are not sufficient to defeat a securities fraud claim." *Dandong v. Pinnacle Performance Ltd.*, 2011 U.S. Dist. LEXIS 126552, at *34 (S.D.N.Y. Oct. 31, 2011) (citation omitted).

The disclosures upon which Defendants rely here provided only vague warnings that the Company might expand its borrower base, possibly causing higher delinquency rates; they do not disclose that Qudian was planning to (or, in the case of those disclosures made in or after the third quarter of 2018, already had) lowered its credit standards in CLB after secretly shifting its best borrowers to OP to such a great extent that a full 20% of CLB's borrowers did not meet its traditional credit standards. ¶¶57, 111, 116, 136, 182. *See*, *e.g.*, Def. Br. at 26-27 (citing 2018 20-F at 5 ("As our business develops or in response to competition . . . [w]e will also seek to expand the base of prospective borrower that we serve, which may result in higher delinquency rates."); 3Q 18 earnings call (stating that Qudian's credit standards "will actually relax a lot more into fourth quarter," leading to a "higher number of outstanding borrowers")). Indeed, Qudian

19

established the Credit Trial Program in the third quarter of 2018 (¶110) – around the same time as

the 3Q18 earnings call and before the 2018 20-F was issued (on April 15, 2019). ¶228. As such,

these disclosures are insufficient to defeat Plaintiffs' claims. *See In re Facebook, Inc.*, 986 F.Supp.

2d 487, 516 (S.D.N.Y. 2013) (liability for misrepresentations where Registration Statement

represented that "revenue cut was merely possible when, in fact, it had already materialized");

*Dodona I,* 847 F.Supp. 2d at 647 (actionable omission where defendants "were aware of a buildup

of negative events in the subprime mortgage market" but provided only "boilerplate statements

regarding . . . the possibility of market downturns, and the risks generally associated with

mortgage-backed assets").[14]

### C.     Defendants Violated Their Duty to Disclose Known Trends and Uncertainties

Defendants had a duty, pursuant to Form 20-F Item 5(d), to disclose "any known trends,

uncertainties, . . . events that are reasonably likely to have a material effect on the company's net

sales or revenues, income from continuing operations, profitability, liquidity or capital resources,

or that would cause reported financial information not necessarily to be indicative of future

operating results or financial condition."[15] Further, "[i]f a company . . . 'puts the topic of the cause

of its financial success at issue, then it is obligated to disclose information concerning the  source

of its success, since reasonable investors would find that such information would significantly alter

the mix of available information." *Freudenberg v. E*Trade Fin. Corp.*, 712 F.Supp. 2d 171, 179

(S.D.N.Y. 2010) (citation omitted).

Defendants repeatedly misrepresented that their positive performance was a result of

---

[14] *See also Freudenberg*, 712 F.Supp. 2d at 179 (explaining that when assessing cautionary language, "the law provides 'no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'") (citation omitted).

[15] Item 5(d) is the corollary of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") applicable to foreign issuers such as Qudian. "[T]he SEC and courts have interpreted Item 303 and Item 5 to require the same disclosures." *Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 163 (D. Conn. 2019) (citations omitted).

Qudian's "conservative" CLB growing alongside OP. ¶¶4, 9, 57, 132-34, 180, 253, 254. When making these affirmative representations, Defendants misleadingly omitted the reasons for the creation and composition of OP and the nature and existence of the Credit Trial Program. Simply put, the risk and uncertainty that lowering the credit standards in CLB to compensate for shifting the highest-quality borrowers to OP would cause an increase in borrower defaults and decrease in revenues were both reasonably foreseeable and material to Qudian's future performance, and therefore that trend was required to be (but was not) disclosed. Defendants even described the Company's supposedly positive performance as a "fantastic growth *trend*," an "encouraging *trend*," and as reflecting "strong momentum" in OP with no "data or *trends* pointing otherwise." ¶¶89, 121, 137, 262, 297 (emphases added). Defendants were required to disclose the true underlying trends that led to these fleeting, short-term results.

