**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN PABLO DI BENEDETTO, GALESSI HOLDING CORP., AND PABLO GRECO, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:20-cv-00577-GHW <br><br> **ORAL ARGUMENT REQUESTED** |
| Plaintiff, | |
| v. | |
| QUDIAN INC., MIN LUO, and CARL YEUNG, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS QUDIAN INC., MIN LUO, AND CARL YEUNG'S MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

James G. Kreissman
jkreissman@stblaw.com
Stephen P. Blake
sblake@stblaw.com
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Counsel for Defendants Qudian Inc., Min Luo, and Carl Yeung*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.  PLAINTIFFS FAIL TO ADEQUATELY ALLEGE A MATERIALLY FALSE
OR MISLEADING STATEMENT OR OMISSION ...................................................3

    A.  The PSLRA Safe Harbor Protects Qudian's Forward-Looking Statements ......3

    B.  Plaintiffs Plead No Other Actionable Misrepresentations Or Omissions ..........5

        1.  Plaintiffs Fail To Plead A Valid Misrepresentation Or Omission
Regarding Regulatory Developments Affecting Qudian's CLB ...........5

        2.  Qudian Accurately Disclosed Its Open Platform Initiative ..................9

        3.  Qudian Accurately Disclosed The Credit Trial Program....................13

II.  PLAINTIFFS FAIL TO PLEAD FACTS GIVING RISE TO A STRONG
INFERENCE OF SCIENTER .......................................................................................15

    A.  Plaintiffs Fail To Adequately Allege Motive And Opportunity .....................15

    B.  Plaintiffs Fail To Allege Facts That Constitute Strong Circumstantial
Evidence Of Conscious Misbehavior Or Recklessness .................................16

    C.  The Totality Of Plaintiffs' Allegations Do Not Support A Finding Of
Scienter ..........................................................................................................19

## **TABLE OF AUTHORITIES**

### **Cases**

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emp. Ret. Sys. v. Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011) ................................................................. 18

*Campo v. Sears Holdings Corp.*,
    371 Fed. Appx. 212 (2d Cir. 2010) ...................................................................... 9

*E\*Trade, Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................ 14

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................................ 15

*Emp. Ret. Sys. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) .................................................................................. 9

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018) .................................................................. 8

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) ......................................................... 8

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) .................................................................. 5

*In re Bear Stearns Cos. Inc. Sec., Deriv., and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................................. 9

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) ................................................................ 17

*In re Manulife Fin. Corp. Sec. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) .................................................................... 17, 20

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) .................................................................. 9

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................ 19

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009) ................................................................ 17

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) .................................................................................... 9

*In re Sina Corp. Sec. Litig.*,
    No. 05CIV2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) ...................................... 10

*In re Vale S.A. Sec. Litig.*,
    No. 1:15-CV-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ........................ 4

*In re Vivendi Univ., S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................................................................. 5

*In SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ................................................................. 5

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    No. 07 Civ 0976, 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ............................ 11, 12

*Lewy v. Skypeople Fruit Juice, Inc.*,
    No. 11 CIV. 2700 PKC, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ........................ 18

*Lickteig v. Cerberus Capital Mgmt.*,
    No. 19-cv-5263-GHW, 2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) ............................ 8

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) ................................................................. 18

*Long Miao v. Fanhua Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) ............................................................. 9, 18

*Martinich v. Ward*,
    2017 U.S. Dist. LEXIS 3713 (E.D.N.Y. Jan. 7, 2017) ...................................... 20

*Monec Holding AG v. Motorola Mobility, Inc.*,
    No. CV 11-798-LPS-SRF, 2014 WL 4402825
    (D. Del. Sept. 5, 2014) ..................................................................................... 20

*N. Collier Fire Control and Rescue Dist. Firefighter Pension
    Plan et al. v. MDC Partners, Inc.*,
    No. 15 Civ. 6034, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ...................................... 9

*New Orl. Empl. Ret. Sys. v. Cel., Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ..................................................................... 4

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Comm.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................. 20

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
    No. 87CIV3297, 1988 WL 96586 (S.D.N.Y. Aug. 31, 1988) ........................................ 18

*Shanawaz v. Intellipharms. Int'l Inc.*,
   348 F. Supp. 3d 313 (S.D.N.Y. 2018)..................................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................. 19

## **Statutes**

15 U.S.C. § 78u-4 ...................................................................................................... 15

15 U.S.C. § 78u-5 ........................................................................................................ 5

## **INTRODUCTION**

Plaintiffs' opposition confirms that the AC fails to adequately allege either any false or misleading statement of material fact or facts giving rise to a strong inference of scienter.

**Qudian's Forward-Looking Statements**: Defendants seek dismissal of claims based on certain forward-looking statements, such as earnings guidance.  Plaintiffs' claim that the cautionary language in those statements was "boilerplate" ignores the detailed warnings Qudian provided both in those statements and in the SEC filings to which they refer.  Plaintiffs also fail to adequately plead actual knowledge, a separate basis to render those statements non-actionable.

**No Other Materially False or Misleading Statements**: Plaintiffs fail to plead a material misstatement or omission of historical fact.

**License Restriction:** Plaintiffs' claim that Qudian failed to disclose a lending license restriction in May 2019 is eviscerated by their concession that Qudian disclosed *in December 2017* that it stopped funding loans through the entity in question.  While Plaintiffs' claim that Qudian's disclosure only refers to a "temporary" lending halt, they ignore Qudian's many subsequent disclosures, which reaffirm that it ceased making loans under this license.

**Circular 141**: Plaintiffs' next claim, that Qudian failed to disclose that it was violating Circular 141, is undermined by (a) Qudian's repeated disclosures that its provision of credit assessments to banks created regulatory risk because the interpretation and enforcement of Circular 141 were uncertain, and (b) Plaintiffs' failure to allege that Qudian has ever even been accused of violating Circular 141.  In response, Plaintiffs rely solely on CW4 for their claim that *banks* failed to perform independent credit assessments and thus violated Circular 141.  CW4's statement is vague, conclusory, made by someone who left Qudian months before the Class Period, and insufficiently particularized.  Therefore, it cannot form the basis for this claim.

