# EXHIBIT A

Case 1:20-cv-00577-GHW   Document 59-1   Filed 03/10/22   Page 2 of 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 53

-----------------------------------------------------------------------------------X

TODD FRANCE,

                             Plaintiff,

                      - v -

JIAYIN GROUP INC., DINGGUI YAN, CHUNLIN FAN,
JIONG FENG, YIFANG XU, ROTH CAPITAL PARTNERS,
LLC, SHENWAN HONGYUAN SECURITIES (H.K.)
LIMITED

                            Defendant.

-----------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 654398/2020 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 001 |

**DECISION + ORDER ON MOTION**

HON. ANDREW BORROK:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 79, 80, 81, 83, 88

were read on this motion to/for              DISMISS                .

Jiayin Group Inc. (the **Company**), Roth Capital Partners, LLC (the **Underwriter**), Jiong Feng, and Yifang Xu's (the Company, the Underwriter, Mr. Feng and Mr. Xu, hereinafter, collectively, the **Defendants**) motion to dismiss the putative class action alleging violations of the Securities Act of 1933 (the **1933 Act**) pursuant to CPLR 3016(b) and 3211(a)(1), (a)(5), and (a)(7) must be denied.

Simply put, the well pled complaint adequately alleges that the Defendants violated Sections 11 and 15 of the 1933 because the Defendants offered and sold American Depository Shares (**ADSs**) based on the Company having a particular business model and touting certain competitive advantages when, in fact, they knew that they did not have those competitive advantages and did not intend to maintain that business because of a known regulatory change that was being promulgated (*In re Douyu Intl. Holdings Ltd. Sec. Litig.*, 2021 WL 979297, 2021

**654398/2020   vs.**
**Motion No.  001**

**Page 1 of 12**

NY Slip Op 30822[U], *1, *2 [Sup Ct, NY County 2021]) which they said would not affect them.  This, the plaintiffs allege was false and materially misleading – *i.e.*, the defendants believed that such regulations would affect them and, without prompting, intended to transform its business into a different business because of that very regulatory change at the time of the IPO (hereinafter defined).

Stated differently, according to the Plaintiffs this was a "bait and switch." The Defendants told the market in the May 10, 2019 Initial Public Offering (the **IPO**) documents that the business was well positioned to capitalize on the fewer number of market participants in the peer-to-peer (**P2P**) business sector (which was its core business) as a result of Circular 175 (NYSCEF Doc. No. 33, at 22) when, in fact, like other P2P businesses, the Company intended to transform and exit the P2P market in order to survive, have fewer funding sources and rely principally on institutional investors.  That the government did not take action against the Company and that there were no other intervening events between when the IPO occurred and when the Company almost immediately following such IPO announced the beginning of its metamorphose is *prima facie* evidence that this was pre-planned at the time of the IPO.  Following the IPO, whenever the Defendants slow rolled information about this allegedly pre-IPO planned transmogrify, the stock further tanked.  This is sufficient to state a claim under the 1933 Act.

More specifically, the Defendants' argument that they disclosed Circular 175 in their offering documents, or that the offering documents must be evaluated at the time they were issued and not in hindsight, or that they indicated that they would have to ***respond*** to changes in the

regulatory environment, or that they may have to *in the future* reevaluate Circular 175 such that

dismissal is required, while all true, entirely misses the point.

The gravamen of the complaint is that the offering documents misled investors by telling them

that Circular 175 would not harm and in fact might help their P2P business and that the

Company made changes in its fundamental business model without any prompting from

government authority or material change in the public information about Circular 175 almost

immediately following the IPO by executing a pre-IPO undisclosed plan to transform the

Company from a P2P business (which is what they sold investors) into a fintech company. This

is not what was sold to the investors in the IPO pursuant to offering documents.  It is the

opposite.  As such, viewing the offering documents at the time they were issued and not in

hindsight, the complaint states a claim under the 1933 Act (*In re Netshoes Sec. Litig*., 68 Misc.3d

788 [Sup Ct, NY County 2020]; *In re PPDAI Group Sec. Litig.*, 66 Misc.3d 1226[A] [Sup Ct,

NY County 2020]; *Hoffman v AT&T Inc*., 67 Misc.3d 1212[A] [Sup Ct, NY County 2020].

