UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

PABLO GRECO, GALESSI HOLDING CORP.,    :
and JUAN PABLO DI BENEDETTO, *individually*    :
*and on behalf of all others similarly situated*,    :
                                                        :
                              Lead Plaintiffs,:
                                                        :
                -against-                              :
                                                        :
QUDIAN INC., MIN LUO, and CARL YEUNG,    :
                                                        :
                              Defendants.  :

---------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/13/2022
```

1:20-cv-577-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

Defendant Qudian, Inc. is a leading provider of micro-loans to consumers in China. In June 2019, Qudian raised its guidance for its total non-GAAP net income for the year from 3.5 billion renminbi to 4.5 billion renminbi. Qudian attributed the increase to its strong early results and confidence in its ability to grow through the second half of the year. Not long after Qudian raised its guidance, the company's performance plummeted. By the time the smoke settled, Qudian missed not only its increased guidance, but its initial guidance as well—Qudian's non-GAAP net income for 2019 was 3.4 billion renminbi.

The lead plaintiffs in this action, Juan Pablo di Benedetto, Galessi Holding Corp., and Pablo Greco (together, "Lead Plaintiffs"), brought this securities class action on behalf of themselves and other similarly situated investors who purchased or otherwise acquired Qudian securities between December 13, 2018 and January 15, 2020 (the "Class Period"). Lead Plaintiffs allege that Defendants made a number of false and misleading statements and omissions, including by misrepresenting that Qudian's business was compliant with China's regulations, and by misrepresenting that Qudian was experiencing significant growth while remaining conservative in its lending practices. Lead Plaintiffs allege that Defendants violated Section 10(b) of the Securities

Exchange Act of 1934 and Rule 10b-5, and that Min Luo and Carl Yeung violated Section 20(a) of the Exchange Act.

For the reasons that follow, Lead Plaintiffs have not plausibly alleged that Defendants made materially false or misleading statements with a wrongful state of mind. Therefore, Defendants' motion to dismiss the amended complaint is GRANTED.

## I. BACKGROUND

### A. Facts[1]

#### 1. Qudian

Qudian was founded in 2014 and is "a leading provider of online small consumer credit products in China." Am. Compl., Dkt. No. 44, ¶¶ 24, 28. Almost all of Qudian's transactions are conducted through mobile phones—potential borrowers apply for small amounts of credit on their phones and receive approval within seconds. *Id.* ¶ 28. Qudian's average loan size is less than $300 and has a duration of less than a year. *Id.* Qudian states that it "target[s] the large and growing number of creditworthy borrowers in China who we believe are of emerging prime credit quality but have limited credit history and access to traditional consumer credit from banks or other lenders." *Id.* ¶ 33. Over 80% of Qudian's active borrowers are between 18 and 35 years old. *Id.* Qudian was a private company until October 18, 2017, when the company went public with an initial public offering that listed Qudian's American Depositary Shares ("ADS") on the New York Stock Exchange. *Id.* ¶ 29. Luo is the founder of Qudian and serves as the CEO and chairman of Qudian's board of directors. *Id.* ¶ 24. Yeung was Qudian's CFO. *Id.* ¶ 25.

---

[1] Unless otherwise noted, the facts are drawn from the amended complaint, Dkt. No. 44, and are accepted as true for the purposes of this motion to dismiss. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). But "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Core Loan Book

Lead Plaintiffs refer to Qudian's consumer lending business as its "core loan book." Qudian's core loan book consists of "on-balance sheet" and "off-balance sheet" transactions. *Id.* ¶ 58. On-balance sheet transactions are loans funded either directly by Qudian or by Qudian's institutional funding partners. *Id.* Off-balance sheet transactions are loans that Qudian facilitates between borrowers and third parties. *Id.* ¶ 59. Under this service, Qudian refers qualified credit applications to banks along with Qudian's assessment of the potential borrower's credit profile and suggested credit limits. *Id.* The banks then independently review the credit application and approve or deny the loan. *Id.* If the loan is approved, the banks directly fund the loan to the borrower. *Id.* Qudian receives a facilitation fee for each loan and guarantees the full loan amount in the event of a default. *Id.* In 2018, Qudian's core loan book funded approximately $8.4 billion worth of loans. *Id.* ¶ 58. 64% of the transactions were on-balance sheet and the remainder were off-balance sheet. *Id.*

### 3. Regulatory Issues with the Core Loan Book

China imposes strict regulations on the online consumer lending industry. *Id.* ¶ 61. On December 1, 2017, China's Office of the Leading Group for Specific Rectification against Online Finance Risks and the Office of the Leading Group for Specific Rectification against P2P Online Lending Risks jointly issued the Circular on Regulating and Rectifying Cash Loan Business, which is known as Circular 141. *Id.* In its 2018 Annual Report, Qudian explained that Circular 141 "provides restrictions on banks' collaboration with third parties in cash loan business," including that "[a] bank may not outsource its core business functions, such as credit assessment and risk management, to third parties" and that "[a] bank participating in loan facilitation transactions may not accept credit enhancement services from a third party which has not obtained any license or approval to provide guarantees, including credit enhancement service in the form of a commitment to assume default risks." *Id.* ¶ 62.

Lead Plaintiffs allege that Qudian's off-balance sheet transactions, as well as on-balance sheet loans that were funded by other financial institutions, violate Chinese regulations, including Circular 141. *Id.* ¶ 66. Lead Plaintiffs allege that "it was common for Qudian to violate Circular 141's prohibition on having financial institutions outsource their credit assessments to Qudian," because "many of the banks that Qudian did business with were actually outsourcing the credit assessment function to Qudian" rather than conducting their own independent credit assessments. *Id.* ¶ 69. Despite allegedly violating Circular 141, Qudian "repeatedly assured investors . . . that Qudian was compliant with online lending regulations." *Id.* ¶ 78.

In addition to Circular 141, Qudian was subject to strict licensing regulations. At the end of 2018, Qudian had two online microlending licenses. *Id.* ¶ 72. The licenses were associated with two of Qudian's subsidiaries: Fuzhou Gaoxin District Qufenqi Microlending Co. Ltd. and Ganzhou Happy Life Online Microlending Co. Ltd. *Id.* Lead Plaintiffs allege that, in May 2019, China's government "downgraded the scope of business that Qufenqi Microlending could engage in so that its lending license was narrowed from not having any geographic restriction to being just a regional microlending license. This severely restricted Qudian to making microloans within the limits of Ganzhou district and surrounding counties." *Id.* Consequently, Lead Plaintiffs allege, the number of loans that Qudian was able to fund with its own capital was narrowed. *Id.* ¶ 73. Lead Plaintiffs allege that the restriction impacted Qudian's core loan book—both the number of on-balance sheet transactions and Qudian's financing income from those transactions declined in 2019. *Id.* ¶ 74.

Lead Plaintiffs contend that, as a result of these regulatory issues, Qudian's financial partners became reluctant to provide Qudian funding and some partners ended their partnership completely. *Id.* ¶ 76–77. Qudian became concerned about the viability of the core loan book. *Id.* ¶ 75. These concerns, among other reasons, pushed Qudian to try to generate income through other methods. *Id.* ¶ 75–77. However, Qudian failed numerous times to grow its business outside of its core loan book, including through a relationship with Ant Financial, an auto-financing business, and several e-

commerce projects, among others.  *See id.* ¶ 36–52.  By November 2018, Qudian's share price had

fallen by 82% from its IPO as a result of these failed projects.  *Id.* ¶ 52.

### 4.  Open Platform

In the third quarter of 2018, Qudian developed a new loan-referral business called Open

Platform.  *Id.* ¶¶ 2, 82.  Through Open Platform, Qudian refers borrowers to other financial

institutions which then make loans directly to the borrowers.  *Id.* ¶ 2.  The primary difference

between Open Platform and the off-balance sheet loans that Qudian facilitated through its core loan

book is that Qudian does not guarantee the loans made through Open Platform.  *Id.* ¶ 103.  In its

2018 Annual Report, Qudian explained that Open Platform:

> [O]ffers our large user base with more choices to satisfy their financial needs, while
> incurring no material cost of operations and no credit risk for us.  For users that do
> not meet our credit requirements, we provide recommendations of financial products
> that are offered by financial service providers that participate on our platform.  The
> relevant financial service providers perform independent credit assessment of users
> and make the ultimate credit decisions.  We typically charge such financial
> service providers for lead generation on a cost-per-click basis.  On the other hand, for users
> with better credit profiles that are applying for large loan amounts that exceed the limit
> permitted under our policy, we refer their applications to our institutional funding
> partners.  We do not bear credit risk and receive commissions from our institutional
> funding partners for such referrals.

*Id.* ¶ 82.  Qudian portrayed Open Platform as the next source of growth for Qudian after its other

failed attempts to expand beyond the core loan book.  *Id.* ¶ 84.  Qudian told investors that Open

Platform would allow Qudian to profit off its tens of millions of registered users that were not

taking out loans.  *Id.*

The reality, Lead Plaintiffs allege, was vastly different.  Although Defendants stated that

Open Platform was created as a new business opportunity, Lead Plaintiffs assert that Qudian

"developed Open Platform to address its serious regulatory concerns with its core loan business."

*Id.* ¶ 85.  "Qudian's reason for shifting to Open Platform was actually that it was more compliant

with China's strict online lending regulations, not that it presented a promising new avenue of

growth separate from the core loan book.  But rather than explaining the Company's true reason for

its shift to Open Platform, Defendants described Open Platform as a great new business opportunity that would provide Qudian with its long-sought-after next leg of rapid growth alongside continued growth in its core loan book." *Id.* ¶ 92.  Lead Plaintiffs allege that Qudian's ultimate goal was to "shift their entire business to Open Platform." *Id.* ¶ 192.

Further, Lead Plaintiffs allege that Defendants misrepresented how Open Platform compared to the core loan book.  Rather than being a new product, Lead Plaintiffs assert that Open Platform "was very similar to Qudian's pre-existing off-balance sheet loan facilitation business, which also facilitated loans directly between Qudian's users and third-party" and that therefore Open Platform did not provide an avenue for growth separate from the core loan book. *Id.* ¶ 92. Moreover, Lead Plaintiffs assert that Open Platform was in direct competition with the core loan book. *Id.* ¶ 85.  Because Qudian did not guarantee the risk of default in Open Platform, Qudian's partners demanded that Qudian refer only its highest-quality and most-credit-worthy borrowers.  *Id.* ¶ 104.  "Rather than accessing Qudian's tens of millions of inactive users, Open Platform was actually limited to the much smaller set of the highest-quality borrowers from Qudian's core loan book." *Id.* ¶ 85.  Consequently, Lead Plaintiffs maintain that Qudian's best borrowers shifted from the core loan book to Open Platform. *Id.* ¶ 104.