Judge Gardephe's recent decision in *Panther v. Jianpu Technology Inc.*, 2020 U.S. Dist. LEXIS 177272 (S.D.N.Y. Sept. 27, 2020), is highly instructive. In *Jianpu*, plaintiffs alleged that defendant, a Chinese online lending platform, had failed to disclose impending government regulations for financial service providers in its IPO registration statement.[16] *Id.* at *4-5. The court concluded that that plaintiffs had adequately pled a known material trend – and, therefore, Jianpu was obligated to disclose under Item 503 – information about financial services providers' non-compliance with the Interim Measures, the fact that many of these providers used Jianpu's platform, and the possible effects of their non-compliance on Jianpu's business. *Id.* at *26. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011) (disclosure required where management knew downward trend in real estate market was reasonably likely to have

---

[16] The regulations at issue, called the "Interim Measures," governed peer-to-peer ("P2P") lenders on Jianpu's platform. *Jianpu*, 2020 U.S. Dist. LEXIS 177272 at *5. Panther alleges that the Interim Measures were causing the number of P2P providers in China to decline. *Id.* at *4-5.

material impact on registrant's financial condition). This Court's recent decision in *Plumbers &
Pipefitters Nat'l Pension Fund v. Davis* also shows why "Defendants should have disclosed this
trend." 2020 U.S. Dist. LEXIS 66016, at *25 (S.D.N.Y. Apr. 14, 2020) (Woods, J.) ("The Fund
has adequately alleged that PSG's sales practices created a trend of increasing inventory . . . and
that . . . . It was both reasonably foreseeable and material to PSG's future performance that a
buildup of inventory would lead to a decline in PSG's future sales.") (citations omitted).

### D.       The Safe Harbor Does Not Apply

Defendants contend their statements constituting "forward looking guidance" (*see*
Kreissman Decl. Ex. M) are protected by the PSLRA's narrow safe harbor (15 U.S.C. § 78u-
5(c)(1)) (the "Safe Harbor"), which protects any (a) "forward-looking statement," (2) identified as
such, (3) that is accompanied by "*meaningful* cautionary statements identifying important factors
that could cause actual results to differ materially from those in the forward-looking statement."
These factors are not met here.

"It is well recognized that even when an allegedly false statement has both a forward
looking aspect and an aspect that encompasses a representation of present fact, the safe harbor
provision of the PSLRA does not apply." *In SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555
(S.D.N.Y. 2010) (citation omitted). The statements at issue here consisted of: (i) the purported
reasons for the Company's growth (which formed the basis for the increased and reaffirmed
guidance), including statements about CLB's and OP's current and past performance; (ii)
representations about the quality of CLB borrowers; (iii) the reason why OP was developed; and
(iv) representations about Qudian's compliance with regulations. As such, they are statements of
current and historical fact that are not protected by the Safe Harbor. *See Celestica,* 455 Fed. Appx
at 15 (no protection where defendants "did more than just offer rosy predictions," but "stated that
present inventory was under control or omitted it as a contributor to the company's costs, despite

recklessly disregarding that the opposite was true") (citation omitted); *In re Vale S.A. Sec. Litig.*, 2017 U.S. Dist. LEXIS 42513, at *76 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) (statements that company had risk management systems and followed health, safety, and environmental standards "not forward-looking in nature, but rather, representations of present or historical facts").

Second, Defendants' cautionary language was insufficient. Defendants try to hide behind their generic "Safe Harbor Statement," which cautioned that "[a] number of factors could cause actual results to differ materially from those contained in any forward-looking statement, including but not limited to . . . Qudian's future business development, financial condition and results of operations . . . [and] Qudian's expectations regarding keeping and strengthening its relationships with borrowers, institutional funding partners . . . and other parties" and other equally vague language that lacks meaning. Def. Br. at 5. But "[c]autionary language is not meaningful if it is 'boilerplate,' 'general,' and 'vague.'" *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F.Supp. 3d 821, 847 (S.D.N.Y. 2019) (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010)). The above statements, which refer to only general risks, are insufficient to give rise to Safe Harbor protection. *Id.* (general warnings about "execution risks" and "unspecified 'known…risks [and] uncertainties'" insufficient).