**Open Platform**: Plaintiffs' OP claims also fail.  Plaintiffs cannot claim that Qudian simply "rebranded" its CLB business as OP because Plaintiffs concede that OP—which did not guarantee the loans it referred—employed a different business model than CLB.  Nor can Plaintiffs credibly claim that OP was created to avoid Circular 141's credit assessment rules because Plaintiffs concede that Qudian provided such services under *both* CLB and OP.  While Plaintiffs now claim OP was created to avoid *other* regulatory issues, this claim was not pleaded.

Plaintiffs' argument that Qudian's statement that OP would be a source of growth was misleading because that growth would come at CLB's expense also lacks merit.  Plaintiffs point to no statement by Qudian that OP borrowers *would not* include CLB borrowers.  Moreover, Plaintiffs claim that a "mathematical analysis" shows that the number of CLB borrowers declined in Q3 2019, while the documents they rely on show that this number was stable from Q2 to Q3 2019 and that CLB borrowing grew overall after OP was created.

Plaintiffs also make the related argument that Qudian failed to disclose that OP took the "highest-quality" borrowers from CLB, negatively affecting CLB's business.  Yet, Qudian never told investors that OP would ***not*** focus on the "highest-quality" borrowers.  And the disclosures Plaintiffs cite show that, while Plaintiffs assume that high-quality OP borrowers would not also borrow from CLB, the opposite proved to be true.

**Credit Trial Program**: Plaintiffs cannot claim that Qudian's Credit Trial Program disclosures were inadequate because they concede that Qudian disclosed that: (i) it loosened its credit standards from time to time and (ii) it loosened its credit standards "a lot more" ***in Q4 2018***, at the beginning of the class period.  Plaintiffs also concede that Qudian never disclosed its specific credit standards.  As such, Qudian had no duty to disclose the details of changes to those standards.  Moreover, while Plaintiffs claim Qudian should have disclosed that 20% of CLB

borrowers were part of the Credit Trial Program in late 2019, they fail to allege that this was materially *different* from Qudian's usual percentage of lower-quality borrowers or past trials.

**No Scienter**: Plaintiffs also fail to plead facts giving rise to a strong inference of scienter. The only motive they assert is Defendant Luo's decision to forgo a salary and bonus until Qudian's market cap reached $100 billion—20 times its level during the class period. Plaintiffs' claim—that Luo intentionally created short-term growth that quickly led Qudian's business to decline—is inconsistent with such a motive. Plaintiffs' effort to rely on supposed admissions by Luo and Yeung in late 2019 also fails because, as Plaintiffs' brief shows, the statements in question were not admissions, and in fact were consistent with Defendants' prior statements. Plaintiffs' remaining scienter arguments are mere boilerplate that should be readily rejected.

In sum, the far stronger inference, based on Plaintiffs' own cited documents and other materials properly before the Court, is that Qudian continued to prosper in 2019, while performing slightly worse than initially expected in the face of a nationwide credit slowdown and negative regulatory developments. Plaintiffs' primary response is that Defendants impermissibly rely upon "documents and facts" outside the pleadings. But Defendants attached those materials only to aid the Court in its comparative scienter inquiry, not to refute Plaintiffs' falsity allegations. Courts routinely consider public reports of regulatory developments or broad economic trends in determining whether an inference of fraud is at least as compelling as competing inferences. With or without considering these sources, the Court should reject Plaintiffs' implausible allegations and dismiss the AC on this separate basis as well.

## ARGUMENT

### I. PLAINTIFFS FAIL TO ADEQUATELY ALLEGE A MATERIALLY FALSE OR MISLEADING STATEMENT OR OMISSION

#### A. The PSLRA Safe Harbor Protects Qudian's Forward-Looking Statements

Defendants' opening brief showed that a number of the statements Plaintiffs allege were false or misleading are forward-looking and thus protected by the PSLRA safe harbor. *See* Op. Br. at 14; Kreissman Decl. ¶ 14, Ex. M (list). Plaintiffs respond that "[t]he statements at issue. . . are statements of current and historical fact." Opp. at 22. But Plaintiffs notably fail to cite even a single statement that they allege to be one of historical fact. *Id.* at 22-23. Indeed, even a cursory review of the disclosures shows that they are classic forward-looking statements. *See, e.g.*, AC ¶ 199 ("the Company expects that its total non-GAAP net income for the full year of 2019 will be greater than RMB3.5 billion"); *id.* ¶ 261 (citing "preliminary expectations of the relevant regulatory environment in the near future") (emphasis omitted).[1]

Plaintiffs also claim the cautionary language in these statements is inadequate, arguing that it "refer[s] to only general risks." Opp. at 23. But Plaintiffs ignore the detailed warnings given to investors in these earnings releases and analyst calls. *See, e.g.*, Op. Br. at 15 (discussing risk disclosures). Moreover, while conceding that these forward-looking statements expressly refer investors to Qudian's annual SEC filings, Opp. at 24, Plaintiffs also ignore more than ***50 pages of detailed disclosures*** in each of those filings covering, among other things, numerous regulatory and business risks. Op. Br. at 15 and n.5. Notably, Plaintiffs' lone case involved only boilerplate statements about "execution risks" and "unspecified 'known . . . risks [and] uncertainties,'" *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019), a far cry from Qudian's detailed cautionary language.

---

[1] Qudian's opening brief cited numerous cases holding earnings guidance and similar statements are protected by the safe harbor. Op. Br. at 14-16. By contrast, Plaintiffs' cases are easily distinguishable, because they involve historical fact statements that "present inventory was under control," *New Orl. Empl. Ret. Sys. v. Cel., Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011), or defendant used "operational procedures" and "audits" to "minimize the risks of its operations." *In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *10 (S.D.N.Y. Mar. 23, 2017).