### The Relevant Facts and Circumstances

The Company was founded in China in 2011 as a P2P company that connected individual

borrowers and individual lenders, targeting borrowers who were underserved by institutional

funding sources.  As relevant, the Company began talks with U.S. regulators regarding an IPO in

2018, and conducted its IPO on May 10, 2019.  The Company filed a Prospectus (the

**Prospectus**, NYSCEF Doc. No. 33), which included a previous registration statement and

amendments made after communications with the Securities and Exchange Commission (the

**SEC**).  One such amendment was made in response to the Circular on The Classification and Disposal of Risks of Online Lending Institutions and Risk Prevention (**Circular 175**) which mandated that P2P lenders not demonstrate any high-risk characteristics and be designated a "Normal Marketplace".

Circular 175 classified P2P marketplaces as either (i) marketplaces on which investors were not fully repaid or otherwise couldn't operate their business, and (ii) marketplaces that have not been involved in such incidents and were either (a) shell companies with zero loan balance or loan origination for more than three months, (b) small-scale marketplaces, or (c) large-scale marketplaces (NYSCEF Doc. No. 33, at 21).  Circular 175 also set forth factors that would consider P2P lenders as high risk, including marketplaces that fund loans to themselves or facilitate sham loans, marketplaces with unclear fund flows, marketplaces with negative publicity and complaints, and marketplaces that refuse or are reluctant to rectify non-compliant operations (*id.*).

In the Prospectus, the Company indicated that it did not believe it would fall into category (i) or (ii)(a) above (*id.*, at 22).  The Prospectus also stated that the Company anticipated it would be considered a large-scale marketplace and that it did not possess any high-risk characteristics (*id.*).  This according to the plaintiffs was false and materially misleading:

> "6. By the time Jiayin's conducted its IPO on May 10, 2019, the Company was under considerable regulatory pressure to cease operating as a P2P business. ***But an investor would not have known that from reading any of the materials the Company submitted to the SEC in connection with the IPO – in fact, investors were led to believe that, despite the regulations, the Company was staying the course. In fact, when the SEC specifically requested Jiayin expand its disclosure on the Circular on the Classification and Disposal of Risks of Online***

**654398/2020   vs.**
**Motion No.  001**                                                                                   **Page 4 of 12**

NYSCEF DOC. NO. 89

> *Lending Institutions and Risk Prevention ("Circular 175"), one of the harsher of these regulations, the Company stated in a February 22, 2019 correspondence, it believed it "would not be materially and adversely impacted by Circular."* That same statement was later incorporated into the prospectus filed with the SEC"

(NYSCEF Doc. No. 16, ¶ 6 [emphasis added).

In the offering documents, the Company explained that given Circular 175 and the decreasing number of market participants, it was well positioned as a "Normal Marketplace" participant. In fact, in the Prospectus, the Defendants stated that the Company believed it operated a "Normal Marketplace," that it did not possess any high-risk characteristics, and that Circular 175 would not have a material adverse impact on the Company's business and operations (NYSCEF Doc. No. 33, at 22).

In other words, the Company sold itself to the investors in the IPO as a Normal Marketplace lender who would not only be unaffected by Circular 175 but also was well positioned to take advantage of a real business opportunity – *i.e.*, the opportunity to buy into a business where the number of market participants was shrinking and where demand remained high. However, as the Plaintiffs allege:

> "7. Despite these assurances, the Company was materially impacted by Circular 175. The regulatory headwinds were much stronger than it disclosed.
>
> 8. Circular 175 mandated that the only P2P lenders that could stay in business had to be so-called normal marketplaces that had not demonstrated any high-risk characteristics ("Normal Marketplaces"). Jiayin stated in its Offering Documents that it believed it would be considered a Normal Marketplace.
>
> 9. However, Jiayin had many high-risk characteristics. For example, the organization had massive negative publicity and complaints, a history of failure to

comply with mandated fee maximums and a recurring problem with its delinquency rates.

10. Numerous articles were written about problems with Jiayin, including articles written about (i) its abusive collection methods; and (ii) its over-charging on fees.