### 5. Credit Trial Program

In the third quarter of 2018, Qudian began lowering its credit standards in the core loan book through its Credit Trial Program. *Id.* ¶¶ 108–10.  The Credit Trial Program "entailed Qudian making loans in its core business to riskier borrowers that were not approved under Qudian's traditional risk assessment." *Id.* ¶ 108.  Lead Plaintiffs allege that the Credit Trial Program was created to compensate for the fact that Qudian had diverted its highest-quality borrowers from the core loan book to Open Platform. *Id.* ¶ 4.  The Credit Trial Program allowed "Qudian to portray its core loan book as continuing to grow alongside Open Platform," when in reality, "Qudian was populating its legacy business with much riskier loans that would have a much higher rate of

default." *Id.* ¶ 108.  Qudian did not disclose the Credit Trial Program until August 16, 2019.  *Id.*

¶ 110.  After the third quarter of 2019, Qudian revealed that it had stopped the Credit Trial

Program, but that twenty percent of the loans in the core loan book were part of the Credit Trial

Program.  *Id.* ¶ 116.

### 6.  Qudian's 2019 Financial Guidance

On December 13, 2018, Qudian issued a press release announcing its financial guidance for

2019.  *Id.* ¶ 198.  In the press release, Qudian announced that it expected that its non-GAAP net

income in 2019 would exceed 3.5 billion renminbi.  *Id.* ¶ 54.  Qudian's stock price rose twenty

percent by the close of trading on December 13, 2018.  *Id.*

Qudian subsequently updated its 2019 Financial Guidance multiple times throughout the

Class Period.  On June 21, 2019, Qudian issued a press release announcing that it was raising its

income guidance for 2019 from 3.5 billion renminbi to greater than 4.5 billion renminbi.  *Id.* ¶¶ 260–

61.  Shortly after releasing its updated guidance, Qudian began to suffer poor performance.  On

November 18, 2019, Qudian issued a press release announcing its financial results for the third

quarter of 2019.  *Id.* ¶ 299.  In the press release, Qudian reduced its financial guidance for 2019 from

4.5 billion renminbi to 4.0 billion renminbi.  *Id.* ¶ 144.  Compared to the previous quarter, revenue in

the core loan book dropped from 1.6 billion renminbi to 1.4 billion renminbi, and new active

borrowers decreased from 1.1 million to less than 700,000.  *Id.* ¶¶ 145, 147.  In addition, Qudian

recorded over 1 billion renminbi in expenses related to credit costs in the quarter and the

delinquency rate of loans in the core loan book rose by more than four percent.  *Id.* ¶¶ 148–50.

As a result of Qudian's poor results and updated guidance, Qudian's share price began to fall

rapidly.  *Id.* ¶¶ 329, 334.  By November 21, 2019, Qudian's share price had fallen over 45% below

the price on November 15, 2019.  *Id.* ¶ 335.  In an attempt to assuage investor concerns, Qudian

held an emergency "Business Update Call" on November 25, 2019.  *Id.* ¶ 157.  On the call, Yeung

stated, "[w]e are perplexed, first of all, on how the market reacted.  We think it's unreasonable . . . ."

*Id.* Yeung also reinforced Qudian's new financial guidance for 2019, which he described as "conservative." *Id.* ¶ 309–10.

Less than two months later, on January 16, 2020, Qudian abandoned its 2019 financial guidance. *Id.* ¶ 17.  In a press release, Qudian explained "that the Company withdraws its fiscal 2019 guidance and will not issue guidance in the near term due to uncertainty related to the recent regulatory and operating environment." *Id.* ¶ 159.  The market reacted strongly—Qudian's stock price fell 24.8% by the close of trading on January 21, 2020.  *Id.* ¶ 351.

Qudian announced its results for 2019 on March 18, 2020.  *Id.* ¶ 160.  Qudian had fallen short of its guidance—its non-GAAP net income for 2019 was 3.4 billion renminbi.  *Id.* ¶ 161.  Qudian's fourth quarter results were particularly bad.  The company earned only approximately 157 million renminbi in the quarter, down from 1.1 billion in the third quarter.  *Id.* ¶ 160.  Qudian acknowledged that "[i]f you look at our fourth quarter number, if we single out the open platform business, we are actually experiencing a loss for our loan book business."  *Id.* ¶ 162.  On the same day, the company announced that Yeung was resigning from his position as CFO effective immediately.  *Id.* ¶ 164.

### B. Procedural History

Stephen Bellingham, an investor who purchased Qudian's ADS during the Class Period, initiated this action on January 22, 2020 against Qudian, Luo, and Yeung.  Dkt. No. 1.  On April 7, 2020, the parties stipulated to appoint Juan Pablo di Benedetto, Galessi Holding Corp., and Pablo Greco as lead plaintiffs in this action.  Dkt. No. 34.  Lead Plaintiffs filed an amended complaint on June 17, 2020.  Dkt. No. 44.

The amended complaint asserts two claims for relief.  First, the amended complaint alleges violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), ("Section 10(b)") and rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Am. Compl. ¶¶ 382–92.  Second, the amended complaint alleges control person liability against Luo and Yeung

under section 20(a) of the Exchange Act, 15 U.S.C. § 78t, ("Section 20(a)") for the same violations alleged in the first cause of action.  Am. Compl. ¶¶ 393–400.

On September 4, 2020, Defendants moved to dismiss the amended complaint, on the basis that Lead Plaintiffs had failed to state a claim.  Mot. to Dismiss Pls.' Am. Compl., Dkt. No. 54; *see also* Defs.' Mem. of Law in Support of Their Mot. to Dismiss the Am. Compl. ("Mem."), Dkt. No. 55; Kreissman Decl., Dkt. No. 56.  Lead Plaintiffs opposed Defendants' motion on October 2, 2020.  Pls.' Mem. in Opp'n to Defs' Mot. to Dismiss ("Opp'n"), Dkt. No. 57.  Defendants replied on October 16, 2020.  Defs.' Reply Mem. of Law in Supp. of Their Mot. to Dismiss ("Reply"), Dkt. No. 58.  On March 10, 2022, Lead Plaintiffs submitted a notice of supplemental authority, notifying the Court of the February 16, 2022 opinion in the case *France v. Jiayin Grp. Inc.*, 161 N.Y.S. 3d 755 (N.Y. Sup. Ct. 2022).  Dkt. No. 59.  Defendants responded on March 17, 2022.  Dkt. No. 60.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If a complaint fails to meet this pleading standard, a defendant may move to dismiss it for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (second alteration in original) (internal quotation marks and citations omitted) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* Under the PSLRA, plaintiffs must also specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must therefore "do more than say that the statements . . . were false and misleading; they

must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). In that context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

In ruling on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98 (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)). As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch*, 952 F.3d at 79 (citations omitted). Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

A court can also consider documents that are "integral to" the complaint. *Lynch*, 952 F.3d at 79. In order for a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary

judgment, the complaint must rely heavily upon its terms and effects.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.") (internal quotation marks omitted)). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (quoting *Faulkner*, 463 F.3d at 134).  "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157.  The Second Circuit has "recognized the applicability of this exception where the documents consisted of emails that were part of a negotiation exchange that the plaintiff identified as the basis for its good faith and fair dealing claim, or consisted of contracts referenced in the complaint which were essential to the claims." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 108–09 (2d Cir. 2021) (citations omitted) (first citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); and then citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n.4 (2d Cir. 2002)).

"Where a district court considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint, the district court, to decide the issue on the merits, must convert the motion into one for summary judgment." *Id.* at 106. "This requirement 'deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence [outside] the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it.'"

*Id.* at 107–08 (alteration in original) (quoting *Glob. Network Commc'ns, Inc.*, 458 F.3d at 155).  "A district court therefore 'errs when it consider[s] affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.'"  *Id.* at 108 (alteration in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000)).

Here, Defendants attached 28 articles regarding regulatory developments in China to their motion to dismiss.  *See* Mem. at 6 n.3, Kreissman Decl., Ex. G.  None of the articles were attached to the complaint, incorporated by reference in the complaint, or integral to the complaint. Defendants also attached five SEC filings from two of Qudian's competitors to their motion to dismiss.  *See* Mem. at 34 n.22; Kreissman Decl., Ex. Q.  Although the Court can consider legally required public disclosure documents filed with the SEC, the Court can consider them "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'"  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). Defendants solely rely on the SEC filings for the truth of their contents.  *See* Mem. at 34–35 (relying on the documents to show that two of Qudian's competitors "experienced downturns in their loan book volume that paralleled Qudian's").  Accordingly, the Court has not considered these materials in deciding this motion.

## III. DISCUSSION

### A.  Section 10(b) and Rule 10b-5 Liability

Lead Plaintiffs have not plausibly alleged that Defendants' statements violated federal securities laws.  Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b).  To survive a defendant's motion to dismiss a Section 10(b) claim, a plaintiff must plausibly plead "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a

wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance;

(5) economic loss; and (6) loss causation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir.

2013) (alterations omitted) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

Defendants challenge the first and second elements.

### 1. False or Misleading Statements or Omissions

#### a. Legal Standard

"A statement is misleading if a reasonable investor would have received a false impression

from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be

both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re

Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a

corporation makes "a disclosure about a particular topic, whether voluntary or required, the

representation must be complete and accurate" (internal quotation marks omitted)). And "literally

true statements" are actionable if they "create a materially misleading impression." *SEC v. Gabelli*,

653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013). "The literal

truth of an isolated statement is insufficient; the proper inquiry requires an examination of

defendants' representations, taken together and in context." *Morgan Stanley Info. Fund,* 592 F.3d at

366 (internal quotation marks omitted). Accordingly, plaintiffs "may not cherry pick certain public

statements for [their] complaint and divorce them from the universe of disclosed information to

plausibly allege fraud." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v.

Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under section 10(b).

An omission is actionable if the omitted information was subject to "an affirmative legal disclosure

obligation" or the omitted information is "necessary to prevent existing disclosures from being

misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011). The key is the

"presence of a prior statement that otherwise is or will become materially misleading" as a result of the omission; without such a statement, "a corporation need not affirmatively disclose" negative facts to the market. *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).

To incur liability, misrepresentations or omissions must be material. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

i.    Statements of Opinion

As a general principle, "[t]o be actionable, a misrepresentation must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (quotation omitted). Statements of opinion must be examined in the context in which they arise. "[T]he investor takes into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* Statements of opinion can give rise to liability in two distinct ways, even if they are sincerely believed: if they contain false embedded statements of fact or if they "omit[ ] material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion." *Id.* at 189; *see Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (applying *Omnicare* beyond Section 11 claims to claims arising under Section 10(b) and Rule 10b-5).