Third, the Safe Harbor does not apply where – as here – the statement was made by someone who had "actual knowledge" that the statement was false or misleading. *In re SLM Corp.*, 740 F. Supp. 2d at 555 (citation omitted); *see also In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 736 (S.D.N.Y. 2015) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired'") (citations omitted); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 756 (S.D.N.Y. 2001) ("No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were

false when made.") (citations omitted). Plaintiffs' allegations that Defendants knew their statements were false (¶354, 363-64, 372) are sufficient to refute Safe Harbor protection. *See Fresno Cnty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547-48 (S.D.N.Y. 2017) (rejecting application of the safe harbor for statements regarding increased guidance where, like here, the "defendant made the projections knowing they were based on a false premise"); *E*Trade*, 712 F.Supp. 2d at 194 ("general statements that loan losses and securities impairments 'could be affected by market risks and were subject to change'" insufficient to insulate defendants where they knew loans were deficient and risky) (citation omitted); *AMC Entm't Holdings*, 422 F.Supp. 3d at 847 ("The reasonable inference is available from Plaintiffs' allegations that by this time, AMC plausibly 'possessed information' that the risks…had already materialized….the warnings identified by Defendants are insufficient at this stage of the litigation to conclude that these statements fall into the…safe harbor.") (citations omitted).

Finally, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Davis*, 2020 U.S. Dist. LEXIS 66016, at *35-36 (statements that company "may experience excess inventory levels or inventory shortages" which could result in "write-downs and sale of excess inventory at discounted prices" not protected because defendant knew of actual or likely buildup of inventory) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). This is precisely the case here. For example, Defendants warned that "[a]ny significant change to our business model not achieving expected results may have a material and adverse impact on our financial condition and results of operation" (2018 20-F at 5), but they knew they had *already* made significant changes to Qudian's business model by lowering credit standards in CLB. ¶¶9, 10, 57, 108, 107-18, 128-36. Accordingly, the Safe Harbor provides no protection. *See Jianpu*, 2020 U.S. Dist. LEXIS 177272, at *29-30 (finding disclosures insufficient where they

were "all framed as mere hypotheticals, however, and thereby imply that the risk of regulation is a theoretical one, rather than – as Plaintiff alleges – a risk that has already materialized in the marketplace").[17]

## V.    The Statements are Neither Opinion nor Puffery

Defendants claim that the following categories of misrepresentations are inactionable puffery or opinion: (i) confidence that Defendants would meet their guidance (Def. Br. at 16 n.6 (citing ¶¶200, 201, 226, 262, 284)); (ii)  representations that Qudian was compliant with applicable regulations (*id.* at 20-21 & n.11 (citing ¶¶3, 78, 79, 122, 222, 224, 230, 271, 273)); and (iii) characterizations of Qudian's credit standard practices as "conservative." *Id.* at 28 n.17 (citing ¶¶253, 292-95, 315-17).  Defendants are wrong even as to this *limited subset* of the misstatements alleged in the Complaint.

Defendants repeatedly expressed their confidence in Qudian's raised guidance for 2019. For example, on June 21, 2019, when Qudian raised its financial guidance for 2019, Luo stated: "[G]iven our sufficient funding and strong user demand, growth of our loan book is well ahead of our previously set targets, giving us strong confidence that we will meet our revised guidance." ¶262. These statements are not puffery, as they are not "so vague, broad, and non-specific that a reasonable investor would not rely on [them], thereby rendering [them] immaterial as a matter of law." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011).

---

[17] Notably, the disclosures in *Jianpu* were very similar to those here: China "has not adopted a clear regulatory framework governing the young and rapidly evolving online consumer finance market"; China "may also enhance the implementation of existing laws and regulations"; "new government laws and regulations [or] stricter enforcement of existing laws and regulations . . . may materially and adversely affect our business"; "if any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected." 2020 U.S. Dist. LEXIS 177272, at *29-30. *Compare with*, *e.g.*, Def. Br. at 15-16 & n.5 (Qudian had "a limited operating history in a new and evolving market, which makes it difficult to evaluate our future prospects"; "regulatory regime and practice" were "evolving and subject to uncertainty"; regulations were in "nascent stage and subject to further change and interpretation," which could "materially and adversely affect[]" the business").

Defendants also repeatedly assured investors that Qudian was compliant with online lending regulations, touting its "regulatory compliant and stable operating structure." ¶¶3, 78, 122, 222, 224; *see also* ¶¶79, 273 ("Regulatory Compliant [sic] is Embedded in our DNA."). These statements, too, are not inactionable puffery. *See In re Bear Stearns Cos. Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (statement that defendant was "in compliance with CSE regulatory capital requirements" materially false); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("statements regarding its general integrity and ethical soundness," although they "may be mere puffery" when "viewed in isolation," were actionable because Company used the statements "in an effort to reassure the investing public about the Company's integrity") (citation omitted).