Finally, Plaintiffs claim that the Safe Harbor is inapplicable because Defendants knew their forward-looking statements were false. Opp. at 23. This argument fails for two reasons. First, Plaintiffs misstate the law, which, as even Plaintiffs' cases show, holds that the safe harbor applies if there is meaningful cautionary language **_or_** insufficient actual knowledge allegations. *See* 15 U.S.C. § 78u–5(c)(1); *In SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 (S.D.N.Y. 2010) (explaining disjunctive nature of safe harbor requirements). In any event, Plaintiffs fail to allege facts giving rise to an inference of actual knowledge, as set out below. *See infra* Part II.[2]

**B.    Plaintiffs Plead No Other Actionable Misrepresentations Or Omissions**

Plaintiffs also identify no actionable misrepresentation or omission based on statements of historical fact concerning regulatory issues, Qudian's OP, or Qudian's Credit Trial Program.[3]

**1.    Plaintiffs Fail To Plead A Valid Misrepresentation Or Omission Regarding Regulatory Developments Affecting Qudian's CLB**

**License Restriction**: The AC alleges that Qudian failed to disclose that in May 2019, one of its subsidiaries, Fuzhou Microcredit, had its lending license restricted, and that this omission was material because it "substantially narrowed the amount of loans that Qudian was able to

---

[2] As the opening brief explains, many statements at issue also fail because they merely express "confidence" that Qudian will meet its earnings guidance, and thus are non-actionable puffery. *See* Op. Br. at 16 n.6 (list). In response, Plaintiffs offer only the *ipse dixit* that "[t]hese statements are . . . not 'so vague, broad, and non-specific that a reasonable investor would not rely on [them].'" Opp. at 25 (quoting *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011)). But unlike Qudian's cases showing "confidence" statements are puffery, Op. Br. at 16 n.6—which Plaintiffs ignore—*Vivendi* involved specific, verifiable fact statements such as that Vivendi had "'zero net debt' and 'free cash flow.'" *Vivendi*, 765 F. Supp. 2d at 573.

[3] Plaintiffs claim that, in arguing the AC fails to plead falsity, "Defendants impermissibly offer documents and facts outside the Complaint," citing to news articles and Qudian's competitors' SEC filings attached to Defendants' opening brief. Opp. at 4. Plaintiffs are mistaken. Defendants provide these materials solely for the comparative scienter analysis discussed *infra* at Part II, not to rebut Plaintiffs' falsity allegations. Plaintiffs' failure to adequately plead falsity can and should be determined solely from the AC, documents incorporated therein by reference, and related SEC filings by Defendants, which Plaintiffs do not challenge. *See* Opp. at 4-5.

make itself." AC ¶¶ 72-73.  Defendants' opening brief showed that Qudian had no duty to disclose this development because it disclosed in ***December 2017*** that it had "ceased funding credit drawdowns through [its] online small credit companies," including Fuzhou Microcredit. Op. Br. at 17 (quoting 2017 20-F at 12).  Plaintiffs now claim that Qudian's disclosure was irrelevant because it only announced a temporary halt and because it did not explicitly mention Qudian's lending licenses.  Opp. at 12.  Neither argument makes sense.

*First*, Qudian disclosed that it stopped using this entity for "funding credit drawdowns." Op. Br. at 17; Kreissman Decl. ¶ 11, Ex. J (2017 20-F) at 87.  This disclosure advised investors that Qudian was not using this entity (or its license) to make loans in any form.  Plaintiffs' claim that this conclusion requires a "factual leap" or resolving "ambiguities," Opp. at 12, is misplaced.

*Second,* after disclosing it temporarily ceased using the subsidiary in December 2017, Qudian then disclosed ***in each subsequent 20-F*** that its use of this entity was "'historical[]'" and that Qudian no longer used it to make loans.  Op. Br. at 9 ("'We ***historically*** funded credit drawdowns through online small companies . . . .'") (quoting 2018 20-F at 9) (emphasis added).[4]  Qudian explained that it instead "'rel[ied] on institutional funding partners and trusts . . . to fund . . . credit drawdowns.'"  Op. Br. at 9 (quoting 2018 20-F at 9).  Thus, long before May 2019, Qudian made clear that it was no longer relying on the license in question to fund loans.

*Third*, Plaintiffs' claim that the license restriction harmed Qudian's business is not well-pleaded.  Plaintiffs incorrectly claim that Qudian experienced a decline in revenue from its "on-balance sheet" transactions (where Qudian funds the loans itself) beginning in Q2 2019, citing

---

[4] Plaintiffs also point to Qudian's 2017 20-F disclosure that "[w]e fund credit directly to our borrowers through . . . Fuzhou Microcredit."  Opp. at 12 (quoting 2017 20-F at 62).  But this statement clearly referred to Qudian's practice ***before*** it suspended the entity in December 2017; afterwards, Qudian consistently referred to its use of the entity as "historical."  *See* Op. Br. at 9.

what it purports were Qudian's reported results.  *See* AC ¶ 74.   However, Qudian's results for that period—which Plaintiffs do not challenge—show that on-balance sheet revenue ***grew YOY by 10% in Q2 2019***—the quarter in which the restriction allegedly occurred.  Kreissman Decl. ¶¶ 3-5, Exs. B-D (full-year 2018 and Q1-Q2 2019 earnings releases).  These facts bely any claim that the lending license restriction had a significant effect on Qudian's business.  *Cf.* AC ¶ 74.[5]

**Circular 141**: Plaintiffs claim Qudian failed to disclose that it was violating Circular 141 by providing credit assessment services to its partner banks.  AC ¶ 80.  Defendants explained that Qudian disclosed its credit assessment services, the uncertainty surrounding Circular 141, and the regulatory risk it faces.  Op. Br. at 18-19.  Qudian had no obligation to go further and characterize its activities as unlawful—especially because Plaintiffs fail to allege that a regulator has ever found, or even alleged, that Qudian violated Circular 141.  *See id.* at 19-20 and citations.