11. The Company had a recent history of flouting Chinese rules and regulations concerning the maximum amount of fees it could charge for its loans. While P2P lenders were only allowed to charge a maximum of 36% in fees, and Jiayin reported in its Offering Documents it was in compliance with that limit, it was often in violation of the cap. A civil court had in fact recently found Jiayin was charging over 50% in fees.

12. Circular 175 also codified a long-discussed policy requiring each business reduce the number of lenders, the scale of business and the number of borrowers (known as the "Three Drops Policy").

13. The Offering Materials did not properly disclose what impact complying with these mandated business reductions would have on Jiayin's business"

(NYSCEF Doc. No. 16, ¶¶ 7-13).

Additionally, the Defendants touted the strength of its business model based on its relationship with its affiliate, Shanghai Caiyin Asset Management Co., Ltd. (**Shanghai Caiyin**). Shanghai Caiyin provided post-origination loan management services (NYSCEF Doc. No. 33, at 4), was used by the Company as part of its investor assurance program to provide guarantees to investors who invested in unsecured loans (*id.*, at 107), and also maintained the Company's risk reserve fund used to repay investors for loans that were past due (*id.*, at 156).

To be sure, the Company disclosed Circular 175 in the offering documents. In fact, it disclosed that there were uncertainties about the meaning and application of Circular 175 because it had not been officially issued by any government agency (NYSCEF Doc. No. 33, at 22). Based on these uncertainties, the Company indicated that it would be materially adversely affected *if it*

*were ultimately deemed* to not be a Normal Marketplace (*id.*). The Prospectus further indicated that the Company had not received any notices from the government requiring it to set limits on its loan balance or number of investors. Significantly, the Prospectus further provided that, *relying on advice of counsel*, *the Company believed that Circular 175 would not have a material adverse effect on them.* (*id.*) The Plaintiffs allege, however:

> "14. While the Company's IPO materials offered the public reassurances and generic risk warnings typical to this type of business, *behind the scenes the Company was preparing to totally transform its business model away from being a P2P lender.* Its violations of Chinese rules and regulations made it unlikely to be officially categorized as a Normal Marketplace. Additionally, its financial figures reported in the Offering Materials would inevitably drop because of the Company's required increased compliance with the already-in-place Three Drops Policy and certain inevitable decisions regarding business combinations"

(NYSCEF Doc. No. 16, ¶ 14).

With respect to these disclosures however, it is undisputed that none of these risks came to pass or that any of these risks caused the Company to fundamentally begin changing its business within one month of the IPO. The government did not deem the Company not to be a Normal Marketplace. The Company did not receive or respond to any notice from the government requiring it to set limits on its loan balances or number of investors. In fact, as alleged, nothing that the Perspective disclosed as a potential risk associated with Circular 175 came to pass. Instead, as alleged, the Defendants unilaterally had decided prior to the IPO that because of Circular 175, they would need to fundamentally change the business and they began to execute their plan soon after they raised the investors' money based on the false promises of capitalizing on shrinking competition in the P2P business model.

This carefully considered plan was only disclosed to investors after the IPO and in dribs and drabs. For example, approximately one month after the IPO, on the June 11, 2019 earnings call, Mr. Yan announced that the Company was "ramping up its marketing efforts to institutional lenders" (NYSCEF Doc. No. 42, at 2). On an earnings call on September 4, 2019, Shelley Bai, the Company's IR Director announced that the Company was "shifting [its] focus aggressively to institutions like banks, trust companies and the like" (NYSCEF Doc. No. 43, at 5). As alleged in the complaint:

> "15. ***Almost immediately after the Company went public, Defendant Dinggui Yan ("Yan") announced on a June 11, 2019 earnings call that the Company was "ramping up [its] marketing to institutional lenders." In other words, the Company was changing its business model entirely. While it told the public in the documents it submitted in conjunction with the IPO that its P2P model was succeeding, the Company omitted the truth. It could not survive as a P2P company. However, rather than disclose that right then, Defendant Chunlin Fan ("Fan") stressed that the "major hit from uncertainty [was] behind" the Company and he expected "conditions to stabilize."***
>
> 16. On the next earnings call, as the Company's financials continued to deteriorate, Yan again referenced that the Company was shifting its funding from individuals toward institutions. He blamed the Three Drops Policy for the Company's financial hardships. These issues were not fully disclosed in the Offering Materials even though that policy was not a new one; it was codified before the IPO"

(NYSCEF Doc. No. 16, ¶¶ 15-16 [emphasis added]).