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 185–86).  "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (quoting *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y.2004)).  The Second Circuit has firmly rejected the "fraud by hindsight" approach.  *See Stevelman v. Alias Rsch., Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89). A reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188–89.  However, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[ ] not expect that *every* fact known to [a speaker] supports its opinion statement." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194).  Therefore, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* (quoting *Omnicare*, 575 U.S. at 194).

At the pleading stage, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 209 (quoting *Omnicare*, 575 U.S. at 194).  The "core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194).  The Supreme Court emphasized that this "is no small task for an investor." *Omnicare*, 575 U.S. at 194.

ii.      Corporate Optimism and Puffery

General statements of optimism and puffery are non-actionable under federal securities laws because they are not "sufficiently specific that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome.'" *Lopez*, 173 F. Supp. 3d at 29 (quoting *City of Pontiac*, 752 F.3d at 185); *see also In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what Vale is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable). Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because, as stated above, the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'" *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Allegations that a defendant should have been "more alert and more skeptical" are insufficient; speakers are "not required to take a gloomy, fearful or defeatist view of the future." *Id.*

However, like opinion statements, statements of optimism and puffery can be actionable where they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)).

iii.      Forward-Looking Statements

A statement is not actionable if it falls under the PSLRA's safe-harbor provision for "forward-looking statements." *See* 15 U.S.C. § 78u–5(c). The PSLRA includes several definitions of forward-looking statements. *See* 15 U.S.C. § 78u–5(i)(1)(A)–(C)). Under the safe-harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the

plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies.'" *Id.* at 245–46 (quoting *Slayton*, 604 F.3d at 766). However, the Second Circuit has held that "'[a] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements. *Id.* (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.,* 620 F.3d 137, 144 (2d Cir. 2010); *see also Makor Issues & Rts, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").

However, there are limits to the safe harbor's reach. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see also City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) ("[G]eneric and mere boilerplate words of caution—for example, a statement at the beginning of a conference call that states merely that 'forward-looking statements are subject to certain risks and uncertainties'—are insufficient to put investors on notice of the risks at hand and therefore to inoculate these statements." (quoting *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 265 n.3 (2d Cir. 2010) (summary order)). Because "[c]autionary language in securities offerings is just about universal[,]" "the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin v. eBanker USA.com*, 295 F.3d 352, 359 (2d Cir. 2002). The Court must evaluate the language "on a case-by-case basis. In all cases, however, the court must keep in mind that a

complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Id.*

### b. Application

Lead Plaintiffs allege that Defendants made a myriad of statements during the Class Period that were false and misleading because Defendants misrepresented and failed to disclose the following information:  (1) that the core loan book violated Circular 141; (2) that the Chinese government narrowed the geographic scope of Qudian's lending license in May 2019; (3) that Qudian lowered its lending standards in the core loan book to such a degree that at least 20% of the loans in its core loan book were made to borrowers that did not meet Qudian's lending standards; (4) that Open Platform took the best, highest-quality borrowers from Qudian's user base; and (5) that Open Platform was developed to address regulatory problems in the core loan book.  The amended complaint frames the allegations around these five buckets.  For each individual statement, the amended complaint alleges that the statement was false or misleading "for the reasons set forth" with respect to the bucket.  Similarly, rather than focusing on whether any specific statement was false or misleading, the parties' briefing focuses on whether the information in each bucket was properly disclosed or whether the information was material.

For purposes of this opinion, the Court will follow the structure of the complaint and address the parties' arguments regarding each of the five buckets in turn.  However, the Court cannot resolve Defendants' motion solely by analyzing the buckets; instead, analysis of each of the specific, stand-alone statements is required.  For many of the challenged statements, Lead Plaintiffs have relied on selective quotations.  Portions of statements not included in the amended complaint, but incorporated into it by reference, are discussed below for context.

### i.        Bucket One:  Circular 141

First, Lead Plaintiffs allege that Defendants misrepresented or failed to disclose that "the core loan book violated Circular 141's prohibition on Qudian conducting credit assessments on

behalf of other financial institutions." Am. Compl. ¶ 197. Lead Plaintiffs claim that Defendants'

omission rendered numerous of Defendants' statements false or misleading.

Lead Plaintiffs' allegations must be contextualized in light of Defendants' disclosures.

Qudian's 2018 Annual Report contained the following disclosure regarding Circular 141:

> Among other things, Circular 141 provides restrictions on banks' collaboration with
> third parties in cash loan business. Pursuant to Circular 141, a bank may not outsource
> its core business functions, such as credit assessment and risk management, to third
> parties. Circular 141 also prohibits a bank participating in loan facilitation transactions
> from accepting credit enhancement services from a third party which has not obtained
> any license or approval to provide guarantees, including credit enhancement service in
> the form of a commitment to assume default risks. As Circular 141 is relatively new,
> it remains uncertain how the regulatory authorities will interpret and enforce the
> requirements. We have entered into arrangements with several banks which directly
> fund credit drawdowns to borrowers. We refer to such banks qualified credit
> applications from borrowers, including our assessment of their credit profiles and our
> suggested credit limits. They will then review the credit applications and approve
> credit for drawdown.

Kreissman Decl., Ex. K at 12–13; *see also* Am. Compl. ¶¶ 66–67. Qudian also disclosed:

> We have entered into cooperative agreements with banks in China and started to fund
> credit drawdowns to borrowers under such arrangements in April 2017. The banks
> are able to utilize our data-driven credit assessment model to screen potential
> borrowers who are traditionally underserved by banks due to the lack of credit data.
> Under such agreements, we refer to such banks qualified credit applications from
> borrowers, including our assessment of their credit profiles and our suggested credit
> limits. They will then review the credit applications independently in accordance with
> their credit assessment standards and approve credit for drawdown.

Kreissman Decl., Ex. K at 63; *see also* Am. Compl. ¶¶ 66–67.

Lead Plaintiffs admit that "Defendants disclosed: (i) the existence of Circular 141, (ii) that

under Circular 141, '[a] bank may not outsource its core business functions, such as credit

assessment and risk management, to third parties,' and (iii) that Qudian referred and transferred

qualified credit applications and assessments to banks that supposedly conducted independent

assessments of those files." Opp'n at 13. Notably, Lead Plaintiffs do not allege that Qudian

violated Circular 141 by providing credit assessments to banks. Nor do Lead Plaintiffs allege that

Qudian has been investigated or found liable for violating Circular 141. Further, Lead Plaintiffs

concede that Qudian was not "obligated to disclose legal conclusions or legal interpretations" regarding Circular 141. *Id.*

Given this context, Lead Plaintiffs' allegations are considerably narrower than they are framed in the amended complaint. There is no dispute that Defendants disclosed that Circular 141 prevented banks from outsourcing credit assessments to third parties, disclosed that Qudian provided credit assessments to banks, and disclosed the uncertainty regarding how regulatory authorities would interpret and enforce Circular 141. Rather than alleging that Qudian's conduct violated Circular 141, Lead Plaintiffs allege that Qudian's funding partners violated Circular 141 by relying on Qudian's credit assessments instead of conducting their own credit assessments. What Defendants failed to disclose, Lead Plaintiffs allege, is "that banks were outsourcing credit assessments to [Qudian] and not conducting their own, independent evaluations of credit files." Opp'n at 13.

Lead Plaintiffs support this allegation with statements from a single confidential witness, CW 4. Courts in the Second Circuit allow "plaintiffs to rely on unnamed sources so long as '[the unnamed sources] are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.,* 709 F.3d 109, 123–24 (2d Cir. 2013) (quoting *Novak,* 216 F.3d at 314). Here, Lead Plaintiffs allege:

> CW 4—a former employee who directly assisted Defendant Luo, communicated with him on a daily basis, and worked with Qudian's funding partners from early 2018 until the summer of 2018—explained that many of the banks that Qudian did business with were actually outsourcing the credit assessment function to Qudian. This witness explained that already in 2018, Qudian and the financial institutions that provided it with funding were aware of the prohibition on Qudian conducting credit assessments for these funding partners. The witness also described how certain financial institutions that "had a good relationship with the local regulator" would rely on Qudian's risk assessment rather than conducting their own independent risk assessment after receiving Qudian's initial review. In other words, CW 4 confirmed that it was common for Qudian to violate Circular 141's prohibition on having financial institutions outsource their credit assessments to Qudian.

Am. Compl. ¶ 69.

Although a close call, the amended complaint describes CW 4 with sufficient particularity to support that a person in the position would know that certain banks were relying solely on Qudian's risk assessments rather than conducting their own independent assessments. Defendants contend that the amended complaint "offer[s] *no facts* suggesting how CW4 supposedly knew what the institutions were doing." Reply at 8. To the contrary, the amended complaint alleges that CW 4 worked directly with the funding partners and that CW 4 worked closely with Luo, the founder and CEO of Qudian. At this stage, the Court is required to draw all reasonable inferences in Lead Plaintiffs' favor. *Burch*, 551 F.3d at 124. It is plausible that a person who worked closely with Qudian's CEO as well as Qudian's funding partners would know that some of the funding partners were not conducting independent risk assessments.[2]

Next, Defendants argue that "CW4's allegations are insufficient because he or she left Qudian *months before the class period*, and thus cannot speak to what Qudian or its banking partners were doing during the class period." Reply at 8 (internal citation omitted). Yet, "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). Although CW 4 left Qudian at least a few months prior to the Class Period, the fact that banks were not conducting independent credit assessments in the summer of 2018 supports the inference that the banks continued that practice into the Class Period. *See Iowa Pub. Emps.*, 620 F.3d at 143 n.13

---

[2] The cases Defendants cite in opposition are distinguishable. In *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011), the court held that three confidential witnesses' allegations regarding the defendant company were insufficient where the confidential witnesses did not work for the defendant company and "plaintiffs make no allegation that those sources ever had any contact with anyone at [the defendant company], much less with the Individual Defendants." *Id.* at 594. Similarly, in *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018), the court did not accept allegations from confidential witnesses because the employees worked mainly within a single corporate unit and did not have insight into corporate units or divisions. *Id.* at 223. Here, by contrast, the amended complaint alleges that CW 4 worked at the highest level of Qudian's corporate structure and that CW4 worked with Qudian's funding partners. These allegations are sufficient to support that CW 4 could plausibly have knowledge that Qudian's funding partners were relying solely on Qudian's credit assessments rather than conducting their own.

("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier.").

In sum, CW 4's statements support that Qudian's funding partners were violating Circular 141 by relying on Qudian's risk assessments rather than conducting their own independent assessments. Accordingly, the Court must analyze each of the challenged statements to determine whether Qudian's omission renders the statements misleading.