Defendants' characterization of statements as opinion fares no better.  Recently, the Second Circuit explained that the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), "reduced the significance of district courts' classifications of statements as those of fact or opinion" by "increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion" by either (1) "alleg[ing] that a statement of opinion contained one or more embedded factual statements that can be proven false," or (2) "alleg[ing] that a statement of opinion, without providing critical context, implied facts that can be proven false." *NewLink,* 965 F.3d at 175-76. Here, even accepting Defendants' flimsy argument that their statements of present or historical fact regarding Qudian's compliance with applicable regulations were opinions, they would still be actionable because they embedded and implied facts that were false and that had no reasonable basis, based on omitted information. *See* ¶¶78-81; *see also Omnicare,* 135 S. Ct. at 1327 ("A fact is a thing done or existing," whereas "[a]n opinion is a belief, a view, or a sentiment which the mind forms of persons or things.").

Finally, Defendants' false characterizations of CLB's credit standards as "conservative" (¶¶253, 292-95, 315-17) are not puffery, because they were directed at Qudian's then-existing condition, and because they misrepresented the fact that, in fact, Qudian's credit standard practices were *not* conservative, as they had substantially lowered their credit standards in CLB, thus drastically increasing the risk of borrower default. *See E\*Trade*, 712 F. Supp. 2d at 176-78, 182, 189 (statements that defendant utilized "conservative" credit standards or followed "conservative" loan origination and acquisition practices were not puffery).

## VI.     The Complaint Adequately Pleads Scienter

### A.     Applicable Pleading Standards

A 10(b) plaintiff must allege facts "giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). A "strong inference" is one a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324. Further, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Davis*, 2020 U.S. Dist. LEXIS 66016, at \*41 (citation omitted). Finally, "[a]ccepting Plaintiffs' allegations as true and construing them in the light most favorable to Plaintiffs, the Court must consider the Complaint **_in its entirety_** to determine "whether **_all of the facts alleged, taken collectively_**, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 324 (emphases added). An inference of scienter can be established by showing either that defendants had a motive to commit fraud or "circumstantial evidence of conscious misbehavior or recklessness." *Blanford*, 794 F.3d at 306 (citation omitted).

### B.     Indicia Supporting a Strong Inference of Scienter

In addition to motive and opportunity, which are not required but are abundantly alleged here (*infra* §VI.C), Plaintiffs' scienter allegations include Yeung and Luo's own admissions; Yeung's creation of OP; Yeung's abrupt and suspiciously-timed departure from the Company;

corroborative statements of the nine CWs; Yeung's statements about the Credit Trial Program that demonstrate his knowledge of adverse facts about the true nature of OP and CLB; Yeung and Luo's direct involvement in Qudian's day-to-day operations; and the existence of red flags of which Defendants were aware and/or had a duty to investigate.

After Qudian performed poorly in the third quarter of 2019, Luo and Yeung made a number of crucial admissions on calls with investors regarding the true nature of OP and the Credit Trial Program (¶¶167-71, 173-79, 182-85, 189-90), which support an inference of scienter because they show that the reasons for creation of OP, and the borrower composition of CLB and OP, were crucial business decisions that Defendants had made but did not accurately tell investors. *See Acer*, 2020 U.S. Dist. LEXIS 105814, at *33-34 (inference of scienter bolstered by admissions in SEC filings); *see also World Wrestling* 2020 U.S. Dist. LEXIS 140925, at *27-29 (crediting executive's admission as circumstantial evidence of scienter); *AMC Entm't Holdings*, 422 F.Supp. 3d at 850 (finding CEO's public statements supported inference of scienter) (citation omitted).

Yeung revealed on the third quarter earnings release call that because the financial institutions with which Qudian worked took on the risk of default in OP, "the economics only makes sense to my funding partner if the loss rate is lower," which required sending them Qudian's best borrowers, and he stated with respect to OP: "We can do the ***same business***, focus on the high quality borrowers, earn an interesting fee and carry on growth." ¶¶178-79, 189; *see also* ¶183 (Yueng admitting on Nov. 25, 2019 call that OP focuses on the "highest-quality borrowers" and the "best-quality users"). In addition, Yeung apologized to borrowers on this call when responding to a question about how the borrowers in OP compared to those in CLB: "I'm sorry that this may not have been apparent to the market yet, but it will be over time." ¶184; *see also* ¶185 (same call: "We want to be transparent. We are already leading the industry in transparency, I think. So,

28

whether we can do more? Let us -- give us some time to think about how we can be better at this. There's obviously still much work to do"). Luo and Yeung also admitted that OP's purpose for both Qudian and its funding partners was to be the "ultimate form of regulatory compliant fintech in China" and "the most regulatory compliant structure." ¶¶168-71, 174-75, 193-95. These admissions show Defendants grappling with how much to disclose to investors of the basic nature and purpose of OP, which they created to address these grave concerns.