Plaintiffs concede that Qudian was not "obligated to disclose legal conclusions or legal interpretations."  Opp. at 13.  Instead, they claim Qudian should have disclosed "that banks were outsourcing credit assessments to it and not conducting their own, independent evaluations of credit files."  *Id*.  The AC bases this claim on a single, conclusory sentence from CW4:  "The witness also described how certain financial institutions that 'had a good relationship with the local regulator' would rely on Qudian's risk assessment rather than conducting their own independent risk assessment after receiving Qudian's initial review."  AC ¶ 69.  However, the AC provides no meaningful information about CW4, including his or her position or

---

[5] Plaintiffs' claim that the license restriction caused a decline in on-balance sheet CLB loan revenue in the second half of 2019, *id.*, is also incorrect.  Qudian's quarterly results, upon which Plaintiffs purport to rely, show that CLB's on-balance sheet loan book revenue and its "loan facilitation" revenue (*i.e.*, revenue from loans Qudian did not fund itself, *id.*) ***each declined by 20.6%*** in Q4 2019, undercutting any suggestion that the license restriction impacted the decline.  Kreissman Decl. ¶ 9, Ex. H at 5.  Indeed, Plaintiffs themselves claim the decline resulted from customers migrating to OP, not from the license restriction.  AC ¶ 146.  *See infra* Part I.B.2.

responsibilities, describing CW4 only as "a former employee who directly assisted Defendant

Luo" from "early 2018 until the summer of 2018." AC ¶ 69. Moreover, the only alleged contact

between CW4 and the unspecified "financial institutions" is that CW4 "worked with Qudian's

funding partners" during those few months. *Id.* Plaintiffs offer *no facts* suggesting how CW4

supposedly knew what the institutions were doing. *See id.* Without such well-pleaded facts,

Plaintiffs cannot rely on CW4 to support their claim. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F.

Supp. 2d 573, 594 (S.D.N.Y. 2011) (rejecting CW statements about business partner conduct

where CWs were never employed by the partner); *Frankfurt-Tr. Inv. Luxemburg AG v. United

Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (dismissing complaint that failed to

explain how or why CWs would have access to the information they purported to possess).

In addition to failing to describe CW4's position or his or her basis to make the claim on

which Plaintiffs rely, this allegation also fails because it lacks the specificity required by the

PSLRA. *See* Op. Br. at 13, 23-24. CW4 fails to identify who the "certain" financial institutions

were, how many there were, when this conduct occurred, what actions the banks took, and how

prevalent the conduct was. Thus, the allegation falls far short of setting forth the "particularized

facts" required to meet the heightened pleading standard under the PSLRA. *Lickteig v. Cerberus

Capital Mgmt.*, No. 19-cv-5263-GHW, 2020 WL 1989424, at *9 (S.D.N.Y. Apr. 26, 2020).

Finally, CW4's allegations are insufficient because he or she left Qudian ***months before

the class period***, AC ¶ 69, and thus cannot speak to what Qudian or its banking partners were

doing during the class period. *See* Op. Br. at 19 n.9; [6] *N. Collier Fire Control and Rescue

---

[6] Plaintiffs argue that witnesses in Defendants' cases either "recanted," Opp. at 10 n.11 (citing
*Campo v. Sears Holdings Corp.*, 371 Fed. Appx. 212 (2d Cir. 2010)), or were not "described
with sufficient particularity.'" *Id.* (quoting *Long Miao v. Fanhua Inc.*, 442 F. Supp. 3d 774, 804
(S.D.N.Y. 2020)). These claims are wrong. *See, e.g.*, *Campo*, 371 Fed. Appx. at 216-17 (two
CWs "had no personal knowledge" of individual defendants' awareness of real estate reports).

*District Firefighter Pension Plan et al. v. MDC Partners, Inc.*, No. 15 Civ. 6034, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (rejecting CW allegation "regarding nonpublic information that postdates his tenure"). While Plaintiffs dispute this well-established legal principle, the cases they cite either (i) involved CWs ***who were present*** during the relevant time period or (ii) did not involve CWs at all. *Cf. Emp. Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (relying on allegations of CWs employed by the company during the class period); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (crediting "sales data" trend including pre-class period quarters, not CW statements regarding pre-class conduct).[7]

## 2.    Qudian Accurately Disclosed Its Open Platform Initiative

Defendants' opening brief explained that Qudian accurately disclosed that OP was a different business model from CLB, dispelling Plaintiffs' claim that it was merely a rebranding of the CLB business. Op. Br. at 23. In response, Plaintiffs appear to drop their "rebranding" claim, Opp. at 15, arguing instead that: (1) Qudian failed to disclose that it launched OP because CLB was violating Circular 141; (2) Qudian failed to disclose that OP's growth was the result of its cannibalization of CLB's borrowers; and (3) Qudian failed to disclose OP would take the "best borrowers" from the CLB. *Id.* at 14-18. Each of these remaining arguments fails.

**Launch of OP to Avoid Circular 141 Violations**: Plaintiffs' allegation is premised entirely on their assertion that CLB violated Circular 141, which is not well-pleaded. *See supra*

---

In any event, as discussed above, CW4 also is not "described with sufficient particularity."

[7] As the opening brief explains, this claim also fails because many of the alleged misstatements concerning regulatory compliance are immaterial puffery. *See* Op. Br. at 20-21 and n.11. Rather than respond to Defendants' precedent, Plaintiffs merely deny that the statements in question constitute puffery, Opp. at 26, relying on case law that involved far more specific compliance-related statements. *Cf., e.g., In re Bear Stearns Cos. Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (defendant was in compliance with specific "capital requirements"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 372, 381 (S.D.N.Y. 2015) (company denied involvement in bribery in case alleging multi-billion dollar bribery scheme).

Part I.B.1.  Plaintiffs' failure to allege facts suggesting that Qudian violated Circular 141 renders any claim that Qudian failed to disclose that it created OP to rectify this issue deficient.