On September 16, 2019, remarkably, the Company announced that Shanghai Caiyin – the company it had told the marketplace in the IPO in May 2019 (*i.e.,* a few months earlier) provided a competitive advantage -- would no longer be an affiliated entity of the Company (NYSCEF Doc. No. 44). This was without any prompting from the government or the market and was only done because Shanghai Caiyin would not be needed with the Company's new focus on

654398/2020    vs.                                                                Page 8 of 12
Motion No. 001

8 of 12

institutional investors and its pre-IPO secret plan to transform from a P2P company to a fintech company.  This caused the stock to drop another 4.35% (NYSCEF Doc. No. 16, ¶¶ 17-18).

On November 26, 2019, Yifang Xu, the Company's Chief Risk Officer, announced on an earnings call that P2P companies like the Company were "focusing very much on how to transition our funding sources from the individual funding sources towards the institutional funding sources" (NYSCEF Doc. No. 46, at 9).  This caused the stock to drop further -- to $7.50.

Significantly, on April 1, 2020, Ms. Bai admitted that "*right after the IPO*, we started transitioning funding from individuals to institutions" (NYSCEF Doc. No. 47, at 5 [emphasis added]).  The Company released its unaudited financial results for the first quarter of 2020 on June 11, 2020 (NYSCEF Doc. No. 48), and the stock price dropped to $3.90:

> "19. On November 26, 2019, during pre-market hours, Jiayin issued a press release announcing the Company's financial results for the third quarter of 2019 (the "3Q19 Press Release"). Specifically, that press release reported, in relevant part, that "[r]evenue from post- origination services was RMB59.3 million (US$8.3 million), representing a decrease of 3.4% from the same period of 2018," which the Company attributed to "the disposal of [its] previously- consolidated affiliated company Shanghai Caiyin . . . which provided certain post-origination loan services." On an earnings call that same day, Defendant Yifang Xu stated that "for peer-to-peer companies like" Jiayin, the focus was "on how to transition our funding sources from the individual funding sources[.]" Mention of this transition was notably absent in the Offering Documents just months prior, despite the fact that the relevant regulations had not changed.
>
> 20. On November 26, 2019, the Company's ADS price fell $0.10 per share, or 1.32%, to close at $7.50 per share on November 26, 2019.
>
> 21. On April 1, 2020, Jiayin issued a press release announcing the Company's financial results for the fourth quarter and full year 2019. That press release disclosed, among other results, that for the fourth quarter: "[l]oan origination volume[] was RMB2,900 million (US$417 million), representing a decrease of 56.1% from the same period of 2018, and a decrease of 38.6% sequentially";

"[r]evenue from loan facilitation services was RMB276.6 million (US$39.7 million), representing a decrease of 51.0% from the same period of 2018, primarily due to the decreased loan origination volume"; "[r]evenue from post-origination services was RMB48.6 million (US$7.0 million), representing a decrease of 32.1% from the same period of 2018," which "was due to the decreased loan origination as well as the cease of post-origination loan services previously served by Shanghai Caiyin"; as well as similarly disappointing results related to the same metrics for full year 2019"

(NYSCEF Doc. No. 16, ¶¶ 19-21).

Finally, on September 2, 2020, Ms. Bai admitted that the Company had successfully executed its plan to transform from a P2P company to a financial technology company (NYSCEF Doc. No. 49, at 4). The stock price dropped to $2.90 per share.

## Discussion

On a motion to dismiss pursuant to CPLR 3211, the court must afford the pleading a liberal construction, accepting the facts as alleged as true and accord the plaintiffs the benefit of every possible favorable inference, determining only whether the facts as alleged fit within any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]).