Most of the challenged statements are not actionable. First, Lead Plaintiffs challenge various statements consisting of Defendants' opinions regarding Qudian's financial outlook for 2019. *See* Am. Compl. ¶¶ 199–201, 204 (statements announcing Qudian's guidance, justifying the guidance, expressing confidence in Qudian's growth prospect, and expressing confidence in the guidance); *id.* ¶ 237 (reaffirming Qudian's guidance); *id.* ¶ 261 (raising Qudian's guidance); *id.* ¶ 262 (expressing confidence in Qudian's raised guidance); *id.* ¶ 265 (reaffirming Qudian's raised guidance); *id.* ¶ 282 (stating that Qudian raised its guidance based on "solid second quarter results driven by strong momentum in our open platform initiative and better-than-expected loan book growth"); *id.* ¶ 297 (reaffirming Qudian's updated 2019 financial guidance); *id.* ¶ 301 (lowering Qudian's 2019 financial guidance); *id.* ¶ 306 (Yeung's statement that "I think we are going to start to see some pretty interesting good trends into Q1. Q4 will still be like a tail end of what's happening in 2019, but Q1, we should expect to see some fantastic results from doing all of this."); *id.* ¶¶ 309–11 (justifying Qudian's lowered guidance). Lead Plaintiffs have not adequately alleged that Qudian's omission renders these statements misleading. None of these statements contain representations about the regulatory compliance of the core loan book. Instead, Lead Plaintiffs' theory is that Defendants lacked a basis to make these statements given that Qudian's funding partners were violating Circular 141 by relying solely on Qudian's credit assessments.

This is a clear attempt to plead fraud by hindsight. "It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent

events." *Lopez*, 173 F. Supp. 3d at 24.  The Second Circuit has firmly rejected the "fraud by

hindsight" approach.  *See Stevelman*, 174 F.3d at 85.  Here, Lead Plaintiffs "have failed to sufficiently

allege facts that show that Defendants did not believe these opinions and expectations at the time

they made the statements."  *In re Adient plc Sec. Litig.*, No. 18-cv-9116, 2020 WL 1644018, at *17

(S.D.N.Y. Apr. 2, 2020).  The fact that some of Qudian's funding partners were not conducting

independent credit assessments and therefore may have been violating Circular 141, standing alone,

does not establish that Defendants lacked a basis to believe in their guidance statements.  Therefore,

Lead Plaintiffs fail to adequately allege that Defendants' statements regarding Qudian's financial

guidance for 2019 were false or misleading.[3]

        Another set of challenged statements are non-actionable puffery.  Lead Plaintiffs challenge

several statements regarding Defendants' regulatory compliance.  *See* Am. Compl. ¶ 230 (statement

that "[w]e will continue to make efforts to ensure that we are compliant with the existing laws,

regulations and governmental policies relating to our industry and to comply with new laws and

regulations or changes under existing laws and regulations that may arise in the future"); *id.* ¶ 273

(management presentation stating that "Regulatory Compliant is Embedded in Our DNA" and

---

[3] Defendants also argue that many of these statements are protected under the PSLRA's safe-harbor provision.  *See* Mem. at 14–16.  To determine whether the statements are protected under the PSLRA's safe-harbor provision, the Court must conduct a statement-by-statement analysis.  A threshold issue in determining the applicability of the PSLRA's safe harbor is a determination of whether the challenged statements are forward-looking in nature.  "As a general rule, statements whose truth cannot be ascertained until some time after they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (citation omitted).  In contrast, "the safe harbor . . . do[es] not apply to statements of present or historical facts." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 385 (S.D.N.Y. 2012); *see also Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (concluding that PSLRA safe harbor was inapplicable because statements at issue "state[d] a present or historical fact alone or incorporate[d] forward-looking aspects into statements of present or historical fact").  Next, the Court would have to determine, for each forward-looking statement, whether the statements are immaterial or whether the statements are identified and accompanied by meaningful cautionary language.  Defendants' briefing on these issues is insufficient.  Rather that analyze the language of the individual statements, Defendants summarily assert that the statements are forward looking.  Similarly, although Defendants argue that each of the statements was accompanied by sufficient cautionary language, Defendants only list examples and do not identify the cautionary language that accompanied each statement.  Plaintiffs also fail to analyze the language of the statements or the accompanying cautionary language, and instead summarily argue that the statements were statements of present or historical fact and that the cautionary language was insufficient.  Because the Court concludes that Lead Plaintiffs have not sufficiently alleged that these statements were materially false or misleading, the Court need not resolve whether these statements are also protected under the PSLRA's safe-harbor provision.

describing Qudian's key "compliance undertakings"); *id.* ¶ 278 (statement that "[w]e pride ourselves in having a competitive regulatory compliance fee"); *id.* ¶ 282 (statement that "[s]ince 2019, we have made effective efforts to address evolving regulation and partnership landscape"). These statements are too general to cause a reasonable investor to rely upon them. None of the statements assert that Qudian is compliant with all regulations, or that Qudian has never faced regulatory issues. Instead, they are general statements regarding Qudian's attempts to remain compliant with regulations. Accordingly, these statements are non-actionable puffery. *See In re Synchrony*, 988 F.3d at 170 ("Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are 'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'" (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009))); *City of Pontiac*, 752 F.3d at 183 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are [non]actionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them. This is particularly true where . . . the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" (internal quotation marks and citations omitted)); *see also Smallen v. W. Union Co.*, No. 17-cv-00474, 2019 WL 1382823, at *15 (D. Colo. Mar. 27, 2019) (holding that the statement "compliance culture is in our DNA" was "nothing more than unverifiable puffery"), *aff'd sub nom. Smallen v. The W. Union Co.*, 950 F.3d 1297 (10th Cir. 2020).

Similarly, Lead Plaintiffs challenge a statement from Qudian's November 18, 2019 press release. The press released stated:

> In our risk undertaking business, we implemented a conservative strategy of reducing credit volumes and paused our credit trial program. Our proactive and prompt management of macro driven risk was effective in stabilizing the delinquency rates. . . . [W]e expect to continue a conservative approach on our risk-taking book into the final quarter of 2019 and thus revise our full year guidance accordingly.

Am. Compl. ¶ 303.  Lead Plaintiffs assert that this statement was materially false or misleading because "Qudian was not taking a 'conservative' approach to risk in its core loan book" and that Defendants misrepresented the regulatory problems with the core loan book.  *Id.* ¶ 304.  The press releases' generic statements that Qudian's strategy was "conservative" and that Qudian "expect[ed] to continue a conservative approach" are non-actionable puffery.  *See In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010) ("Plaintiffs' allegations that [Defendant] made material misrepresentations when it referred to its underwriting approach as 'disciplined' and 'conservative' and its overcollateralization triggers as 'robust' in the face of deterioration are classic examples of puffery.").

Lead Plaintiffs also challenge a statement from Yeung that "[w]e stay away from anything that are susceptible to regulatory change."  Am. Compl. ¶ 287.  Lead Plaintiffs assert that this statement was false or misleading because "Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions."  *Id.* ¶ 288.  Yeung's full statement reads:

> Insurance.  Yes, thank you for observing the recent regulation on CBIRC preventing insurance company to participate in so-called cash lending.  We did explore that as part of a product enhancement in the fourth quarter last year and partially in the first quarter 2019.  But we had the foresight to not get close to so-called regulatory sort of fringes.  We stay away from anything that are susceptible to regulatory change.  So essentially, there are no insurance fees or income in second quarter 2019.  We are one of the earliest companies in the sector to explore this, and we are the earliest of the companies to basically stop that, and way ahead of the potential regulation came—when that came in, I think, June.  So they are essentially immaterial, nothing in Q2.

Kreissman Decl., Ex. L at 9.  Yeung's statement is related to a specific area of regulations.  In that context, no reasonable investor would consider Yeung's vague and general statement that "[w]e stay away from anything that are susceptible to regulatory change" as a concrete guarantee that none of Qudian's business was susceptible to regulatory change.  *See In re New York Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) ("Generalized statements regarding a company's fiscal discipline and risk management amount to no more than inactionable puffery.").

26

Lead Plaintiffs also fail to adequately allege that two additional statements are materially false or misleading.  First, Lead Plaintiffs challenge a statement made by Yeung during Qudian's August 16, 2019 earnings call.  Yeung stated:

> We've adopted a purely institutional approach where the funding of these loans are made strictly by licensed financial institutions, whom their core business is to understand risk.  These would be your banks and financial—consumer finance companies.  So there's a big difference in the way we get the funding into the hands of the borrowers.
>
> And in our case, we have taken this to an even further step by not touching the loan in itself.  So if you look at the regulation that applies in this transaction structure, we are an Internet technology company.  We have a proper ITP license to allow us to run our apps, run the technology platform, manage that traffic on behalf of the banks.
>
> The banks have a proper lending license, so that the lending relationship happens between the borrower and the bank.  We don't touch that money.  Just don't.  And when that transaction goes through, the bank pays us a service fee.  Now that can be recorded as financing income.  If it's our capital that is being invested through a bank or a loan facilitation income if that capital happens to be bank's own capital.

Am. Compl. ¶ 286; Kreissman Decl., Ex. L at 13.  Lead Plaintiffs assert that Yeung's statement "affirmed that both Qudian's core loan book and Open Platform were regulatory compliant," and therefore the statement was materially false and misleading because "Qudian's core loan book violated Circular 141's prohibition on conducting credit assessments on behalf of other financial institutions."  *Id.* ¶¶ 286, 288.  Lead Plaintiffs are mistaken.  Yeung's statement is a description of Open Platform; the statement simply does not relate to the core loan book in any manner.  Yeung explained that Open Platform is a "purely institutional approach" in which the loans are funded by banks and consumer finance companies rather than Qudian.  He also explained that "if you look at the regulation that applies in this transaction structure, we are an Internet technology company" and that "[w]e have a proper ITP license to allow us to run our apps, run the technology platform, manage that traffic on behalf of the banks."  In context, the "transaction structure" Yeung is describing is clearly Open Platform, not the core loan book.  Yeung's statements would be understood as a description of the licensing requirements for Open Platform, not as an assertion

that the core loan book was compliant from a regulatory standpoint.  Thus, Yeung's statement is not

adequately alleged to have been false or misleading to a reasonable investor.

Second, Lead Plaintiffs challenge a statement made by Yeung during Qudian's earnings call

for the first quarter of 2019.  Yueng stated:

> [O]ur loan book grew by 91.2% year-on-year this demonstrated robust user demand
> and ample institutional funding.  During this quarter, through successful efforts in
> testing and activating our dormant user base, new active borrowers increased by 16.6%
> from last quarter and contributed 18% of total active borrower. . . .  While our loan
> book business continue[s] robust growth, our open platform initiative contributed
> meaningful revenue with little marginal operating costs and zero credit costs.

Am. Compl. ¶ 256.  Qudian's alleged omission does not render this statement false or misleading.

This statement merely describes the core loan book's performance in the first quarter of 2019, which

Lead Plaintiffs' do not challenge.  A reasonable investor would not be misled by this statement into

believing that the core loan book faced no regulatory uncertainty.  Accordingly, this statement is not

actionable.