Seeking to distance themselves from these damning admissions, Defendants argue that they were "not admissions at all." Def. Br. at 33. As an example, Defendants point to Luo's statement that CLB was "in full compliance with Circular 141." *Id.* (citing ¶168). But this argument ignores the admissions, simply pointing to another statement that was itself materially false and misleading. Somewhat remarkably, Defendants next argue – citing "context" – that Yeung was not apologizing on the November 25, 2019 conference call, but instead was expressing "disappointment that the market did not yet fully appreciate" OP. *Id.* But Plaintiffs' inference is certainly "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Petrobras*, 116 F.Supp. 3d at 382 (citing *Tellabs*, 551 U.S. at 314).

The suspicious timing of Defendant Yeung's departure further supports an inference of scienter. Yeung – who created OP, the source of the Company's misrepresentations – resigned suddenly from the Company on March 18, 2020 for unspecified "personal reasons," on the very same day Qudian announced its disastrous full-year 2019 results. ¶¶25, 83, 164. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) ("timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter") (citation omitted); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (crediting resignations of executives two weeks after fraud revealed); *Varghese*

*v. China Shenghou Pharm. Holdings*, 672 F.Supp. 2d 596, 608 (S.D.N.Y. 2009) (director resignation and CEO removal contributed to inference) (citation omitted).[18]

In addition, Plaintiffs' scienter allegations are bolstered by nine corroborated CW statements of well-placed former employees, which establish that: (i) CLB was in crisis during the Class Period because of the loss of business from Ant and failure of other business projects (¶¶40, 41, 44, 75, 107, 359); (ii) regulatory pressure on CLB made financial institutions stop providing Qudian with funding and challenged the viability of the business (¶¶7, 75-77, 359); (ii) Yeung created OP (¶¶83, 357); (iii) OP was essentially a rebranding of Qudian's loan facilitation business (¶¶95, 96, 98, 101, 359); (iv) OP took business away from CLB (¶100); and (v) Qudian was violating Circular 141 (¶¶5, 69, 359). These allegations support a strong inference that Defendants knew, or should have known, about the business and regulatory pressures on CLB; the reasons for creation, and composition of, OP; and that Qudian was violating Circular 141. *See AMC Entm't Holdings*, 422 F.Supp. 3d at 851-52 (CW statements "provide some further support for an inference of scienter").

Defendant Yeung's own public statements regarding the Credit Trial Program also demonstrate his knowledge of adverse facts about the true nature of OP and CLB that undermined Defendants' false and misleading statements during the Class Period. For example, when discussing the Credit Trial Program after the second quarter of 2019 – before admitting to its true extent the following quarter – Yeung described the "so-called user profile" of borrowers in that program as "a highly [*sic*] trade secret" (¶110), indicating that he was aware of that information

---

[18] Defendants' argument that Yeung's departure cannot contribute to an inference of scienter because there are no facts linking it to any misconduct (Def. Br. at 31 n.19) ignores the wealth of authority discussed above. And Defendants' reliance on *In re BISYS Sec. Litig.* is misplaced, as, unlike here, documents cited in the *Bisys* complaint "suggest[ed] that [one executive] resigned to accept another opportunity and [the other executive] resigned for health reasons." 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005).

that he chose not to disclose at that time. This shows not only that Yeung had "access to [the] information" that Defendants misrepresented about the nature of Qudian's borrowers – which itself would be enough to plead a strong inference of scienter, *see Blanford*, 794 F.3d at 306 – but he was actually aware of key information he chose to underplay by describing the Credit Trial Program as a mere "sales and marketing expense" to acquire new borrowers. ¶¶112-16, 293. *See Lewy v. Skypeople Fruit Juice, Inc.*, 2012 U.S. Dist. LEXIS 128416, at *47-48 (S.D.N.Y. Sept. 7, 2012) (defendant "overlooked or ignored" information "she was or should have been aware" of).