Plaintiffs also do not dispute the fact that Qudian repeatedly ***disclosed*** from OP's inception that it viewed OP as more conservative from a regulatory standpoint.  *See* Op. Br. at 23-24; Opp. at 14-15.  Indeed, there is no material difference between Qudian's initial comments regarding OP and the alleged "admissions" on which Plaintiffs rely in late 2019.  *Compare* Kreissman Decl. ¶ 13, Ex. L (Q2 2019 call) at 13 (touting advantage of OP over CLB in terms of being "regulatory compliant" because under OP "we have taken this to an even further step ***by not touching the loan in itself***") (emphasis added), *with* AC ¶ 170 (alleging that Qudian "finally revealed" one quarter later that "'[w]e found a better way, the way where we do open platform, where we allow licensed lenders . . . to lend, ***we don't touch the loan***'") (emphasis added).[8]

Plaintiffs' position is also untenable for the independent reason that, as they concede, Qudian provided credit assessments ***in both CLB and OP***.  *See* Op. Br. at 24; Opp. 15-16.  Thus, Qudian could not have started OP to avoid Circular 141's prohibition on outsourcing credit decisions where it provided the same services to banks in OP and CLB.  Unable to respond, Plaintiffs assert that they "do not argue that OP was created *only* to address Circular 141's ban on outsourcing credit assessments, but rather, that it was intended to resolve the problem that CLB guaranteed loans for other financial institutions."  Opp. at 16 (emphasis in original).  This about-face is inconsistent with the AC, which focused exclusively on alleged credit assessment violations.  At most, the AC makes vague assertions about "regulatory concerns" with respect to

---

[8] In any event, Qudian was not required to disclose every reason for its business decisions as a matter of law.  *See, e.g.*, *In re Sina Corp. Sec. Litig.*, No. 05CIV2154, 2006 WL 2742048, at *6-8 (S.D.N.Y. Sept. 26, 2006) (fact that defendant provided some reasons for business change that increased revenue did not require it to disclose other motivations related to regulatory concerns).

"an intermediary such as Qudian guaranteeing loans," AC ¶ 76, but it fails to allege this practice violated Chinese law.  Indeed, it explicitly notes that such guarantees are permitted if a party is licensed to make them.  *Id.* ¶ 62.  Having conceded that Qudian had such licenses, AC ¶¶ 71-72, Plaintiffs cannot now claim that making such guarantees exposed Qudian to regulatory penalties.

**OP as an "Independent" Source of Growth**: Plaintiffs next argue that Qudian falsely claimed that OP provided it with "the ability to attain additional 'growth beyond [the core] loan book,'" when, in reality, it grew by taking borrowers from the CLB.  Opp. at 16 (quoting 2019 Management Presentation).  This argument fails for multiple reasons.  First, Plaintiffs fail to cite any disclosure in which Qudian suggested OP would ***not*** include CLB borrowers.  *See id.* at 16-17.  Because Qudian never promised that OP would consist entirely of unique borrowers, it had no obligation to disclose that some might come from the CLB.  *See, e.g.*, *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976, 2008 WL 4449280, at *16 n.16 (S.D.N.Y. Sept. 30, 2008) (omitted facts must be "necessarily inconsistent" with the disclosures to be actionable).

Moreover, Plaintiffs fail to plead any facts suggesting that OP "cannibalized" borrowers from the CLB.  *See* Opp. at 16.  The primary basis for this assertion is Plaintiffs' "mathematical analysis" showing that the number of CLB borrowers declined from 5,700,000 to 5,300,000 between Q2 and Q3 2019.  Opp. at 16-17.  However, the earnings call transcripts on which Plaintiffs rely for this claim show that CLB borrowers remained steady at 6 million in both quarters.  *Compare* Kreissman Decl. ¶ 13, Ex. L (Q2 2019 call) at 4, *with* Kreissman Decl. ¶ 7, Ex. F (Q3 2019 call) at 9.  In other words, OP did not take borrowers away from CLB.  Instead, a majority of OP borrowers used ***both*** platforms.  Op. Br. at 25.[9]  Additionally, the documents

---

[9] These documents—relied on by Plaintiffs—show that OP borrowers increased from 440,000 to one million borrowers from Q2 to Q3 2019, *see* AC ¶ 181, while CLB borrowers remained stable at 6 million.  It appears that Plaintiffs mistakenly assumed that any OP borrower was not also a

relied on by Plaintiffs show that, from the time of its inception in Q3 2018 to the end of 2019, OP borrowers grew from zero to one million, while CLB borrowers grew from 4.9 to 6 million. *Compare* Kreissman Decl. ¶ 3, Ex. B, *with id.* ¶ 7, Ex. F.  Thus, Plaintiffs' own cited documents show OP grew independently, rather than by taking borrowers from CLB.

**OP's Alleged Appropriation of CLB's "Best Borrowers"**: Plaintiffs also make the related argument that Qudian failed to disclose that OP "was taking the 'highest-quality,' most credit-worthy borrowers" from CLB, leaving "lower quality borrowers who were more likely to default on their loans."  Opp. at 16.  This argument similarly fails because Plaintiffs identify no statement by Qudian suggesting that OP would ***not*** focus on CLB's "highest-quality" borrowers or that no high-quality borrowers would migrate from CLB to OP.  *See* Opp. at 16-18; Op. Br. at 25-26.  Qudian thus had no duty to disclose that OP would take high-quality CLB borrowers. *Ladmen*, 2008 WL 4449280, at *16 n.16.  In any event, however, Plaintiffs concede that Qudian disclosed from the inception of OP that it would look to lend to, among others, CLB borrowers with "better credit profiles" who sought larger loans than Qudian wanted to approve for the CLB. Opp. at 18 (quoting 2018 20-F); *see* Kreissman Decl. ¶ 12, Ex. K  (2018 20-F) at 16 (explaining that OP "offers ***our large user base*** with ***more choices***," including users who "meet our credit requirements" for CLB but seek "larger loan amounts") (emphasis added); *see also* AC ¶ 46 (discussing pre-OP earnings call in which Defendant Luo described "the large number of Qudian's 62.4 million registered users who 'sought a larger credit size'").[10]  Indeed, these early

---

CLB borrower, an assumption that is directly contradicted by the documents on which Plaintiffs rely, which show that 700,000 out of the one million OP borrowers in Q3 2019 were also CLB borrowers.  *See* Kreissman Decl. ¶ 7, Ex. F (Q3 2019 earnings call transcript) at 3, 9.

[10] Plaintiffs' claim that, "even if OP's borrowers were taking out larger loans . . . they still were no longer taking out loans in CLB," Opp. at 17-18, is not well-pleaded because Plaintiffs' documents show 70% of OP borrowers also borrowed from CLB in Q3 2019.  *See supra* n.9.

disclosures are materially indistinguishable from the later supposed "admissions" on which

Plaintiffs rely.  *See* AC ¶ 179 (November 2019 statement that "'good borrowers'" could "'get

access to the ***credit enhancement***, get to a ***more appropriate credit size***'") (emphasis added); *id.*

¶ 290 (OP platform was "for larger ticket size").