It is well settled that to survive a motion to dismiss brought pursuant to CPLR 3211, a claim brought under the 1933 Act need not satisfy the heightened pleading standard of CPLR 3016 (b) and must only satisfy CPLR 3013:

"In our view, claims based on the Securities Act should not be seen through the prism of fraud and/or misrepresentation. This approach is consistent with the one taken by federal courts in interpreting similar claims brought under the Securities Act. Federal courts have held that since fraud is not an element or a prerequisite to such a claim, ordinary notice pleading standards apply. We are persuaded by this reasoning and hold that the heightened pleading standard should not have

**654398/2020    vs.**
**Motion No.  001**

**Page 10 of 12**

been applied to plaintiffs' Securities Act claims because they are not premised on common-law fraud"

(*Feinberg v Marathon Patent Group Inc.*, 193 AD3d 568, 570-571 [1st Dept 2021]; *In re Netshoes Sec. Litig.*, 68 Misc.3d at 794-795; *In re PPDAI Group Sec. Litig.*, 66 Misc.3d 1226[A], at *6; *In re Uxin Limited Sec. Litig.*, 2020 WL 1146636, at *6 [Sup Ct, NY County 2020]).[1]

Section 11 of the Securities Act is a strict liability statute that holds issuers liable for the contents of a registration statement, both for what it includes and for what it omits *(Omnicare, Inc. v Laborers Dist. Council Const. Industry Pension Fund*, 575 US 175, 186-191 [2015]; *In re Uxin Limited Sec. Litig.*, 2020 WL 1146636 at *7).  To be actionable, statements or omissions must be supported by concrete allegations that the issuer knew that such statements or omissions were false or misleading when made (*In re Netshoes Sec. Litig.* 64 Misc.3d 926, 932 [Sup Ct, NY County 2019]).

As discussed above, the core of the plaintiffs' allegations are that the offering documents were materially misleading because the Defendants told the investors that they were planning on exploiting a business opportunity in the P2P business market and that they did not believe that they would be affected by Circular 175 when in reality they believed the opposite and secretly had a plan to transform the Company into a fintech company as soon as they raised the money. This is sufficient to ground liability under the 1933 Act at this stage of the pleadings (*In re Douyu Intl. Holdings Ltd. Sec. Litig.*, 2021 WL 979297, 2021 NY Slip Op 30822[U], *1, *2 [Sup Ct, NY County 2021]).  It does not matter that the Defendants disclosed Circular 175 or that they

---

[1] For completeness, were CPLR 3016(b) to apply, the well pled complaint satisfies this standard as well.

**654398/2020    vs.**                                                                                   **Page 11 of 12**
**Motion No.  001**

disclosed that they may have to reevaluate the impact of Circular 175 or that they may have to respond to government action in connection with Circular 175. As alleged, none of that happened and the plan was in place prior to the IPO and inapposite to what the Defendants told the investors. Thus, the motion to dismiss must be denied.

The Defendants' motion to dismiss the complaint as against the Underwriter pursuant to 15 USC §77m must be granted. The claims are untimely. Additionally, the court notes that the plaintiffs did not oppose this branch of the Defendants' motion.

To state a claim under Section 15, "a plaintiff must allege (i) a primary violation by a controlled person and (ii) control by the defendant of the primary violator" (*In re Netshoes Sec. Litig.*, 68 Misc.3d at 805). The well pled complaint satisfies these requirements (NYSCEF Doc. No. 16, ¶¶ 150-152). Thus, the Section 15 claims are also not dismissed.

It is hereby ORDERED that the Defendants motion to dismiss is denied except as to the Underwriter; and it is further

ORDERED that the claims against the Underwriter are dismissed.

20220216111012ABORROK82720B63E573488AB3BDF30D3B632492

_____
**2/16/2022**
**DATE**

CHECK ONE:

| | | | |
|---|---|---|---|
| CASE DISPOSED | | X | NON-FINAL DISPOSITION |
| GRANTED | X DENIED | | GRANTED IN PART |  OTHER |

APPLICATION:    SETTLE ORDER    SUBMIT ORDER

CHECK IF APPROPRIATE:    INCLUDES TRANSFER/REASSIGN    FIDUCIARY APPOINTMENT    REFERENCE

**654398/2020    vs.**
**Motion No.  001**

**Page 12 of 12**