Lead Plaintiffs have adequately alleged that the remaining statements are materially false or

misleading.  Although generic, several of the statements specifically represent that Qudian is

compliant with all regulations or that Qudian does not face material regulatory uncertainty.  *See* Am.

Compl. ¶ 206 ("Qudian is a leader and pioneer to operate a purely institutional funding base of

licensed lenders strictly under regulatory compliant annual interest rate and regulated lending

activities happen between borrowers and institutions, meaning there are no material regulatory

uncertainties for us."); *id.* ¶ 218 ("On regulatory risks, there were various new regulations and

guidance issued in 2018 for Internet finance.  Yet, we are the first in the industry to shift from being

a direct lender to being a pure platform assisting loans between borrowers and licensed institutional

funding partners with annual interest rate kept under legal cap.  Therefore, there are no material

regulatory uncertainties for us."); *id.* ¶ 222 (stating that Qudian's "solid results" for the fourth

quarter of 2018 were partially attributable to its "regulatory compliant operating structure"); *id.* ¶ 224

Case 1:20-cv-00577-GHW   Document 61   Filed 09/13/22   Page 29 of 52


("Given our current regulatory compliant and stable operating structure, we look to put more that cash into our product that design that we work with our funding partners."). Lead Plaintiffs also challenge Qudian's disclosures regarding Circular 141 in its 2018 Annual Report.[4] *See id.* ¶ 234; *see also* Kreissman Decl., Ex. K at 63; Am. Compl. ¶¶ 66–67. The 2018 Annual Report explains that Qudian refers credit applications to banks along with Qudian's assessments of the potential borrowers' credit profile. The Report then asserts that the banks "review the credit applications independently in accordance with their credit assessment standards." Kreissman Decl., Ex. K at 63. These statements are adequately alleged to be misleading given the fact that some of Qudian's funding partners were violating Circular 141 by relying solely on Qudian's credit assessments rather than conducting their own independent assessments. Accordingly, these statements are actionable.

ii.     Bucket Two: May 2019 License Restriction

Second, Lead Plaintiffs allege that Qudian made a material omission by failing to disclose that "in May 2019, the government severely restricted Qudian's lending license by changing it to a narrow local license." Am. Compl. ¶ 6. Specifically, Lead Plaintiffs allege that Qudian had two online microlending licenses at the beginning of the Class Period, but that in May 2019, the Chinese government "downgraded the scope of business that Qufenqi Microlending could engage in so that its lending license was narrowed from not having any geographic restriction to being just a regional microlending license." *Id.* ¶ 72. Lead Plaintiffs contend that the reduction in scope "severely restricted Qudian to making microloans within the limits of Ganzhou district and surrounding counties," "which substantially narrowed the amount of loans that Qudian was able to make itself." *Id.* ¶¶ 72–73.

Lead Plaintiffs do not allege that Defendants had an affirmative legal obligation to disclose the license restriction. Thus, the alleged omission is actionable only if the omitted information was

---

[4] The disclosures are quoted in full above.

"necessary to prevent existing disclosures from being misleading." *Litwin*, 634 F.3d at 715–16.  Lead Plaintiffs point to numerous statements that they allege are materially false or misleading as a result of the omitted information.  However, in their motion to dismiss, Defendants do not analyze whether the alleged omission was necessary to prevent the challenged statements from being misleading.  Nor do Defendants dispute that they failed to disclose the license restriction.

Instead, Defendants make generalized arguments regarding the alleged omission itself. Defendants argue that that Lead Plaintiffs' "claim fails because Qudian publicly disclosed that it had abandoned the use of its micro-lending licenses long before May 2019."  Mem. at 17.  Defendants assert that Qudian disclosed that it had temporarily "ceased funding credit drawdowns through [its] online small credit companies" and disclosed in each subsequent Form 20-F filed with the SEC that its use of those entities was "historical."  *Id.*; Reply at 6.  Defendants argue that "[h]aving disclosed that it no longer used this entity to make loans, any later restriction of the entity's lending license was clearly immaterial."  Mem. at 18.

The Court cannot determine, as a matter of law, that Defendants' omission was immaterial without analyzing each challenged statement.  Defendants did not disclose the license restriction and there is a difference between being able to use a license and choosing not to, and being unable to use the license.  A reasonable investor could understand the temporal terms like "temporarily" and "historically" to mean that Qudian was not currently using the license, but that Qudian retained the ability to resume use of the license in the future.  Depending on the challenged statement, this difference could be material.  For example, a statement that Qudian retained the ability to use the license in the future would clearly be materially false in light of the omission.  Accordingly, the Court cannot conclude as a matter of law that, regardless of the challenged statement at issue, the omission would not have been viewed by a reasonable investor as having significantly altered the total mix of information made available.  Therefore, the Court must analyze each of the challenged statements in turn.

After reviewing the amended complaint and the public filings from which the statements described in the complaint are found, the Court concludes that none of the challenged statements in this bucket are actionable.  As in bucket one, Lead Plaintiffs challenge a number of Defendants' opinions regarding Qudian's financial outlook for 2019.  *See* Am. Compl. ¶ 237 (reaffirming Qudian's guidance); *id.* ¶ 261 (raising Qudian's guidance); *id.* ¶ 262 (expressing confidence in Qudian's raised guidance); *id.* ¶ 265 (reaffirming Qudian's raised guidance); *id.* ¶ 297 (reaffirming Qudian's updated 2019 financial guidance); *id.* ¶ 301 (lowering Qudian's 2019 financial guidance); *id.* ¶ 306 (Yeung's statement that "I think we are going to start to see some pretty interesting good trends into Q1.  Q4 will still be like a tail end of what's happening in 2019, but Q1, we should expect to see some fantastic results from doing all of this."); *id.* ¶¶ 309–11 (justifying Qudian's lowered guidance).

These allegations fail for the same reason as in the first bucket:  Lead Plaintiffs are improperly attempting to plead fraud by hindsight.  Lead Plaintiffs have not established that any of these statements contain misrepresentations of existing fact regarding Qudian's lending license.  Nor could they—none of these statements discuss, either directly or indirectly, Qudian's lending licenses.  Instead, Lead Plaintiffs argue that, because Qudian had its lending license restricted, Defendants lacked a basis to provide the guidance statements.  Yet, Lead Plaintiffs again "failed to sufficiently allege facts that show that Defendants did not believe these opinions and expectations at the time they made the statements."  *In re Adient*, 2020 WL 1644018, at *17 (S.D.N.Y. Apr. 2, 2020).

Finally, the remaining statements, Am. Compl. ¶¶ 273, 278, 282, 286, 287, 303, are not actionable for same reasons as reasons described for bucket one.

### iii.     Bucket Three:  Credit Trial Program

Third, Lead Plaintiffs allege that Defendants misrepresented, or failed to disclose, that "Qudian lowered its lending standards in the core loan book under the Credit Trial Program to such a degree that at least 20% of the loans in its core loan book were made to borrowers that did not

meet Qudian's lending standards." Am. Compl. ¶ 197.  None of the challenged statements suggest

that Qudian would never lower its lending standards.  To the contrary, Qudian disclosed that it

periodically lowers its credit standards, and that lowering its credit standards may result in higher

delinquency rates.  *See* Mem. at 26.  Further, on its November 21, 2018 earnings call, Qudian

disclosed that its credit standards "will actually relax a lot more into fourth quarter," leading to a

"higher number of outstanding borrowers."  Kreissman Decl., Ex. O at 12.  Lead Plaintiffs concede

that Defendants made these disclosures but assert that the disclosures were too generic and did not

disclose that Qudian was planning to lower its credit standards in the core loan book to such a

significant extent.  *See* Opp'n at 19–20.  The Court cannot conclude as a matter of law that

Defendants' failure to disclose the size of the Credit Trial Program was immaterial.  Accordingly, the

Court will address each allegedly false or misleading statement in turn below.

   The amended complaint lacks sufficient allegations demonstrating the falsity of any

statements made by Defendants.  First, Lead Plaintiffs challenge a number of Defendants' opinions

and expectations regarding Qudian's financial outlook and prospect for growth.  *See* Am. Compl.

¶¶ 199–201, 204 (statements announcing Qudian's guidance, justifying the guidance, expressing

confidence in Qudian's growth prospect, and expressing confidence in the guidance); *id.* ¶ 226

(reaffirming Qudian's 2019 guidance); ¶ 237 (reaffirming Qudian's guidance); *id.* ¶ 261 (raising

Qudian's guidance); *id.* ¶ 262 (expressing confidence in Qudian's raised guidance); *id.* ¶ 265

(reaffirming Qudian's raised guidance); *id.* ¶ 282 (stating that Qudian raised its guidance based on

"solid second quarter results driven by strong momentum in our open platform initiative and better-

than-expected loan book growth"); *id.* ¶ 284 (Yeung's statement that "again on guidance, we remain

fully confident in our growth prospects given sufficient funding, strong user demand and ramp up

of our open platform."); *id.* ¶ 297 (reaffirming Qudian's updated 2019 financial guidance); *id.* ¶ 301

(lowering Qudian's 2019 financial guidance); *id.* ¶ 306 (Yeung's statement that "I think we are going

to start to see some pretty interesting good trends into Q1.  Q4 will still be like a tail end of what's

happening in 2019, but Q1, we should expect to see some fantastic results from doing all of this.");
*id.* ¶¶ 309–11 (justifying Qudian's lowered guidance).

Here, again, Lead Plaintiffs' allegations are an improper attempt to plead fraud by hindsight.
Lead Plaintiffs have not sufficiently alleged facts that show that Defendants did not believe their
opinions.  "A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur
unless an alleged material misstatement was false at the time it was made."  *In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see also San Leandro
Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996)
("[P]laintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis
for their optimistic, but qualified, predictions as to the company's future performance.").  Lead
Plaintiffs' belief that Qudian's guidance statements were misguided in light of the size of the Credit
Trial Program is insufficient.  *See Lopez*, 173 F. Supp. 3d at 24 ("It is not sufficient . . . to allege that
an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent
events.").