In addition, under the "core operations" doctrine, "a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'" *AMC Entm't Holdings,* 422 F.Supp. 3d at 852 (citation omitted).[19] The alleged misrepresentations and omissions at issue here concerned Qudian's core operations: CLB (*i.e.,* the Company's self-described ***Core*** Loan Book) and OP.  *See* ¶364 (Qudian announcing on May 20, 2019 that it was focusing its attention on its "***core*** business lines" of CLB and OP and "will stay focused on our technology-based consumption credit services and have discontinued efforts outside of consumption credit opportunities") (emphasis added).

Also, because Yeung and Luo took it upon themselves to be the two individuals that spoke so positively about Qudian's CLB and OP businesses when representing the Company on its quarterly earnings releases and conference calls during the Class Period, they had a duty to investigate the facts that they discussed. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 U.S. Dist. LEXIS 199809, at *48 (S.D.N.Y. Nov. 26, 2018) (holding that defendants' attempts to "placate"

---

[19] *See also Celestica,* 455 Fed. App'x at 14 n.3 ("allegations of a company's core operations … can provide supplemental support for allegations of scienter"). Defendants suggest that the core operations doctrine is no longer "viable" in this Circuit. Def. Br. at 32 n.20. But the Second Circuit has held "that the doctrine can provide supplemental support for allegations of scienter, even if it cannot establish scienter independently." *AMC Entm't Holdings*, 422 F.Supp. 3d at 852 (citation omitted); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp*., 2020 U.S. Dist. LEXIS 55410, at *94-96 (S.D.N.Y. Mar. 30, 2020) (adopting this approach) (citation omitted).

concerns raised by analysts supported an inference of scienter); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) (finding recklessness in CEO "speaking so positively"). Plaintiffs further allege that the Luo and Yeung – as CEO and CFO – were directly involved in Qudian's day-to-day operations and had access to the information that was misrepresented or omitted (¶¶24, 25, 363), and they signed and/or certified the relevant SEC filings, such that they had a duty to inquire about these issues. ¶¶198, 203, 228, 229, 236, 260, 264, 299, 354. "Plaintiffs thus easily allege that [Yeung and Luo] were presented with sufficient "red flags," such that they had a duty to "investigate the doubtful," and thus should have known that their statements were false or misleading. These allegations, "taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 324; *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (scienter may be found where there are 'specific allegations of various reasonably available facts, *or 'red flags,'* that should have put the officers on notice' that the public statements were false") (citation omitted). The more compelling inference is that the Luo and Yeung knew the true nature of CLB and OP when they misrepresented Qudian's performance and operations during the Class Period.

### C. Luo and Yeong Had Motive and Opportunity to Commit Fraud

Luo had a financial motive to commit fraud – namely, his decision in March 2018 to "relinquish [his] salary and bonus until [Qudian's] market capitalization reaches US$100 billion." ¶¶51 n.5, 362. At that time, Qudian's market capitalization was $5.54 billion. ¶51 n.5. This highly unusual arrangement incentivized Luo to falsely portray Qudian's business as having much more room for growth than it actually did, in order to buy more time for the Company to find a way to achieve those goals. ¶362. This, too, contributes to an inference of scienter. *See Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F.Supp. 3d 313, 326 (S.D.N.Y. 2018) (incentive packages tied to stock price evidence of scienter); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)

("When financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter.") (citation omitted).

Defendants also had a motive to commit fraud because of the failures of Qudian's previous business projects. *See generally* ¶¶40-42, 44, 107, 359 (explaining how the loss of business from Ant in 2018 and failure of Qudian's projects outside of its consumer lending business negatively affected Qudian's business, with Qudian's total loan balance dropping from approximately $89 billion in 2017 to $59 billion in 2018); ¶52 (because of Qudian's loss of business from Ant and failure of other projects such as Dabai Auto, Qudian's share price fell over 82% from its IPO price of $24 per ADS to just $4.2 per ADS on November 5, 2018, just before the start of the Class Period). *See Acer*, 2020 U.S. Dist. LEXIS 129104, at *14 ("company's financial position" relevant to scienter analysis).