### 3.    Qudian Accurately Disclosed The Credit Trial Program

Plaintiffs claim Qudian failed to disclose it materially lowered credit standards during

the Class Period by adopting the Credit Trial Program.  The opening brief explained that Qudian:

- Disclosed that it relaxes its credit standards from time to time.  Op. Br. at 26-27.

- Disclosed that its credit standards would "relax a lot more into [Q4 2018]," when the Credit Trial Program was initiated.  *Id.*

- Warned investors that it "expect[s] to experience higher delinquency rates" for these new borrowers.  *Id.* at 19.

- Disclosed the Credit Trial Program in detail *during* the Class Period, including an increase in delinquencies.  *See* Op. Br. at 26-27.

Plaintiffs' claim that Qudian "provided only vague warnings that the Company might expand its

borrower base" is directly contradicted by this language, dooming this claim.

Plaintiffs cannot revive this claim by focusing on generic statements that Qudian made

describing its lending practices as "conservative," notwithstanding the Credit Trial Program.  *See*

Opp. at 18-19.  This theory fails because the term "conservative" is non-actionable puffery in

this context.  *See* Op. Br. at 28 n.17.[11]  Plaintiffs also claim that Defendants' disclosures were

---

[11] Plaintiffs ignore Defendants' precedent and claim that Defendants' statements were not puffery, because Qudian had drastically lowered credit standards.  Opp. at 27.  The lone case Plaintiffs cite is readily distinguishable, because it involved a very specific representation, in contrast to the generic statement at issue here.  *See E\*Trade*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 178, 182-83 (S.D.N.Y. 2010) (investment firm's description of "conservative approach" actionable because claimed approach included "high FICOs, low LTVs [loan-to-value ratio] and high owner occupancy levels," which was demonstrably false).

insufficient because the risk had already materialized. Opp. at 18-19. This argument is misplaced. Qudian did not disclose a "possible" decline of credit standards or increase in delinquencies; it ***specifically disclosed*** a relaxation of standards beginning in Q4 2018 and an ***expectation*** of resulting increased delinquencies. *See* 2018 20-F at 7; Op. Br. at 26. Any reasonable investor would thus expect higher delinquencies during the Class Period.[12]

Finally, Plaintiffs claim that Qudian should have disclosed that 20% of its CLB borrowers were part of the Credit Trial Program prior to Q3 2019 (when Qudian announced this figure). However, Plaintiffs plead no facts suggesting what percentage of CLB borrowers were part of the Credit Trial Program before Q3 2019. Moreover, because Qudian had not previously disclosed its specific lending standards or how many borrowers failed to meet those standards, it had no obligation to disclose that data in any particular quarter. *See* Op. Br. at 26. Similarly, Plaintiffs' claim that Qudian inaccurately labelled the Credit Trial Program as "small," Opp. at 18, is not well-pleaded. The term "small" is Plaintiffs' characterization, but, contrary to their claim, Defendant Yeung did not characterize the program as small or otherwise seek to quantify it during the call in question. Kreissman Decl. ¶ 16, Ex. O at 12. Plaintiffs fail to allege how the size of the Credit Trial Program compared to Qudian's prior relaxation of credit standards, and thus they have no basis to allege that any description of the size of the program was inaccurate.[13]

---

[12] Moreover, Plaintiffs fail to allege that Qudian's CLB delinquency rate increased materially until late 2019. Indeed, through Q2 2019, the Qudian disclosures cited in the AC show that delinquencies had only increased by 0.5% due to the Credit Trial Program borrowers. Kreissman Decl. ¶ 13, Ex. L (Q2 2019 call) at 4. While delinquency rates attributed to the Credit Trial Program increased in the second half of 2019, those increases followed Qudian's numerous disclosures in which it told investors to expect higher delinquencies. *See supra* Part I.B.3.

[13] Plaintiffs' claims based on an affirmative duty to disclose under Item 303 of Regulation S-K fail for similar reasons (*i.e.*, that Qudian disclosed all purported "trends" that Plaintiffs allege were concealed). Op. Br. at 28. Plaintiffs' opposition does nothing more than rehash its deficient "trends" allegations. Opp. at 20-22. Moreover, Plaintiffs concede they must also plead actual knowledge under Item 303. *Id.* As set forth below, they also fail to make this showing.

## II.  PLAINTIFFS FAIL TO PLEAD FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

The opening brief showed Plaintiffs fail to allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), by pleading either (i) motive and opportunity or (ii) strong circumstantial evidence of conscious misbehavior or recklessness.  Op. Br. at 29-35.  Plaintiffs offer little response.

### A.  Plaintiffs Fail To Adequately Allege Motive And Opportunity

Plaintiffs concede that they allege no stock sales or other traditional motive to commit fraud.  *See* Opp. at 32-33.  Instead, they rely on Luo's plan to forego his salary and bonus until Qudian's market capitalization reached $100 billion.  *Id*.  As the opening brief explains, this argument fails as a matter of law, because a general desire "to keep stock prices high to increase officer compensation . . . *do[es] not constitute* '*motive*.'"  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis added).[14]

Moreover, Plaintiffs' argument is illogical.  Plaintiffs concede that, when Luo instituted this arrangement, Qudian's market capitalization was just over $5 billion, requiring a *twenty-fold increase* to reach the $100 billion market cap target.  *See* Opp. at 32.  Yet Plaintiffs ask the Court to accept the inference that Luo intentionally drove up delinquencies to conceal slowing growth, facts that were quickly revealed in Qudian's 2019 financial results.  Plaintiffs' suggestion that Luo intentionally jeopardized Qudian's business (of which he owned 20%, 2018 20-F at 133), to achieve a short-term result with no prospect of taking Qudian's market capitalization to $100 billion, is so implausible that it cannot give rise to any inference of scienter.