Next Lead Plaintiffs challenge a number of statements on the grounds that Defendants
failed to disclose that "Qudian lowered the credit standards in its core loan book and therefore
could not profit from both the core loan book and Open Platform in the way that Defendants
represented."  *See* Am. Compl. ¶ 239 ("We remained focused on growing our loan book steadily
looking for exceptional risk-adjusted profits, while investing in our open-platform initiative launched
in the third quarter of 2018 to drive additional profit growth."); *id.* ¶ 241 ("Looking ahead, we will
continue to invest in our open platform and expand partnerships in funding and user engagement,
fueling growth above and beyond the capacity of our balance sheet.  Given the exciting and visible
growth throughout these core business lines, we will stay focused on our technology-based
consumption credit services."); *id.* ¶ 243 (representing that Open Platform could provide growth
beyond the core loan book); *id.* ¶ 248 ("Our core small more consumption finance business

continues to deliver exceptional risk-adjustment profit driven by strong user demand and risk management capability.  First, on the user side.  Since our thoughtful and streamlined product and service offering, as well as strong brand recognition, our registered users continued to grow to 73.3 million with a little additional marketing costs.  In particular, our efforts to activate our dormant user base have paid off, evidenced by a sequential growth of 16.6% in new active borrowers."); *id.* ¶ 251 (stating that Qudian has "have a lot of hope that [Open Platform] would grow even faster in the upcoming quarters" and that "there should be no problem growing" the core loan book); *id.* ¶ 256 ("While our loan book business continue[s] robust growth, our open platform initiative contributed meaningful revenue with little marginal operating costs and zero credit costs."); *id.* ¶ 267 ("Strategically, via our open-platform initiative we are further opening up our dormant registered user base beyond our loan book to financial institution partners who wish to grow their own loan book."); *id.* ¶ 269 (describing the growth in Qudian's user base and outstanding borrowers in the second quarter of 2019); *id.* ¶ 271 (describing Qudian's growth and stating that Open Platform "continued to prove its strong potential to become a major growth driver"); *id.* ¶ 280 (stating that Qudian's record non-GAAP net income "came as a result of continuing to ramp up our risk-free open platform initiative and successfully growing our loan balance, while managing risk appropriately"); *id.* ¶ 290 (describing that Qudian's funding partners "enjoy both" the core loan book and Open Platform).  Yet, none of these statements represent that the growth in the core loan book, or any future growth, would not be driven in part by a lowering of the core loan book's credit standards.  Given that Qudian had disclosed that it periodically lowered its lending standards, Lead Plaintiffs have failed to sufficiently allege that Defendants' omission of the size of the Credit Trial Program was necessary to prevent the challenged statements from being misleading.

Another significant portion of the challenged statements consistent of non-actionable puffery.  *See* Am. Compl. ¶ 208 (describing Open Platform as an example of an investment that Qudian undertook "responsibly with the priority that our core consumption finance operations will

not be interrupted and targets will be delivered."); *id.* ¶ 210 (touting that Qudian's growth in

outstanding borrowers "demonstrate[ed] that an innately affordable and attractive service does not

require costly marketing or special channels to successfully grow"); *id.* ¶ 220 (stating that Qudian has

a "commitment in . . . [a] conservative risk management approach" and that Qudian "remained

selective in serving new users"); *id.* ¶ 222 (stating that Qudian's "solid results" in 2018 "were

attributable to our growing user base, low operating costs, regulatory compliant operating structure

and solid asset quality" and that the growth in the core loan book "demonstrated the strong demand

from our users with reliable funding to serve"); *id.* ¶ 243 (representing that the core loan book was

expanding "at [s]table and [h]ealthy [l]everage"); *id.* ¶ 249 (stating that Qudian had an "exciting and

reasonable growth outlook throughout our core business line"); *id.* ¶ 253 (representing that Qudian

"had been overall quite conservative" in the core loan book); *id.* ¶ 254 (explaining that, for Open

Platform, "[s]ince, we don't underwrite the risk, we don't really care . . . where the losses are"); *id.*

¶ 276 ("[B]oth the loan book and open platform approaches are making strong inroads with our

massive proprietary app-based user base."); *id.* ¶ 278 (stating that "[o]ur scalable and profitable

platform allows us to consistently catch the new and dormant users using NPL, allowing us to have

an organic based user growth."); *id.* ¶ 282 (representing that Qudian's second quarter results were

"driven by strong momentum in our open platform initiative and better-than-expected loan book

growth"); *id.* ¶ 289 (assuring that Qudian was "carefully managing" its mix between the core loan

book and Open Platform "so that we meet our guidance numbers carefully"); *id.* ¶ 292 (explaining

that Qudian has "about 40 million potential customers, that we've just been conservative on"); *id.*

¶ 295 ("We continue to be conservative on our provisioning and operations."); *id.* ¶ 303 (assertion

that "[i]n our risk undertaking business, we implemented a conservative strategy of reducing credit

volumes and paused our credit trial program.  Our proactive and prompt management of macro

driven risk was effective in stabilizing the delinquency rates. . . . .  [W]e expect to continue a

conservative approach on our risk-taking book into the final quarter of 2019 and thus revise our full

year guidance accordingly."); *id.* ¶ 313 (stating that "we are a dynamic company that knows how to navigate the changing landscape."); *id.* ¶ 319 (stating that "risk remains well managed" and "we expect to continue a conservative approach on our risk-taking book into the final quarter of 2019.").

These statements are not sufficiently specific that a reasonable investor could rely on them as a guarantee of some concrete fact or outcome. *See Lopez*, 173 F. Supp. 3d at 29; *see also Tobia v. United Grp. of Companies, Inc.*, No. 15-cv-1208, 2016 WL 5417824, at *10 (N.D.N.Y. Sept. 22, 2016) (concluding that statements describing an investment fund as a "good investment" and "conservative" were "too general to be anything more than opinion and puffery."); *Shemian v. Rsch. In Motion Ltd.*, No. 11-cv-4068, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (holding that statements such as "we're laying in the pieces here to sustain really exciting growth" were "non-actionable corporate puffery"), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d at 597 ("Plaintiffs' allegations that [Defendant] made material misrepresentations when it referred to its underwriting approach as 'disciplined' and 'conservative' and its overcollateralization triggers as 'robust' in the face of deterioration are classic examples of puffery."); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434 (S.D.N.Y. 2010) (holding that the statement that "[Defendant's] leadership believes that the managed growth strategy, commitment to risk management and conservative lending practices that helped the firm avert the subprime crisis and post solid operating results in 2007 will continue to serve the company well in the coming year" was "nothing more than a general platitude that accompanies nearly every press release or public statement issued by a financial institution—it defines the term 'puffery'"); *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 633 (S.D.N.Y. 2005) ("The particular misstatements that plaintiffs allege—generalizations regarding integrity, fiscal discipline and risk management—amount to no more than puffery."); *Frazier v. VitalWorks*, Inc., 341 F. Supp. 2d 142, 153 (D. Conn. 2004) ("Saying that a product is 'significant,' 'attractive' or 'great' is merely 'puffery,' not actionable securities fraud.").

None of the remaining challenged statements are actionable.  Lead Plaintiffs challenge the

following statements made by Yeung on Qudian's August 16, 2019 earnings call regarding the Credit

Trial Program:

- So if we look at the big data, about 76 million registered users and around 30-plus million approved users.  So we have—actually have a fairly large gap, about 40 million potential customers, that we['ve] just been conservative on.

- [W]e are proactively doing this so-called NPL marketing method.  And if we were to take out the NPL for marketing purpose, I think the delinquency rate on some of the back calculations we've done would have been just around 3.7% on M1+ and then just around 2.1% on the M6 charge off.  So it's pretty much stable like before.  That's kind of how we think about it.  I'm trying very hard to see if we can, in the next few quarters, be able to separate that delinquency by vintage into what is the core business and what is really for sales and marketing purpose so everybody can have a better comparison in terms of how we spend money on acquiring users versus others.

- [W]e have be[en] continuing the activation of our dormant user base by effective credit trial programs.  Instead of purchasing high-cost traffic to our app, our credit assessment model identifies specific user cohorts to which we extend very small credit size for a short duration to quickly gauge their credit behavior data and thereby can extrapolate risk profiles for multiple clusters of the test user group, gradually adding qualified users to our core user group.  Through this effort, our new active borrowers increased by 108.2% from the last quarter and approximately RMB 500 million was provisioned in the quarter to bring on more outstanding borrowers to reach over 6 million on our own loan book in the second quarter, growing the outstanding borrower base on the loan book by 12% in 1 single quarter.  Our M1+ vintage delinquency rates would have decreased by 0.5% excluding users in these trial programs.

Am. Compl. ¶¶ 292–95; Kreissman Decl., Ex. L at 4, 6, 11.  Lead Plaintiffs argue that these

statements "falsely minimized the Credit Trial Program as a small program that was the equivalent

of a marketing expense to acquire new borrowers," and "tried to pass the Credit Trial Program off

as tantamount to a marketing expense."  *See* Am Compl. ¶¶ 292–93.  The Court is not persuaded.

Yeung's statements would be understood to mean that Qudian used the Credit Trial Program to

identify new qualified users, rather than relying on traditional sales and marketing approaches.  No

reasonable investor would be misled by Yeung's statements into believing the Credit Trial Program was small or was equivalent to traditional marketing expenses.

Finally, Lead Plaintiffs challenge a number of statements made by Yeung during Qudian's Business Update Call on November 25, 2019.  *See* Am. Compl. ¶¶ 313, 315–17.  Lead Plaintiffs do not challenge the content of the specific statements, but rather assert that the statements were false or misleading because "Defendants still misrepresented the full extent to which Qudian had lowered credit standards in Qudian's core loan book."  *See id.*  However, Yeung had already revealed the extent to which Qudian lowered its credit standards in the core loan book prior to the Business Update Call.  The amended complaint asserts that Yeung's revelation took place on November 25, 2019.  *See id.* ¶ 182.  But Lead Plaintiffs have the date wrong—Yeung's revelation was made on November 18, 2019.  *Compare id.*, *with* Kreissman Decl., Ex. F at 7.  Accordingly, Lead Plaintiffs have not sufficiently alleged that Yeung's statements on the Business Update Call were false or misleading to a reasonable investor.

### iv.   Bucket Four:  Composition of Open Platform

Fourth, Lead Plaintiffs allege that Defendants misrepresented, or failed to disclose, that "Open Platform took the best, highest-quality borrowers from Qudian's user base, which hurt the core loan book's credit quality and its ability to perform alongside Open Platform."  Am. Compl. ¶ 197.  Lead Plaintiffs maintain that Open Platform cannibalized users from the core loan book. However, this theory rests on an unsupported assumption.  Lead Plaintiffs assume that any user who borrowed from Open Platform otherwise would have borrowed the core loan book.  Yet, Defendants disclosed that Open Platform would include "users with better credit profiles that are applying for large loan amounts that exceed the limit permitted under our policy."  Am. Compl. ¶ 232; *see also* Opp'n at 18.  Lead Plaintiffs do not challenge this disclosure.  Thus, it is clear that at least some of Open Platform's users sought loans that would not have been approved through the core loan book.