Finally, Luo and Yeong were high-level corporate insiders – founder, CEO, and Chairman of the Board (Luo) and CFO (Yeung) (¶¶24, 25) – which "gives rise to the presumption of an opportunity to commit fraud." *Lexmark*, 367 F. Supp. 3d at 36.

### D.    Corporate Scienter is Adequately Alleged

"[S]cienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *Patel v. L-3 Communs. Holdings, Inc.*, 2016 U.S. Dist. LEXIS 42978, at *46-47 (S.D.N.Y. Mar. 30, 2016) (citation omitted); *see also Eletrobras*, 245 F. Supp. 3d at 469-70 ("scienter against two key officers…necessarily alleges scienter against Eletrobras itself") (citations omitted). Plaintiffs have alleged ample facts to support a strong inference of corporate scienter through the Yeung and Luo's conduct. *See* ¶365; *supra* §§ VI.B, C. Moreover, the person "whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341,

33

372 (S.D.N.Y. 2012) (citations omitted). Even in the wholly unrealistic scenario that Qudian's two most senior leaders did not know these facts about Qudian's basic operations, it is impossible they were not known by a senior manager or other high-level employee whose scienter is attributable to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015); *In re VEON Ltd. Sec. Litig.*, 2017 U.S. Dist. LEXIS 152240, at *31 n.3 (S.D.N.Y. Sept. 19, 2017) (citation omitted).

## VII.   Plaintiffs Adequately Plead Liability Under Section 20(a)

Plaintiffs have sufficiently alleged a primary violation of Section 10(b) by Qudian and Defendants concede control. Def. Br. at 35. Therefore, the only element in contention is culpable participation.[20] Plaintiffs adequately allege that Yeung and Luo signed and/or certified the relevant SEC filings; the false statements contained therein were known to be false or were recklessly disregarded as such; Yeung and Luo had direct and supervisory involvement in Qudian's day-to-day operations, knowledge of the filed statements, and controlled the Company, including the content and dissemination of these statements; and Yeung and Luo had motive. *Supra* §§ VI.B, C. Nothing more is required. *See BioScrip,* 95 F. Supp. 3d at 741 (denying motion to dismiss where each defendant was responsible for reviewing…SEC filings").

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Motion in its entirety.[21]

---

[20] Section 20(a) requires a plaintiff to show: (1) a primary violation; (2) control of the primary violator; and (3) culpable participation. *See Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted).
[21] If the Court grants any part of the Motion, Plaintiffs request leave to amend. *See Petedge, Inc. v. Garg*, 234 F. Supp. 3d 477, 499 (S.D.N.Y. 2017) (Woods, J.) ("Dismissals made pursuant to Fed. R. Civ. P. 9(b) are 'almost always' accompanied by a grant of leave to amend. . . .").

Dated: October 2, 2020                       Respectfully submitted,

                                             **KAHN SWICK & FOTI, LLC**


                                             */s/ Kim E. Miller*
                                             Kim E. Miller (KM-6996)
                                             J. Ryan Lopatka
                                             **KAHN SWICK & FOTI, LLC**
                                             250 Park Ave., Suite 2040
                                             New York, NY 10177
                                             Telephone: (212) 696-3730
                                             Facsimile: (504) 455-1498
                                             Email: kim.miller@ksfcounsel.com
                                             Email: j.lopatka@ksfcounsel.com

                                             -and-

                                             Melissa H. Harris (MH-3553)
                                             1100 Poydras Street, Suite 3200
                                             New Orleans, LA 70163
                                             Telephone: (504) 455-1400
                                             Facsimile: (504) 455-1498
                                             Email: Melissa.harris@ksfcounsel.com

                                             *Co-Lead Counsel for Co-Lead Plaintiff*
                                             *Pablo Greco*

                                             **POMERANTZ LLP**


                                             */s/ Michael Grunfeld*

                                             Jeremy A. Lieberman
                                             Michael Grunfeld
                                             600 Third Avenue, 20th Floor
                                             New York, NY 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (212) 661-8665
                                             Email: jalieberman@pomlaw.com
                                             Email: mgrunfeld@pomlaw.com

                                             *Co-Lead Counsel for Co-Lead Plaintiffs*
                                             *Juan Pablo di Benedetto and Galessi*
                                             *Holding Corp*

35

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 2, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing via U.S. first-class mail to any non-CM/ECF participants.

*/s/ Kim E. Miller*
Kim E. Miller