---

[14] Plaintiffs' case law is not to the contrary.  In those cases, courts relied on stock sales or other concrete motive to commit fraud, not compensation arrangements tied to the stock price.  *Cf., e.g.*, *Shanawaz v. Intellipharms. Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (declining to determine whether incentive arrangements amounted to anything more than "*typical . . . executive incentive packages*," where stock sales supported scienter) (emphasis added).

**B.**     **Plaintiffs Fail To Allege Facts That Constitute Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness**

**Alleged Admissions**: While Plaintiffs claim supposed "damning admissions" by Luo and Yeung, *see* Opp. at 28-29, a review of those statements shows that neither Defendant admitted to Plaintiffs' claims.  Plaintiffs argue that, in November 2019, Luo and Yeung "admitted that OP's purpose for both Qudian and its funding partners was to be the 'ultimate form of regulatory compliant fintech in China.'"  Opp. at 29.  But these statements include Luo's assertion that CLB already "was 'in full compliance with Circular 141,'" *id.*, not in violation of it.

Similarly, Plaintiffs misrepresent Defendant Yeung's supposed November 25, 2019 apology.  Plaintiffs claim Yeung explained that Qudian had "only allowed 5.5 million out of the 21 million [approved borrowers] access to [OP]" and then apologized for not disclosing OP had taken CLB's best borrowers.  Opp. at 17 (quoting AC ¶ 184).  But Yeung never characterized the 5.5 million borrowers as Qudian's highest quality borrowers.  Instead, he explained that OP had room for further growth, saying "[w]e haven't opened the entire open-platform to our borrower base yet. ***This is so that we don't get a too large a flow*** . . . . ."  Kreissman Decl. ¶ 17, Ex. P (Nov. 25, 2019 Call) at 9 (emphasis added).  He concluded, "So, ***I think we are in a fairly good position*** that there's still a ***deep pocket*** for open-platform . . . . I'm sorry that this may not have been apparent to the market yet, but it will be over time."  *Id.* (emphasis added); *see also* AC ¶ 157 (showing this comment followed Yeung's statement that "[w]e are perplexed, first of all, on how the market reacted" to Q3 financial results following stock drop).  Rather than an admission, Yeung's statement is an effort to educate investors about OP's potential for further growth.

Finally, Plaintiffs point to Yeung's statement on Qudian's Q3 2019 earnings call that "'the economics [for OP] only makes sense to my funding partner if the loss rate is lower.'"  Opp. at 28 (quoting AC ¶¶ 178-79, 189).  However, Yeung did not attribute OP's lower loss rate

to Qudian sending OP the "best borrowers" from CLB.  Rather, he referred to Qudian's credit tightening across CLB and OP in that quarter.  *Compare* Kreissman Decl. ¶ 7, Ex. F at 4 (noting Qudian "swiftly reduced credit volumes and paused credit trial programs" in CLB), *with id.* at 5 ("[I]t's our overall direction with our funding partners in an overall macroeconomic down cycle to focus on the high-quality borrowers."); *see also id.* at 5-6 (describing OP's technological advantages and explaining that OP borrowers were a "gold mine" that Qudian "***didn't mine . . . before***" because CLB does not offer large enough loans).  Yeung thus made no admission.

**Yeung's Resignation**: Plaintiffs claim Yeung's March 2020 resignation was suspicious and thus supports scienter.  Opp. at 29.  But resignations only give rise to a scienter inference if there is "a specific allegation that the resignation resulted from . . . wrongdoing."  *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011); *see also* Op. Br. at 31 n. 19.  Here, as Plaintiffs concede, Yeung stated he resigned for personal reasons.  Opp. at 29.  Qudian also did not face a restatement or accounting/financial scandal, and Yeung left two months after Qudian withdrew guidance in January 2020.  By contrast, Plaintiffs' cases involve departures occurring in close proximity to serious misconduct.  *Cf., e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 n.12 (S.D.N.Y. 2017) ("[T]he CEO and board were replaced, at least in part, because of the findings of . . . the internal investigation"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24 (S.D.N.Y. 2009) (company fired CFO one day after discovering fraud and accepted other resignations less than two weeks later).  Thus, there is no basis for a scienter inference here.

**CW Allegations**: Finally, Plaintiffs argue that their scienter allegations are bolstered by nine CWs' statements which allegedly establish that OP cannibalized CLB and that Qudian was violating Circular 141.  Opp. at 30.  First, Plaintiffs fail adequately to plead that either of those things actually happened.  *See supra* Part I.  Moreover, only one confidential witness, CW4, is

alleged to have had *any* contact with any senior executive,[15] and the AC fails to allege that CW4

communicated any alleged wrongdoing to them.  *See, e.g.*, AC ¶ 69.  This deficiency alone

dooms the CW allegations.  *See, e.g.*, *Bd. of Trustees of City of Ft. Lauderdale Gen. Emp. Ret.*

*Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 880 (S.D.N.Y. 2011) (rejecting CW allegation that

"d[id] not describe any communications with the Defendants or provide grounds to believe they

were aware of the alleged scheme").  Moreover, CW4 left Qudian well before the class period,

*see supra* at 8-9, and is not alleged to have communicated with Luo during the class period.  *See*

*Long Miao*, 442 F. Supp. 3d at 805.[16]

---

[15] Because Plaintiffs do not allege that any of the other eight CWs communicated with senior management about anything, Op. Br. at 32; Opp. at 30, these CWs' statements cannot give rise to any inference of scienter.  *See, e.g.*, *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) (rejecting CW statements by "low-level employees [who] had no contact with the Individual Defendants").  Moreover, even these conclusory CW allegations fail to support Plaintiffs' falsity claims.  *See, e.g.*, AC ¶ 98 (CW1 was low-level employee who erroneously "described Open Platform as substantially the same as Qudian's prior loan business"); *id.* ¶ 83 (CW6 was "financial analyst" who left before class period and "described Open Platform as being Defendant Yeung's idea")