More fundamentally, Lead Plaintiffs' theory is premised on hindsight. Lead Plaintiffs allege that, because Open Platform took the "best" borrowers from the core loan book, it was inevitable that Qudian would be unable to grow the core loan book. However, Lead Plaintiffs do not allege that any of the challenged statements suggested that the core loan book's "best" or "highest-quality" borrowers would not migrate to Open Platform, or that Open Platform would not target such users. Rather, Lead Plaintiffs rely on an alleged omission—Lead Plaintiffs contend that Defendants "in no way disclosed to investors that [Open Platform] focused on [the core loan book's] *best* borrowers." Opp'n at 18. Lead Plaintiffs assert that the omitted information was necessary to prevent various statements from being misleading. Specifically, Lead Plaintiffs challenge any statement that suggested that Open Platform and the core loan book could grow in tandem, or that expressed a positive view of Qudian's growth.

Lead Plaintiffs fail to allege circumstances which support their allegation that Defendants' statements were false at the time they were made. Lead Plaintiffs attempt to rely on a confidential witness, CW 7, alleging that the witness "stated that while Open Platform 'made much profit in the short term, in the long term, it was just using up its own customers'" and "elaborated that Open Platform relied on old customers from Qudian's core loan book and '[i]t basically reduced the lifecycle of its customers' by offering them higher loan balances." Am. Compl. ¶ 100. However, the amended complaint's description of CW 7 as a "a business manager at Qudian from July 2017 to June 2019," is insufficient to support the probability that CW 7 was in a position to possess this information. *See N.J. Carpenters Health Fund,* 709 F.3d at 123–24 ("[W]e have permitted plaintiffs to rely on unnamed sources so long as '[the unnamed sources] are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (quoting *Novak,* 216 F.3d at 314)); *In re Hebron Tech. Co., Ltd. Sec. Litig.,* No. 20-cv-4420, 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021) (concluding that

the complaint's "threadbare descriptions of titles and functions do not indicate access to knowledge on the issues . . . to which . . . [the confidential witnesses] have opined").

Lead Plaintiffs also argue that Defendants' financial results in the third quarter of 2019 "establish that even if the number of [Open Platform] borrowers was growing, that came at the expense of the quality of borrowers in [the core loan book]." Opp'n at 16–17. "Plaintiffs are not permitted, however, to proceed with allegations of 'fraud by hindsight,' in which statements are proven false on the basis of subsequent information." *In re Ferroglobe PLC Sec. Litig.*, No. 1:19-cv-629, 2020 WL 6585715, at *6 (S.D.N.Y. Nov. 10, 2020); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs allege no circumstances to support their allegation that the allegedly false statements, made at least three weeks before the 8.3 percent figure was announced, were false at the time made."). The mere fact that Qudian's development of Open Platform may have ultimately hurt the core loan book's ability to grow in the third quarter of 2019 is insufficient to establish that Defendants' statements were false when made.

Consequently, Lead Plaintiffs have failed to sufficiently allege that Defendants' omission— namely, that Open Platform targeted the "best" and "highest-quality" borrowers from the core loan book and not just "users with better credit profiles"—was necessary to prevent the challenged statements from being misleading.

v.     Bucket Five:  Intent Behind Open Platform

Finally, Lead Plaintiffs allege that Defendants misrepresented, or failed to disclose, that Open Platform was "intended to address regulatory problems in the core loan book." Am. Compl. ¶ 197. Lead Plaintiffs allege that "Defendants did not view Open Platform as an additional product that generated revenue on top of Qudian's core loan book, but rather, as a revised business model that would allow Qudian to conduct its loan business in a regulatory compliant manner," and that

"Defendants actually planned to shift Qudian's entire loan business to Open Platform."  Am.
Compl. ¶ 124.

It is important to clarify Lead Plaintiffs' allegation.  For purposes of this bucket, Lead
Plaintiffs are not alleging that Defendants failed to disclose regulatory issues with the core loan
book.  Those allegations are separate and are addressed by the first and second buckets.  *See supra*
Sections III(A)(1)(b)(i)–(ii).  Nor do Lead Plaintiffs allege that Defendants misrepresented the fact
that Open Platform was more regulatory compliant that the core loan book.  Instead, Lead
Plaintiffs' allegation is that Defendants misrepresented, or failed to disclose, the *intent* behind
developing Open Platform.

Lead Plaintiffs do not provide particularized facts in the amended complaint to support their
allegation that Open Platform was developed in order to address regulatory issues in the core loan
book.  Citing four paragraphs of the amended complaint, Lead Plaintiffs argue that the amended
complaint "adequately pleads that Defendants did not view [Open Platform] as an additional
product that generated revenue on top of [the core loan book], as described to investors, but rather
as a revised business model that would allow Qudian to conduct its business in a regulatory
compliant manner."  Opp'n at 15. (citing Am. Compl. ¶¶ 57, 65, 98, 124).  Three of the four
paragraphs cited by Lead Plaintiffs do not include any particularized facts and consist solely of Lead
Plaintiffs' unsupported speculation premised on "information and belief."  *See* Am. Compl. ¶ 57
(conclusory allegation that "Qudian started Open Platform not because it was a promising new
business line, but rather, in order to address the regulatory problems in Qudian's core lending
business"); *id.* ¶ 65 (conclusory allegation that "Open Platform was started to address the regulatory
problems with Qudian's core loan book"); *id.* ¶ 124 (conclusory allegation that "Qudian's true
reason for developing Open Platform was that its core lending business ran afoul of China's strict
online lending regulations and risked being shut-down," that "Defendants did not view Open
Platform as an additional product that generated revenue on top of Qudian's core loan book, but

rather, as a revised business model that would allow Qudian to conduct its loan business in a

regulatory compliant manner," and that "Defendants actually planned to shift Qudian's entire loan

business to Open Platform"). "[I]t is well-settled that bare-bones allegations based upon

'information and belief,' without more, are insufficient to support a securities fraud claim." *Doscher*

*v. Sobel & Co., LLC*, No. 14-cv-646, 2015 WL 774695, at *5 (S.D.N.Y. Feb. 11, 2015) (citing *First*

*Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004)).

In addition, Lead Plaintiffs attempt to support their allegation with statements from a

confidential witness, CW 1. *See* Am. Compl. ¶ 98. Lead Plaintiffs allege that:

> CW 1 worked for Qudian's loan business until CW 1 left the Company in May 2019. CW 1 described Open Platform as substantially the same as Qudian's prior loan business and stated that Qudian described Open Platform as a new line of business "[f]or compliance reasons." CW 1 explained that part of Qudian's prior loan business was "renamed as Open Platform" around the time that CW 1 left the Company in May 2019. . . . In addition, CW 1 explained that because of Circular 141, which came out in 2017, Qudian could no longer give loans itself the way that it had previously and the old loan business therefore "could no longer be continued."[5]

*Id.* However, the amended complaints' generic description of CW 1 as "a manager in Qudian's loan

business," Am. Compl. ¶ 118, is insufficient to support the probability that CW 1 was in a position

to know Qudian's motivation behind developing Open Platform. *See New Jersey Carpenters Health*

*Fund,* 709 F.3d at 123–24 ("[W]e have permitted plaintiffs to rely on unnamed sources so long as

'[the unnamed sources] are described in the complaint with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information

alleged.'" (quoting *Novak*, 216 F.3d at 314)); *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500,

at *17 (concluding that the complaint's "threadbare descriptions of titles and functions do not

---

[5] Notably, CW 1 does not assert that Qudian developed Open Platform due to concerns over Circular 141. Lead Plaintiffs appear to concede that Open Platform could not have been designed to address Circular 141's ban on credit assessments because, as Defendants argue, Qudian continues to perform credit assessments through Open Platform. *See* Mem. at 24; Opp'n at 16.

indicate access to knowledge on the issues . . . to which . . . [the confidential witnesses] have opined").

Finally, to the extent that Lead Plaintiffs assert that Defendants' November 2019 statements regarding Open Platform support their allegation, Lead Plaintiffs are mistaken.  None of the statements address Defendants' original motivation for developing Open Platform; instead, the statements only describe Defendants' view of Open Platform at the time the statements were made.[6] Accordingly, because Lead Plaintiffs have not pleaded with particularity facts on which their belief that Open Platform was intended to address regulatory problems in the core loan book is based, this allegation cannot serve as a basis for securities fraud liability.

### 2.  Scienter

#### a.  Legal Standard

A plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has explained that the "PSLRA requires plaintiffs to state with particularity both

---

[6] See Am. Compl. ¶ 170 (Luo explaining that Qudian was not "too interested in new forms of [lending] licenses" because "[w]e found a better way, the way where we do open platform, where we allow licensed lenders, 100% licensed lenders, to lend, we don't touch the loan from a lending perspective, but we just service the loan.  It's probably the better way to conduct FinTech.  And it just makes us sleep better at night.  It should make all of our shareholders sleep better at night over time. So that's our direction to be a tech company."); id. ¶ 171 (Luo emphasizing that "most importantly, most, most importantly, for us and all my funding partners, [Open Platform] is the most regulatory compliant structure because there is no third party involved in guaranteeing risk.  Banks are doing exactly what they're supposed to do, lend and put stuff on balance sheet."); id. ¶ 174 (Yeung explaining that Qudian was "diligently interpreting regulatory directions" which caused Qudian to conclude that "the future of fintech in China is not about risk-taking.  The existence of fintech is about putting together technology to help license regulated [financial institutions] do what they are supposed to do in the first place, namely, lending month and taking risk on it.  We want to be clear we do not take risk or provide any kind guarantees on open platforms."); id. ¶ 175 (Yeung explaining that "[s]ince our inception in 2016, we have gone through stages of business and regulatory compliance upgrades from license-based lending to loan facilitation for financial institutions to now becoming a technology-based free driven platform."); id. ¶ 176 (Yeung explaining that "[w]e are investing in the better business model and the technologies in a regulatory-compliant way to do things for the long term"); id. ¶ 193 (Yeung stating that Qudian "strives to be a technology company rather to be a lender. . . . all our focus now is to become a tech company.  And I think that's a better way to go from the overall regulatory shifts and changes, our shareholders will be much more protected from any regulatory noise. . . .  If the opportunity allows, if the opportunity really allows, we wouldn't have a loan book at all."); id. ¶ 194 (stating that Open Platform was "the final and long-term viable form of fintech in China.  . . .  Focusing on this is the only path to deliver sustainable results and therefore long-term leadership"); id. ¶ 195 (explaining that by focusing on Open Platform, Qudian was "investing in the better business model and the technologies in a regulatory-compliant way to do things for the long term.").

the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (quotation omitted). The question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23. To plead scienter for a forward-looking statement, a plaintiff must allege that the statement was made "with actual knowledge" of its falsity. 15 U.S.C. § 78u-5(c)(1)(B).