[16] Plaintiffs other scienter arguments are easily dispatched.  While Plaintiffs claim Yeung had confidential information about the Credit Trial Program, Opp. at 30, access to such information can only give rise to an inference of scienter if Plaintiffs show he made a statement inconsistent with that information.  *See, e.g.*, *Polycast Tech. Corp. v. Uniroyal, Inc.*, No. 87CIV3297, 1988 WL 96586, at *6 (S.D.N.Y. Aug. 31, 1988) (access to confidential information, standing alone, insufficient to support inference of scienter).  Because Plaintiffs fail to allege that this information was inconsistent with any of Yeung's statements or gave rise to a disclosure duty, *see supra* Part I, Plaintiffs' precedent is inapposite.  *Cf.*, *e.g.*, *Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *16 (S.D.N.Y. Sept. 10, 2012) (CFO failed to "heed" regulatory filings in China that revealed "basic facts about her company's structure and performance" that were inconsistent with company's disclosures).  Plaintiffs next rely on the "core operations doctrine," but concede that it cannot establish scienter "independently."  Opp. at 31 n.19.  Finally, Plaintiffs allege Luo and Yeung "were directly involved in Qudian's day-to-day operations" and "signed and/or certified the relevant SEC filings."  The opening brief cited controlling authority rejecting such allegations.  Op. Br. at 30-31.  Plaintiffs ignore them, relying on inapposite cases where, unlike here, "red flags" put management on notice of misconduct.  *Cf.*, *e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 652 (S.D.N.Y. 2007) (suspicious "receivable" that appeared at the end of each quarter was "glaring red flag" for management).

C.     **The Totality Of Plaintiffs' Allegations Do Not Support A Finding Of Scienter**

Finally, the opening brief showed that Plaintiffs' allegations are not "*at least as likely as any plausible opposing inference*" based on the "totality" of the allegations.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 328 (2007).  Indeed, the AC and the documents properly before the Court on this motion support the far more plausible inference that Qudian narrowly missed its original 2019 guidance after unexpected economic and regulatory events led to an industry-wide downturn.  Op. Br. at 34-35.

Plaintiffs ask the Court to "disregard[]" Defendants "proffered 'facts' and requests for inferences in their favor," asserting that "Defendants may not rewrite the Complaint with their own purported facts, and they are not entitled to inferences from the facts in their favor."  *Id.* at 5-6.  But Defendants only seek to draw inferences from facts properly before the Court, the very purpose for the *Tellabs* comparative scienter analysis.  *See Tellabs*, 551 U.S. at 328.

Plaintiffs do not dispute the fact that the Court may consider documents incorporated by reference in the AC.  *See* Opp. at 5; Op. Br. at 4 n.1.  Plaintiffs further agree that "the Court may take judicial notice of the publication of a news article on a motion to dismiss" for the fact of publication, as well as public economic data.  Opp. at 4-5 and n.6.  Instead, Plaintiffs claim that Defendants improperly seek to raise a factual dispute about the reason for Qudian's guidance shortfall in the second half of 2020 by relying on publicly available information about the regulatory crackdown and general decline in Qudian's industry in the second half of 2019.  Opp. at 4-5.  However, this information is appropriate for consideration of a competing inference.

As noted above, this information is submitted ***solely*** to allow the Court to consider competing scienter inferences.  *See* Op. Br. at 34-35.  As part of the *Tellabs* inquiry, courts routinely consider publicly available information about broader regulatory, economic or financial trends.  *See, e.g.*, *Manulife*, 276 F.R.D. at 102 (taking judicial notice of results of SEC

investigation, as well as "massive economic and political changes taking place during the Class Period," and concluding that "Plaintiffs' allegations do not give rise to a strong inference of scienter unless all competing inferences are ignored"); *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 301-02 (S.D.N.Y. 2010) (considering "unprecedented paralysis of the credit market and a global recession" as part of "the *Tellabs* 'comparative' inquiry" and finding defendant's "incremental measured response, while erroneous in hindsight, is as plausible an explanation for the losses as an inference of fraud").[17]

In any event, documents incorporated by reference in the AC (*e.g.*, numerous Qudian disclosures) give rise to the same inference as the additional documents submitted by Defendants—that Qudian failed to meet its guidance in the second half of 2020 due to regulatory changes and a broad industry downturn. *See, e.g.*, AC ¶ 343 and n.13 (detailing Qudian disclosures concerning P2P and other regulatory crackdowns). Thus, regardless of which sources the Court considers, it is clear that Qudian and its competitors faced regulatory and economic challenges in late 2019. Moreover, Plaintiffs' theory—that Defendants intentionally took on risky loans to create a short-term upswing in Qudian's performance and then failed to profit from it, only to have Qudian fall short of expectations a few months later—is neither cogent nor compelling and fails to give rise to a strong inference of scienter.

---

[17] Plaintiffs' quibbles with Defendants' sources, Opp. at 4 and n.5, are irrelevant. Plaintiffs offer no basis to question the reliability of those sources. Similarly, their claim that Defendants should provide comparative stock price information, not revenue data for Qudian competitors makes no sense. Both types of data allow consideration of competing inferences. Here, revenue data was simply more relevant. Finally, Plaintiffs' claim that Defendants sought "to circumvent the Court's briefing limitations," Opp. at 4 n.4, is puzzling. The "arguments" Plaintiffs cite were an ***index*** of documents with brief descriptions, Kreissman Decl. ¶ 8, Ex. G—a far cry from Plaintiffs' cases. *See Martinich v. Ward*, 2017 U.S. Dist. LEXIS 3713, at *6 (E.D.N.Y. Jan. 7, 2017) ("thirteen-page affirmation" and "seventeen-page memorandum of law"); *Monec Holding AG v. Motorola Mobility, Inc.*, No. CV 11-798-LPS-SRF, 2014 WL 4402825, at *1 (D. Del. Sept. 5, 2014) (finding plaintiff's chart comparable to exhibits containing "legal argument").

Dated: October 16, 2020                    SIMPSON THACHER & BARTLETT LLP


                                           By: */s/ James G. Kreissman*
                                                James G. Kreissman

                                                James G. Kreissman (jkreissman@stblaw.com)
                                                Stephen P. Blake (sblake@stblaw.com)
                                                425 Lexington Avenue
                                                New York, NY 10017
                                                Telephone: (212) 455-2000
                                                Facsimile: (212) 455-2502

                                                *Counsel for Defendants Qudian Inc., Min Luo,*
                                                *and Carl Yeung*