For all other statements, "recklessness is a sufficiently culpable mental state for securities fraud in this circuit." *ECA*, 553 F.3d at 198 (citation omitted); *see Slayton*, 604 F.3d at 773 ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity."). That standard can be satisfied "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation omitted). A plaintiff need not rely exclusively on one of these theories. Indeed, *Kalnit* held that absent allegations of motive, "the strength of the circumstantial [evidence] must be correspondingly greater." *Id.* at 142 (quotation omitted). That accords with the Supreme Court's admonition to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quotation omitted). But a plaintiff alleging recklessness must allege "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a

heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quotation omitted). "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (quotation omitted). "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* (quotation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777. An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac*, 875 F. Supp. 2d at 372 ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). In sum, "[t]he inquiry on a motion to dismiss is as follows: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

Rule 9(b) requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also DeAngelis v. Corzine,* 17 F. Supp. 3d 270, 281–82 (S.D.N.Y. 2014) ("[Plaintiff] improperly attempts to group-plead the scienter requirement."); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"(citation omitted)).

### b. Application

As explained above, the Court has determined that only certain statements made by Defendants are actionable.  Lead Plaintiffs have not adequately alleged that Defendants had the requisite scienter when making those statements.

First, Lead Plaintiffs have not adequately pleaded facts showing that Defendants had an improper motive to commit fraud.  "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," Lead Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307–08.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*  "Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  *Id.*  As a general matter, "[t]he absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders."  *In re N. Telecom Ltd. Secs. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000).

Lead Plaintiffs have not alleged that Luo or Yeung sold securities, or otherwise directly profited in any way from the alleged misstatements and omissions.  Lead Plaintiffs instead allege that Luo had a motive to commit fraud because Luo decided "to relinquish [his] salary and bonus until [Qudian's] market capitalization reaches US$100 billion."  Am. Compl. ¶¶ 51 n.5, 362.  Yet, "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."  *Kalnit*, 264 F.3d at 141 (quotation omitted).

Lead Plaintiffs also argue that Defendants had motive to commit fraud "because of the failures of Qudian's previous business projects."  Opp'n at 33.  The alleged motive of making the Qudian appear successful in light of past failures is "too generalized to demonstrate [D]efendants'

'concrete and personal benefit' from the alleged fraud." *Kalnit*, 264 F.3d at 140; *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability or the success of an investment[.]"); *City of Austin*, 957 F. Supp. 2d at 295 ("[T]he motives of increased compensation and to assure that the company completed its announced initiatives are common to corporate officers."). Accordingly, Lead Plaintiffs have not sufficiently alleged motive.

Absent a showing of motive, "the strength of [Lead Plaintiffs'] circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142). Here, Lead Plaintiffs attempt to demonstrate scienter under the "conscious recklessness" approach, which requires that Defendants "knew facts or had access to information suggesting that [their] public statements were not accurate." *Emps. Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 306.

Lead Plaintiffs have not sufficiently alleged that Luo or Yeung knew or had access to information suggesting that their statements were not accurate. The remaining statements are all premised on Lead Plaintiffs' first bucket of alleged omissions—namely, that banks were outsourcing credit assessments to Qudian rather than conducting their own independent credit assessments and therefore violating Circular 141. However, the amended complaint is devoid of any allegation that Luo or Yeung knew that banks were not conducting independent credit assessments. Lead Plaintiffs' allegations rest solely on the statements of CW 4. Lead Plaintiffs allege that CW 4 "explained that already in 2018, Qudian and the financial institutions that provided it with funding were aware of the prohibition on Qudian conducting credit assessments for these funding partners," and that CW 4 "also described how certain financial institutions that 'had a good relationship with the local regulator' would rely on Qudian's risk assessment rather than conducting their own independent risk assessment after receiving Qudian's initial review." Am. Compl. ¶ 69. Notably, although CW 4 specifically asserts that Qudian was aware of Circular 141, CW 4 does not assert that

47

Luo, Yeung, or anyone else at Qudian knew that some of its financial partners relied solely on Qudian's risk assessments.

Lead Plaintiffs also broadly allege that "Luo and Yeung – as CEO and CFO – were directly involved in Qudian's day-to-day operations and had access to the information that was misrepresented or omitted." Opp'n at 32. "Scienter, however, 'cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.'" *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (quoting *Foley v. Transocean Ltd.*, 861 F.Supp.2d 197, 212 (S.D.N.Y.2012)). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. Lead Plaintiffs do not identify any information that was available to Luo and Yeung which suggested that banks were not conducting independent credit assessments and instead were relying on Qudian's credit assessments.

Finally, Lead Plaintiffs argue that the scienter of Luo and Yeung should be imputed to Qudian. "Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." *In re Vale*, 2017 WL 1102666, at *34 (quoting *Penn. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012)). However, because Lead Plaintiffs have not sufficiently alleged scienter for Luo and Yueng, there is no basis to impute corporate scienter to Qudian. Accordingly, Lead Plaintiffs have not adequately alleged scienter.

### 3.   Item 303

The amended complaint asserts that Defendants violated Item 303 of Regulation S-K, 17 C.F.R. § 228.303(a)(3)(ii) ("Item 303"). "Item 303 does not apply to foreign corporations" such as Qudian. *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021) (quoting *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-cv-9848, 2020 WL 5757628, at *7 n.5 (S.D.N.Y. Sept. 27, 2020)). "Because omissions are not actionable absent a legal duty to disclose, any failure by

[foreign] defendants to comply with SEC Regulation S-K is insufficient to allege securities fraud." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, No. 20-cv-10041, 2022 WL 596679, at *23 (S.D.N.Y. Feb. 28, 2022) (internal quotation marks omitted) (alteration in original).

That said, "the SEC has stated that its interpretations of Item 303 apply to Management Discussion & Analysis disclosures drafted pursuant to Item 5 of Form 20-F, which does apply to foreign corporations." *Willard*, 527 F. Supp. 3d at 619 n.5 (alterations omitted) (quoting *Panther Partners*, 2020 WL 5757628, at *7 n.5); *see also Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 163 (D. Conn. 2019) ("[T]he SEC and courts have interpreted Item 303 and Item 5 to require the same disclosures."). Item 303 requires a public company to describe "known trends or uncertainties" that the company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also id.* ("If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in . . . inventory adjustments), the change in the relationship shall be disclosed."). "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). "Item 303 requires not only a 'discussion' but also an analysis of known material trends." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015). "A violation of Item 303 can constitute a material omission under Rule 10b-5, but plaintiffs must also sufficiently plead the other elements of such a claim, including scienter." *In re Gen. Elec. Sec. Litig.*, No. 19-cv-1013, 2020 WL 2306434, at *8 (S.D.N.Y. May 7, 2020) (citing *Stratte-McClure*, 776 F.3d at 103), *aff'd*, 844 F. App'x 385 (2d Cir. 2021). Lead Plaintiffs must also allege that the omission in violation of Item 303 was material, which requires "balancing . . . both the indicated probability that the event will occur and the

anticipated magnitude of the event in light of the totality of the company activity." *Stratte-McClure*, 776 F.3d at 102–03 (internal quotation marks omitted).

Although the amended complaint does not identify the particular filing that Lead Plaintiffs' challenge, Qudian only filed one Form 20-F with the SEC during the Class Period. *See* Am. Compl. ¶ 228. The Form 20-F was filed on April 15, 2019. *Id.* Lead Plaintiffs allege that Qudian violated two disclosure obligations. First, Lead Plaintiffs assert that Defendants had a duty "to disclose the risk and uncertainty that its fundamental business model in its core loan book violated Chinese regulations and might have to be shut-down because of regulatory issues." Am. Compl. ¶ 370. However, Qudian's Form 20-F contained the following disclosures:

> Among other things, Circular 141 provides restrictions on banks' collaboration with third parties in cash loan business. Pursuant to Circular 141, a bank may not outsource its core business functions, such as credit assessment and risk management, to third parties. Circular 141 also prohibits a bank participating in loan facilitation transactions from accepting credit enhancement services from a third party which has not obtained any license or approval to provide guarantees, including credit enhancement service in the form of a commitment to assume default risks. As Circular 141 is relatively new, it remains uncertain how the regulatory authorities will interpret and enforce the requirements. We have entered into arrangements with several banks which directly fund credit drawdowns to borrowers. We refer to such banks qualified credit applications from borrowers, including our assessment of their credit profiles and our suggested credit limits. They will then review the credit applications and approve credit for drawdown.
>
> . . . .
>
> We have entered into cooperative agreements with banks in China and started to fund credit drawdowns to borrowers under such arrangements in April 2017. The banks are able to utilize our data-driven credit assessment model to screen potential borrowers who are traditionally underserved by banks due to the lack of credit data. Under such agreements, we refer to such banks qualified credit applications from borrowers, including our assessment of their credit profiles and our suggested credit limits. They will then review the credit applications independently in accordance with their credit assessment standards and approve credit for drawdown.

Kreissman Decl., Ex. K at 12–13, 63; *see also* Am. Compl. ¶¶ 66–67. Lead Plaintiffs have not adequately alleged that these disclosures were insufficient. Further, as discussed, the amended complaint does not adequately plead scienter with respect to Lead Plaintiffs' allegations regarding

Circular 141. "The failure to plead scienter mandates dismissal of Plaintiff's claim under Item 303." *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 239 (S.D.N.Y. 2021).

Second, Lead Plaintiffs broadly allege that Defendants had a duty "to disclose the true nature of Open Platform and the trends of which borrowers were populating Open Platform and the core loan book." Am. Compl. ¶ 371. Beyond stating that there were trends that Qudian had the duty to disclose, Lead Plaintiffs do not identify the nature of the alleged trends or explain why the alleged trends were reasonably likely to have a material impact on Qudian's financial condition. Lead Plaintiffs also fail to allege that the unspecified omitted information was material under the "probability/magnitude test" for assessing Item 303 violations. *See Stratte-McClure*, 776 F.3d at 103. As discussed above, Lead Plaintiffs' theory that the core loan book would suffer because of Open Platform is premised on hindsight. Accordingly, Lead Plaintiffs' claims under Item 5 of Form 20-F are dismissed.

### B. Control Person Liability Under Section 20(a)

Under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). To plausibly allege a claim for control person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Because Lead Plaintiffs failed to adequately plead a violation of Section 10(b) or

Rule 10b-5, their Section 20(a) claims also fail. *See Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *12 (S.D.N.Y. Sept. 27, 2021).

### C.  Leave to Amend

Lead Plaintiffs are granted leave to amend their complaint.  In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  "Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend," unless the plaintiff has had a prior opportunity to amend its complaint or the allegations were made after full discovery in a related case. *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (quotation omitted).  Although Lead Plaintiffs have already amended their complaint, they have not yet had an opportunity to do so in response to an opinion of the Court.  Accordingly, the Court does not conclude that allowing them to amend once again would be futile.

## IV. CONCLUSION

Defendants' motion to dismiss the amended complaint is GRANTED.  Lead Plaintiffs are granted leave to amend their complaint.  Lead Plaintiffs are directed to file any amended complaint within thirty (30) days of the date of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 54.

SO ORDERED.

Dated:  September 13, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge